Consolidated Nos. 24-1156, 24-1160, 24-1161, and 24-1162

## United States Court of Appeals
## For the Federal Circuit

---

**SURFCAST, INC.**,

*Appellant*,

v.

**MICROSOFT CORPORATION**,

*Appellee*.

---

Appeal from the Patent Trial and Appeal Board,
Case Nos. IPR2022-00423, IPR2022-00590,
IPR2022-00591, and IPR2022-00592

---

## CONSOLIDATED OPENING APPEAL BRIEF
## FOR APPELLANT SURFCAST, INC.

Brian S. Seal
Shaun D. Gregory
TAFT STETTINIUS & HOLLISTER, LLP
200 Massachusetts Avenue, NW
Suite 500
Washington, DC 20001
Telephone: (202) 664-1537
Facsimile: (202) 664-1586

Jason A. Houdek

TAFT STETTINIUS & HOLLISTER, LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Telephone: 317-713-9458
Facsimile: 317-713-3669

*Counsel for Appellant*
*SURFCAST, INC.*

February 19, 2024

# REPRESENTATIVE PATENT CLAIMS AT ISSUE

U.S. Patent No. 9,363,338

1. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

  a first set of instructions to partition at least a portion of a visual display of a client device into an array of tiles, a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;

  a second set of instructions for the client device to assign a first update rate to the first tile;

  a third set of instructions to, at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;

  a fourth set of instructions for the client device to receive a response to the conditional request from the first server device; and

  a fifth set of instructions for determining whether the client device updates the first tile in accordance with the response from the first server device.

9. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

  a first set of instructions to partition by a first device at least a portion of a visual display into an array of tiles, a first information source being associated with a first tile in the array of tiles, the first information source being located on a second device, wherein the visual display is rendered according to instructions executed on the first device;

  a second set of instructions for the second device to assign first update rate for updating information from the first information source;

a third set of instructions for the second device to, at a time for updating the information from the first information source in accordance with the first update rate, determine whether the information from the first information source has changed since the last update time and to send to the first device an update message including the updated information in accordance with the determination;

a fourth set of instructions for the first device to receive an update message from the second device including updated information for updating the first tile; and

a fifth set of instructions for the first device to update the tile in accordance with the updated information.

U.S. Patent No. 9,946,434

1. A system for simultaneous display of multiple application programs, the system comprising:

a computing device having a memory;

a display; and

a processor configured to execute instructions stored in the memory, to:

arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent;

associate a first application program of the plurality of application programs with a first tile of a first grid of the one or more grids of tiles and a second application program of the plurality of application programs with a second tile of the first grid of tiles;

assign a first refresh rate to the first tile and a second refresh rate to the second tile; and

simultaneously update content displayed in the first tile in accordance with the first refresh rate, and update content displayed in the second tile in accordance with the second refresh rate;

wherein each tile has:

> a first selection operation that calls the application program associated with the tile, the associated application program being different from a program that arranges the display into the one or more grids of tiles, and

> a second selection operation that provides a menu of options for a user to ascertain or adjust properties of the tile; and

wherein the associated application program for the first tile and the associated application program for the second tile are different application programs selected from among the group consisting of a web browser, a word processing application, an electronic mail application, a chat application, a weather application, a news application, a spreadsheet application, a music application, and a streaming video player.

U.S. Patent No. 9,043,712

1. A method executed by a device under the control of a program, the device including a memory for storing the program, the method comprising:

> partitioning a visual display rendered by the device into an array of tiles, wherein each tile in the array of tiles is associated with an information source in a plurality of information sources, wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles;

> assigning a first update rate to the first tile;

> updating information from a first information source in the plurality of information sources presented to the first tile in accordance with the first update rate; and

> updating content of the second tile based on the information updated to the first tile.

U.S. Patent No. 9,032,317

1. A system for communicating with multiple data sources, the system comprising:

a client device adapted for communication with a server device, wherein the client device includes a display device, a processor configured to execute instructions, and a memory connected to the processor, wherein the processor executes instructions to:

display, using the display device, a grid of tiles, wherein a first tile of said grid of tiles is associated with a first data source residing on the server device, and a second tile of said grid of tiles is associated with a second data source, and wherein the first tile displays a current content from the first data source and the second tile displays a current content from the second data source; and

check whether content in the first data source is updated relative to the current content of the first tile and, if so, display updated information from the first data source on the first tile.

5. A method executed by a client device under control of a program, the client device including a processor, a display device for rendering a visual display, and a memory for storing the program, the method comprising:

partitioning by the client device at least a portion of the visual display into an array of tiles, a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;

assigning by the client device a first update rate to the first tile;

at a first update time in accordance with the first update rate, sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;

receiving at the client device a response to the conditional request from the first server device; and

determining whether to update the first tile in accordance with the response from the first server device.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant SurfCast, Inc. certifies the following:

1.  The full name of every party represented by me is: SurfCast, Inc.

2.  The name of the Real Party in Interest represented by me is: SurfCast, Inc.

3.  All parent corporations and publicly held companies that own 10 percent or more of the stock of the party represented by me are: N/A.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Taft Stettinius & Hollister, LLP – Brian S. Seal, Shaun D. Gregory, Jason A. Houdek

5.  The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: *SurfCast, Inc. v. Microsoft Corporation*, No. 2:22-cv-01298-JNW (W.D. Wash.).

6.  Any information required under Fed. R. App. P. 26.1(b) and 26.1(c): N/A.

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATEMENT OF THE ISSUES..........................................................................3

STATEMENT OF THE CASE..............................................................................4

   I.     The SurfCast Patents ................................................................................4

       A. The '338 Patent................................................................................7

       B. The '434 Patent................................................................................8

       C. The '712 Patent................................................................................9

       D. The '317 Patent................................................................................9

   II.    The Prior Art .........................................................................................10

       A. MSIE Kit.......................................................................................10

       B. RFC2068.......................................................................................14

   III.   The *Inter Partes* Review Proceedings .........................................................14

       A. The Board Erroneously Construed "Tile" .................................................16

       B. The Board Erroneously Construed "Grid" ...............................................17

       C. The Board Erroneously Construed the "Conditional Request" Limitation 18

       D. The Board Erred in Finding Substantial Evidence Supported Invalidity.21

SUMMARY OF THE ARGUMENT .....................................................................23

STANDARD OF REVIEW ..................................................................................23

ARGUMENT .......................................................................................................24

   I.     THE BOARD ERRONEOUSLY CONSTRUED "TILE" ...........................24

A. The Board Erroneously Relied On Prior Constructions Under the Broadest Reasonable Interpretation (BRI) Standard ...............................................24

B. The Board's Construction of "Tile" Conflicts With The Specification...27

II.    THE BOARD ERRONEOUSLY CONSTRUED "GRID" ........................35

A. The Specification Supports SurfCast's Construction of "Grid" ..............36

B. Continuous Enforcement Is Consistent with Moving Tiles to Different Grid Locations and Overlap of Tiles while Being Moved ......................39

C. Dictionary Definitions Are Consistent with the Specification and SurfCast's Construction.............................................................................42

III.   THE BOARD ERRONEOUSLY CONSTRUED "CONDITIONAL REQUEST" ...............................................................................................43

A. The Board Erred In Applying Two Different Interpretations Of The "Conditional Request" Limitation...........................................................43

B. The Board Erroneously Construed The "Conditional Request" Limitation 46

IV.    THE BOARD ERRED IN FINDING SUBSTANTIAL EVIDENCE SUPPORTED INVALIDITY OF THE CHALLENGED CLAIMS AS ANTICIPATED AND/OR OBVIOUS ......................................................52

A. The "tile" Limitations Patentably Distinguish Over MSIE Kit ..............52

1. MSIE Kit Fails to Disclose a "tile" Under SurfCast's Construction .......53

B. The "grid" Limitations Patentably Distinguish Over MSIE Kit ..............54

1. MSIE Kit Fails to Disclose a "grid" Under SurfCast's Construction ......55

2. The Default MSIE Kit Layout Is Not "Regular" Even Under the Meaning Adopted by the Board..............................................................................59

C. The "conditional request" Limitations Patentably Distinguish Over MSIE Kit Alone or in Combination With RFC2068 ..........................................60

CONCLUSION ...................................................................................................61

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands Corp. v. Fellowes, Inc.*,
  813 F.3d 1361, 1365 (Fed. Cir. 2016) ...........................................................23

*Astrazeneca AB v. Mut. Pharm. Co.*,
  384 F.3d 1333, 1340 ............................................................................ 27, 42

*Boss Control, Inc. v. Bombardier Inc.*,
  410 F.3d 1372, 1377 (Fed. Cir. 2005) ...........................................................28

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858, 862 (Fed. Cir. 2004) ...............................................................42

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359, 1366 (Fed. Cir. 2002) ...........................................................28

*Consol. Edison Co. of N.Y., Inc. v. NLRB*,
  305 U.S. 197, 229-30 (1938) .........................................................................24

*CVI/Beta Ventures, Inc. v. Tura LP*,
  112 F.3d 1146, 1159 (Fed. Cir. 1997) ...........................................................43

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
  800 F.3d 1375, 1378 (Fed. Cir. 2015) ...........................................................26

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322, 1333 (Fed. Cir. 2009) ...........................................................28

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973, 980 (Fed. Cir. 1999) ...............................................................43

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1, 17-18 (1966) ...............................................................................24

*In re Gartside*,
  203 F.3d 1305, 1312 (Fed. Cir. 2000) ...........................................................23

*Intel Corp. v. Qualcomm Inc.*,
    21 F.4th 801, 810 (Fed. Cir. 2021) ..................................................47

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985, 990 (Fed. Cir. 1999) ..............................................28

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398, 406 (2007) ..............................................................24

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340, 1349-50 (Fed. Cir. 2004)......................................44

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282, 1293 (Fed. Cir. 2005) ..........................................44

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331, 1340 (Fed. Cir. 2006) ..........................................27

*Phillips v. AWH Corp.*.
    415 F.3d 1303 (Fed. Cir. 2005) ....................................... 24, 25, 43

*Randall Mfg. v. Rea*,
    733 F.3d 1355, 1362 (Fed. Cir. 2013) ..........................................24

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336, 1344 (Fed. Cir. 2001) ................................... 28, 43

*SkyHawke Techs., LLC v. Deca Int'l Corp.*,
    828 F.3d 1373, 1376 (Fed. Cir. 2016) ..........................................25

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
    164 F.3d 1372, 1378 (Fed. Cir. 1998) ..........................................28

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ....................................................36

*Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*,
    366 F.3d 1311, 1318 (Fed. Cir. 2004) ..........................................42

**Statutes**

35 U.S.C. §316(e) ...................................................................................27

**Regulations**

83 Fed. Reg. 51341 ...............................................................................25

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Appellant SurfCast, Inc. identifies the following cases as the only ones from the same civil action or the same proceedings in the lower court that are before this or any other appellate court:

*SurfCast, Inc. v. Microsoft Corporation*, No. 24-1160 (Fed. Cir.);

*SurfCast, Inc. v. Microsoft Corporation*, No. 24-1161 (Fed. Cir.); and

*SurfCast, Inc. v. Microsoft Corporation*, No. 24-1162 (Fed. Cir.).

The court consolidated the above-identified appeals with the instant appeal.

Appellant SurfCast, Inc. further identifies *SurfCast, Inc. v. Microsoft Corporation*, No. 2:22-cv-01298-JNW (W.D. Wash.), which case is currently stayed pending the outcome of the instant appeal.

# JURISDICTIONAL STATEMENT

Microsoft Corporation ("Microsoft" or "Appellee") filed four petitions for *inter partes* review:

- IPR2022-00423 (the "'423 IPR"), challenging claims 1-19 of U.S. Patent No. 9,032,317 (the "'317 Patent");

- IPR2022-00590 (the "'590 IPR"), challenging claims 1-4 of U.S. Patent No. 9,043,712 (the "'712 Patent);

- IPR2022-00591 (the "'591 IPR"), challenging claims 1-24 of U.S. Patent No. 9,946,434 (the "'434 Patent"); and

- IPR2022-00592 (the "'592 IPR"), challenging claims 1-13 of U.S. Patent No. 9,363,338 (the "'338 Patent).

The Patent Trial and Appeal Board (Board) issued a Final Written Decision ("FWD") in each of the IPRs on October 2, 2023.  APPX00001-00161.  SurfCast filed timely notices of appeal.

This court therefore has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(a).

## **STATEMENT OF THE ISSUES**

1.     The Board erred in construing "tile" as "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source," which is inconsistent with the specifications' use of the term "tile" to mean "a graphical representation of an associated information source capable of displaying refreshed content, the graphical representation being persistent and selectable to provide access to underlying information of the associated information source, but providing a representation of the underlying information that is more limited than the representation provided by a window."

2.     The Board erred in construing "grid" as "a regular arrangement of rows and columns," which is inconsistent with the intrinsic and extrinsic evidence.

3.     The Board erred in construing "if the information from the first information source currently displayed in the first tile has not changed since a last update" as describing the content of a conditional request instead of as a condition precedent for sending the conditional request.

4.     The Board erred in finding substantial evidence supported invalidity of the challenged claims as anticipated and/or obvious.

## STATEMENT OF THE CASE

### I.    The SurfCast Patents

The four SurfCast patents – U.S. Patent Nos. 9,363,338 (the "'338 Patent), 9,946,434 (the "'434 Patent"), 9,043,712 (the "'712 Patent), and 9,032,317 (the "'317 Patent") – all relate to a graphical user interface for organizing simultaneous display of information from a multitude of sources. *See*, for example, APPX00193-00194 ('338 Patent) at 4:57-5:17; APPX00239-00240 ('434 Patent) at 4:66-5:27; APPX00286-00287 ('712 Patent) at 4:50-5:10; APPX00330-00331 ('317 Patent) at 4:51-5:11 (all describing inventive aspects of the various patents and their improvements over the prior art).

The specification[1] discloses "a graphical user interface for organizing simultaneous display of information from a multitude of sources." APPX00192 (1:31-33). In particular, the specification discloses that a "grid of tiles provides a uniform, graphical environment in which a user can access, operate, and/or control multiple data sources." APPX00193 (4:61-64). The specification further discloses "automatic control of the refresh rates of multiple data sources, based on the character of the data." APPX00193 (4:65-67). In addition, the "multitude of

---

[1] The four SurfCast patents share or otherwise contain common disclosure and this brief cites to the '338 Patent for simplicity.

sources" are presented "to the user uniformly and simultaneously."  APPX00194 (5:12-13).

The specification introduces and defines a "tile" which it also refers to as a "Tile Object."  APPX00197 (11:1-2); APPX00196 (10:34).  The specification makes reference to graphical user interfaces and existing elements of graphical user interfaces, such as icons and windows.  *See* APPX00196(10:35-37).  It then defines a "tile" as "a ***third*** graphical representation of programs and files."  APPX00197 (11:1-2); APPX00196 (10:34) (emphasis added).   The specification states "[c]onventional graphical user interfaces of the background art provide two distinct representations of programs, files, and datastreams."  APPX00196 (10:39-41).  The specification then proceeds to describe how tiles, icons, and windows represent "programs, files, and datastreams" while contrasting each of these representations.  APPX00196-00198 (10:42-14:13).  Thus a tile's defining characteristic is how it presents content, not its size or shape.  This characteristic distinguishes a tile from other graphical elements such as windows and icons.

The specification discloses four distinct manners in which a tile provides a more limited representation of information than a window but a less limited representation than an icon:

> [T]he tiles may present [1] a miniaturized, "thumbnail" view of the underlying information; [2] a "porthole" view of a portion of the underlying information as viewed at full size; [3] a symbol indicating

whether the information has been updated since it was last viewed; or [4] a custom interface designed to allow rapid access to the underlying information.

APPX00197 (11:36-41). Furthermore, "each tile is a viewer of a single information source." *Id*. (11:3-4). In contrast to an icon, a tile "provides a real-time or near real-time view of underlying information in that it contains continually refreshed content." *Id*. (11:9-11). In contrast to a window, "[a] tile provides an at-a-glance view of the current state of the program or file associated with it" and "many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do." *Id*. (11:15-22). In combination with this flexibility, the intermediate representation of tiles provides "a uniformity of appearance between tiles which correspond to different programs and datastreams. The display content of a tile will differ from application to application though its size and format need not." *Id*. (11:23-27).

The specification also discloses a "Grid Object" or "grid" that "can replace the functionality of a user's computer desktop and offers similar and additional features." APPX00198 (14:21-23). The "Grid Object" section of the specification describes defining characteristics of a grid that allow it to control the arrangement, layout, and independent functioning of tiles. *Id*. The specification further discloses that a grid "comprises a matrix or array of tiles" and "[t]he grid ***controls*** the layout

6

and priorities of the tiles." *Id*. (14:22-28). Furthermore, "[t]he grid can be configured to **contain** any number of tiles, from one to as many as can reasonably fit on the user's display." APPX00199 (16:1-3). Thus, the "grid" or "grid object" contains and controls the arrangement and layout of tiles.

## A.    The '338 Patent

Claim 1 of the '338 Patent recites, in part:

… at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update; …

APPX00206 (30:32-44).

Claim 9 of the '338 Patent recites, in part:

… at a time for updating the information from the first information source in accordance with the first update rate, determine whether the information from the first information source has changed since the last update time and to send to the first device an update message including the updated information in accordance with the determination; …

APPX00207 (31:26-32:11).

The '338 Patent refers to the conditional get of the HTTP1.1 specification, which is disclosed by RFC2068 (i.e., the HTTP1.1 specification) as "[a] conditional GET method requests that the entity be transferred only under the circumstances

7

described by the conditional header field(s)."  APPX03698; *see also* APPX00204

(25:32-33).

The '338 Patent also discloses:

In another embodiment of the present disclosure, tiles communicate
with one another and have conditional content.  That is, the content of
one tile depends upon the content of another.  Such conditional content
enables more than one tile to be refreshed simultaneously, or nearly
simultaneously, by requesting a given tile to be refreshed.
Alternatively, a tile may be set up to specify one or more tiles whose
contents are linked to it.

APPX00197 (13:26-33).

As such, the '338 Patent distinctly discloses a conditional request (i.e., an

HTTP1.1 conditional GET) as well as determining whether displayed content has

changed (i.e., conditional content).

## B.    The '434 Patent

Claim 1 of the '434 Patent recites, in part:

… arrange a portion of a display into one or more grids of non-
overlapping tiles, each grid of tiles being persistent; …
wherein each tile has:
a first selection operation that calls the application program associated
with the tile, …
a second selection operation that provides a menu of options for a user
to ascertain or adjust properties of the tile; …

APPX00253 (31:17-39).

### C. The '712 Patent

Claim 1 of the '712 Patent recites, in part:

…partitioning a visual display rendered by the device into an array of tiles, wherein each tile in the array of tiles is associated with an information source in a plurality of information sources, wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles; …

APPX00299 (30:27-32).

### D. The '317 Patent

Claim 1 of the '317 Patent recites, in part:

…display, using the display device, a grid of tiles, …
check whether content in the first data source is updated relative to the current content of the first tile and, if so, display updated information from the first data source on the first tile.

APPX00343 (30:28-39).

Claim 5 of the '317 Patent recites, in part:

… partitioning by the client device at least a portion of the visual display into an array of tiles, …
at a first update time in accordance with the first update rate, sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the

first information source currently displayed in the first tile has not changed since a last update; …

APPX00343 (30:53-65).

As noted above, the '338 and '317 Patents share a common specification which distinctly discloses a conditional request (i.e., an HTTP1.1 conditional GET) as well as determining whether displayed content has changed (i.e., conditional content).

## II.    The Prior Art

### A.    MSIE Kit

In each of the IPR proceedings, the Petitioner relied on an Active Desktop Item described in Microsoft Internet Explorer Resource Kit ("MSIE Kit") as disclosing a "tile" as recited in each challenged independent claim.  APPX00382-00384; APPX09481-09485; APPX10743-10747; APPX12604-12606.  In the IPR proceedings for the '434 and '317 Patents, the Petitioner relied on MSIE Kit as disclosing a "grid" as recited in each challenged independent claim.  APPX09481-09482; APPX12604.  In the IPR proceedings for the '338 and '317 Patents, the Petitioner relied on MSIE Kit as disclosing the "conditional request" limitation of various challenged independent claims.  APPX00385-00387; APPX00389-00390; APPX12606-12608; APPX12610.

MSIE Kit is a manual providing "complete technical information" for "understanding, customizing, deploying, and supporting" Microsoft Internet Explorer version 4 ("IE4"). APPX02714; APPX02731; APPX03635. MSIE Kit discloses Active Desktop items which are essentially miniature Web pages that appear on the desktop. APPX02746; APPX02937.

MSIE Kit discloses that an Active Desktop item is a "borderless frame" of a web browser (i.e., IE4) that displays the complete underlying information of an associated information source (i.e., the complete, entire web page or web site). Based on this disclosure, a person of ordinary skill in the art understands that an Active Desktop item does not provide a more limited graphical representation of a web page, but is instead the same graphical representation of the web page as provided by a browser window. APPX05665 (¶117).

MSIE Kit discloses:

The Active Desktop in Internet Explorer 4 is built from two separate layers. … The HTML layer is described by a single, local HTML file called Desktop.htm, which is created and edited automatically by Internet Explorer 4. This file contains … HTML tags that represent each Active Desktop item. …
Active Desktop items provide dynamic links from the desktop to Web content. An Active Desktop item can be an ActiveX control, a Java applet, an image, or an HTML document.

APPX02935.

11

MSIE Kit discloses that "Active Desktop items are hosted in an instance of the WebBrowser control." *Id.* As explicitly stated by MSIE Kit, an Active Desktop item is an HTML file rendered by and displayed within a frame of IE4. APPX05666 (¶119). Thus an Active Desktop item provides the same graphical representation of a webpage, in its entirety, as that of a window of IE4. *Id.*

"Each Active Desktop item consists of a single HTML tag with arbitrary x- and y-positions." APPX02935. MSIE Kit also does not enforce any size restrictions on the Active Desktop. APPX02943. Similarly, IE4 does not enforce any placement restrictions on an Active Desktop item. *See id.*, APPX02935. Without the ability to enforce any size or position restrictions, IE4 cannot enforce the placement of Active Desktop items into any formation including that of a grid of non-overlapping tiles. APPX05668 (¶123). IE4 thus cannot enforce a regular arrangement of Active Desktop items because IE4 cannot control the size or position of each item.

MSIE Kit makes clear that the Active Desktop is a local HTML file that includes one or more Active Desktop items with each item being referenced by a HTML tag and containing underlying information (i.e., ActiveX control, Java applet, image, or HTML document) of an associated information source. APPX05667-05668 (¶122). The local HTML file is rendered by a web browser (i.e., IE4) within a window occupying an entire display (i.e., Active Desktop) and each Active Desktop item is a frame within the window. APPX05666-05667 (¶119-121).

MSIE Kit repeatedly and consistently refers to Active Desktop items as "miniature Web pages" and "Web sites" and fails to disclose any difference between how the underlying information of a web page/web site is displayed in an Active Desktop item or a browser window. The graphical representation provided by a web page/web site is the same for both an Active Desktop item and an IE4 browser window. APPX05666 (¶119).

MSIE Kit discloses that "[b]y default, Internet Explorer lays out new Active Desktop items on a 3 by 2 grid." APPX02943. This default layout results from default settings for arbitrary x and y positions of Active Desktop items and only if the underlying HTML file of the Active Desktop item does not include x and y positions. Importantly, MSIE Kit fails to disclose a grid or grid object (or any other feature) that provides a regular arrangement of tiles. The lack of regularity is underscored by the fact that even under the default layout, Active Desktop items will start to overlap as more are added. *Id*.

MSIE Kit discloses that Active Desktop items can be provided with hyperlinks or hotspots which are "designated area[s]" or established "regions of the screen that can process mouse clicks." APPX02937; APPX02973; APPX03180. Clicking on a hyperlink or hotspot will open a separate browser window to display the linked content. APPX02937; APPX02973. Hyperlinks can also be selected via keyboard commands. APPX02937; APPX03322.

**B.     RFC2068**

In the IPR proceedings for the '338 and '317 Patents, the Petitioner alternatively relied on RFC2068 in combination with MSIE Kit as disclosing the "conditional request" limitation of various challenged independent claims. APPX00399; APPX12623.   RFC2068 describes the Hypertext Transfer Protocol (HTTP) version 1.1 which is an Internet standard application-level protocol for distributed, collaborative, hypermedia systems. *See* APPX03649; APPX03655.

## III.    The *Inter Partes* Review Proceedings

The Board instituted review on all grounds in the '592 IPR and, in the FWD, found Microsoft met its burden with respect to claims 1-8 as obvious in view of the combination of MSIE Kit and RFC2068 under Ground 4 and claims 9-13 as anticipated by MSIE Kit under Ground 1.  APPX00031.  The Board declined to address claims 1-8 under Ground 1 as well as all other Grounds.  APPX00031 (fns. 13-18).

The Board instituted review on all grounds in the '591 IPR and, in the FWD, found Microsoft met its burden with respect to claims 1, 2, 4-10, 12-18, and 20-24 as anticipated by MSIE Kit under Ground 1 and claims 3, 11, and 19 as obvious in view of MSIE Kit under Ground 2.  APPX00061.  The Board declined to address all other Grounds.  APPX00061 (fns. 14-16).

The Board instituted review on all grounds in the '590 IPR and, in the FWD, found Microsoft met its burden with respect to claims 1-4 as anticipated by MSIE Kit under Ground 1. APPX00105. The Board declined to address all other Grounds. APPX00105-00106 (fns. 22-29).

The Board instituted review on all grounds in the '423 IPR and, in the FWD, found Microsoft met its burden with respect to claims 1-19 as anticipated by MSIE Kit under Ground 1. APPX00159. The Board declined to address all other Grounds. APPX00159-00160 (fns. 31-36).

Claim 1 of the '338 Patent, addressed in the '592 IPR, and claim 5 of the '317 Patent, addressed in the '423 IPR, both recite the same "conditional request" limitation. In the '592 IPR, the Board declined to address this limitation as anticipated by MSIE Kit and instead relied on "RFC2068's conditional GET method to request an update if the server's information *has not* changed since a last update." APPX00027 (emphasis added). In particular, the Board relied on the "If-Unmodified-Since" header field as disclosed in RFC2068 (and not disclosed in MSIE Kit). *See* APPX00023; *see also* APPX03698. In contrast, the Board, in the '423 IPR, addressed this limitation as anticipated by MSIE Kit based on the "If-Modified-Since header field" of a conditional GET request as disclosed by MSIE Kit. *See* APPX00154-00155. That is, not only did the Board err in construing the

"conditional request" limitation, but the Board applied the erroneous construction differently to the same limitation in two claims.

## A.    The Board Erroneously Construed "Tile"

Each independent claim of the '338, '434, '712, and '317 Patents recites "tile" or "tiles". *See e.g.,* APPX00206 (30:33); APPX00207 (31:27); APPX00253 (31:17-18, 32:5, 32:60); APPX00299 (30:27-28, 30:47-48); APPX00343 (30:28, 30:53-54); APPX00344 (31:36-37, 32:18-19).  The specification introduces "tile" as a new graphical user interface ("GUI") element and explicitly contrasts this new element with existing GUI elements, including icons and windows. *See* APPX00196 (10:35-37); APPX00196 (10:39-54); *see also* APPX00197 (11:1-14).

Despite the explicit definition of a "tile" as different from either an icon or a window, the Board adopted a construction of "tile" that treats a "tile" and a window as the same GUI element.  Specifically, the Board noted "[w]hile … the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition" and concluded "that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction."  APPX00012.  As such, the Board erred in construing "tile" in a fashion that fails to distinguish a "tile" from a window.

### B.    The Board Erroneously Construed "Grid"

Each independent claim of the '434 Patent recites "one or more grids of non-overlapping tiles".  APPX00253 (31:17-18, 32:4-5, 32:60).  Similarly, independent claim 1 of the '317 Patent recites "a grid of tiles."  APPX00343 (30:28).  The specification defines a "grid object" or "grid" as a new feature addressing "[t]he arrangement, layout and independent functioning of the tiles on the display and exemplary software for their control."  APPX00198 (14:15-17).  The specification further discloses "[t]he Grid 700 is the top level functionality to which application programs are subordinate," "[t]he grid controls the layout and priorities of the tiles," "[t]he grid assigns a priority to a tile," and "[a] single grid, composed of multiple tiles, may therefore present a number of information sources simultaneously."  APPX00198 (14:19-21); APPX00198 (14:28); APPX00198 (14:56); APPX00198-00199 (14:67-15:2).

The specification makes clear that the inventors intended to serve as their own lexicographers and defined "grid" to mean "a regular arrangement of rows and columns, which may, but need not, allow a single tile to occupy more than one row and/or column."  *Id*.  The specification further makes clear that "grid" is both a structure and software implementing that structure, such that "a regular arrangement" is one that enforces conformity to the positions delimited by the "rows and columns" continuously.

17

As defined by the specification, the term "grid" should be construed as "a regular arrangement of rows and columns, the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously." This full construction is necessary to resolve the dispute between the parties. The Board erred in not construing the term "grid" as requiring "the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously." APPX00050; APPX00129-00130. The Board's construction is erroneous because it fails to articulate fully the meaning of the term grid established by the intrinsic record.

### C. The Board Erroneously Construed the "Conditional Request" Limitation

Independent claim 1 of the '338 Patent and independent claim 5 of the '317 Patent each recite, in part:

> …at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;…

APPX00206 (30:39-44); APPX00343 (30:60-65). This brief and the record below refer to this limitation generally as the "conditional request" limitation.

A simple grammatical analysis of the "conditional request" limitation reveals that the action is "send" and the object of such action is "a conditional request." The

action is performed "at a first update time in accordance with the first update rate." The action results in the object being sent "from the client device to the first server device" with the intent "for an update of information in the first tile." However, the action is further conditioned on "if the information from the first information source currently displayed in the first tile has not changed since a last update." This further condition is generally referred to herein as the "if clause" and plainly indicates that the action will only occur if currently displayed information is unchanged from a prior update.

The specification provides support for sending a conditional request by disclosing, for example, "[r]efresh function 510 is able to indicate a retrieval rate at which information is retrieved from a source of information so that the information is displayed and refreshed in the tile." APPX00198 (13:3-5). The specification also provides support for the conditional request being an HTTP1.1 conditional GET request. *See* APPX00204 (25:29-33).

Separately, the specification provides support for conditionally sending a conditional request based on what is currently displayed in a tile and/or whether currently displayed content has or has not changed. For example, the specification discloses:

> In another embodiment of the present disclosure, tiles communicate with one another and have conditional content. That is, the content of one tile depends upon the content of another. Such conditional content

> enables more than one tile to be refreshed simultaneously, or nearly
> simultaneously, by requesting a given tile to be refreshed.
> Alternatively, a tile may be set up to specify one or more tiles whose
> contents are linked to it.

APPX00197 (13:26-33).

Ignoring the straightforward grammatical analysis and clear disclosure of the specification while purportedly construing the "conditional request" limitation the same in two of the IPR proceedings, the Board applied not one, but two different interpretations of the same limitation. In the '592 IPR, the Board relied on the "If-Unmodified-Since" header field as disclosed in RFC2068 and effectively rewrote the limitation such that the if condition is a determination performed by a server instead of a local client or otherwise describes the content of the conditional request. *See* APPX00023; *see also* APPX00027 ("RFC2068's conditional GET method to request an update if the server's information has not changed since a last update"); APPX00022 ("Instead, the "if clause" describes the content of the conditional request."). In the '423 IPR, the Board relied on the "If-Modified-Since header field" of a conditional GET request as disclosed by MSIE Kit and effectively rewrote the limitation such that the if condition does not exist or is otherwise superfluous. *See* APPX00154-00155. In both instances, the Board erred by failing to construe "if the information from the first information source currently displayed in the first tile has

not changed since a last update" as a condition precedent to "send[ing] a conditional request."

## D. The Board Erred in Finding Substantial Evidence Supported Invalidity

In the '592 IPR, the Board acknowledged "Patent Owner's argument [that Active Desktop items are not tiles] is premised on its claim construction, which we do not adopt" and "we do not construe 'tile' as limited to being selectable in a certain manner." APPX00024. The Board further concluded "Patent Owner's argument that the claim language 'imposes a condition precedent that must be satisfied before sending the conditional request' is not persuasive." APPX00026. The Board also concluded "that MSIE Kit discloses claim 1's partition limitation" and "our conclusion regarding claim 1 applies also to claim 9." APPX00027.

Since the Board relied on erroneous constructions, the Board erred in finding substantial evidence supporting determining claims 1-8 of the '338 Patent invalid as obvious and claims 9-13 of the '338 Patent invalid as anticipated.

In the '591 IPR, the Board concluded that MSIE Kit discloses a "grid" based on an erroneous construction. *See* APPX00052-00054. The Board also determined "[b]ecause, as discussed above, we do not limit selecting a tile to a particular selection method (*see supra* at 13 (§ II.B.1)), Petitioner's reliance on a user clicking a hyperlink is consistent with selecting a tile." APPX00056.

21

Since the Board relied on erroneous constructions in the '591 IPR, the Board erred in finding substantial evidence supporting determining claims 1, 2, 4-10, 12-18, and 20-24 of the '434 Patent invalid as anticipated and claims 3, 11, and 19 of the '434 Patent invalid as obvious.

In the '590 IPR, the Board determined "the Active Channel element satisfies our construction of 'tile' and is a first tile." APPX00087. Since the Board relied on an erroneous construction of "tile" in the '591 IPR, the Board erred in finding substantial evidence supporting determining claims 1-4 of the '712 Patent invalid as anticipated.

In the '423 IPR, the Board found "[b]ecause, as discussed above, we do not agree that a 'tile' may be distinguished based on comparing its representation to that of a window (*see* Section II.C.1), Patent Owner's argument is not persuasive" and "[b]ecause, as discussed above regarding claim construction, we do not agree that a 'tile' limits how it may be selected (*see* Section II.C.1), Patent Owner's argument is not persuasive." APPX00143-00144. The Board also determined that "Patent Owner's arguments [that MSIE Kit does not disclose a 'grid'] are premised on its proposed claim construction" and "[b]ecause we reject Patent Owner's proposed construction, *see* Section II.C.2.(c), those arguments are inapposite." APPX00145. In addition, the Board acknowledged "[b]ecause we did not adopt Patent Owner's proposed condition precedent claim construction and, instead, conclude that the

claim simply required a conditional request, Patent Owner's argument is inapposite." APPX00155.

Since the Board relied on erroneous constructions in the '423 IPR, the Board erred in finding substantial evidence supporting determining claims 1-19 of the '317 Patent invalid as anticipated.

## SUMMARY OF THE ARGUMENT

The Board erred in construing "tile" in a fashion that fails to distinguish a "tile" and a window contrary to explicit disclosure and clear disavowal.

The Board erred in not construing the term "grid" as requiring the "regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously."

The Board erred by failing to construe "if the information from the first information source currently displayed in the first tile has not changed since a last update" as a condition precedent to "send[ing] a conditional request."

The Board erred in finding substantial evidence supported invalidity of the challenged claims as anticipated and/or obvious.

## STANDARD OF REVIEW

This court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *ACCO Brands Corp. v. Fellowes, Inc.*, 813 F.3d 1361, 1365 (Fed. Cir. 2016). Substantial evidence "means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229-30 (1938)).

Obviousness is a question of law with underlying factual issues relating to the "scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

## ARGUMENT

### I.   THE BOARD ERRONEOUSLY CONSTRUED "TILE"

#### A. The Board Erroneously Relied On Prior Constructions Under the Broadest Reasonable Interpretation (BRI) Standard

The '338, '434, '712, and '317 Patents are each a child, through a chain of continuations and continuations in part, of the same ultimate parent – U.S. Patent No. 6,724,403 to Santoro, *et. al.* ("the '403 Patent"). *See* APPX00162-00163; *see also* APPX00208-00209; APPX00255-00256; APPX00300-00301. The '403 Patent was the subject of IPR2013-00292, in which "tile" was construed under the Broadest Reasonable Interpretation ("BRI") standard. *See* APPX03921-03924. However, in the current IPR proceedings "tile," and any other term in controversy, should have been construed under the standard articulated in *Phillips v. AWH Corp..* 415 F.3d

1303 (Fed. Cir. 2005).  *See* 83 Fed. Reg. 51341 (Oct. 11, 2018) (adopting *Phillips* for IPR petitions).

The Board's prior construction of claims under the BRI standard does not have a preclusive effect on proceedings that apply the *Phillips* standard because the "ordinary elements of issue preclusion" are not met.  *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) ("Because the Board applies the broadest reasonable construction of the claims while the district courts apply a different standard of claim construction as explored in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the issue of claim construction under *Phillips* to be determined by the district court has not been actually litigated.") (emphasis added).

Despite clear guidance and without any analysis or further explanation, the Board "conclude[d] that, to the extent the 403 FWD [in IPR2013-00292] construed terms applicable in this proceeding, those constructions comport with the *Phillips* standard."  APPX00009; APPX00042; APPX00071; APPX00118.  Yet, at least one district court, U.S. District Court for the District of Maine, determined in litigation related to the '403 Patent that "tile" has a fundamentally different claim construction under *Phillips*.  *See* APPX03987-APPX04005.  Specifically, the district court concluded that "a 'tile' is 'a graphical representation of an associated information source capable of displaying refreshed content, the graphical representation being

persistent and selectable to provide access to underlying information of the associated information source.'" APPX04005. Of note, the district court explicitly stated "the Court disagrees with the PTO's construction of many of the disputed claim terms." APPX03986. And of further note, the district court adopted the proper construction of "tile" while being aware of the construction previousy adopted by the Board. *See* APPX03987.

Against the detailed and well-reasoned district court analysis covering approximately 18 pages, the Board, with a single conclusory sentence, incorrectly determined that constructions based on BRI somehow comported with the *Phillips* standard. Such clear error should be vacated and this court should construe "tile" such that a "tile" is distinguished from either an icon or a window consistent with the district court's construction under *Phillips*.

SurfCast also notes that, by determining in conclusory fashion that the prior BRI constructions comport with *Phillips* and adopting those incorrect prior constructions, the Board effectively shifted the burden of persuasion from Petitioner to Patent Owner. In an IPR, "the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. §316(e)). Rather than requiring Microsoft to establish that their proposed constructions should be adopted, the Board

summarily adopted the prior constructions and required Patent Owner to establish

patentability of the distinct claims of the '338, '434, '712, and '317 Patents. Instead

of requiring Microsoft to prove "unpatentability by a preponderance of the

evidence," the Board assumed that the claims were unpatentable because the claims

shared terms with the '403 Patent which was found to be unpatentable. In turn, the

Board required Patent Owner to prove that the *Phillips* standard should be applied

and would result in different constructions. For at least this additional reason, the

Board erred and should be reversed.

### B. The Board's Construction of "Tile" Conflicts With The Specification

The Board correctly noted that "[t]he specification frames tiles as ***contrasting***

with two other graphical user interface elements–icons and windows." APPX00010

(emphasis added); *see also* APPX00043; APPX00072; APPX00119. Yet, the Board

ignored their own finding to adopt a construction that fails to distinguish between a

"tile" and a window or otherwise afford any weight to any contrasting aspect of a

"tile."

A patentee need not expressly state "my invention does not include X" to

indicate his exclusion of X from the scope of his patent because "the patentee's

choice of preferred embodiments can shed light on the intended scope of the claims."

*Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340; *see also On Demand*

*Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen

the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1333 (Fed. Cir. 2009) (finding disavowal implicitly); *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005) (same).

A patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). "[T]he claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citing *e.g.*, *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999); *Rexnord*, 274 F.3d at 1342.). Further, "a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *Id*. (citing *e.g.*, *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) (narrowing a claim term's ordinary meaning based on statements in intrinsic evidence that distinguished claim invention from prior art)).

Here, the patentee explicitly acted as his own lexicographer.  *See* APPX00197 (11:1-2) ("In the present disclosure, a third graphical representation of programs and files, herein called a tile, is introduced.").  And like *Spectrum Int'l*, the specification distinguishes "tile" from a prior art window through expressly disclaimed subject matter.  For example, a tile "does not necessarily have the large number of active areas associated with windows such as title bar, menu bar, toolbars, and scroll bars." APPX00197 (11:15-18).  And, as noted by the Board, the specification contrasts a "tile" and a window, thereby disclaiming a window as any type of "tile."  *See* APPX00196 (10:35-67).

The Board takes issue with SurfCast's articulation that a "graphical representation of an associated information source" is not merely a graphical user interface ("GUI") element and that the Board's adoption of "GUI element" is unduly broad to include items that are not displayed or that are not a representation of anything.  *See* APPX00011; *see also* APPX00043-00044; APPX00073; APPX00120.  But the Board incorrectly focuses only on the displayed aspect and fails to address whether all GUI elements are a representation of anything.  *See id.* The Board overlooked that "elements such as scroll bars, pointers, menus, and buttons provide functionality to a window but are not a representation of an underlying information source as they are not a likeness or image of the information source."  APPX00760; APPX09685; APPX10965; APPX12813.  The Board's

overbroad adoption of a GUI element would encompass, for example, a scroll bar that might otherwise meet the Board's construction (e.g., is refreshable and selectable), but is not representative of anything. As such, the Board's construction is overly broad and does not accurately reflect the definition of "tile" provided in the specification.

While the proper construction of "tile" does not include an explicit negative limitation that a "tile" is not a window, that a "tile" provides "a representation of the underlying information that is more limited than the representation provided by a window" does negatively limit the scope of a "tile". And, as shown throughout the proceedings below, such negatively limited scope is fully supported by the specification. *See* APPX00760-00765; APPX09685-09690; APPX10955-10959; APPX12813-12817.

The Board complains that "[w]hile … the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition." APPX00012; APPX00044; APPX00074; APPX00121. But regardless of how the definition is articulated, the specification does, as acknowledged by the Board, contrast a "tile" and a window thereby indicating that a "tile" is not a window. And in doing so, the specification distinguishes or otherwise disclaims a "tile" as not being a window.

The Board observed:

> Further, Patent Owner's construction is unclear whether a tile must
> provide a graphical representation of its associated information source
> or of the information underlying that source.   The proposed
> construction first requires a tile represent the source but then
> additional[ly] requires it "provid[e] a representation of the underlying
> information," seemingly allowing no room for a tile that represents only
> the information source.  PO Resp. 6-7.  Those competing requirements
> would not comport with the specification.

APPX00013;  APPX00045;  APPX00075;  APPX00122.    But the Board

mischaracterizes these two requirements as competing and mischaracterizes two

exemplary tiles as only "relat[ing] to the source itself."  *Id*.  To the contrary, the

specification consistently discloses that a "tile" necessarily represents a source's

underlying information while relating to the associated information source.  Neither

"tile 408" nor "tile 410" relate only to "the source itself" as incorrectly suggested by

the Board.

For example, the specification discloses "[t]ile 410 displays a name, 'FM

101', denoting the title of a broadcast signal, in this case audio, that is associated

with the tile."  APPX00197 (11:66-12:1).  The specification further discloses

"[d]ouble-clicking tile 410 causes the audio stream to become audible over the

appropriate channel of the system."  APPX00197 (12:37-39).  As such, tile 410

provides a representation of an associated information source (i.e., broadcast signal

"FM 101") as well as a representation of the underlying information (i.e., audio stream).

In another example, the specification discloses "[t]ile 408 has been configured to link to an electronic mail program" and "tile 408 has been configured so that the tile displays an envelope and the message "New Mail!" when an unread message has been received by the mail program." APPX00197 (11:56-60). As such, tile 408 provides a representation of an associated information source (i.e., electronic mail program) and a representation of underlying information (i.e., a newly arrived message). In a variation, the specification discloses "[t]ile 20 displays the active folders in an electronic mail utility." APPX00195 (7:38-39). That is, in the absence of new mail, a tile associated with an electronic mail program provides a representation of the associated information source (i.e., mail program) and a representation of the underlying information (i.e., active folders).

Throughout, the specification consistently presents examples of tiles that provide a representation of an associated information source and a representation of the underlying information. This is contrary to the Board's assertion that "[t]he exemplary tiles do not necessarily represent a source's underlying information, but instead may relate to the source itself." APPX00013; APPX00045; APPX00075; APPX00122. As such, there is no internal inconsistency in the meaning of a tile, as suggested by the Board.

The specification discloses "[a]n icon … comprises an easily recognizable depiction of the program or file, either through its logo 322 or some characteristic picture with the name 324 of the program visible." APPX00196 (10:42-43). That is, an icon provides only a representation of an associated information source. However, the specification discloses "[a] tile is different from an icon because it provides a real-time or near real-time view of the underlying information in that it contains continually refreshed content." APPX00197 (11:9-11). In view of this disclosure, a "tile" would not represent only an information source as suggested by the Board and neither tile 408 nor 410 support the Board's contention.

The Board concluded "that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction" that a "tile" is a "graphical representation of an associated information source … providing a representation of the underlying information that is more limited than the representation provided by a window." APPX00012; APPX00044; APPX00074; APPX00121. Yet, as discussed herein, the Board ignored their own finding that a "tile" contrasts with either an icon or a window as well as ignored and/or failed to appreciate consistent explicit and implicit disclaimers throughout the specification that a "tile" and a window each provide different representations of underlying information.

For example, the specification discloses:  1) a miniaturized "thumbnail" view; 2) a partial "porthole" view; 3) a symbol;  and 4) a customer interface.  *See* APPX00197 (11:34-41).  A "thumbnail," a "porthole," a symbol, and a custom interface are each representations of underlying information that differ from the representation of an entire file provided by a window.  The specification explains:

> Tile 412 displays a "thumbnail" of the document viewed in a window such as 340.  A "thumbnail", as used herein, is a miniaturized representation of an image that retains sufficient characteristics to permit easy recognition of the image.  For example, *if the document displayed in a window were a document with **multiple pages**, tile 412 may display a thumbnail of the **first page** of the document*.

APPX00197 (12:1-7) (emphasis added).  The specification explicitly distinguishes a window that displays multiple pages of a document from a "tile" that displays only "a thumbnail of the first page of the document."  While only a portion of the multi-page document may be visible in the window at any given time, any portion of the document may be made visible (e.g., via scrolling) such that the content of the window is the entire multi-page document.  In contrast, the first page thumbnail is the only content of tile 412.  There can be no doubt that "a thumbnail of the first page of the document" as the only content of a "tile" is more limited than multiple pages of the document as the content of a window.

The Board mischaracterizes and ignores explicit disclosure within the intrinsic record to attack the proper construction of "tile."  At the same time, the Board provides nothing more than a conclusory statement that a previous construction under BRI somehow comports with the *Phillips* standard to support their adoption of the prior construction.  This clear error should be vacated.

The term "tile" should be construed to mean "a graphical representation of an associated information source capable of displaying refreshed content, the graphical representation being persistent and selectable to provide access to underlying information of the associated information source, but providing a representation of the underlying information that is more limited than the representation provided by a window."  As required by the specification, this construction distinguishes a "tile" from a window.

## II.    THE BOARD ERRONEOUSLY CONSTRUED "GRID"

The term "grid" should be construed as "a regular arrangement of rows and columns, the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously."  The Board correctly adopted the first part of this construction.  But the Board erred in not construing the term "grid" as requiring "the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously."  APPX00050; APPX00129-00130.  The Board's

construction is erroneously incomplete because it fails to articulate fully the meaning of the term grid established by the intrinsic record.

## A. The Specification Supports SurfCast's Construction of "Grid"

The specification provides a section entitled "Grid Object" that teaches what the "grid" is and how it controls "[t]he arrangement, layout and independent functioning of the tiles on the display …." APPX00198 (14:15-16). And the Maine district court determined "the patentee here shows intent to act as his own lexicographer with respect to 'grid.'" APPX04054. As shown below, the specification defines essential attributes of the grid and illustrates these attributes in multiple examples.

The "Grid Object" section states that "[t]he grid controls the layout and priorities of the tiles." APPX00198 (14:28). Furthermore, "[t]he grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display." APPX00199 (16:1-3). These categorical statements are definitional and establish that the "grid" must "contain" tiles and "control" their layout across multiple configurations. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016).

To "contain" and "control" tiles and their layout, the grid must enforce conformity to a rule. In particular, each tile in the grid must conform to the positions delimited by its rows and columns. Furthermore, this rule must apply across

different configurations with any number of tiles. Thus, the grid rule must be enforced continuously across various tile configurations. Continuous enforcement is relevant because a user can assign, resize, or move tiles around the grid. APPX00197 (11:22-25); APPX00198 (14:64-66); APPX00199 (16:32-37); APPX00201 (19:37-41).

As shown above, the specification defines a "grid" as a particular structure (also called a "grid object") that imposes a rule to control the layout of tiles contained in the grid across various arrangements and configurations. The specification provides several examples illustrating these essential attributes.

"In a preferred embodiment, the grid permits a regular layout of tiles on the display screen such that the tiles are uniform in size and shape, as depicted in **FIGS. 8-11**. Each tile is indexed by its position on the grid." APPX00199 (16:4-7). For example, "**FIG. 8** shows one embodiment in which all tiles are the same size and are presented in an array comprising M rows and N columns." APPX00199 (16:14-16).



Fig. 8

In another example, "FIG. 9 shows an arrangement in which there is a unit tile size, that of tile 802-1-1, but tile 802-1-2 and tile 802-M-1 have each been configured to occupy regions of the grid equal to exact multiples of the unit tile size." APPX00199 (16:25-28).



Fig. 9

The foregoing examples illustrate how the grid contains and controls tiles. Each tile is "indexed" to the rows and columns of the grid and configured to occupy

38

a region of the grid equal to the "unit tile size" or its exact multiples. This confirms that the grid "contains" and "controls" the layout of tiles by enforcing conformity to the positions delimited by its rows and columns. It also illustrates that this rule is imposed across different arrangements and configurations of tiles that may be contained in the grid. Indeed, the same type of conformity is illustrated in every example of the grid in the specification including the embodiments illustrated in FIGs. 1, 7 and 8-11. APPX00195 (7:34-37); APPX00198 (14:18-42); APPX00199 (16:4-59).

The specification also discloses that a user can assign, resize, or move tiles around the grid. As shown below, the Board erred in concluding that this disclosure contradicts SurfCast's construction. On the contrary, the reconfigurable nature of the grid further demonstrates that its enforcement is continuous and not happenstantial.

### B. Continuous Enforcement Is Consistent with Moving Tiles to Different Grid Locations and Overlap of Tiles while Being Moved

The specification discloses that a user can assign, resize, or move tiles around the grid, for example, using a "'drag and drop' technique" to arrange tiles in the grid. APPX00197 (11:22-25); APPX00198 (14:65-66); APPX00199 (16:32-44); APPX00201 (19:37-41). Furthermore, tiles may temporarily overlap when being moved from one location to another. APPX00197(11:22-25). The Board erred in

concluding that these features are inconsistent with the grid continuously enforcing conformity to the positions delimited by its rows and columns, as per SurfCast's construction.

The Board *sua spontae* cited an extrinsic definition of "continuous" as "marked by uninterrupted extension in space, time, or sequence" and reasoned that this is the antithesis of alterable. APPX00197 (11:22-25). The Board also reasoned the grid cannot continuously enforce conformity with its rules because tiles can overlap while being moved. This is mistaken.

The Board's reasoning erroneously finds contradiction where none exists. The specification establishes that the grid can contain different configurations of tiles, and that the tiles can be added to the grid and moved to different configurations. APPX00197 (11:22-25). It also establishes that tiles can exist independently of and need not be contained in the grid. *Id*.

When a tile is contained at a given grid location, the grid enforces its rule on the tile. When the tile is being picked up and moved, it is not contained in the grid and therefore not subject to its rule. When the tile is dropped at a new grid location, it is again contained in the grid and must again conform to its rule. Thus, the grid continuously enforces its rule across different arrangements of tiles that it contains, but, of course, does not enforce the rule on tiles not contained in the grid. The claim language itself also supports this understanding.

40

The Board acknowledged that the claim language "grid of tiles" refers to "multiple tiles *in a grid*." APPX00128. This reinforces the conclusion that the continuous containment of the grid pertains to tiles contained in the grid, not to a tile that a user has removed from the grid container to move elsewhere.

The Board's conclusion that the specification is silent as to temporal continuity is mistaken. The SurfCast Patents disclose that the grid continuously enforces its rule across the various arrangements of tiles that it may contain. Continuous enforcement must be understood in this context, not relative to the extrinsic definition cited by the Board. Moving tiles from one location in a grid to another necessarily involves a particular temporal component—the times before and after a tile is moved, which are the times that it is contained in a grid and subject to its rule.

The Board's extrinsic definition also allows for continuity in space or sequence rather than time. These concepts are also consistent with the specification's description of continuous conformity across different arrangements. Thus, the Board's proffered definition of "continuous" supports SurfCast's construction and does not refute it.

## C. Dictionary Definitions Are Consistent with the Specification and SurfCast's Construction

The Board incorrectly frames SurfCast's construction of "grid" as an argument about the meaning of the term "regular." APPX00049. As shown above, the specification establishes that the grid continuously enforces conformity to the positions delimited by its rows and columns, as per SurfCast's construction.

The extrinsic dictionary definitions of "regular" cited by the Board are "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004), *quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004); *see also Astrazeneca AB*, 384 F.3d at 1337 (Fed. Cir. 2004). SurfCast offered dictionary definitions to show that the ordinary meaning of regular is consistent with the meaning established by the specification, the interlocutory construction of "grid" by a lower court as being "regular," and SurfCast's proposed construction of "grid." The cited definitions do support these propositions.

The Board approved of the definition "'following a pattern, especially with the same time and space between each thing and the next' … [as] most consistent with the other dictionary definition to which the [SurfCast] cites and the specification in describing an orderly arrangement of the tiles." APPX00051. The Board indicated that this definition failed to support a temporal component,

42

notwithstanding the fact that it refers to "the same *time* and space between each thing." *Id*. It also acknowledged that another definition refers to a temporal period, but discounted the relevance of that definition. *Id*.

The Board's analysis of dictionary definitions is mistaken. The definition that the Board cited approvingly supports a temporal component. Furthermore, as shown above, the specification is the primary source of the relevant temporal component (the times before the tile is moved, when it is contained in the grid). Even if the Board's preferred definition did not expressly refer to a temporal aspect, the specification's description must prevail.

## III. THE BOARD ERRONEOUSLY CONSTRUED "CONDITIONAL REQUEST"

### A. The Board Erred In Applying Two Different Interpretations Of The "Conditional Request" Limitation

A well-established rule of claim interpretation dictates that like terms should be construed consistently across related claims. *See Phillips*, 415 F.3d at 1314; *see also Rexnord*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997). "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). This court has held that where multiple patents "derive from

43

the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (finding that statements by the patentee in prosecution of sibling patent were a "representation of its own understanding of the inventions disclosed" in all sibling patents, despite the statement being made *after* the issuance of the patent in which the term being analyzed was used.).

As noted above, the '338 and '317 Patents share the same ultimate parent–the '403 Patent. In addition, both patents share the same "conditional request" limitation in common. *See* APPX00206 (30:39-44); *see also* APPX00343 (30:60-65). As such, the "conditional request" limitation should be interpreted consistently across both patents. Yet the Board, while purporting to adopt Microsoft's proposed construction in both IPR proceedings, applied two different interpretations to the same claim term.

In the '592 IPR, the Board stated "that the limitation simply requires sending a conditional request that asks if tile-displayed information ***that is stored at the server*** 'has not changed since a last update.'" APPX00019 (emphasis added); *see also* APPX00023; APPX00022 ("Instead, the "if clause" describes the content of the conditional request."). As such, the Board effectively rewrote the limitation such

that the if condition is a determination performed by a server instead of a local client. In turn, the Board relied on the "If-Unmodified-Since" header field as disclosed in RFC2068 in combination with MSIE Kit to find "it would have been obvious to use MSIE Kit's web-crawling functionality with RFC2068's conditional GET method to request an update *if the server's information has not changed since a last update*." APPX00026-00027.

In the '423 IPR, the Board also stated "that the limitation simply requires sending a conditional request that asks if tile-displayed information *that is stored at the server* 'has not changed since a last update.'" APPX00139 (emphasis added); *see also* APPX00141 ("Instead, the "if clause" describes the content of the conditional request."). That is, the Board purports to adopt the same construction for the "conditional request" limitation in both IPR proceedings. However, the Board then relied on the "If-Modified-Since header field" of a conditional GET request as disclosed by MSIE Kit as anticipating the "conditional request" limitation. *See* APPX00154-00155. As disclosed by MSIE Kit, the use of an "If-Modified-Since" GET will result in an update if the information has changed. *Id*.

While the Board, incorrectly, suggests that the "if clause" describes the conditional request content in both IPR proceedings, the Board interprets that description in two different ways in the two IPRs – in the '592 IPR as an "If-Unmodified-Since" GET and in the '423 IPR as an "If-Modified-Since" GET. Such

inconsistent interpretations are clear errors and the Board's findings should be reversed.

## B. The Board Erroneously Construed The "Conditional Request" Limitation

As noted above, the Board adopted a construction of the "conditional request" limitation such that "the 'if clause' describes the content of the conditional request." APPX00022; APPX00141.  As disclosed in RFC2068, "[a] conditional GET method requests that the entity be transferred only under the circumstances described by the conditional header field(s)."  APPX03698.  As agreed by Microsoft, SurfCast, and the Board, the "conditional request" recited in the "conditional request" limitation is an HTTP1.1 conditional GET as disclosed by RFC2068.  *See* APPX00020; *see also* APPX00139.   As such, the recited "conditional request" necessarily already describes the content as a request to determine, by a server, whether information stored at the server meets a condition.  The Board confirmed that "[t]he conditional GET has the condition in the request."  APPX00020; APPX00140.

Since the recited "conditional request" already describes the nature of the request, the "if clause" as inconsistently construed by the Board is superfluous. Specifically, the Board interprets the "if clause" as alternatively describing both an "If-Modified-Since" (in the '317 Patent) and an "If-Unmodified-Since" (in the '338 Patent) request, both of which are already encompassed by the recited "conditional request".  As such, the "if clause" unnecessarily captures the same scope that is

already captured by the recited "conditional request" and is void or otherwise meaningless. "It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021). For at least this reason, the Board erred and their construction of the "conditional request" limitation should be vacated.

The "if clause" recites "the information … currently displayed in the first tile has not changed." As agreed by all parties, an HTTP1.1 conditional GET is a server-side determination of whether a condition is met. *See* APPX03698. RFC2068 discloses "If-Modified-Since times are interpreted by the server." APPX03768. RFC2068 also discloses that HTTP is "a generic, stateless, object-oriented protocol." APPX03649. Under HTTP1.1, a server, by default, would be unaware of "the information … currently displayed in the first tile". In addition, RFC2068 explicitly discloses that both "If-Modified-Since" and "If-Unmodified-Since" are determinations based on a date string. *See* APPX03768; *see also* APPX03772. The Board's construction that the "if clause" "asks if tile-displayed information that is stored at the server 'has not changed since a last update'" effectively rewrites the plain explicit language of a simple local determination of whether currently displayed content has changed to instead not only become a server determination (i.e., "that is stored at the server"), but also require additional identification and exchange of a date string or exchange of an indication of the displayed content with

the server.  Nowhere does the intrinsic record support such an expanded convoluted interpretation of a simple explicit limitation.  For this additional reason, the Board also erred in rewriting the limitation and their "conditional request" limitation construction should be vacated.

Of note, the logical consequence of the Board's incorrect construction would result in the unnecessary transfer of unchanged content that is already displayed in the tile.    Under the Board's construction (and consistent with Microsoft's interpretation), a "conditional request" will always be sent in order to prompt a server to determine whether "information that is stored at the server has not changed."  In addition, if the server stored content has not changed, the conditional request will result in a response that includes the unchanged content that is already displayed in the tile.  At the same time, if the server stored content has changed, the response will not include any content and the tile will display outdated content.  Both of these results are nonsensical and contradict the invention's goal of providing real-time or near real-time content while maximizing available bandwidth.  Such a nonsensical construction that contradicts the intended invention cannot be proper.  For at least this further reason, the Board also erred and their construction should be vacated.

Claim 9 of the '338 Patent recites, in part:

… the first information source being located on a second device, …

a third set of instructions for the second device to, at a time for updating the information from the first information source in accordance with the first update rate, determine whether the information from the first information source has changed since the last update time and to send to the first device an update message including the updated information in accordance with the determination;…

APPX00207 (31:29-32:11). Claims 12 and 16 of the '317 Patent also recite similar language. *See* APPX00344 (32:3-8, 26-32). Significantly, this language is directed to the server action to be taken in response to a conditional request or otherwise performed by a server. And more significantly, this language is "determine whether *the information from the first information source **has changed*** since the last update time." That is, multiple consistent recitations make clear that a server determines whether server stored content has changed. In contrast, the "if clause" recites "*the information from the first information source **currently displayed in the first tile has not changed*** since a last update." That this distinctly different language is recited in a limitation intended to be performed by a client device makes clear that the "if clause" is a determination to be made by the client device. If the patentee had intended for the "if clause" to simply describe the content of a conditional request, the patentee would have used the same language consistently and repeatedly used elsewhere for that description.

In declining to adopt the proper construction of the "conditional request" limitation, the Board failed to appreciate the two distinct elements of the limitation. Specifically, the limitation first recites "send a conditional request from the client device to the first server device for an update of information in the first tile" and second recites conditioning the sending on "if the information from the first information source currently displayed in the first tile has not changed since a last update." Such an interpretation is based on a simple grammatically correct reading of the limitation. It is also based on language used elsewhere in the claims.

While the specification clearly shows intent to provide lexicography for the terms "tile" and "grid", nowhere does the specification suggest such an intent for the "conditional request" limitation. However, the Board unnecessarily construed the "conditional request" limitation in direct contradiction to the plain and ordinary meaning of the claim.

The Board agrees that "[t]he conditional GET in the HTTP1.1 protocol does not discuss a condition precedent to sending the request." APPX00020-00021; APPX00140. As such, the action to "send a conditional request" will always be performed if the "if clause" is not interpreted as a condition precedent. However, as acknowledged by the Board, "the specification involves tiles communicating with each other and having 'conditional content'" and "[s]uch conditional content refers to 'the content of one tile depend[ing] upon the content of another.'" APPX00021;

50

APPX00140.  In the '592 IPR, the Board then states "[t]his has nothing to do with the conditional request claimed."  APPX00021.  And in the '423 IPR, the Board then states "[t]his has nothing to do with conditional requests."  APPX00140.  While the Board is correct that disclosure related to "conditional content" has nothing to do with "conditional requests", the Board failed to appreciate that this "conditional content" disclosure provides written description support for interpreting the "if clause" as a condition precedent.

The "if clause" recites "information … currently displayed in the first tile has not changed since a last update."  In a situation where "the content of [the first tile] depends upon the content of another," the "information … currently displayed in the first tile" may have changed due to such a dependency.  In this situation, the first tile would already display updated information and sending another conditional request would be unnecessary.  Interpreting the plain and ordinary meaning of the "if clause" as a condition precedent avoids this unnecessary conditional request being sent.

The plain and ordinary meaning of the "conditional request" limitation is simple, straightforward, and grammatically correct.  In addition, nowhere does the intrinsic record suggest any intent by the patentee to serve as their own lexicographer for or disavow any scope of the "conditional request" limitation.  At the same time, the Board's adopted construction makes the "if clause" superfluous, lacks any support, and would result in nonsensical behavior contrary to the intended invention.

As such, the Board's construction should be vacated and the "conditional request" limitation should be afforded its plain and ordinary meaning such that the "if clause" serves as a condition precedent to sending a "conditional request."

## IV. THE BOARD ERRED IN FINDING SUBSTANTIAL EVIDENCE SUPPORTED INVALIDITY OF THE CHALLENGED CLAIMS AS ANTICIPATED AND/OR OBVIOUS

### A. The "tile" Limitations Patentably Distinguish Over MSIE Kit

The Board concluded:

> Patent Owner argues that Active Desktop items are not tiles and are not partitioned into an array. PO Resp. 35-43. Patent Owner argues that Active Desktop items are not tiles because they do not provide a representation of an associated information source more limited than the full information provided by a window. PO Resp. 36-38. Patent Owner's argument is premised on its claim construction, which we do not adopt. *See supra* at 10-14 (§ II.B.1). Accordingly, the argument is not persuasive.

APPX00024; *see also* APPX00042-00048, APPX00071-00077, APPX000143. In doing so, the Board clearly erred in declining to adopt the proper construction of "tile" such that a "tile" and a window are distinguishable graphical representations.

### 1.  MSIE Kit Fails to Disclose a "tile" Under SurfCast's Construction

MSIE Kit explicitly discloses that an Active Desktop item is a window. APPX02746; APPX02935; APPX02937; *see also* APPX05666-05667(¶119-121). As such, an Active Desktop item cannot be a "tile".

Active Desktop items are web pages with the full information provided by a regular Internet Explorer window.  As explicitly disclosed by MSIE Kit, the "Internet Explorer 4 program, Iexplore.exe, is basically a wrapper program for two browser ActiveX controls, Shdocvw.dll (also called the WebBrowser Control) and Mshtml.dll, which provide all of the functionality of the browser."  APPX02896. Further, Active Desktop items "are essentially miniature Web pages that reside on the desktop."   APPX02746; APPX02904; APPX02937; APPX02972.   Active Desktop items "encapsulate[] an entire arbitrary HTML document that can contain anything the publisher desires."  APPX02935.

The Board stated "MSIE Kit's items do not appear to depict information the same as it would appear with a web browser."  APPX00554.  Such a statement is directly contradicted by the explicit disclosure of MSIE Kit.  MSIE Kit discloses that Active Desktop items are depicted in a web browser window.  The Board's determinations to the contrary are unsupported by substantial evidence.

Petitioner did not present any argument or evidence below that an Active Desktop item might be considered a "tile" when that term is properly construed. Since MSIE Kit does not, and cannot, disclose a "tile" and Petitioner does not argue that MSIE Kit discloses a properly construed "tile", the Board's determinations that claims 1-8 of the '338 Patent are obvious over MSIE Kit in view of RFC2068 and claims 9-13 of the '338 Patent are anticipated by MSIE Kit are unsupported by substantial evidence and should be reversed. Similarly, the Board's determinations that claims 1-19 of the '317 Patent and claims 1-4 of the '712 Patent are anticipated by MSIE Kit are unsupported by substantial evidence and should be reversed. Likewise, the Board's determinations that claims 1, 2, 4-10, 12-18, and 20-24 of the '434 Patent are anticipated by MSIE Kit and claims 3, 11, and 19 of the '434 Patent are obvious over MSIE Kit are unsupported by substantial evidence and should be reversed.

**B. The "grid" Limitations Patentably Distinguish Over MSIE Kit**

Claim 1 of the '317 Patent recites computer-implemented instructions to "display, using the display device, a grid of tiles." Claim 1 of the '434 Patent recites computer-implemented instructions to "arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent." All other claims of the '434 Patent recite substantially the same limitations.

The Board erred in finding that MSIE Kit discloses the foregoing "grid" limitations. No substantial evidence supports this finding under SurfCast's construction of "grid" or even under the construction adopted by the Board. The court should reverse the Board's determinations of unpatentability as unsupported by substantial evidence and find claims 1-4 of the '317 Patent (IPR2022-00423) and all claims of the '434 Patent (IPR2022-00591) patentable over MSIE Kit.

**1. MSIE Kit Fails to Disclose a "grid" Under SurfCast's Construction**

The Board erroneously concluded that MSIE Kit discloses the "grid" of the SurfCast Patents based on the following disclosure:

> By default, Internet Explorer lays out new Active Desktop items on a 3 by 2 grid. As more items are added to the desktop, they will start to overlap each other. For a desktop at a resolution of 640 x 480, allowing for reasonable spacing between items, this would translate into a size of no more than 200 x 200 pixels. This size specification is merely a guideline. Internet Explorer 4 does not itself enforce any restrictions on the size of an Active Desktop item.

APPX02943.

The default layout of new Active Desktop items on a 3 by 2 grid bears only superficial similarity to the "grid" of the SurfCast Patents. The full disclosure of MSIE Kit makes clear that this default layout lacks multiple required characteristics

of the "grid" when correctly construed as "a regular arrangement of rows and columns, the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously." *See § II, above*.

### a. *MSIE Kit Does Not Enforce Conformity to the Positions Delimited By the Rows and Columns of the Grid*

The default layout does not enforce conformity to the positions delimited by the rows and columns of the grid. On the contrary, MSIE Kit discloses that "[e]ach Active Desktop item consists of single HTML tag with arbitrary x- and y-positions." Appx. APPX02935. Allowing arbitrary x- and y-positions for Active Desktop items is contrary to enforcing conformity to the rows and columns of a grid. MSIE Kit is explicit that its default layout does enforce any such conformity and instead allows arbitrary positioning.

MSIE Kit discloses that its software, IE4,[2] "does not itself enforce any restrictions on the size of an Active Desktop item." APPX02943. This separately establishes that MSIE Kit does not enforce conformity to the rows and columns of a grid. Because each Active desktop item can have any unrestricted size, they need not conform to the grid. Again, MSIE Kit is explicit that it does not enforce conformity to a grid.

As shown above, the default layout does not enforce conformity to the rows

---

[2] IE4 refers to Internet Explorer 4 which is the subject software of MISE Kit.

and columns of a grid (continuously or otherwise). Thus, MSIE Kit fails to anticipate claims reciting the "grid." MSIE Kit also does not render any of these claims obvious at least because its intended operation depends on arbitrary positioning and unrestricted sizing which are antithetical to and technically incompatible with the claimed grid.

The foregoing distinction applies regardless of whether the grid is construed as "*continuously*" enforcing conformity to its rows and columns. The continuous enforcement of the grid, however, establishes an additional patentable distinction over MSIE Kit.

### b. *The Default MSIE Kit Layout Is Not Enforced Continuously*

MSIE Kit discloses that Active Desktop items "will start to overlap each other" as more of them are added. This establishes that MSIE Kit's default layout is not enforced continuously, unlike the grid of the SurfCast Patents. APPX02943.

As shown above, the grid continuously enforces its rule across different arrangements of tiles. *See § II.B, above.* For example, when a new tile is added to the grid, it must conform to the grid's rows and columns. *Id.* In contrast, MSIE Kit discloses that adding new Active Desktop items will cause them to overlap. These added Active Desktop items are not forced to conform to the rows or columns of a grid. On the contrary, they violate those boundaries to overlap one another. This is

contrary to the continuous enforcement of the claimed grid.

The Board also erred in concluding that MSIE Kit discloses "locking down" the Default MSIE Kit Layout such that it becomes continuous. APPX00145-00146. The Board relies on Petitioner's expert for this proposition. *Id.* As shown below, the cited expert testimony fails to provide substantial evidence for the Board's conclusion.

Much of the testimony cited by the Board is irrelevant because it describes locking down a "channel" which is not an Active Desktop item, but a distinct feature of MSIE Kit. APPX00145-00146; *see also* APPX02995. Testimony about a different feature not at issue here fails to provide substantial evidence as a matter of law. *In re Chudik*, 851 F.3d 1365, 1371-75 (Fed. Cir. 2017) (reversing anticipation findings as unsupported by substantial evidence because prior art had to be distorted or modified from its actual disclosure).

As to Active Desktop items, MSIE Kit discloses that an administrator tool can be used to prevent a user from rearranging or adding Active Desktop items. APPX03361; APPX02940; APPX13787-13788. But preventing the addition of Active Desktop items disables the very feature that allegedly constitutes a grid, namely adding "new Active Desktop items." APPX02942; APPX13787-13788. Thus, the features allegedly disclosing a grid would be disabled by the features allegedly establishing continuous enforcement by the grid. This testimony is self-

contradictory and fails to provide substantial evidence to support the Board's conclusion.

As shown above, MSIE Kit fails to anticipate the claimed "grid" because it does not *continuously* enforce conformity to the rows and columns of a grid. Furthermore, MSIE Kit also does not render the grid obvious at least because its intended operation depends on the ability to add tiles that will start to overlap which is antithetical to and technically incompatible with the claimed grid.

### 2. The Default MSIE Kit Layout Is Not "Regular" Even Under the Meaning Adopted by the Board

MSIE Kit fails to disclose the "grid" of the SurfCast patents even under the Board's construction. The Board's construction requires "a regular arrangement of rows and columns" where the term regular has the everyday meaning as reflected in the Board's preferred dictionary definitions, namely "following a pattern, especially with the same time and space between each thing and the next."

As shown above, the default layout does not follow the pattern of a grid with respect to time and space. On the contrary, MSIE Kit discloses that it will violate the confines of a grid over time as Active Desktop items are added and start to overlap. Thus, the Board's conclusion of anticipation fails even on its own terms. Furthermore, as shown above, the lack of any "regular" arrangement is fundamental

to MSIE Kit's express operating principles and cannot therefore support a finding of obviousness.

### C. The "conditional request" Limitations Patentably Distinguish Over MSIE Kit Alone or in Combination With RFC2068

Regarding the '338 Patent, the Board concluded:

> Patent Owner argues first that "send a conditional request" requires conditionally sending a request, in that the request must be sent only when a condition is satisfied.  PO Resp. 44.  As discussed above, we do not agree with Patent Owner's proposed construction for the conditional-request limitation.  *See supra* at 19 (§ II.B.4).  Accordingly, Patent Owner's argument that the claim language "imposes a condition precedent that must be satisfied before sending the conditional request" is not persuasive.  *See* PO Resp. 44.

APPX00026.  In doing so, the Board clearly erred in declining to adopt the proper construction of the "conditional request" limitation such that the "if clause" is a condition precedent.

The Board determined that the combination of MSIE Kit and RFC2068 discloses an HTTP1.1 conditional GET.  APPX00026.  However, the Board did not find, and Petitioner does not argue, that the combination discloses any condition precedent for sending an HTTP1.1 conditional GET.  As such, the Board's determination that claims 1-8 of the '338 Patent are obvious over MSIE Kit in view of RFC2068 is not supported by substantial evidence and should be reversed.

Regarding independent claim 5 of the '317 Patent, the Board concluded:

> Because we did not adopt Patent Owner's proposed condition precedent claim construction and, instead, conclude that the claim simply required a conditional request, Patent Owner's argument is inapposite. *See* Section II.C.4.

APPX00155.  In doing so, the Board clearly erred in declining to adopt the proper construction of the "conditional request" limitation such that the "if clause" is a condition precedent.

The Board determined that MSIE Kit discloses a conditional GET. APPX00154-APPX00155.  However, the Board did not find, and Petitioner does not argue, that MSIE Kit discloses any condition precedent for sending a conditional GET.  As such, the Board's determination that claims 5-11 of the '317 Patent are anticipated by MSIE Kit is not supported by substantial evidence and should be reversed.

## CONCLUSION

For the foregoing reasons, the Board's decisions in IPR2022-00592, IPR2022-00591, IPR2022-00590, and IPR2022-00423 should be reversed.


Date:  February 19, 2024          /s/ Brian S. Seal
                                  Brian S. Seal
                                  Shaun D. Gregory
                                  TAFT STETTINIUS & HOLLISTER, LLP
                                  200 Massachusetts Avenue, NW

Suite 500
Washington, DC 20001
Telephone: (202) 664-1537
Facsimile: (202) 664-1586

Jason A. Houdek
TAFT STETTINIUS & HOLLISTER, LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Telephone: 317-713-9458
Facsimile: 317-713-3669

*Counsel for Appellant*
*SURFCAST, INC.*

Trials@uspto.gov
571-272-7822

Paper No. 21
Entered: October 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MICROSOFT CORP.,
Petitioner,

v.

SURFCAST, INC.,
Patent Owner.

IPR2022-00592
Patent 9,363,338 B2

Before SCOTT B. HOWARD, JASON W. MELVIN, and
MICHAEL T. CYGAN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00592
Patent 9,363,338 B2

## I.    INTRODUCTION

Microsoft Corporation ("Petitioner" or "Microsoft") filed a Petition (Paper 1, "Pet.") requesting institution of *inter partes* review of claims 1–13 ("the challenged claims") of U.S. Patent No. 9,363,338 B2 (Ex. 1001, "the '338 patent"). SurfCast, Inc. ("Patent Owner") filed a Preliminary Response. Paper 6. We instituted review. Paper 9 ("Institution Decision" or "Inst.").

Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 14, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 15, "PO Sur-Reply"). We held a hearing on July 12, 2023 (Paper 20, "Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all of the challenged claims are unpatentable.

### A.    REAL PARTIES IN INTEREST

Petitioner identifies only itself as the real party in interest. Pet. 2. Patent Owner identifies only itself as the real party in interest. Paper 3, 2.

### B.    RELATED MATTERS

The parties both identify the following matter related to the '338 patent: *SurfCast, Inc. v. Microsoft Corporation*, No. 6:21-cv-01018-ADA (W.D. Tex.). Pet. 3; Paper 3, 2. Petitioner additionally identifies *SurfCast, Inc. v. Microsoft Corporation*, No. 2:12-cv-00333-DBH (D. Me.), along with a number of IPR proceedings: IPR2013-00292, IPR2013-00293, IPR2013-00294, IPR2013-00295, IPR2014-00271, IPR2022-00423, IPR2022-00590, IPR2022-00591. Pet. 3–4.

## C.   THE '338 PATENT

The '338 patent is entitled "System and Method for Simultaneous Display of Multiple Information Sources" and is directed to a graphical user interface that organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. Ex. 1001, codes (54), (57). The '338 patent describes a graphical user interface "comprising a grid of tiles that resides on the user's computer desktop." *Id.* at 4:60–61. "The grid of tiles provides a uniform graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices." *Id.* at 4:61–64. Figure 1 is reproduced below.



IPR2022-00592
Patent 9,363,338 B2

Ex. 1001, Fig. 1. Figure 1 illustrates "a user interface comprising a grid of tiles as might be depicted on a display screen." *Id.* at 6:32–34; *see also id.* at 7:34–61 (describing the various tiles).

### D.    CHALLENGED CLAIMS

Claims 1 and 9 are independent. Claim 1 is reproduced below:

> 1. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:
>
> > a first set of instructions to partition at least a portion of a visual display of a client device into an array of tiles, a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;
> >
> > a second set of instructions for the client device to assign a first update rate to the first tile;
> >
> > a third set of instructions to, at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;
> >
> > a fourth set of instructions for the client device to receive a response to the conditional request from the first server device; and
> >
> > a fifth set of instructions for determining whether the client device updates the first tile in accordance with the response from the first server device.

Ex. 1001, 30:29–50. Claim 9 is reproduced below:

> 9. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

IPR2022-00592
Patent 9,363,338 B2

> a first set of instructions to partition by a first device at
> least a portion of a visual display into an array of
> tiles, a first information source being associated with
> a first tile in the array of tiles, the first information
> source being located on a second device, wherein the
> visual display is rendered according to instructions
> executed on the first device;

> a second set of instructions for the second device to
> assign first update rate for updating information from
> the first information source;

> a third set of instructions for the second device to, at a
> time for updating the information from the first
> information source in accordance with the first
> update rate, determine whether the information from
> the first information source has changed since the last
> update time and to send to the first device an update
> message including the updated information in
> accordance with the determination;

> a fourth set of instructions for the first device to receive
> an update message from the second device including
> updated information for updating the first tile; and

> a fifth set of instructions for the first device to update the
> tile in accordance with the updated information.

*Id.* at 31:23–32:12. The remaining claims depend directly from claim 1 or 9.
*Id.* at 30:51–32:31.

E.    UNPATENTABILITY GROUNDS

Petitioner asserts the following unpatentability grounds:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–13 | 102 | MSIE Kit[1] |

---

[1] Microsoft Press. (1998). *Microsoft Internet Explorer Resource Kit.*
(Ex. 1010). All citations are to the native pagination.

IPR2022-00592
Patent 9,363,338 B2

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–13 | 103 | MSIE Kit |
| 1–13 | 103 | MSIE Kit, Jones[2] |
| 1–8 | 103 | MSIE Kit, RFC2068[3] |
| 1–8 | 103 | MSIE Kit, RFC2068, Jones |
| 1–13 | 103 | Excel97[4], Igra[5] |
| 9–13 | 103 | Excel97, Igra, Perez[6] |

Pet. 4. Petitioner relies also on the Declaration of Dr. Henry Houh. Ex. 1003.

## F.   LEGAL STANDARDS

A patent claim is unpatentable under 35 U.S.C. § 102 if "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). "A single prior art reference may anticipate without disclosing a feature of the claimed invention if such feature is necessarily present, or inherent, in that reference." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Moreover, the reference must also "disclose[] within the four corners of the document not only all of the limitations claimed but also

---

[2] U.S. Patent No. 6,819,345 B1, filed Feb. 17, 1998 (Ex. 1011).

[3] *Hypertext Transfer Protocol -- HTTP/1.1*, Network Working Group, Request for Comments 2068, R. Fielding, January 1997 (Ex. 1012).

[4] Person, R. (1997). *Special Edition Using Microsoft Excel 97* (Ex. 1005). All citations are to the native pagination.

[5] U.S. Patent No. 6,701,485 B1, filed June 15, 1999 (Ex. 1007).

[6] U.S. Patent No. 5,319,777, issued June 7, 1994 (Ex. 1013).

all of the limitations arranged or combined in the same way as recited in the claim." *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). However, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

A patent claim is unpatentable as obvious if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103. Obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness.[7] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

## II.    ANALYSIS

### A.    LEVEL OF ORDINARY SKILL IN THE ART

Petitioner contends that a person or ordinary skill in the art "would have had a Master's degree in software engineering or computer science (or equivalent experience working in industry) and several years of experience

---

[7] Patent Owner has not submitted such objective evidence here.

IPR2022-00592
Patent 9,363,338 B2

designing, writing or implementing software products, either at the application or operating system level." Pet. 11. Petitioner submits further that skilled artisans "would have been familiar with various technological concepts, including those relating to user interfaces, operating systems and software applications, basic computer functionality, networking and data processing." *Id.* Patent Owner does not challenge or otherwise address Petitioner's definition (*see generally* PO Resp.), and we adopt it here because it reflects the level of skill in the prior art.

### B.    CLAIM CONSTRUCTION

We construe claims according to the standard used in the federal courts in civil actions under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b). Under *Phillips*, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

In IPR2013-00292, the Board construed a number of terms in the '403 patent,[8] which is the "ultimate parent" of the '338 patent through a chain of continuations and continuations in part. IPR2013-00292, Paper 93 (Ex. 1017, the "403 FWD").[9] *See* Pet. 1. Because the '403 patent is the

---

[8] U.S. Patent No. 6,724,403 (Ex. 1019).

[9] The Federal Circuit affirmed the 403 FWD's unpatentability determinations. *SurfCast, Inc. v. Microsoft Corp.*, 639 F. App'x 651 (Fed. Cir. 2016).

IPR2022-00592
Patent 9,363,338 B2

'338 patent's "ultimate parent," Petitioner submits that the 403 FWD constructions drive the proper constructions here. *Id.* at 12–19; Pet. Reply 1–13. Moreover, Petitioner argues, collateral estoppel bars Patent Owner from contesting constructions of the same terms in the '434 patent.[10] Pet. Reply 1 (citing *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294–95 (Fed. Cir. 2018)). Patent Owner argues that because the 403 FWD applied the "broadest reasonable interpretations," it does not have preclusive effect here, where we construe claims using the *Phillips* standard. PO Sur-Reply 1 (citing *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016)). We need not resolve that dispute, because we conclude that, to the extent the 403 FWD construed terms applicable in this proceeding, those constructions comport with the *Phillips* standard.

Petitioner also discusses constructions by the United States District Court for the District of Maine, which also construed terms of the '403 patent. *See* Pet. 13–19; Pet. Reply 7, 23; Ex. 1018.

Other than as discussed below, we conclude no additional claim term requires construction. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

---

[10] Patent Owner does not dispute that the '403 patent and '434 patent specifications substantively match.

IPR2022-00592
Patent 9,363,338 B2

*1.    "tile"*

Claim 1 recites "instructions to partition at least a portion of a visual display of a client device into an array of tiles, a first tile in the array of tiles being associated with a first information source." Ex. 1001, 30:32–35. Claim 9 recites a parallel limitation. *Id.* at 31:26–29.

Petitioner argues that a "tile" is "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source." Pet. 11–15; Pet. Reply 1–8. The 403 FWD construed "tile" the same as Petitioner's proposed construction here. Ex. 1017, 7–10.

Patent Owner submits that a "tile" is "a graphical representation of an associated information source capable of displaying refreshed content, the graphical representation being persistent and selectable to provide access to underlying information of the associated information source, but providing a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 11 (emphasis omitted); PO Sur-Reply 2–10.

We do not read the claim language as counseling in favor of one party's proposed construction.

The specification discusses "Tile Objects" at some length. Ex. 1001, 10:34–14:12. It states that "[a] tile presents content from any information source." *Id.* at 10:37–38. Further, "[t]iles are selectable and live" and the specification explains that "tiles are live in that each contains real-time or near real-time information" and, when selected, "the tile instantly provides the user with access to the underlying information." *Id.* at 12:8–10.

The specification frames tiles as contrasting with two other graphical user interface elements—icons and windows. *Id.* at 10:38–11:14. It presents

IPR2022-00592
Patent 9,363,338 B2

tiles as "a third graphical representation of programs and files" and explains that "each tile is a viewer of a single information source." *Id.* at 11:1–4. To distinguish tiles, the specification states that, unlike icons, a tile "contains continually refreshed content" and compared to windows, "a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired." *Id.* at 11:9–14. Significantly, that comparison to windows uses exemplary characteristics without defining aspects applicable to all tiles. The specification asserts that "many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do." *Id.* at 11:19–22. That said, the specification also gives an example of "expanding tile 406 to occupy the full area of the display" (*id.* at 11:54–56), demonstrating that size does not define a tile or distinguish a tile from a window.

According to Patent Owner, a tile is a "graphical representation of an associated information source," not merely a graphical user interface element. PO Resp. 9–11. Patent Owner submits that "a graphical user interface element," as Petitioner proposes, "does not require a tile to be graphically displayed and does not require it to be a representation of anything." *Id.* at 10. In Patent Owner's view, while such an element is used for user interaction, it "need not be a representation of an information source or its underlying information." *Id.* at 10. As Petitioner points out, however, other claim language requires tiles be displayed. Pet. Reply 2. We therefore do not agree with Patent Owner that Petitioner's construction is deficient.

Moreover, in light of Petitioner's unpatentability contentions for MSIE Kit discussed below, the graphical-representation aspect of Patent Owner's construction would not impact our conclusion. Patent Owner

IPR2022-00592
Patent 9,363,338 B2

contends otherwise, in a general way, but does not explain that contention. *See* PO Resp. 11 ("These differences impact the prior art analysis."), 35–43 (the cited discussion, which does not distinguish MSIE Kit's asserted tiles based on whether they provide a representation of an information source or its underlying information).

Next, Patent Owner argues that a tile must provide "a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 6–7, 11–16; *see also* Tr. 53:10–54:8. We do not agree.

While, as described above, the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition. *See* Ex. 1001, 11:11–32. During the hearing, Patent Owner was unable to describe particular restrictions that would embody the limited representation. For example, Patent Owner asserted that degraded resolution would satisfy its proposed construction (Tr. 64:24–65:11) but that does not comport with a distinction from a window. A window may depict content at a variety of zooms, some of which would show an image with degraded resolution. *See* Tr. 68:6–15 (Patent owner discussing how pixels can be lost on a zoomed image). Patent Owner asserts that a window with zoom functionality lacks "a fundamentally or different in nature likeness or image." Tr. 68:11–15. But that assertion is detached from Patent Owner's proposed construction and unsupported by the specification. We conclude that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction.

In fact, Patent Owner admits that the specification does not have a clear definition but insists that it nonetheless defines a tile "as something

IPR2022-00592
Patent 9,363,338 B2

other than either an icon or a window." Tr. 48:20–25. We do not agree.
When identifying features that the specification describes to distinguish tiles
from windows, Patent Owner points to other claim limitations, such as
"[s]electability to provide access to the underlying information." Tr. 49:7–
10; *see also id.* at 50:3–8 (asserting a tile must be refreshable). Although
such limitations may capture aspects that the specification uses to
distinguish tiles from other graphical interface elements, they do not support
further construing "tile" narrowly as Patent Owner asserts. Stated otherwise,
the specification's distinctions for tiles over icons or windows already
appear as claim limitations and do not counsel in favor of further limiting
"tile."

Further, Patent Owner's construction is unclear whether a tile must
provide a graphical representation of its associated information source or of
the information underlying that source. The proposed construction first
requires a tile represent the source but then additional requires it "provid[e] a
representation of the underlying information," seemingly allowing no room
for a tile that represents only the information source. PO Resp. 6–7. Those
competing requirements would not comport with the specification. The
exemplary tiles do not necessarily represent a source's underlying
information, but instead may relate to the source itself. *See* Ex. 1001, Fig. 4
(tile 410, displaying the name of a broadcast signal; tile 408, displaying an
icon indicating "New Mail!"), 11:56–65 (describing tile 408), 11:66–12:12
(describing tile 410). Patent Owner, at oral hearing, stated that tile 410 is an
example of the claimed tile, thus confirming that the claimed "tile"
encompasses at least one such exemplary tile. Tr. 50:5–22. Thus, Patent
Owner's proposed addition regarding the nature of a tile's representation

13

IPR2022-00592
Patent 9,363,338 B2

would create an internal inconsistency in the meaning of a tile. We do not adopt Patent Owner's proposed restriction on the nature of a tile's representation.

Next, Patent Owner attempts to distinguish a tile "whose content may be refreshed" from one "capable of displaying refreshed content." PO Resp. 16–17. In this regard, Patent Owner distinguishes Petitioner's construction, which Patent Owner asserts "does not require that [tile] element to be capable of displaying the refreshed content." *Id.* We agree with Petitioner that the parties' different language regarding refreshed content does not implicate any aspect of our unpatentability analysis. *See* Pet. Reply 4–5.

Finally, Patent Owner contends that a tile must be "selectable to provide access to underlying information of the associated information source," not just an element that, "when selected, provides access to an information source." PO Resp. 17–20. As Patent Owner explains, it seeks a distinction that "tiles themselves are selectable to provide access to underlying information of associated information sources, rather than access being provided by selecting the contents of a tile." *Id.* at 18. Patent Owner argues that Petitioner's construction, referring to an element "that, when selected, provides access to an information source," does not require the tile itself be selectable. *Id.* at 19–20. Patent Owner relies primarily on the specification's description that "[t]iles are selectable and live" and that, "[w]hen a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information." *Id.* at 17–18 (quoting Ex. 1001, 12:8–10). Petitioner relies on that same specification disclosure to argue that we should not restrict the manner of

14

IPR2022-00592
Patent 9,363,338 B2

selecting a tile. Pet. Reply 6. The specification indicates that a tile may be selected "by mouse click or otherwise." Ex. 1001, 12:8–9.

Petitioner points out that the 403 FWD concluded that when "a user selects a link *included* in an Active Desktop item, the user necessarily selects the Active Desktop item." Ex. 1017, 36. That conclusion, which was part of a decision affirmed on appeal, *Surfcast, Inc. v. Microsoft Corp.*, 639 F. App'x 651 (Fed. Cir. May 9, 2016), indicates that Patent Owner's proposed claim construction here would not preclude the claims from reading on MSIE Kit, because selecting a link within an item selects the item itself. Thus, Patent Owner's construction would not affect the outcome here. Regardless, we agree with Petitioner that, when the specification discloses a tile may be selected "by mouse click or otherwise," it indicates a broader range of selection mechanisms than proposed by Patent Owner. *See* Pet. Reply 7.

Although Patent Owner asserts that its proposed construction alone focuses on tiles themselves being selectable, we do not view the two constructions as supporting that distinction. As Petitioner points out, its proposed construction requires that a tile, "when selected, provides access to an information source" and therefore requires "that tiles can be selected." *Id.* at 7. Although Patent Owner seeks a construction that would not permit selection through activation of a link within a tile, we do not read the specification as so restrictive.

Based on the foregoing, and consistent with the Board's prior construction, we construe "tile" as "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source."

IPR2022-00592
Patent 9,363,338 B2

    2.   *"partition at least a portion of a visual display of a client device into an array of tiles"*

Claim 1 recites "instructions to partition at least a portion of a visual display of a client device into an array of tiles." Ex. 1001, 30:32–33. Claim 9 recites a parallel limitation. Ex. 1001, 31:26–27; *see* PO Resp. 20.

The Petition construes the partition limitation according to how the 403 FWD construed a similar phrase, "partitioning a visual display of the device into an array of tiles," to mean "dividing a display or window into two or more tiles." Pet. 18 (quoting Ex. 1017, 12–13). Petitioner notes that the Maine court construed that phrase to mean "dividing some or all of a display into an array of tiles," where "array of tiles" meant "multiple tiles displayed in an orderly fashion." *Id.*; Ex. 1018, 27–38.

Patent Owner submits that the partitioning limitation means "dividing some or all of a display into multiple tiles displayed in an orderly fashion." PO Resp. 20. In Patent Owner's view, because the claim already recites "tiles," it is insufficient for "array" to require simply two or more tiles. *Id.* at 21. Rather, argues Patent Owner, "array" should require the tiles be displayed in an orderly fashion. *Id.*

We conclude, below, that our unpatentability analysis would not change by adopting one party's construction for "array of tiles." Accordingly, we decline to construe the phrase.

    3.   *"assign a first update rate for updating information from the first information source"*

Claim 1 recites a set of instruction for a "client device to assign a first update rate to the first tile." Ex. 1001, 30:37–38. Independent claim 9 recites "the first information source being located on a second device" and a set of

instructions "for the second device to assign a first update rate." *Id.* at
31:29–30, 32:1–3. In other words, claim 1 requires the device displaying
tiles assign an update rate, while claim 9 requires the device hosting the
information source assign an update rate.

Patent Owner points to Petitioner's contention that MSIE Kit satisfies
claim 9's update-rate assignment when a CDF file on the hosting computer
is used to set the update rate for an Active Desktop item on a client
computer. PO Resp. 23. In Patent Owner's view, a "server cannot assign a
schedule because the author of the CDF file has already assigned the
schedule." *Id.* Patent Owner therefore proposes we construe "assign" to
mean "to deterministically impose a specific refresh rate on a tile based on
whatever input factors and algorithms have been provide by the system
designer and/or user." *Id.* at 25.

Petitioner responds that Patent Owner's proposed construction departs
from the ordinary meaning of "assign" without adequate support.
Pet. Reply 10. Petitioner additionally submits that, in the 403 FWD, the
Board determined that downloading a CDF file satisfied claim language
directed to "[automatically] assigning a first refresh rate to a first tile." *Id.* at
11 (citing Ex. 1017, 31–38; Ex. 1019, 24:23–25, 24:61–62).

Patent Owner points to the specification's description of Figure 24, in
which "grid generator 2404 on the server creates a grid of tiles according to
user-specified content." PO Resp. 24 (quoting Ex. 1001, 27:57–59). The
specification adds that, in an alternative embodiment, "the tile creator
automatically assigns a priority to the tile based on the type of the
information content." Ex. 1001, 27:67–28:2. Petitioner submits that Patent
Owner's cited passages discuss "priority" rather than "update rate" and that

IPR2022-00592
Patent 9,363,338 B2

Patent Owner fails to explain why the passages would support Patent
Owner's proposed construction. Pet. Reply 10.

We agree with Petitioner that there is no need to construe "assign"
here, beyond holding that Patent Owner's proposed construction is
unwarranted. The specification uses "assign" in various ways, without
indicating the special meaning Patent Owner seeks. For example, it states
that the software "is able to recognize the type or format of the information
source and assign properties to tiles according to the type." Ex. 1001, 7:54–
56. It explains that, when assigning "a refresh rate to a tile according to an
identifier presented with each source of information, the nature of the
identifier may vary according to the type of date or the protocol that is
employed for its transmission." *Id.* at 9:55–59; *accord id.* at 9:40–10:24
(explaining the ability to assign tile update rates depending on a variety of
identifiers).

Moreover, the specification makes clear that "assign" is not used in a
deterministic fashion. When discussing automatically assigning an update
rate, it states that "in the absence of initial preferences specified by the user,
the present technology is able to assign a rate at which the display of a tile is
refreshed according to" a number of factors. Ex. 1001, 9:40–46. That
assignment does not "deterministically impose a specific refresh rate" as
Patent Owner would have us construe "assign," because it depends on
multiple factors and may be overridden by a user's preferences.

We are also not persuaded that the specification's description of "grid
generator 2404" supports Patent Owner's proposed construction. That
portion of the specification describes a manner of creating a grid of tiles on a
server and delivering that grid to a client. Ex. 1001, 27:51–28:67. In the

IPR2022-00592
Patent 9,363,338 B2

described embodiment, although "tile creator 2408-1" can assign a priority to a tile and tile refresh rates are preferably "allocated according to the priorities associated with each tile," a user may nonetheless manually update a tile ((*id.* at 27:64–28:2, 28:49–56), showing that even an assigned update rate is not "deterministic" as Patent Owner contends.

We conclude that the specification does not provide a sufficient basis on which to limit the "assign" claim language beyond its ordinary meaning.

### 4. *"send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update"*

Claim 1 recites instructions to "send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update." Ex. 1001, 30:40–44.

Patent Owner contends that the conditional-request limitation "imposes a condition precedent that must be satisfied before sending the conditional request." PO Resp. 25–29. Petitioner, on the other hand, reads the claim language to require that the server determine whether relevant information has changed and sending a response. Pet. Reply 11–13.

Based on the full record, and for the reasons given below, we do not agree with Patent Owner that the "if clause" imposes a condition precedent before the request is sent from the first client device to the server. Instead, we agree with Petitioner that the limitation simply requires sending a conditional request that asks if tile-displayed information that is stored at the server "has not changed since a last update."

IPR2022-00592
Patent 9,363,338 B2

Both parties direct us to the specification's recitation of a conditional GET of HTTP1.1. *See* PO Resp. 27 (citing Ex. 1001, 25:32–33); Pet. Reply 12 ("Rather, as the petition pointed out, the only plausible support for this claim language comes from a passage in the specification that refers to the two 'conditional gets' of HTTP1.1, neither of which entail a client making a determination that information displayed at a client 'has not changed' before sending a conditional request."). That section of the specification states that "a pre-fetch utility such as URL pre-fetch manager 2208 can be implemented." Ex. 1001, 25:23–24. One strategy for performing the pre-fetch is the conditional GET:

> Another function of a pre-fetch utility is to periodically check the validity of the items in the cache to make sure they are up to date. As would be familiar to one skilled in the art, some of the new HTTP1.1 methods would prove very useful for this, namely the conditional gets.

Ex. 1001, 25:29–33. According to the HTTP1.1 protocol (Ex. 1012), a GET request "retrieve[s] whatever information (in the form of an entity) is identified by the Request-URI." Ex. 1012, 50. Such a GET is called a "'conditional GET' if the request message includes an If-Modified-Since, If-Unmodified-Since, If-Match, If-None-Match, or If-Range header field. A conditional GET method requests that the entity be transferred only under the circumstances described by the conditional header field(s)." Ex. 1012, 50.

That conditional GET, which both parties point to as support, is consistent with Petitioner's construction, which we adopt. The conditional GET has the condition in the request, not as a condition precedent to sending the request. *See* Ex. 1012, 50; Ex. 1003 ¶¶ 180–181. The conditional GET in

IPR2022-00592
Patent 9,363,338 B2

the HTTP1.1 protocol does not discuss a condition precedent to sending the request.

In its Sur-reply, Patent Owner also directs us to a different portion of the specification relating to conditional tile content. PO Sur-reply 12 (citing Ex. 1001, 13:26–28). We do not agree with Patent Owner's argument based on that portion of the specification. That section of the specification involves tiles communicating with each other and having "conditional content." *See* Ex. 1001, 13:26–28. Such conditional content refers to "the content of one tile depend[ing] upon the content of another." Ex. 1001, 13:28. This has nothing to do with the conditional request claimed. *See* Ex. 1001, 13:26–28.

We have considered Patent Owner's remaining arguments and, for the reasons given below, do not find they support imposing a condition precedent.

First, we do not agree that the conditional request construction "encompass a mere coincidence." PO Resp. 26–27. In making that argument, Patent Owner does not accurately represent Petitioner's arguments. Petitioner never argues that the claim was broad enough to cover a mere coincidence. *See* Pet. 29–30. Instead, as discussed above, Petitioner's construction requires a specific type of request to be sent. *See id.*; Pet. Reply 13, 16–17.

Second, we do not agree with Patent Owner's arguments relating to the difference between the words "while" and "if" or the definition of the word "if." *See* PO Resp. 26–27; PO Sur-reply 13. As with the prior argument, Patent Owner is not accurately representing Petitioner's claim construction, which focuses on the type of request that is sent as opposed to its timing. *See* Pet. 29–30; Pet. Reply 13.

IPR2022-00592
Patent 9,363,338 B2

Third, we agree with Patent Owner that its condition precedent construction does not always result in the claim language being satisfied. *See* PO Sur-reply 14. But we find Patent Owner's argument inapposite. For the reasons discussed above, we do not believe that the "if clause" imposes a condition precedent on when the conditional request is sent.

Accordingly, for the reasons set forth above, the "if clause" does not impose a condition precedent on when the conditional request is sent. Instead, the "if clause" describes the content of the conditional request.

### C.     OBVIOUSNESS OVER MSIE KIT AND RFC2068

Petitioner contends that MSIE Kit discloses each limitation of claims 1–13. Pet. 23–37. It additionally asserts obviousness over MSIE Kit and RFC2068 for claims 1–8, based on an alternative view of the conditional-request limitations (referred to as "elements [1.d] and [6.b]"). Pet. 42–46. For other limitations, Petitioner relies on MSIE Kit alone, as set forth in its anticipation ground. *See* Pet. 23 ("Additional grounds, building on and incorporating the basic analysis and addressing arguments Patent Owner may raise, are also included below.").

Because Petitioner's obviousness contentions are consistent with our construction for the conditional-request limitations, we address them first. Patent Owner disputes only certain aspects of Petitioner's contentions, and we address those disputes below. We have reviewed the undisputed aspects of Petitioner's contentions and conclude that Petitioner has shown that MSIE Kit discloses those limitations for the reasons given by Petitioner. Pet. 23–37, 42–46.

MSIE Kit describes features of Microsoft Windows Internet Explorer 4, including Microsoft Active Desktop functionality in conjunction

IPR2022-00592
Patent 9,363,338 B2

with Windows 98 or Windows NT. Ex. 1010, 174, 180, 183, 211. MSIE Kit
describes Active Desktop items presented on a user's desktop. *Id.* Each item
is associated with an information source on the Web. *Id.* at 174, 176, 177,
180, 183. Each item is presented typically on the desktop in a borderless
frame without a title bar or scrollbars. *Id.* at 176, 183. By default, the items
are laid out in a 3x2 grid. *Id.* at 176–177, 180, 183. Each item displays
information from a URL and is updated periodically. *Id.* at 176–177, 180,
188, 201. The user may choose how frequently to update, or a content
provider may specify the frequency in a Channel Definition Format, or
"CDF" file. *Id.* at 177, 183, 188, 212–15, 223.

     RFC2068 is a specification describing the Hypertext Transfer
Protocol, version 1.1. Ex. 1012. It describes conditional GET requests, and
provides that such requests may use an "If-Unmodified-Since" statement,
which cause the server to return the requested information only if it has not
changed since a specified time. *Id.* at 124.

     1.   *"partition at least a portion of a visual display*
*of a client device into an array of tiles"*

     Claim 1 recites "instructions to partition at least a portion of a visual
display of a client device into an array of tiles." Ex. 1001, 30:32–33.
Petitioner contends that MSIE Kit discloses partitioning a client display into
an array of tiles by disclosing that, "[b]y default, Internet Explorer lays out
new Active Desktop Items on a 3 by 2 grid." Ex. 1010, 183. According to
Petitioner, "[a] 'grid' is a form of an array because it is an ordered
arrangement of items in a non-overlapping row/column format." Pet. 24–25.
Petitioner contends that Active Desktop items are tiles because they are
"rectangular, borderless frames on the user's display that a user may interact

IPR2022-00592
Patent 9,363,338 B2

with," "provide access to an information source when selected," and "can be refreshed at a specified rate assigned to that desktop item." Pet. 26.

Patent Owner argues that Active Desktop items are not tiles and are not partitioned into an array. PO Resp. 35–43. Patent Owner argues that Active Desktop items are not tiles because they do not provide a representation of an associated information source more limited than the full information provided by a window. PO Resp. 36–38. Patent Owner's argument is premised on its claim construction, which we do not adopt. *See supra* at 10–14 (§ II.B.1). Accordingly, the argument is not persuasive.

Next, Patent Owner argues that Active Desktop items are not selectable to provide access to underling information of the associated information source. PO Resp. 38–40. In particular, Patent Owner argues that clicking a hyperlink or host spot within an Active Desktop item cannot select the item because that action relates to the item's content rather than the item itself. *Id.* at 38–39. We do not agree. As discussed above, we do not construe "tile" as limited to being selectable in a certain manner. *See supra* at 14–15 (§ II.B.1). Accordingly, Patent Owner's argument is not persuasive.

Patent Owner argues that MSIE Kit does not disclosure partitioning at least a portion of a visual display into an array of tiles. PO Resp. 40–43. In Patent Owner's view, because MSIE Kit discloses that Active Desktop items may be placed in arbitrary positions (Ex. 1010, 175), its tiles are not displayed in an orderly fashion. PO Resp. 41. We do not agree. When the grid of Active Desktop items is created, the location of the relative position of the Active Desktop items is not arbitrary; instead, by default the Active Desktop items are arranged in a 3 by 2 grid. *See* Ex. 1010, iii; Ex. 1065 ¶¶ 7, 10–11.

IPR2022-00592
Patent 9,363,338 B2

Moreover, although we do not construe the claims to require enforced arrangement, MSIE Kit also discloses that the default grid arrangement can be enforced. As Petitioner's expert testified, "MSIE Kit discloses that administrators can prevent users from rearranging or removing Desktop Items, including locking down the 'default' Active Desktop layout of a '3 by 2 grid' of Desktop Items." Ex. 1003 ¶ 150 (citing Ex. 1010, 235, 601); *see also* Ex. 1065 ¶ 7; Ex. 1010, 235 ("Once you've built your custom packages, you can use the IEAK Configuration Wizard to lock down channel options and restrict users from changing settings."), 601 ("You can control, or *lock down*, features and functions in these areas. . . . More important, you can prevent users from adding or deleting channels that you have preset, or *from rearranging or adding Active Desktop items*." (second emphasis added)). When the default grid is locked according to MSIE Kit's teachings, it necessarily maintains the grid without any arbitrary movement or overlap. *See* Ex. 1003 ¶ 150; Ex. 1065 ¶ 7.

Based on the evidence, and under either party's definition of "partition at least a portion of a visual display of a client device into an array," we agree with Petitioner that MSIE Kit discloses partitioning at least a portion of a visual display of a client device into an array of tiles.

2. *"send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update"*

Claim 1 recites instructions to, "at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the

IPR2022-00592
Patent 9,363,338 B2

information from the first information source currently displayed in the first tile has not changed since a last update." Ex. 1001, 30:39–44.

Petitioner submits that MSIE Kit discloses "web crawling functionality" in which Internet Explorer periodically examines a linked web page. Pet. 29 (citing Ex. 1010, 191–92, 215–16, 176, 177, 180, 182; Ex. 1003 ¶¶ 161–162). Petitioner submits further that it would have been obvious to include RFC2068's conditional GET functionality in MSIE Kit's client device "to, for example, download the remainder of a web page (or other web document) when an earlier download was interrupted." Pet. 43 (citing Ex. 1012, 123; Ex. 1024, 160, 79). Petitioner points out that MSIE Kit discusses RFC2068 and discloses the conditional HTTP GET method. *Id.* at 44 (citing Ex. 1010, 125, 129–30, 192, 787). Petitioner contends that the combination would have involved arranging old elements with each performing a known function and yielding expected results. *Id.* at 44.

Patent Owner argues first that "send a conditional request" requires conditionally sending a request, in that the request must be sent only when a condition is satisfied. PO Resp. 44. As discussed above, we do not agree with Patent Owner's proposed construction for the conditional-request limitation. *See supra* at 19 (§ II.B.4). Accordingly, Patent Owner's argument that the claim language "imposes a condition precedent that must be satisfied before sending the conditional request" is not persuasive. *See* PO Resp. 44.

Patent Owner does not otherwise challenge Petitioner's contentions. We conclude that Petitioner has shown by a preponderance of the evidence that it would have been obvious to use MSIE Kit's web-crawling

IPR2022-00592
Patent 9,363,338 B2

functionality with RFC2068's conditional GET method to request an update
if the server's information has not changed since a last update.

### 3.   *Conclusion*

Patent Owner does not otherwise challenge Petitioner's showing as to
obviousness of claims 1–8. Having reviewed the record, we conclude
Petitioner has shown by a preponderance of the evidence that MSIE Kit and
RFC2068 render those claims unpatentable as obvious.

### D.   ANTICIPATION BY MSIE KIT

Petitioner contends MSIE Kit discloses each limitation of claims 1–
13. Pet. 23–37. Because our obviousness discussion already addresses Patent
Owner's challenges to those contentions regarding claims 1–8, we need not
repeat them. Additionally, having concluded that Petitioner has proven
obviousness for claims 1–8, we do not address anticipation for those claims.

As discussed above, we conclude that MSIE Kit discloses claim 1's
partition limitation. *See supra* at 23 (§ II.C.1). Claim 9 recites a parallel
limitation. Ex. 1001, 31:26–27; PO Resp. 20. Accordingly, our conclusion
regarding claim 1 applies also to claim 9.[11]

For independent claim 9, and claims 10–13, which depend from
claim 9, Patent Owner disputes only one additional aspect of Petitioner's
contentions, which we address below. We have reviewed the undisputed
aspects of Petitioner's contentions and conclude that Petitioner has shown
that MSIE Kit discloses those limitations for the reasons given by Petitioner.
Pet. 23–37.

---

[11] Claim 9 does not include the conditional-request limitation discussed
above for claim 1. *See* Ex. 1001, 31:23–32:17.

Claim 9 further recites instructions "for the second device to assign first update rate for updating information from the first information source." Ex. 1001, 32:1–3. Petitioner contends that MSIE Kit discloses this limitation through a CDF file located on the server, which is downloaded to a client device and establishes an Active Desktop item with a particular update schedule. Pet. 34 (citing Ex. 1010, 186, 217; Ex. 1003 ¶ 237).

To the extent that Patent Owner relies on its proposed construction for the assigning limitation, we do not adopt that construction (*see supra* at 16 (§ II.B.3)) and therefore Patent Owner's arguments are not persuasive.

Patent Owner argues that "a schedule set by a CDF file is not the same as the second device assigning the first update rate." PO Resp. 45. According to Patent Owner, the update rate is assigned by an author when creating the CDF file and therefore cannot be assigned by the server. *Id.* Patent Owner, however, contends additionally that the client computer's software (Internet Explorer 4) "interprets the CDF file to assign the schedule." *Id.* at 46 (citing Ex. 1010, 186). Those two arguments suggest that assigning the update rate is not limited to a single event, but rather multiple assignments may occur for a particular tile—one when an author creates a file and another when the client computer interprets the file. In this regard, we agree with Petitioner that even if creating a CDF file "assigns" a tile's update rate in some sense, transferring that file from the server to a client also assigns the tile's update rate. Pet. Reply 17–18.

Patent Owner argues that "the '338 Patent does not provide a single example of a user, a grid object, or a tile object assigning a priority based on 'a file that defines the update rate for an item.'" PO Resp. 46 (quoting Inst. 21). The specification, however, discloses that a grid comprises a

matrix or array of tiles and controls the layout and priorities of the tiles. Ex. 1001, 14:14–28. The grid may "manage the refresh rate of each tile in the grid." *Id.* at 17:12–14. And "grids should also be sendable" or "transferred as a file," for example using a markup language like HTML or XML. *Id.* at 18:4, 18:23–24, 18:42–44. Thus, it appears that the specification contemplates using a file to control the refresh rate of a tile. Patent Owner seems to recognize this, and argues that a grid object on a server is created by a "grid generator" whereas MSIE Kit's CDF file is created by a user and uploaded to a server. PO Resp. 47. The problem with Patent Owner's argument is that it attempts to limit the claims to one disclosed embodiment. *See* Ex. 1001, 27:42–28:67. Nothing about the description of grid objects elsewhere in the specification suggests that server-located grid objects must be created on a server by the server. *See* Ex. 1001, 18:4 ("grids should also be sendable"), 18:59–62 ("The application program may be downloaded from a predetermined web-site and preferably operates in a client-server mode. Users may download preconfigured grids from the predetermined server.").

We conclude that a server transmitting a CDF file to a client assigns an update rate to the Active Desktop item created from the CDF file. *See* Ex. 1010, 186, 217; Ex. 1003 ¶ 237. Accordingly, Petitioner has shown that MSIE Kit discloses the assigning limitation.

Patent Owner does not otherwise challenge Petitioner's showing as to anticipation of claims 9–13. Having reviewed the record, we conclude Petitioner has shown by a preponderance of the evidence that MSIE Kit renders those claims unpatentable as anticipated.

IPR2022-00592
Patent 9,363,338 B2

## III.    CONCLUSION[12]

For the reasons discussed above, we conclude that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00592
Patent 9,363,338 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–13 | 102(a), (b) | MSIE Kit[13] | 9–13 | |
| 1–13 | 103(a) | MSIE Kit[14] | | |
| 1–13 | 103(a) | MSIE Kit, Jones[15] | | |
| 1–8 | 103(a) | MSIE Kit, RFC2068 | 1–8 | |
| 1–8 | 103(a) | MSIE Kit, RFC2068, Jones[16] | | |
| 1–13 | 103(a) | Excel97[17] | | |
| 9–13 | 103(a) | Excel97, Igra, Perez[18] | | |
| **Overall Outcome** | | | 1–13 | |

## IV.    ORDER

Accordingly, it is

ORDERED that Petitioner has shown by a preponderance of the
evidence that claims 1–13 of the '338 patent are unpatentable; and

---

[13] Because we determine that claims 1–8 are unpatentable as obvious over
MSIE Kit and RFC2068, we decline to address those claims in this ground.

[14] Because we determine that claims 1–13 are unpatentable in other grounds,
we decline to address this ground.

[15] Because we determine that claims 1–13 are unpatentable in other grounds,
we decline to address this ground.

[16] Because we determine that claims 1–13 are unpatentable in other grounds,
we decline to address this ground.

[17] Because we determine that claims 1–13 are unpatentable in other grounds,
we decline to address this ground.

[18] Because we determine that claims 1–13 are unpatentable in other grounds,
we decline to address this ground.

IPR2022-00592
Patent 9,363,338 B2

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00592
Patent 9,363,338 B2

PETITIONER:

Joseph Micallef
SIDLEY AUSTIN LLP
jmicallef@sidley.com

PATENT OWNER:

Shaun Gregory
Jason Houdek
TAFT STETTINIUS & HOLLISTER LLP
sgregory@taftlaw.com
jhoudek@taftlaw.com

33

Trials@uspto.gov
571-272-7822

Paper No. 21
Entered: October 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MICROSOFT CORP.,
Petitioner,

v.

SURFCAST, INC.,
Patent Owner.

———————

IPR2022-00591
Patent 9,946,434 B2

———————

Before SCOTT B. HOWARD, JASON W. MELVIN, and
MICHAEL T. CYGAN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00591
Patent 9,946,434 B2

## I. INTRODUCTION

Microsoft Corporation ("Petitioner" or "Microsoft") filed a Petition (Paper 1, "Pet.") requesting institution of *inter partes* review of claims 1–24 ("the challenged claims") of U.S. Patent No. 9,946,434 B2 (Ex. 1001, "the '434 patent"). SurfCast, Inc. ("Patent Owner") filed a Preliminary Response. Paper 6. We instituted review. Paper 9 ("Institution Decision" or "Inst.").

Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 14, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 15, "PO Sur-Reply"). We held a hearing on July 12, 2023 (Paper 20, "Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all of the challenged claims are unpatentable.

### A. REAL PARTIES IN INTEREST

Petitioner identifies only itself as the real party in interest. Pet. 2. Patent Owner identifies only itself as the real party in interest. Paper 3, 2.

### B. RELATED MATTERS

The parties both identify the following matter related to the '434 patent: *SurfCast, Inc. v. Microsoft Corporation*, No. 6:21-cv-01018-ADA (W.D. Tex.). Pet. 3; Paper 3, 2. Petitioner additionally identifies *SurfCast, Inc. v. Microsoft Corporation*, No. 2:12-cv-00333-DBH (D. Me.), along with a number of IPR proceedings: IPR2013-00292, IPR2013-00293, IPR2013-00294, IPR2013-00295, IPR2014-00271, IPR2022-00423, IPR2022-00590, IPR2022-00592. Pet. 3–4.

IPR2022-00591
Patent 9,946,434 B2

### C. THE '434 PATENT

The '434 patent is entitled "System and Method for Simultaneous Display of Multiple Information Sources" and is directed to a graphical user interface that organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. Ex. 1001, codes (54), (57). The '434 patent describes a graphical user interface comprising a grid of tiles that resides on the user's computer desktop. *Id.* at 4:66–5:3. The grid of tiles provides a uniform graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices. *Id.* at 5:4–6. Figure 1 is reproduced below.



IPR2022-00591
Patent 9,946,434 B2

Ex. 1001, Fig. 1. Figure 1 illustrates "a user interface comprising a grid of tiles as might be depicted on a display screen." *Id.* at 6:44–46; *see also id.* at 7:45–58 (describing the various tiles).

### D.    CHALLENGED CLAIMS

Claims 1, 9, and 17 are independent, with claim 1 reciting a system and claims 9 and 17 reciting methods. Claim 1 is reproduced below:

> 1. A system for simultaneous display of multiple application programs, the system comprising:
>
> a computing device having a memory;
>
> a display; and
>
> a processor configured to execute instructions stored in the memory, to:
>
> > arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent;
> >
> > associate a first application program of the plurality of application programs with a first tile of a first grid of the one or more grids of tiles and a second application program of the plurality of application programs with a second tile of the first grid of tiles;
> >
> > assign a first refresh rate to the first tile and a second refresh rate to the second tile; and
> >
> > simultaneously update content displayed in the first tile in accordance with the first refresh rate, and update content displayed in the second tile in accordance with the second refresh rate;
>
> wherein each tile has:
>
> > a first selection operation that calls the application program associated with the tile, the associated application program being different from a program that arranges the display into the one or more grids of tiles, and

IPR2022-00591
Patent 9,946,434 B2

> a second selection operation that provides a menu of
> options for a user to ascertain or adjust properties of
> the tile; and

> wherein the associated application program for the first tile
> and the associated application program for the second
> tile are different application programs selected from
> among the group consisting of a web browser, a word
> processing application, an electronic mail application, a
> chat application, a weather application, a news
> application, a spreadsheet application, a music
> application, and a streaming video player.

Ex. 1001, 31:10–47. The remaining claims depend directly from claim 1, 9,
or 17. *Id.* at 31:48–34:22.

## E.    UNPATENTABILITY GROUNDS

This review considers the following unpatentability grounds:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–10, 12–18, 20–24 | 102 | MSIE Kit[1] |
| 1–24 | 103 | MSIE Kit |
| 1–24 | 103 | MSIE Kit, Jones[2] |
| 1–24 | 103 | Excel97[3] |
| 1–24 | 103 | Excel97, Bhansali[4] |

---

[1] Microsoft Press. (1998). *Microsoft Internet Explorer Resource Kit.*
(Ex. 1010). All citations are to the native pagination.

[2] U.S. Patent No. 6,819,345 B1, filed Feb. 17, 1998 (Ex. 1011).

[3] Person, R. (1997). *Special Edition Using Microsoft Excel 97* (Ex. 1005).
All citations are to the native pagination.

[4] U.S. Patent No. 6,006,239, filed Mar. 15, 1996 (Ex. 1006).

IPR2022-00591
Patent 9,946,434 B2

Pet. 8. Petitioner relies also on two Declarations of Dr. Henry Houh.

Exs. 1003, 1065. Patent Owner relies on the Declaration of Glenn E.

Weadock. Ex. 2001.

### F.    LEGAL STANDARDS

A patent claim is unpatentable under 35 U.S.C. § 102 if "the four

corners of a single, prior art document describe every element of the claimed

invention, either expressly or inherently, such that a person of ordinary skill

in the art could practice the invention without undue experimentation."

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed.

Cir. 2000). "A single prior art reference may anticipate without disclosing a

feature of the claimed invention if such feature is necessarily present, or

inherent, in that reference." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958

(Fed. Cir. 2014). Moreover, the reference must also "disclose[] within the

four corners of the document not only all of the limitations claimed but also

all of the limitations arranged or combined in the same way as recited in the

claim." *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir.

2008). However, "the reference need not satisfy an *ipsissimis verbis* test."

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

A patent claim is unpatentable as obvious if the differences between

the claimed subject matter and the prior art are such that the subject matter,

as a whole, would have been obvious at the time the invention was made to a

person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. Obviousness is resolved on the basis of underlying factual

determinations including: (1) the scope and content of the prior art; (2) any

differences between the claimed subject matter and the prior art; (3) the level

of ordinary skill in the art; and (4) objective evidence of non-obviousness.[5]
*Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

## II.    ANALYSIS

### A.    LEVEL OF ORDINARY SKILL IN THE ART

Petitioner contends that a person or ordinary skill in the art "would have had a Master's degree in software engineering or computer science (or equivalent experience working in industry) and several years of experience designing, writing or implementing software products, either at the application or operating system level." Pet. 11. Petitioner submits further that skilled artisans "would have been familiar with various technological concepts, including those relating to user interfaces, operating systems and software applications, basic computer functionality, networking and data processing." *Id.* Patent Owner adopts Petitioner's definition (PO Resp. 10), as do we, because it reflects the level of skill in the prior art.

---

[5] Patent Owner has not submitted such objective evidence here.

IPR2022-00591
Patent 9,946,434 B2

### B.    CLAIM CONSTRUCTION

We construe claims according to the standard used in the federal courts in civil actions under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b). Under *Phillips*, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

In IPR2013-00292, the Board construed a number of terms in the '403 patent,[6] which is the "ultimate parent" of the '434 patent through a chain of continuations and continuations in part. IPR2013-00292, Paper 93 (Ex. 1017, the "403 FWD").[7] *See* Pet. 1. Because the '403 patent is the '434 patent's "ultimate parent," Petitioner submits that the 403 FWD constructions drive the proper constructions here. *Id.* at 10–19; Pet. Reply 1–11. Moreover, Petitioner argues, collateral estoppel bars Patent Owner from contesting constructions of the same terms in the '434 patent.[8] Pet. Reply 1 (citing *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294–95 (Fed. Cir. 2018)). Patent Owner argues that because the 403 FWD applied the "broadest reasonable interpretations," it does not have preclusive effect here, where we construe claims using the *Phillips* standard. PO Sur-Reply 1

---

[6] U.S. Patent No. 6,724,403 (Ex. 1019).

[7] The Federal Circuit affirmed the 403 FWD's unpatentability determinations. *SurfCast, Inc. v. Microsoft Corp.*, 639 F. App'x 651 (Fed. Cir. 2016).

[8] Patent Owner does not dispute that the '403 patent and '434 patent specifications substantively match.

IPR2022-00591
Patent 9,946,434 B2

(citing *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376
(Fed. Cir. 2016)). We need not resolve that dispute, because we conclude
that, to the extent the 403 FWD construed terms applicable in this
proceeding, those constructions comport with the *Phillips* standard.

The parties also discuss constructions by the United States District
Court for the District of Maine, which also construed terms of the
'403 patent. *See* Pet. 12–18; PO Resp. 24–26; Ex. 1018.

Other than as discussed below, we conclude no additional claim term
requires construction. *See Nidec Motor Corp. v. Zhongshan Broad Ocean
Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only
construe terms 'that are in controversy, and only to the extent necessary to
resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g,
Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *1.    "tile"*

Petitioner argues that a "tile" is "a graphical user interface element
whose content may be refreshed and that, when selected, provides access to
an information source." Pet. 11–15; Pet. Reply 1–8. The 403 FWD construed
"tile" the same as Petitioner's proposed construction here. Ex. 1017, 7–10.

Patent Owner submits that a "tile" is "a graphical representation of an
associated information source capable of displaying refreshed content, the
graphical representation being persistent and selectable to provide access to
underlying information of the associated information source, but providing a
representation of the underlying information that is more limited than the
representation provided by a window." PO Resp. 11 (emphasis omitted); PO
Sur-Reply 2–10.

IPR2022-00591
Patent 9,946,434 B2

The specification discusses "Tile Objects" at some length. Ex. 1001, 10:51–14:34. It states that "[a] tile presents content from any information source." *Id.* at 10:54–55. Further, "[t]iles are selectable and live" and the specification explains that "tiles are live in that each contains real-time or near real-time information" and, when selected, "the tile instantly provides the user with access to the underlying information." *Id.* at 12:29–37.

The specification frames tiles as contrasting with two other graphical user interface elements—icons and windows. *Id.* at 10:56–11:19. It presents tiles as "a third graphical representation of programs and files" and explains that "each tile is a viewer of a single information source." *Id.* at 11:20–23. To distinguish tiles, the specification states that, unlike icons, a tile "contains continually refreshed content" and compared to windows, "a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired." *Id.* at 11:29–34. Significantly, that comparison to windows uses exemplary characteristics without defining aspects applicable to all tiles. The specification asserts that "many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do." *Id.* at 11:39–42. That said, the specification also gives an example of "expanding tile 406 to occupy the full area of the display," demonstrating that size does not define a tile or distinguish a tile from a window.

According to Patent Owner, a tile is a "graphical representation of an associated information source," not merely a graphical user interface element. PO Resp. 12–14. Patent Owner submits that "a graphical user interface element," as Petitioner proposes, "does not require a tile to be graphically displayed and does not require it to be a representation of

IPR2022-00591
Patent 9,946,434 B2

anything." *Id.* at 13. In Patent Owner's view, while such an element is used for user interaction, it "need not be a representation of an information source or its underlying information." *Id.* at 14. As Petitioner points out, however, other claim language requires tiles be displayed. Pet. Reply 2. We therefore do not agree with Patent Owner that Petitioner's construction is deficient.

Moreover, in light of Petitioner's unpatentability contentions for MSIE Kit discussed below, the graphical-representation aspect of Patent Owner's construction would not impact our conclusion. Patent Owner contends otherwise, in a general way, but does not explain that contention. *See* PO Resp. 14 ("These differences impact the prior art analysis."), 39–45 (the cited discussion, which does not distinguish MSIE Kit's asserted tiles based on Patent Owner's proposed construction for "tile").

Next, Patent Owner argues that a tile must provide "a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 11, 14–19; *see also* Tr. 53:10–54:8. We do not agree.

While, as described above, the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition. *See* Ex. 1001, 11:29–34. During the hearing, Patent Owner was unable to describe particular restrictions that would embody the limited representation. For example, Patent Owner asserted that degraded resolution would satisfy its proposed construction (Tr. 64:24–65:11) but that does not comport with a distinction from a window. A window may depict content at a variety of zooms, some of which would show an image with degraded resolution. *See* Tr. 68:6–15 (Patent Owner discussing how pixels can be lost on a zoomed image). Patent Owner asserts that a window with zoom

11

IPR2022-00591
Patent 9,946,434 B2

functionality lacks "a fundamentally or different in nature likeness or image." Tr. 68:11–15. But that assertion is detached from Patent Owner's proposed construction and unsupported by the specification. We conclude that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction.

In fact, Patent Owner admits that the specification does not have a clear definition but insists that it nonetheless defines a tile "as something other than either an icon or a window." Tr. 48:20–25. We do not agree. When identifying features that the specification describes to distinguish tiles from windows, Patent Owner points to other claim limitations, such as "[s]electability to provide access to the underlying information." Tr. 49:7–10; *see also id.* at 50:3–8 (asserting a tile must be refreshable). Although such limitations may capture aspects that the specification uses to distinguish tiles from other graphical interface elements, they do not support further construing "tile" narrowly as Patent Owner asserts. Stated otherwise, the specification's distinctions for tiles over icons or windows already appear as claim limitations and do not counsel in favor of further limiting "tile."

Further, Patent Owner's construction is unclear whether a tile must provide a graphical representation of its associated information source or of the information underlying that source. The proposed construction first requires a tile represent the source but then additional requires it "provid[e] a representation of the underlying information," seemingly allowing no room for a tile that represents only the information source. PO Resp. 11. Those competing requirements would not comport with the specification. The exemplary tiles do not necessarily represent a source's underlying

IPR2022-00591
Patent 9,946,434 B2

information, but instead may relate to the source itself. *See* Ex. 1001, Fig. 4
(tile 410, displaying the name of a broadcast signal; tile 408, displaying an
icon indicating "New Mail!"), 12:9–14 (describing tile 408), 12:20–22
(describing tile 410). Patent Owner, at oral hearing, stated that tile 410 is an
example of the claimed tile, thus confirming that the claimed "tile"
encompasses at least one such exemplary tile. Tr. 50:5–22. Thus, Patent
Owner's proposed addition regarding the nature of a tile's representation
would create an internal inconsistency in the meaning of a tile. We do not
adopt Patent Owner's proposed restriction on the nature of a tile's
representation.

Next, Patent Owner attempts to distinguish a tile "whose content may
be refreshed" from one "capable of displaying refreshed content."
PO Resp. 19–21. In this regard, Patent Owner distinguishes Petitioner's
construction, which Patent Owner asserts "does not require that [tile]
element to be capable of displaying the refreshed content." *Id.* at 20. We
agree with Petitioner that the parties' different language regarding refreshed
content does not implicate any aspect of our unpatentability analysis. *See*
Pet. Reply 5.

Finally, Patent Owner contends that a tile must be "selectable to
provide access to underlying information of the associated information
source," not just an element that, "when selected, provides access to an
information source." PO Resp. 21–23. As Patent Owner explains, it seeks a
distinction that "tiles themselves are selectable to provide access to
underlying information of associated information sources, rather than access
being provided by selecting the contents of a tile." *Id.* at 21. Patent Owner
argues that Petitioner's construction, referring to an element "that, when

IPR2022-00591
Patent 9,946,434 B2

selected, provides access to an information source," does not require the tile itself be selectable. *Id.* at 23. Patent Owner relies primarily on the specification's description that "[t]iles are selectable and live" and that, "[w]hen a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information." *Id.* at 21 (quoting Ex. 1001, 12:29–31). Petitioner relies on that same specification disclosure to argue that we should not restrict the manner of selecting a tile. Pet. Reply 6. The specification indicates that a tile may be selected "by mouse click or otherwise." Ex. 1001, 12:30.

Petitioner points out that the 403 FWD concluded that when "a user selects a link *included* in an Active Desktop item, the user necessarily selects the Active Desktop item." Ex. 1017, 36. That conclusion, which was part of a decision affirmed on appeal, *Surfcast, Inc. v. Microsoft Corp.*, 639 F. App'x 651 (Fed. Cir. May 9, 2016), indicates that Patent Owner's proposed claim construction here would not preclude the claims from reading on MSIE Kit, because selecting a link within an item selects the item itself. Thus, Patent Owner's construction would not affect the outcome here. Regardless, we agree with Petitioner that, when the specification discloses a tile may be selected "by mouse click or otherwise," it indicates a broader range of selection mechanisms than proposed by Patent Owner. *See* Pet. Reply 7.

Although Patent Owner asserts that its proposed construction alone focuses on tiles themselves being selectable, we do not view the two constructions as supporting that distinction. As Petitioner points out, its proposed construction requires that a tile, "when selected, provides access to an information source" and therefore requires "that tiles can be selected."

14

IPR2022-00591
Patent 9,946,434 B2

Pet. Reply 8. Although Patent Owner seeks a construction that would not permit selection through activation of a link within a tile, we do not read the specification as so restrictive.

Based on the foregoing, and consistent with the Board's prior construction, we construe "tile" as "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source."

## 2.    *"grid"*

The Petition construes "arrange a portion of a display into one or more grids of non-overlapping tiles" as "partitioning a visual display of the device into an array of non-overlapping tiles." Pet. 16. Patent Owner focuses on "grid" alone, arguing it means "a regular arrangement of rows and columns, which may, but need not, allow a single tile to occupy more than one row and/or column." PO Resp. 24–30; *accord* PO Sur-Reply 10–12. Patent Owner "elaborates that the word 'regular' in its construction means that the 'arrangement' enforces conformity to an established rule or standard continuously." PO Resp. 24; *accord id.* at 25 ("Patent Owner makes this explicit and proposes further construing 'grid' to require 'the regular arrangement enforcing conformity to the positions delimited by the rows and columns continuously.'"). Petitioner contends that no basis supports Patent Owner's proposed construction, focusing on whether it requires enforced conformity. Pet. Reply 8–11.

We see no real dispute between the proposed constructions. Petitioner does not contest that a "grid" includes both rows and columns. *See* Pet. Reply 8–9. Additionally, both constructions would allow, but not require a single tile to occupy more than a single row or column. This is explicit in

IPR2022-00591
Patent 9,946,434 B2

Patent Owner's construction and implicit in Petitioner's.[9] Nor is there any real dispute that the grid must be regular. That is explicitly part of Patent Owner's proposed construction. And Petitioner challenges only whether "regular" requires enforced conformity. *Id.* at 9.

Instead, the dispute between the parties is not about the construction of the term "grid," but the meaning of the word "regular" as set forth by Patent Owner in that construction. Based on the full record and for the reasons given below, we do not agree with Patent Owner that "regular" requires a special construction limiting the claims to an arrangement that enforces conformity to an established rule or standard *continuously*.

The cited portions of the specification do not support Patent Owner's construction. According to the specification, "[t]he grid controls the layout and priorities of the tiles." Ex. 1001, 14:49–50. Similarly, the "Grid Object" section of the specification addresses "[t]he arrangement, layout, and independent functioning of the tiles on the display." *Id.* at 14:36–38; *see also id.* at 14:44–46 ("Grid 700 comprises a matrix or array of tiles . . . ."). Although the specification clearly links the grid to the arrangement or look of the tiles, nothing in those sections indicates that the arrangement  must be maintained continuously. To the contrary, the specification is silent as to any temporal requirement.

---

[9] We note that the district court in the Maine proceeding added the optional language to give guidance to the jury that spanning—a tile located in multiple rows and/or columns—is permissible. Ex. 1018, 74. Because there is no jury and spanning is not an issue, there is no need to include the optional language explicitly in the construction. Regardless, because it describes an optional feature, that construction has no bearing on the outcome of this proceeding.

IPR2022-00591
Patent 9,946,434 B2

Moreover, the continuous requirement is inconsistent with other portions of the specification. Specifically, the specification describes how tiles can be moved and, while being moved, may overlap other tiles. *See id.* at 11:42–45 ("Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another."). Because the specification describes how the tiles can be moved out of their location in the grid and overlap tiles still on the grid, the grid cannot "enforce[] conformity to the positions . . . continuously" as Patent Owner argues.

We also do not agree with Patent Owner that even if the grid is alterable, it is still continuous. *See* PO Sur-reply 7–8. Continuous means "marked by uninterrupted extension in space, time, or sequence." Ex. 3001.[10] Uninterrupted extension is the antithesis of alterable. Thus, a grid cannot be both alterable and continuous.

Finally, Patent Owner's argument is premised not on construing the term "grid," but on reading its construction into the word "regular" in its proposed construction. But that is not consistent with the ordinary meaning of the word grid, which simply describes the arrangement of the elements without imposing a temporal requirement. *See* Ex. 1028, 208 (defining grid as "[t]wo sets of lines or linear elements at right angles to each other.").

Nor is the construction consistent with the dictionary definitions Patent Owner has added to the record. We acknowledge that the seventh definition of the word "regular" in the Oxford Learners Dictionary refers to

---

[10] Exhibit 3001 is the Merriam-Webster definition of "continuous." *See* https://www.merriam-webster.com/dictionary/continuous, downloaded July 17, 2023.

IPR2022-00591
Patent 9,946,434 B2

a temporal period. *See* Ex. 2019, 2. But, the first definition of regular is "following a pattern, especially with the same time and space between each thing and the next." *Id.* at 1. That definition is most consistent with the other dictionary definition to which the Patent Owner cites and the specification in describing an orderly arrangement of the tiles. *See* Ex. 2020 (defining "regular" as "conforming in form, build, or arrangement to a rule, principle, type, standard, etc.; orderly; symmetrical regular features") (Collins English Dictionary); Ex. 1001, 14:36–38 ("The arrangement, layout, and independent functioning of the tiles on the display . . . ."), 14:49–50 ("The grid controls the layout and priorities of the tiles."). In light of the specification's silence regarding a temporal component and, instead, its focus on the arrangement of tiles, we see insufficient support for Patent Owner's temporal component.

Accordingly, for the reasons given above, "grid" as used in the claims of the '434 patent means "a regular arrangement of rows and columns." However, we do not adopt Patent Owner's understanding of the word "regular" and instead use the everyday meaning as reflected in the dictionary definitions cited approvingly above.

## C.  Unpatentability over MSIE Kit

MSIE Kit describes features of Microsoft Windows Internet Explorer 4, including Microsoft Active Desktop functionality in conjunction with Windows 98 or Windows NT. Ex. 1010, 174, 180, 183, 211. MSIE Kit describes Active Desktop items presented on a user's desktop. *Id.* Each item is associated with an information source on the Web. *Id.* at 174, 176, 177, 180, 183. Each item is presented typically on the desktop in a borderless frame without a title bar or scrollbars. *Id.* at 176, 183. By default, the items

are laid out in a 3x2 grid. *Id.* at 176–177, 180, 183. Each item displays information from a URL and is updated periodically. *Id.* at 176–177, 180, 188, 201. The user may choose how frequently to update, or a content provider may specify the frequency in a Channel Definition Format, or "CDF" file. *Id.* at 177, 183, 188, 212–15, 223.

### 1.    *Anticipation*

Petitioner provides contentions showing how MSIE Kit discloses each limitation of claims 1–2, 4–10, 12–18, and 20–24. Pet. 23–42. Patent Owner disputes only certain aspects of Petitioner's contentions, and we address those disputes below. We have reviewed the undisputed aspects of Petitioner's contentions and conclude that Petitioner has shown that MSIE Kit discloses those limitations.

### a.    *"one or more grids of non-overlapping tiles"*

Petitioner contends that MSIE Kit discloses software instructions to "arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent" because it "lays out new Active Desktop Items on a 3 by 2 grid." Pet. 25 (quoting Ex. 1010, 183). Because MSIE Kit discloses that "[a]s more items are added to the desktop they will start to overlap," Petitioner contends that items added to the grid before that will not overlap. *Id.* at 25–26 (quoting Ex. 1010, 183).

Patent Owner argues that a "'grid of non-overlapping tiles' requires that tiles be placed in a regular arrangement of rows and columns such that any two adjacent tiles are positioned touching one another without overlap." PO Resp. 39. According to Patent Owner, when MSIE Kit discloses that, "[b]y default, Internet Explorer lays out new Active Desktop items on a 3 by

IPR2022-00591
Patent 9,946,434 B2

2 grid," that does not satisfy the claim language because MSIE Kit further discloses that each Active Desktop item has "arbitrary x- and y-positions." *Id.* at 40 (quoting Ex. 1010, 183, 175) (emphasis omitted). In Patent Owner's view, MSIE Kit does not disclose an example of nonoverlapping items on a grid because it does not disclose that "exactly 6 and only 6 Active Desktop items are created and placed in a non-overlapping fashion on that default subdivision." *Id.* at 42–43. We do not agree.

MSIE Kit discloses a grid of non-overlapping tiles with its default arrangement of a "3 by 2 grid." Ex. 1010, 183. As Petitioner's expert states, "the fact that Active Desktop items may be arbitrarily positioned by the user does not change the fact that MSIE Kit also discloses a default grid layout that discloses 'dividing some or all of a display into multiple tiles displayed in an orderly fashion.'" Ex. 1065 ¶ 8.

Patent Owner argues also that MSIE Kit's default layout does not satisfy the claim language because it explicitly includes gaps between items, whereas the claimed grid does not permit gaps. PO Resp. 43–44. We do not construe "grid" to exclude space between tiles (nor did Patent Owner argue for such a construction), and Patent Owner's argument is therefore not persuasive.

Thus, MSIE Kit's default configuration discloses a grid (a regular arrangement of rows and columns). And MSIE Kit discloses an exemplary configuration for a $640 \times 480$ pixel desktop using items with a "maximum size of no more than $200 \times 200$ pixels" so that the layout "allow[s] for reasonable spacing between items." *Id.* Thus, MSIE Kit discloses a specific example of nonoverlapping items on a grid. Although Patent Owner points to an example in MSIE Kit where Active Desktop items are located in an

assertedly non-grid arrangement (Ex. 1010, xxx), that does not undermine MSIE Kit's other disclosures.

### b.     Each tile's selection operation

Petitioner contends that active desktop items are "tiles" as claimed because they are graphical user interface elements that can be refreshed at a specified, assigned rate, and provide access to an information source when selected. Pet. 26, 30–35. Petitioner asserts that each Active Desktop item has a selection operation because the tile calls the application program associated with the tile (a browser, NetShow application, or email program) when the tile is selected (by clicking a hyperlink or hot spot, or using keyboard navigation, or by manually requesting an update). *Id.* at 32–34. To support that the web browser is different from the program that displays the grid, Petitioner relies on MSIE Kit's architecture description and Dr. Houh's testimony. *Id.* at 34 (citing Ex. 1003 ¶¶ 199–204;[11] Ex. 1010, 137, 145).

Patent Owner contends that because "not every Active Desktop item is required to include a hyperlink or hot spot," MSIE Kit fails to disclose each tile has a selection operation that launches another application. PO Resp. 45–46. In Patent Owner's view, because an Active Desktop item requires "content including a hyperlink" to enable the selection functionality, but "allows for an item without a hyperlink," it does not disclose the claimed "tile." *Id.* at 46. Petitioner responds that selecting the tile (e.g., by clicking a hyperlink) is different from the selection operation, which is the manner in which Active Desktop items respond to the selection

---

[11] While the Petition cites pages in Dr. Houh's testimony (mistakenly including a paragraph symbol), here and elsewhere, we cite the relevant paragraph numbers.

IPR2022-00591
Patent 9,946,434 B2

(by calling the associated application). Pet. Reply 15. Petitioner asserts that because each tile is programmed with functionality to respond to selection, Active Desktop items satisfy the claims. *Id.*

We agree with Petitioner. While Patent Owner argues that "the Petitioner relies on the presence of a hotspot or hyperlink as the 'first selection operation'" (PO Sur-Reply 15), we do not agree. The Petition contends that clicking a hotspot or hyperlink (or clicking "Update Now" for an item associated with an email application) selects an item, but that the item responds to such a selection by calling its associated application (a browser, NetShow application, or email application). Pet. 32–34. Thus, Petitioner does not rely on an item's hyperlink itself as the claimed selection operation, but instead relies on the item calling the associated application.

Patent Owner contends we should view a tile as an object separate from any content it may contain. PO Resp. 47–48 ("If a tile and an Active Desktop item are to be compared as two apparatuses, the only proper comparison is that of the structure and functionality of each apparatus, without regard for and independent of any content which may or may not be displayed by each apparatus."). In that regard, Patent Owner points to "tile-specific attributes" such as a clickable map. *Id.* at 49 (citing Ex. 1001, 13:9–20); *see* Ex. 1001, 13:42–45. The specification describes a tile as "itself an image that at any given instant is resident on the file system" and "separate and distinct from the application program or file associated with the tile." Ex. 1001, 12:65–13:1; *see also id.* at 13:36–39 ("In some embodiments . . . , the tile is itself a document created in a markup language such as HTML or XML . . . .").

IPR2022-00591
Patent 9,946,434 B2

MSIE Kit describes Active Desktop items in similar fashion. For example, items exist as distinct files, separate from the content they reference. Ex. 1010, 182 ("First, you design the desktop item (the page), and then you create its CDF file."), 185 ("[Y]ou are required to create a separate CDF file for each Active Desktop item or Active Channel you author."). Further, specific examples in both the '434 patent and MSIE Kit indicate a similar approach. *Compare* Ex. 1001, 13:36–39 ("[T]he tile is itself a document created in a markup language such as HTML or XML as shown in FIG. 6 as is suitable for display in a web-browser."), Fig. 6, *with* Ex. 1010, 186 ("CDF Example for an Active Desktop Item").

The similar form of the claimed tiles and Active Desktop items supports Petitioner's contentions. Because, as discussed above, we do not limit selecting a tile to a particular selection method (*see supra* at 13 (§ II.B.1)), Petitioner's reliance on a user clicking a hyperlink is consistent with selecting a tile. *See* Pet. 32–33. And because we agree with Petitioner that it relies on the Active Desktop item's *response* to selection as the claimed selection operation—calling the associated program (*see id.* at 32–34)—the selection operation is a characteristic of the tile itself. That conclusion is supported by Petitioner's expert, who testifies that a selecting an item causes the item to launch a separate application. *See* Ex. 1003 ¶¶ 188–204. While the called program may change depending on the nature of the item's content, that does not mean that the operation itself is part of the content. Rather, we agree with Petitioner that "the functionality is still programmed into the system and available for every Active Desktop item." Pet. Reply 15.

IPR2022-00591
Patent 9,946,434 B2

Although Patent Owner argues that MSIE Kit allows for additional configurations and therefore does not satisfy the claims (PO Resp. 47–50), we do not agree. As Petitioner points out, Active Desktop items respond to selection by calling an application, and Petitioner has identified a number of different configurations that satisfy the claim language. Pet. Reply 15–16; Pet. 32–34. We conclude that Petitioner has identified how MSIE Kit discloses the claimed tiles. *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) (claim is satisfied "if the reference discloses an apparatus that is reasonably capable of operating so as to meet the claim limitations, even if it does not the meet the claim limitations in all modes of operation."). And although Patent Owner purports to distinguish independent claims 9 and 17 as method claims (PO Resp. 47), we agree with Petitioner that even the method claims require only that each tile has the selection operation, not that each tile's selection operation is carried out (Pet. Reply 15). Because the record shows that, when selected, Active Desktop items call the application corresponding to their content, Petitioner has shown MSIE Kit satisfies the claim language.

Patent Owner does not otherwise challenge Petitioner's showing as to anticipation of claims 1, 2, 4–10, 12–18, and 20–24. Having reviewed the record, we conclude Petitioner has shown by a preponderance of the evidence that MSIE Kit discloses each limitation as claimed, and therefore anticipates those claims.

### 2.    *Obviousness*

Petitioner asserts that all claims would have been obvious over MSIE Kit, thus encompassing a larger set of claims than with its anticipation challenge—by including claims 3, 11, and 19. Pet. 43–45.

IPR2022-00591
Patent 9,946,434 B2

Claim 3, which is not addressed in the anticipation ground, depends from claim 1 and further recites that "each of two grids is associated with a separate theme." Ex. 1001, 31:51–52.[12] Petitioner submits that MSIE Kit renders that limitation obvious by "disclos[ing] organizing favorite web links by content" and "grouping Active Channels by content." Pet. 43 (citing Ex. 1010, 113–14, 212–13; Ex. 1003 ¶ 231). Petitioner reasons that adding additional grids of Active Desktop items would have been a predictable variation of the default 3x2 grid, and that it would have been obvious to use multiple grids to "organize Active Desktop Items in orderly, theme-based arrangements . . . by content" because doing so "would make it easier for a user to find an item she was looking for." *Id.* at 43–44 (citing Ex. 1003 ¶¶ 230–231).

We noted during institution that Petitioner's contentions may raise factual issues. Inst. 14. Patent Owner contends that "there is no reason to add additional grids" and that MSIE Kit contradicts doing so because it discloses that adding more items to the desktop than the number of default grid spaces will cause items to overlap. PO Resp. 52 (citing Ex. 1010, 183). Patent Owner, however, relies only on MSIE Kit's disclosures and has not provided additional evidence undermining Petitioner's showing, which we find persuasive.

The specification states that, "separate categories of information can be displayed on separate grids allowing each grid to be associated with a theme." Ex. 1001, 15:3–5; *accord id.* at 16:1–3 ("If desired, a user can impose a 'theme' on a grid and thereby categorize, group, and/or otherwise

---

[12] Claims 11 and 19, which depend from claims 9 and 17, respectively, recite parallel limitations to those of claim 3. Ex. 1001, 32:40–41, 34:6–7.

IPR2022-00591
Patent 9,946,434 B2

manage his/her data sources."). In other words, the '434 patent does not restrict how a grid is associated with a theme, other than suggesting that different grids be used for separate categories of information. Petitioner submits that a "theme" means a category of content in a tile (Pet. 20), and Patent Owner does not appear to dispute that construction.

We do not agree with Patent Owner that MSIE Kit's disclosures show that claim 3's limitation was not obvious. *See* PO Resp. 51. Petitioner relies on MSIE Kit's disclosures that suggest organizing favorite web links by content (Ex. 1010, 113–14) and grouping Active Channels by content (*id.* at 212–13). Pet. 43. We agree that MSIE Kit suggested theme-based organization, as recited by claim 3. We further agree that using multiple grids to group items by theme "would make it easier for a user to find an item she was looking for." Pet. 43–44 (citing Ex. 1003 ¶ 231).

Patent Owner takes issue with Petitioner's contention that adding additional grids to MSIE Kit's default would have been a predictable variation. PO Resp. 51 (citing Pet. 43). According to Patent Owner, that statement is conclusory. *Id.* We do not agree. Nothing about MSIE Kit's disclosures suggest that using multiple grids would be anything other than predictable. The record contains no evidence that undermines Petitioner's expert, who views multiple grids as a predictable variation of MSIE Kit's default grid. Ex. 1003 ¶ 230. Although Patent Owner accurately points out that MSIE Kit discloses overloading a grid such that items overlap, that does not preclude using multiple grids, and we conclude that Petitioner's stated reasons for doing so are logical.

Patent Owner's position is that a display partitioned into multiple grids would have to impose the desired organization for tiles in the grid. *See*

IPR2022-00591
Patent 9,946,434 B2

PO Resp. 52. We do not agree. As discussed above, a grid need only provide for an arrangement of tiles and need not continuously enforce a particular arrangement. *See supra* at 15 (§ II.B.2). Claim 3 requires only that each of two grids "is associated with a separate theme," not that the grid imposes or controls the theme. Thus, we agree with Petitioner's contentions that when a user arranges multiple grids to contain items with a common theme for each grid, that satisfies claim 3.

In light of MSIE Kit's suggestion to organize links and Active Channels by content, and the predictable approach of using multiple grids, we agree with Petitioner that claims 3, 11, and 19 would have been obvious over MSIE Kit.

## III.    CONCLUSION[13]

For the reasons discussed above, we conclude that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

---

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00591
Patent 9,946,434 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–10, 12–18, 20–24 | 102(a), (b) | MSIE Kit | 1, 2, 4–10, 12–18, 20–24 | |
| 1–24 | 103(a) | MSIE Kit | 3, 11, 19 | |
| 1–24 | 103(a) | MSIE Kit, Jones[14] | | |
| 1–24 | 103(a) | Excel97[15] | | |
| 12–19 | 103(a) | Excel97, Bhansali[16] | | |
| Overall Outcome | | | 1–24 | |

## IV.    ORDER

Accordingly, it is

ORDERED that Petitioner has shown by a preponderance of the evidence that claims 1–24 of the '434 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[14] Because we determine that claims 1–24 are unpatentable as anticipated by or obvious over MSIE Kit, we decline to address additional grounds.

[15] Because we determine that claims 1–24 are unpatentable as anticipated by or obvious over MSIE Kit, we decline to address additional grounds.

[16] Because we determine that claims 1–24 are unpatentable as anticipated by or obvious over MSIE Kit, we decline to address additional grounds.

IPR2022-00591
Patent 9,946,434 B2

FOR PETITIONER:

Joseph Micallef
SIDLEY AUSTIN LLP
jmicallerf@sidley.com


FOR PATENT OWNER:

Shaun Gregory
Jason Houdek
TAFT STETTINIUS & HOLLISTER LLP
sgregory@taftlaw.com
jhoudek@taftlaw.com

Trials@uspto.gov
571-272-7822

Paper 22
Date: October 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

MICROSOFT CORP.,
Petitioner,

v.

SURFCAST, INC.,
Patent Owner.

———————————

IPR2022-00590
Patent 9,043,712 B2

———————————

Before SCOTT B. HOWARD, JASON W. MELVIN, and
MICHAEL T. CYGAN, *Administrative Patent Judges.*

HOWARD, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00590
Patent 9,043,712

# I.  INTRODUCTION

## A.  Background and Summary

Microsoft Corp. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–4 of U.S. Patent No. 9,043,712 B2 (Ex. 1001, "the '712 patent").  Surfcast, Inc. ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 6.  We instituted an *inter partes* review of claims 1–4 of the '712 patent on all grounds of unpatentability alleged in the Petition.  Paper 9 ("Institution Decision" or "Inst. Dec.").

After institution of trial, Patent Owner filed a Response (Paper 14, "PO Resp."), Petitioner filed a Reply (Paper 15, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 16, "PO Sur-reply").

An oral hearing[1] was held on July 12, 2023, and the record contains a transcript of this hearing.  Paper 21 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all of the challenged claims are unpatentable.

## B.  Real Parties in Interest

Petitioner identifies itself as the real party in interest.  Pet. 3.

Patent Owner identifies itself as the real party in interest.  Paper 3, 2 (Patent Owner's Mandatory Notices).

## C.  Related Matters

The parties identify the following district court proceeding:  *SurfCast, Inc. v. Microsoft Corporation*, No. 6:21-cv-01018-ADA (W.D. Tex.).

---

[1]  A single consolidated oral hearing was held for IPR2022-00423, IPR2022-00590, IPR2022-00591, and IPR2022-00592.  Tr. 1, 3:2–5.

IPR2022-00590
Patent 9,043,712

Pet. 3; Paper 3, 2.  Additionally, Petitioner identifies *SurfCast, Inc. v. Microsoft Corporation*, No. 2:12-cv-00333-DBH (D. Me.) ("Maine Proceeding") and various *inter partes* review proceedings, including a series of *inter partes* review proceedings that determined that the claims of a related patent were unpatentable.[2]  Pet. 3–4.

### D.  The '712 Patent

The '712 patent is entitled "System and Method for Simultaneous Display of Multiple Information Sources" and is directed to a graphical user interface that organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others.  Ex. 1001, codes (54), (57).  As described in the "Background," at the time of the invention, display technologies lacked a user interface capable of presenting any type of information in a consistent manner and in such a way that all open channels could indicate their activity on a continual basis.  Ex. 1001, 4:38–49.  In response to this need, the '712 patent describes a graphical user interface comprising a grid of tiles that resides on the user's computer desktop.  Ex. 1001, 4:53–54.  "The grid of tiles provides a uniform[] graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices."  Ex. 1001, 4:54–57.  Figure 1 is reproduced below.

---

[2]  *Microsoft Corporation v. SurfCast, Inc.*, IPR2013-00292 is representative of those proceedings.  A copy of the Final Written Decision ("the 403 FWD") is Exhibit 1017.

3

IPR2022-00590
Patent 9,043,712



Figure 1 illustrates "a user interface comprising a grid of tiles as might be depicted on a display screen." Ex. 1001, 6:25–27; *see also* Ex. 1001, 7:27–39 (describing the various tiles).

E. *Illustrative Claim*

Claims 1 and 3 are independent. Claim 1, reproduced below, is illustrative of the claimed invention.[3]

> 1. [1.a] A method executed by a device under the control of a program, the device including a memory for storing the program, the method comprising:

> [1.b] partitioning a visual display rendered by the device into *an array of tiles*, [1.c] wherein each tile in the array of tiles is associated with an information source in a plurality of information sources, [1.d] wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles;

---

[3] For ease of reference, we use Petitioner's claim numbering scheme.

IPR2022-00590
Patent 9,043,712

[1.e] assigning a first update rate to the first tile;

[1.f] *updating information from a first information source in the plurality of information sources presented to the first tile* in accordance with the first update rate; and

[1.g] *updating content of the second tile based on the information updated to the first tile.*

Ex. 1001, 30:23–38 (emphases added).

   *F. Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–4 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4 | 102(a), (b) | MSIE Kit[4] |
| 1–4 | 103(a) | MSIE Kit, Jones[5] |
| 1–4 | 103(a) | MSIE Kit, Miklos[6] |
| 1–4 | 103(a) | MSIE Kit, Miklos, Jones |
| 1–4 | 102(a), (b) | Excel97[7] |
| 1–4 | 103(a) | Excel97 |
| 1–4 | 103(a) | Excel97, Bhansali[8] |
| 1–4 | 103(a) | Excel97, Igra[9] |
| 1–4 | 103(a) | Excel97, Igra, Bhansali |

---

[4] Microsoft Press. (1998). *Microsoft Internet Explorer Resource Kit.* (Ex. 1010). All citations are to the native pagination.

[5] U.S. Patent No. 6,819,345 B1, filed Feb. 17, 1998 (Ex. 1011)

[6] U.S. Patent No. 5,226,117, issued July 6, 1993 (Ex. 1013).

[7] Person, R. (1997). *Special Edition Using Microsoft Excel 97* (Ex. 1005). All citations are to the native pagination.

[8] U.S. Patent No. 6,006,239, filed Mar. 15, 1996 (Ex. 1006).

[9] U.S. Patent No. 6,701,485 B1, issued Mar. 2, 2004 (Ex. 1007).

IPR2022-00590
Patent 9,043,712

Petitioner relies on the testimony of Henry Houh, Ph.D.. Ex. 1003;

Ex. 1065. Dr. Houh was cross-examined. Ex. 2003.[10]

Patent Owner relies on the testimony of Glenn E. Weadock.

Ex. 2001. Mr. Weadock was not cross-examined in this proceeding.

## II. ANALYSIS

### A. Legal Standard

A patent claim is unpatentable under 35 U.S.C. § 102 if "the four

corners of a single, prior art document describe every element of the claimed

invention, either expressly or inherently, such that a person of ordinary skill

in the art could practice the invention without undue experimentation."

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed.

Cir. 2000). "A single prior art reference may anticipate without disclosing a

feature of the claimed invention if such feature is necessarily present, or

inherent, in that reference." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958

(Fed. Cir. 2014). Moreover, the reference must also "disclose[] within the

four corners of the document not only all of the limitations claimed but also

all of the limitations arranged or combined in the same way as recited in the

claim." *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir.

2008). However, "the reference need not satisfy an *ipsissimis verbis* test."

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

---

[10] Contrary to our rules, Patent Owner only filed excerpts of the cross-examination testimony. *See* 37 C.F.R. § 42.53(f)(7) (2021) ("The testimony *must* be filed as an exhibit." (emphasis added). Accordingly, we only consider the pages cited and do not, because we cannot, consider other pages even if cited by the parties. *See* Pet. Reply 9 (citing Ex. 2003, 191:5–18); PO Sur-reply 6 (citing Ex. 2003, 180:10–181:21).

IPR2022-00590
Patent 9,043,712

   *B.  Level of Ordinary Skill in the Art*

   Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)).  "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

   Petitioner argues that a person having ordinary skill in the art would have had "a Master's degree in software engineering or computer science (or equivalent experience working in industry) and several years of experience designing, writing or implementing software products, either at the application or operating system level." Pet. 12 (quoting Ex. 1003 ¶ 63). Petitioner further argues that a person having ordinary skill in the art "would have been familiar with various technological concepts, including those relating to user interfaces, operating systems and software applications, basic computer functionality, networking and data processing." Pet. 12 (citing Ex. 1003 ¶ 63).

   Patent Owner does not address the level of skill or Petitioner's description of what a person having ordinary skill in the art would have been familiar with.  *See* PO Resp.

   Because Petitioner's formulation of the level of ordinary skill in the art is consistent with the '712 patent and the asserted prior art and is not challenged by Patent Owner, we adopt it and apply it in our analysis below.

IPR2022-00590
Patent 9,043,712

### C. *Claim Construction*

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2021). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

The parties argue that we should construe five terms: "tile," "information source," "partitioning a visual display rendered by the device into an array of tiles," "update rate," and "presented to the first tile." Pet. 12–21; PO Resp. 6–26. We construe three of those terms below. For all other limitations, we need not expressly construe any claim terms at this time. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In IPR2013-00292, the Board construed a number of terms in the '403 patent,[11] which is the "ultimate parent" of the '434 patent through a chain of continuations and continuations in part. IPR2013-00292, Paper 93

---

[11] U.S. Patent No. 6,724,403.

IPR2022-00590
Patent 9,043,712

(Ex. 1017, the "403 FWD").[12]  *See* Pet. 1.  Because the '403 patent is the
'434 patent's "ultimate parent," Petitioner submits that the 403 FWD
constructions drive the proper constructions here.  Pet. 10–19; Pet. Reply 1–
11. Moreover, Petitioner argues, collateral estoppel bars Patent Owner from
contesting constructions of the same terms in the '434 patent.[13]  Pet. Reply 1
(citing *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294–95
(Fed. Cir. 2018)).  Patent Owner argues that because the 403 FWD applied
the "broadest reasonable interpretations," it does not have preclusive effect
here, where we construe claims using the *Philips* standard.  PO Sur-Reply 1
(citing *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376
(Fed. Cir. 2016)).  We need not resolve that dispute, because we conclude
that to the extent the 403 FWD construed terms applicable in this
proceeding, those constructions comport with the *Philips* standard.

  *1. Tile(s)*

  Petitioner argues that a "tile" is "a graphical user interface element
whose content may be refreshed and that, when selected, provides access to
an information source." Pet. 12–18; Pet. Reply 1–8.  The 403 FWD
construed "tile" the same as Petitioner's proposed construction here.
Ex. 1017, 7–10.

  Patent Owner submits that a "tile" is "a graphical representation of an
associated information source capable of displaying refreshed content, the
graphical representation being persistent and selectable to provide access to

---

[12]  The Federal Circuit affirmed the 403 FWD's unpatentability
determinations. *SurfCast, Inc. v. Microsoft Corp.*, 639 F. App'x 651
(Fed. Cir. 2016).

[13] Patent Owner does not dispute that the '403 patent and '434 patent
specifications substantively match.

IPR2022-00590
Patent 9,043,712

underlying information of the associated information source, but providing a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 6 (emphasis omitted); PO Sur-Reply 1–6.

Claim 1 recites "partitioning a visual display rendered by the device into an array of *tiles*." Ex. 1001, 30:27–28 (emphasis added). The context of the use of "tile" in the claims does not provide any assistance in determining its meaning.

The specification discusses "Tile Objects" at some length. Ex. 1001, 10:28–14:7. It states that "[a] tile presents content from any information source." Ex. 1001, 10:31–32. Further, "[t]iles are selectable and live" and the specification explains that "tiles are live in that each contains real-time or near real-time information" and, when selected, "the tile instantly provides the user with access to the underlying information." Ex. 1001, 12:3–11.

The specification frames tiles as contrasting with two other graphical user interface elements—icons and windows. Ex. 1001, 10:33–11:8. It presents tiles as "a third graphical representation of programs and files" and explains that "each tile is a viewer of a single information source." Ex. 1001, 10:62–11:2. To distinguish tiles, the specification states that, unlike icons, a tile "contains continually refreshed content" and compared to windows, "a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired." Ex. 1001, 11:3–8. Significantly, that comparison to windows uses exemplary characteristics without defining aspects applicable to all tiles. The specification asserts that "many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do." Ex. 1001, 11:13–16.

IPR2022-00590
Patent 9,043,712

That said, the specification also gives an example of "expanding tile 406 to occupy the full area of the display" (Ex. 1001, 11:49–51), demonstrating that size does not define a tile or distinguish a tile from a window.

According to Patent Owner, a tile is a "graphical representation of an associated information source," not merely a graphical user interface element. PO Resp. 7–10. Patent Owner submits that "a graphical user interface element," as Petitioner proposes, "does not require a tile to be graphically displayed and does not require it to be a representation of anything." PO Resp. 8. In Patent Owner's view, while such an element is used for user interaction, it "need not be a representation of an information source or its underlying information." PO Resp. 9. As Petitioner points out, however, other claim language requires tiles be displayed. Pet. Reply 2. We therefore do not agree with Patent Owner that Petitioner's construction is deficient.

Moreover, in light of Petitioner's unpatentability contentions for MSIE Kit discussed below, the graphical representation aspect of Patent Owner's construction would not impact our conclusion. Patent Owner contends otherwise, in a general way, but does not explain that contention. See PO Resp. 10 ("These differences impact the prior art analysis."), 39–45 (the cited discussion, which distinguishes MSIE Kit's asserted tiles based only on providing the same representation "as any Internet Explorer window").

Next, Patent Owner argues that a tile must provide "a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 6, 10–14; see also Tr. 53:10–54:8. We do not agree.

IPR2022-00590
Patent 9,043,712

While, as described above, the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition. *See* Ex. 1001, 11:5–8. During the hearing, Patent Owner was unable to describe particular restrictions that would embody the limited representation. For example, Patent Owner asserted that degraded resolution would satisfy its proposed construction (Tr. 64:24–65:11) but that does not comport with a distinction from a window. A window may depict content at a variety of zooms, some of which would show an image with degraded resolution. *See* Tr. 68:6–15 (Patent owner discussing how pixels can be lost on a zoomed image). Patent Owner asserts that a window with zoom functionality lacks "a fundamentally or different in nature likeness or image." Tr. 68:11–15. But that assertion is detached from Patent Owner's proposed construction and unsupported by the specification. We conclude that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction.

In fact, Patent Owner admits that the specification does not have a clear definition but insists that it nonetheless defines a tile "as something other than either an icon or a window." Tr. 48:20–25. We do not agree. When identifying features that the specification describes to distinguish tiles from windows, Patent Owner points to other claim limitations, such as "[s]electability to provide access to the underlying information." Tr. 49:7–10; *see also* Tr. 50:3–8 (asserting a tile must be refreshable). Although such limitations may capture aspects that the specification uses to distinguish tiles from other graphical interface elements, they do not support further construing "tile" narrowly as Patent Owner asserts. Stated otherwise, the specification's distinctions for tiles over icons or windows already appear as claim limitations and do not counsel in favor of further limiting "tile."

IPR2022-00590
Patent 9,043,712

Further, Patent Owner's construction is unclear whether a tile must provide a graphical representation of its associated information source or of the information underlying that source. The proposed construction first requires a tile represent the source but then additionally requires it "provid[e] a representation of the underlying information," seemingly allowing no room for a tile that represents only the information source. PO Resp. 11. Those competing requirements would not comport with the specification. The exemplary tiles do not necessarily represent a source's underlying information, but instead may relate to the source itself. *See* Ex. 1001, Fig. 4 (tile 410, displaying the name of a broadcast signal; tile 408, displaying an icon indicating "New Mail!"), 11:51–55 (describing tile 408), 11:61–63 (describing tile 410). Thus, Patent Owner's proposed addition regarding the nature of a tile's representation would create an internal inconsistency in the meaning of a tile. We do not adopt Patent Owner's proposed restriction on the nature of a tile's representation.

Next, Patent Owner attempts to distinguish a tile "whose content may be refreshed" from one "capable of displaying refreshed content." PO Resp. 14–15. In this regard, Patent Owner distinguishes Petitioner's construction, which Patent Owner asserts "does not require that [tile] element to be capable of displaying the refreshed content." PO Resp. 14–15. We agree with Petitioner that the parties' different language regarding refreshed content does not implicate any aspect of our unpatentability analysis. *See* Pet. Reply 5.

Finally, Patent Owner contends that a tile must be "selectable to provide access to underlying information of the associated information source," not just an element that, "when selected, provides access to an information source." PO Resp. 15–18. As Patent Owner explains, it seeks a

13

IPR2022-00590
Patent 9,043,712

distinction that "tiles themselves are selectable to provide access to underlying information of associated information sources, rather than access being provided by selecting the contents of a tile." PO Resp. 16. Patent Owner argues that Petitioner's construction, referring to an element "that, when selected, provides access to an information source," does not require the tile itself be selectable. PO Resp. 17–18. Patent Owner relies primarily on the specification's description that "[t]iles are selectable and live" and that, "[w]hen selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information." PO Resp. 15–16 (quoting Ex. 1001, 12:3–5). Petitioner relies on that same specification disclosure to argue that we should not restrict the manner of selecting a tile. Pet. Reply 6. The specification indicates that a tile may be selected "by mouse click or otherwise." Ex. 1001, 12:3–4.

Petitioner points out that the 403 FWD concluded that when "a user selects a link *included* in an Active Desktop item, the user necessarily selects the Active Desktop item." Ex. 1017, 36. That conclusion, which was part of a decision affirmed on appeal, *Surfcast*, 639 F. App'x 651, indicates that Patent Owner's proposed claim construction here would not preclude the claims from reading on MSIE Kit, because selecting a link within an item selects the item itself. Thus, Patent Owner's construction would not affect the outcome here. Regardless, we agree with Petitioner that, when the specification discloses a tile may be selected "by mouse click or otherwise," it indicates a broader range of selection mechanisms than proposed by Patent Owner. *See* Pet. Reply 6–7.

Although Patent Owner asserts that its proposed construction alone focuses on tiles themselves being selectable, we do not view the two constructions as supporting that distinction. As Petitioner points out, its

14

proposed construction requires that a tile, "when selected, provides access to an information source" and therefore requires "that tiles can be selected." Pet. Reply 8. Although Patent Owner seeks a construction that would not permit selection through activation of a link within a tile, we do not read the specification as so restrictive.

Based on the foregoing, and consistent with the Board's prior construction, we construe "tile" as "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source."

### 2. "Partitioning . . . at Least a Portion of the Visual Display into an Array of Tiles"

#### a) Arguments of the Parties

Petitioner argues that "partitioning . . . at least a portion of the visual display into an array of tiles" means "dividing a display or window into two or more tiles." Pet. 18–19 (quoting Ex. 1016, 12–13). According to Petitioner, this construction "represents the ordinary meaning of the term, as it is consistent with the description of tiles in the specification." Pet. 19 (citing Ex. 1001, 7:27–39, Fig. 1).

Patent Owner argues that the phrase means "dividing some or all of a display into multiple tiles displayed in an orderly fashion." PO Resp. 19. Specifically, Patent Owner argues "that 'partitioning' and 'arranging' mean 'dividing[]' and 'array of tiles' means 'multiple tiles displayed in an orderly fashion.'" PO Resp. 19.

Patent Owner further argues that "Petitioner's attempt[] to redefine the 'visual display' recited by the claims to refer to 'a display or window' is inconsistent with the specification." PO Resp. 19 (emphasis omitted); *see also* PO Sur-reply 6–7 (citing Ex. 1001, 3:48–49). Patent Owner further

argues that the '712 patent draws a distinction between a window and a portion of the visual display:

> The specification also distinguishes between a window and an area of a visual display. For example, "while a window may be resized as appropriate, it will frequently occupy the full display area . . ." (EX1001, 3:47-48; EX2001, ¶ 100.) This distinction is important to the tile technology introduced by the '712 Patent.

PO Resp. 20. According to Patent Owner, placing tiles in a window "will fail to provide the uniformity of appearance realized by dividing a visual display into an array of tiles" and "cannot provide a replacement for a desktop." PO Resp. 20 (citing Ex. 1001, 4:7–43, 4:65–5:10, 6:3–11, 11:23–27, 14:15–17, 15:17–19; Ex. 2001 ¶¶ 91–92, 99–101, 123–126); *see also* PO Sur-reply 6–7. Patent Owner also argues that the fact that a window can occupy some or all of the visual display reinforces the idea that they are separate elements. PO Sur-reply 7–8.

With regard to "array," Patent Owner argues it must mean something more than two or more tiles, as that is already captured in the use of the term "tiles." PO Resp. 20–21. According to Patent Owner, in order "[f]or different tiles to be first *in an array* and second *in an array* and to display information from different sources, they must be ordered, *i.e.*, displayed in an orderly fashion." PO Resp. 21. Patent Owner also argues this is consistent with the specification, which shows tiles displayed in an orderly fashion. PO Resp. 21–22 (citing Ex. 1001, 11:41, 11:49–51, Fig. 4). Specifically, Patent Owner directs us to Figures 7 through 11, which, according to Patent Owner, each show the tiles arranged in an orderly fashion. PO Resp. 22–24 (citing Ex. 1001, Figs. 7–11, 14:17–19, 16:2, 16:8–10, 16:18–52).

IPR2022-00590
Patent 9,043,712

Patent Owner also argues that the specification "criticizes the state of the art as forcing users to 'contend with a wide range of icons and program windows that may occupy space on a user's display screen.'" PO Resp. 24 (quoting Ex. 1001, 3:23–25). Patent Owner argues that the claimed invention solves this problem by "standardiz[ing] the ways in which different types of information are presented to the user." PO Resp. (quoting Ex. 1001, 3:27–28). According to Patent Owner, "[c]onstruing an array to merely refer to tiles without also requiring the tiles to be displayed in an orderly fashion, would recreate the problems criticized by the specification." PO Resp. 25.

Petitioner responds by pointing out that the Board's construction in the Institution Decision[14] essentially adopted the construction from the Maine proceeding. Pet. Reply 9 (citing Inst. Dec. 11–12; Pet. 18–19). However, Petitioner argues that adopting Patent Owner's position that the claim "cannot be satisfied by dividing the area *within a window* into multiple tiles" would be legal error. Pet. Reply 9. According to Petitioner, because "[a] window displayed on a computer display obviously occupies some or all of that display, as the 712 Patent itself recognizes, . . . dividing some or all of the window is necessarily dividing some or all of the display." Pet. Reply 9–10 (citing Ex. 1001, 3:48–49). Petitioner also argues it is inconsistent with the Board's prior decision in the 403 FWD. Pet. Reply 10–12.

_____

[14] In the Institution Decision, we adopted Patent Owner's proposed construction of "dividing some or all of a display into multiple tiles displayed in an orderly fashion." Inst. Dec. 11–12. We further noted that "[i]n doing so, any array that is similar to that shown in a figure of the '712 patent would be orderly." Inst. Dec. 12.

*b) Our Analysis*

As noted in footnote 14, we preliminarily construed this limitation to mean "dividing some or all of a display into multiple tiles displayed in an orderly fashion" and that "any array that is similar to that shown in a figure of the '712 patent would be orderly." Inst. Dec. 11–12. Although Petitioner proposed a different construction in the Petition, Petitioner did not maintain its construction in its Reply or argue that we erred. Accordingly, for the reasons given in the Institution Decision, which we incorporate by reference, we reach the same construction in this Decision.

However, the real dispute between the parties does not focus explicitly on our construction, but whether it implicitly excludes placing the array of tiles in a window.[15] Based on the record, we agree with Petitioner that the claim limitation does not preclude having the array of tiles located within a window on the video display.

We begin, as always, "with the words of the claim themselves." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) (quoting *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006)). The claim is silent as to which part of the visual display will contain the array of tiles. *See* Ex. 1001, 30:27–28. It is not limited to, as Patent Owner argues (PO Resp. 20), a replacement for a desktop. Nor, as Patent Owner also argues (PO Resp. 20), is there anything in the claim or our construction of tiles that requires the tiles to be presented "in a consistent

---

[15] This issue is not relevant to the instant proceeding. However, it is relevant to IPR2022-00590, decided concurrently. Because the parties agree that the terms should have the same construction in all four pending proceedings (Tr. 11:1–8 (Petitioner), 54:11–17 (Patent Owner)), we address the dispute here.

IPR2022-00590
Patent 9,043,712

manner" and be capable of "run[ning] on any device." Rather, the claim simply states "partitioning . . . a portion of the visual display into an array of tiles" without any other limitations. *See* Ex. 1001, 30:27–28.

Our construction is further supported by the specification of the '712 patent. The specification makes it clear that windows are a part of the visual display. For example, the background section describes how a window is on the visual display: "Thus, while a window may be resized, it will frequently occupy the full display area, effectively limiting the user to a view of a single program." Ex. 1001, 3:48–50; *see also* Ex. 1001, 10:49–50. Additionally, the '712 patent describes how a window has "a display area 354." Ex. 1001, 10:50–51. Thus, so long as the window is shown on the video display, the claim limitation is broad enough to encompass partitioning the portion of the video display where there is a window into an array of tiles.

Although we agree with Patent Owner that the video display and the window are two different elements (PO Resp. 19–20; PO Sur-reply 7–8), that fact does not require us to adopt Patent Owner's construction. Because the window is shown on the video display, partitioning a window is necessarily also partitioning a video display.

Moreover, the portion of the specification cited by Patent Owner does not support its construction. The specification simply states "[t]hus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program." Ex. 1001, 3:47–49 (citied by PO Resp. 20). That section provides no guidance as to whether there is a difference between partitioning a display and partitioning a window.

IPR2022-00590
Patent 9,043,712

Accordingly, for the reasons discussed above, "partitioning . . . at least a portion of the visual display into an array of tiles" means dividing some or all of a display into multiple tiles displayed in an orderly fashion and that any array that is similar to that shown in a figure of the '712 patent would be orderly. Additionally, the claim is broad enough to encompass partitioning a window that is located on the video display.

### 3. *Presented to the First Tile*

Petitioner argues that "presented to the first tile" means "displayed within the first tile." Pet. 20–21. According to Petitioner, "'tiles' are graphical structures on a computer display, so the phrase 'presented to' in this claim language cannot be meaningful if interpreted in a physical sense, and there is no disclosed functionality that could be an example presenting information to a tile, other than displaying that information within the tile." Pet. 20–21 (citing Ex. 1001, 7:26–39, Fig. 1; Ex. 1003 ¶ 93). Patent Owner agrees with this construction. PO Resp. 26 (adopting Petitioner's construction); *see also* PO Resp. 47–48 (arguing Petitioner's construction is correct).

This phrase appears in the following limitation: "updating information from a first information source in the plurality of information sources *presented to the first tile* in accordance with the first update rate." Ex. 1001, 30:34–36 (emphasis added). In the Institution Decision, we held that "although the claim requires updating information to the first tile, the claim does not recite displaying the updated information." Inst. Dec. 27 (citing Ex. 1001, 30:34–36); *see also* PO Resp. 47–48 (acknowledging implicit construction in the Institution Decision); Pet. Reply 16 (same). Based on the record of the full trial, we maintain that construction.

IPR2022-00590
Patent 9,043,712

We begin, as always, "with the words of the claim themselves."
*Allergan Sale*, 935 F.3d at 1373 (quoting *Amgen*, 457 F.3d at 1301).
Although the claim limitation recites that updated information be "presented
*to* the first tile," nothing in the words of the claim requires that updated
information to be displayed or presented *by* the first tile.  Ex. 1001, 30:34–
36 (emphasis added).  That is, the claim simply requires "updating
information . . . presented to the first tile" without any discussion of
updating what information is displayed.  Ex. 1001, 30:34–36.  This stands in
contrast to the next limitation, which requires "updating *content* of the
second tile," which connotes updating the displaying content.  *See* Ex. 1001,
30:34–38 (emphasis added).

The parties do not direct us to any language in the claim that requires
the first tile to display the updated information.  *See* Pet. 20–21;
PO Resp. 26, 47–48.  That is because nothing in the language explicitly or
implicitly requires that the updated information be displayed.  *See* Ex. 1001,
30:34–36.

The section of the specification cited by the parties does not support
their proposed construction.  That section describes Figure 1, which shows
various tiles on a display.  Ex. 1001, 7:26–39.  Nothing in the cited sections
discusses updating the title.  Ex. 1001, 7:26–39.  Nor does it use the word
"presented."  Ex. 1001, 7:26–39.

D. *Asserted Anticipation by MSIE Kit*

1. *Summary of MSIE Kit*

MSIE Kit describes features of Microsoft Windows Internet Explorer
4, including Microsoft Active Desktop functionality in conjunction with
Windows 98 or Windows NT.  Ex. 1010, 174, 180, 183.  Specifically, MSIE
Kit describes how a user may subscribe to "publisher-specified Active

21

IPR2022-00590
Patent 9,043,712

Channels" which "delivers a defined range of Web content." Ex. 1010,
xxxiv. "Users can check for updates on specific types of content and can
accept a publisher's predefined update schedule or specify their own custom
schedule." Ex. 1010, xxxiv. "Active Channels allow Web site authors to
optimize, personalize, and more fully control how a site is Webcast, and
adding a Channel Definition Format (CDF) file is the only step required to
convert any existing Web site into an Active Channel." Ex. 1010, xxxiv.

 "After a user subscribes to an Active Channel, Internet Explorer will
automatically add the subscribed channel logo to the Channel bar on the
Active Desktop and in the browser, making the Web site more prominent
and more easily accessible." Ex. 1010, xxxv. MSIE Kit shows a sample
desktop, which is reproduced below, and referred to as Figure xxxvi.



IPR2022-00590
Patent 9,043,712

Ex. 1010, xxxvi. Figure xxxvi shows an "Active Channel bar inside Internet Explorer 4." Ex. 1010, xxxvi. Reproduced below is a version of Figure xxxvi annotated by Petitioner to highlight various elements.



Pet. 25 (annotating Ex. 1010, xxxvi). The annotated version of Figure xxxvi shows a "Channel Bar Pane" on the left (annotated in blue) with a "Browser Pane" on the right (annotated in green). Pet. 25; Ex. 1010, xxxvi, 212, 694.

### 2. Analysis of Claim 1

#### a) Limitation 1.a: "A Method Executed by a Device under the Control of a Program, the Device Including a Memory for Storing the Program, the method comprising."

The preamble of claim 1 recites "[a] method executed by a device under the control of a program, the device including a memory for storing the program, the method comprising." Ex. 1001, 30:24–26. Petitioner argues that MSIE Kit discloses the preamble. Pet. 24. More specifically, Petitioner argues MSIE Kit discloses "the Active Desktop and Active Channel interfaces available on computers running the Windows and Internet Explorer 4 programs" and that "computers necessarily include a processor to perform operations implemented by stored software in a

memory." Pet. 24 (citing Ex. 1010,[16] 4, 174, 176, 179, 180; Ex. 1028, 515; Ex. 1003 ¶¶ 103–104, 170).

After reviewing Petitioner's arguments and information regarding the preamble, including the Houh Declaration, which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that MSIE Kit discloses the preamble.[17]

> b) Limitation 1.b: "Partitioning a Visual Display Rendered by the Device into an Array of Tiles"

Claim 1 further recites "partitioning a visual display rendered by the device into an array of tiles." Ex. 1001, 30:27–28. In analyzing this claim limitation, we initially discuss whether MSIE Kit discloses tiles. Then we address whether MSIE Kit discloses partitioning a visual display rendered by the device into an array of tiles.

> (1) "Tile"

Petitioner argues MSIE Kit discloses tiles, specifically a first tile and a second tile. Pet. 25–29; Pet. Reply 13–14. For the reasons set forth below, we are sufficiently persuaded by Petitioner's arguments.

MSIE Kit discloses an example of an internet explorer display with a Channel Bar Pane and a Browser Pane. Ex. 1010, xxxvi, 212, 694; Ex. 1003 ¶ 114. Figure xxxvi depicts a Channel Bar Pane including various Active Channel elements. *See* Ex. 1010, xxxvi; Ex. 1003 ¶ 114. This is illustrated in the annotated version of Figure xxxvi below.

---

[16] Petitioner incorrectly cited Exhibit 1006. That is a typographical error, which we corrected.

[17] Because we find that MSIE Kit discloses the preamble, we need not decide whether the preamble is limiting. *See Nidec*, 868 F.3d at 1017.

IPR2022-00590
Patent 9,043,712



Pet. 26 (annotating Ex. 1010, xxxvi). Figure xxxvi depicts a sample desktop with an internet explorer window divided into an Active Channel Bar Pane (on the left) which includes a number of Active Channel elements, one of which is expanded and highlighted in blue and annotated with the caption "a first tile." Ex. 1010, xxxvi; Ex. 1003 ¶ 114. The right-side of Figure xxxvi shows a browser pane displaying a webpage and has been highlighted in green and annotated with the caption "a second tile". Ex. 1010, xxxvi; Ex. 1003 ¶ 114.

As discussed in detail below, the Active Channel element satisfies our construction of "tile" and is a first tile. First, the Active Channel element is a graphical user interface element. Ex. 1003 ¶ 115. The Active Channel element is an area of the display which is separate from the rest of the display (as shown by the lines shown on Figure xxxvi dividing them), displays logos, links and/or content of an associated website, and which can be manipulated by a user. Ex. 1003 ¶ 115; Ex. 1010, xxxv–xxxvi, 212, 690. Accordingly, the Active Channel element acts as an interface to the software and computer system. Ex. 1003 ¶ 115. Such Active Channel elements are also similar to various tiles identified in the '712 patent. *See* Ex. 1001,

IPR2022-00590
Patent 9,043,712

Figs. 1 (middle left and bottom left tiles), 4 (Element 404), 11:45–46 (describing the tile as "a portion of . . . text of a world-wide web page").

Second, the Active Channel element's content can be refreshed. Ex. 1003 ¶ 116. Specifically, MSIE Kit describes how the Active Channel elements can be refreshed according to an assigned rate. Ex. 1003 ¶ 116; Ex. 1010, 185, 213, 215, 223. For example, MSIE Kit states that "[c]hannel updates use scheduled Web crawls. Users can accept the publisher's schedule (specified in the CDF file) for updates or specify custom update schedule." Ex. 1010, 213. A red gleam is then used to indicate that one of the elements has updated data. Ex. 1010, 213. MSIE Kit also states that "[p]ublishers can specify a schedule using the SCHEDULE element as a child element in the first CHANNEL element. All subchannels and items in a CDF file are updated according to this schedule." Ex. 1010, 223.

Third, an Active Channel element can be selected to provide access to an information source. Ex. 1003 ¶ 117. Specifically, Active Channel elements can be selected by clicking on an element, which provides access to the underlying website or page, which Petitioner maps to the information source. Ex. 1003 ¶ 117; Ex. 1010, 212, 220, 694, 696. For example, MSIE Kit states that "[w]hen a user clicks the top-level channel, the lower-level items appear. Each item typically represents a Web page, but can represent any URL." Ex. 1010, 212. "Similarly, as shown in the figure above, pointing to a hyperlink displayed in the Active Channel Bar selects the Channel associated with the hyperlink and displays a summary of the linked page." Ex. 1003 ¶ 117; *see also* Ex. 1010, 694 (The summary page "provide[s] a brief description of available updates and provide[s] hyperlinks to the corresponding notification page for each update."), 696 ("When users

26

IPR2022-00590
Patent 9,043,712

select the channel on the Channel bar or in the Favorites menu, the summary page appears in the browser's right pane." (emphasis omitted)).

Petitioner has also sufficiently shown that the browser pane is also a tile, specifically the second tile. First, because the browser pane is a separate area of the display that can be manipulated by the user, it is a graphical user interface element. Ex. 1003 ¶ 119. For example, the user can select one of the hyperlinks displayed on the page in the browser pane. Ex. 1003 ¶ 121.

Second, the browser pane can be refreshed. Ex. 1003 ¶ 120. The refresh can be done by clicking one of the Active Channel elements, clicking the refresh button on the browser, or pressing F5 on the keyboard. *See* Ex. 1003 ¶ 120; Ex. 1010, 140, 212, 694, 696. Specifically, MSIE Kit states that "[w]hen a user clicks an item in the Channel bar hierarchy, the corresponding Web page displays in the browser." Ex. 1010, 212. Similarly, MSIE Kit explicitly describes refreshing a webpage by clicking the refresh button (Ex. 1010, 133)[18] or by pressing the F5 key (Ex. 1010, 558).[19] Ex. 1003 ¶ 120.

Third, the browser pane can be selected to provide access to an information source. *See* Ex. 1003 ¶ 121. As discussed with regard to the graphical user interface element requirement, a user can click on a hyperlink located in the browser pane. Ex. 1003 ¶ 121 (citing Ex. 1010, 136, 137, 776). "Such a selection provides the user access to the information from the

---

[18] "[Y]ou can always manually update the cache while browsing Web pages by clicking the **Refresh** button on the browser toolbar to see any changes to the page." Ex. 1010, 133.

[19] Stating that F5 is the shortcut key to "[r]efresh the current page." Ex. 1010, 558.

IPR2022-00590
Patent 9,043,712

associated website." Ex. 1003 ¶ 121; *see also* Ex. 1010, 177 ("Therefore, information in desktop items often includes hyperlinks or hot spots, so users can click designated area to open a browser window and obtain the details they want."), 211 (describing how clicking on a hyperlink takes you to an information source).

Patent Owner argues that neither the Active Channel element nor the browser pane is a tile. PO Resp. 35–39. For the reasons discussed below, we do not agree with Patent Owner's arguments.

First, Patent Owner argues that "[t]he browser pane relied upon by Petitioner is nothing less than a complete Internet Explorer window." PO Resp. 35. Accordingly, to Patent Owner, it is therefore not a tile. PO Resp. 35; *see also* PO Resp. 35–36. However, that argument is premised on a claim construction that we rejected. *See* Section II.C.1., *supra*. Because the argument is not commensurate with the scope of the claim, it is inapposite.

Second, Patent Owner argues that the Active Channel elements cannot be refreshed. PO Resp. 36–39. Specifically, Patent Owner argues that although "CDF files allow a type of updating relating to the URLs associated with Active Channel elements and the schedule tag of the CDF file, . . . this updating does not display refreshed content in Active Channel elements." PO Resp. 36 (citing Ex. 1010, 190–91, 211, 213, 315–16; Ex. 2001 ¶¶ 112, 129, 132, 138, 141–146). According to Patent Owner, that "updated information is displayed in the browser pane, never in the Active Channel element." PO Resp. 36.

As support, Patent Owner directs us to the portions of MSIE Kit that describe how the CDF file is used in channel updating. PO Resp. 36–37. Patent Owner then argues that "[t]he channel updates relied upon by

IPR2022-00590
Patent 9,043,712

Petitioner do _not_ update the displayed table of contents." PO Resp. 38.
Patent Owner also argues that "[t]hese channel updates use scheduled web
crawls that check a website for updated content and may download the
updated content to the user's cache to provide offline accessibility." PO
Resp. 38 (citing Ex. 1010, 190-91, 213; Ex. 2001 ¶¶ 132, 138, 144).
According to Patent Owner, "[t]he web crawls do not display the updated
content in the Active Channel element," but instead display a notification to
the user—a red gleam in the left corner of the icon for the top-level channel.
PO Resp. 38 (citing Ex. 1010, 190–91, 213; Ex. 2001 ¶¶ 139–139, 144).
Because of this, Patent Owner argues, "the Active Channel element is not
configured to or capable of displaying refreshed content—it merely notifies
the user that refreshed content is available from a website or a local cache of
that website." PO Resp. 38.[20]

Patent Owner's description is correct, as far as it goes. MSIE Kit
describes how it retrieves information from a web server and that the
information can be downloaded to provide offline access. Ex. 1010, 190–91,
213. MSIE Kit also describes how it uses a red gleam to notify the user
when updated content is available for a channel. Ex. 1010, 213.
Furthermore, that "red gleam appears in the left corner of the icon for the
top-level channel" and "does not appear for individual channel items or
subchannels." Ex. 1010, 213.

---

[20] Patent Owner also argues that a person having ordinary skill in the art
would not modify MSIE Kit to make the Active Channel elements
refreshable. PO Resp. 38–39. Although that is relevant to Petitioner
grounds based on obviousness, we need not address it in this anticipation
ground.

IPR2022-00590
Patent 9,043,712

However, Patent Owner does not discuss what happens next, and in doing so, misses the refreshed information. Once the red gleam appears, the user can click on the Active Channel element and expand it to see the updated information. Ex. 1003 ¶ 151; Ex. 1010, xxxvi (showing an expanded Active Channel element with updated URL links), 212 ("When a user clicks the top-level channel, the lower-level items appear. Each item typically represents a Web page, but can represent any URL."), 220 (showing example of a CDF file of a news channel with updated articles). Such refreshed updating is explicitly described in MSIE Kit's hypothetical scenarios of using the system with Active Channels with webcasting:

> System administrators can use managed Webcasting to provide a wide variety of information delivery solutions. Possible scenarios include:
>
> . . . .
>
> A credit manager subscribes to an external (fee-based) Active Channel that provides a personalized desktop ticker that delivers news about significant changes in customer credit ratings. . . .
>
> An executive subscribes to Active Channels providing industry news. Some channels are supplied by news providers, while other channels are fed by several electronic news feeds, brought in-house, filtered and categorized, and published internally. When notified that something new has arrived, the executive can scan headlines and decide what to read first.

Ex. 1010, 211. Such tickers and updated headlines show that the Active Channel element is refreshed and new data is displayed.

The implausibility of Patent Owner' argument that the Active Channel element cannot be refreshed is shown by Figure xxxvi. The Active Chanel element in Figure xxxvi is for MSNBC news and has links for various world news articles. If Patent Owner was correct and the Active Chanel element

30

can never be refreshed, then the news stories would never change. That is, the same "news" stories would be shown every day, year after year. That defies common sense.

(2) *Partitioning a Visual Display . . . into an Array of Tile*

Petitioner argues that MSIE Kit discloses "partitioning a visual display rendered by the device into an array of tiles" as recited in claim 1. Pet. 28, 29; Pet. Reply 13–14. For the reasons set forth below, we are sufficiently persuaded by Petitioner's arguments.

As shown in Figure xxxvi, the Active Channel elements and Browser Pane are displayed as a grid within an Internet Explorer window on the video display. Ex. 1010, xxxvi; Ex. 1003 ¶ 122. That grid is an orderly arrangement of tiles with multiple tiles (Active Channel elements) in the first column and one tile (the Browser Pane) in the second column. Ex. 1010, xxxvi; Ex. 1003 ¶ 130. Both columns of tiles have the same height. Ex. 1010, xxxvi; Ex. 1003 ¶ 130. This is similar with what is shown in Figure 9 of the '712 patent. That is, Figure 9 shows elements 802-1-1, 802-2-1, and 802-1-2 arranged as a grid of multiple columns each having the height and with one column having multiple tiles and the second column having a single tile. Ex. 1001, Fig. 9; *see also* Ex. 1001, 16:18–37 (stating that not all tiles need to be the same size). Accordingly, MSIE Kit discloses this limitation.

Patent Owner argues that "Petitioner's argument fails because the element allegedly partitioned into an array of tiles is a *window*, not a *visual display*." PO Reps. 34 (citing Ex. 1010, xxxvi, 104, 108; Ex. 2001 ¶¶ 97–101, 109, 122–126). According to Patent Owner, "[a]lthough a window may appear on a visual display, the two elements are distinct. This distinction is disclosed by the specification and understood by a person of skill in the art.

This distinction has important consequences." PO Resp. 34 (citation omitted); *see also* PO Resp. 34 (describing the advantages of uniformity of appearance).

We do not agree with Patent Owner's argument. Patent Owner's argument is premised on a claim construction that we rejected. *See* Section II.C.2., *supra*. Because the argument is not commensurate with the scope of the claim, it is inapposite.

### c) Limitation 1.c: "Wherein Each Tile in the Array of Tiles Is Associated with an Information Source in a Plurality of Information Sources"

Claim 1 further recites "wherein each tile in the array of tiles is associated with an information source in a plurality of information sources." Ex. 1001, 30:28–30. Petitioner argues MSIE Kit discloses that limitation. Pet. 29–30. Specifically, Petitioner argues that "[t]he disclosed system stores a link, such as a URL, which associates an Active Channel element with an information source, such as a website." Pet. 29 (citing Ex. 1010, 111, 212). Petitioner also argues that "the browser pane of the Internet Explorer window can be associated with an 'information source,' *e.g.*, the web page it is displaying at any point in time, by the system using the URL of that web page to obtain the information to be displayed in the browser pane." Pet. 29 (emphasis omitted) (citing Ex. 1010, xxxv, 111, 188, 212, 220, 690; Ex. 1003 ¶ 132). Petitioner also argues that "Active Channel elements and the browser pane may be associated with any of the plurality of websites and web pages available on the Web because they can include any web content supported by Internet Explorer." Pet. 30 (citing Ex. 1010, 212, 221; Ex. 1003 ¶ 133).

IPR2022-00590
Patent 9,043,712

After reviewing Petitioner's arguments and information regarding this limitation, including the Houh Declaration, which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that MSIE Kit discloses this limitation.

    *d)* *Limitation 1.d: "Wherein Content of a Second Tile of the Array of Tiles Depends upon Content of a first tile of the Array of Tiles"*

Claim 1 further recites "wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles." Ex. 1001, 30:30–32. Petitioner argues MSIE Kit discloses this limitation. Pet. 30–31; Pet. Reply 14–16. For the reasons set forth below, we are sufficiently persuaded by Petitioner's arguments.

MSIE Kit discloses that when a user selects an Active Channel element, it both expands to display a summary notification and causes the browser to display the same. *See* Ex. 1003 ¶ 136; Ex. 1010, xxxvi, 212, 694, 696. Reproduced below is an annotated and modified version of Figure xxxvi.

IPR2022-00590
Patent 9,043,712



Pet. 31 (citing Ex. 1010, xxxvi). Annotated and modified Figure xxxvi above shows one Active Channel element expanded and a portion of the Browser Pane expanded. Pet. 31; Ex. 1010, xxxvi. Two of the items in the Active Channel element are "Mobulu chased out of power" and "Tuskegee survivors get apology." Pet. 31; Ex. 1010, xxxvi. The expanded portion of the browser pane says "U.S. APOLOGIZES Tuskegee called 'shameful'" and "MOBUTU RESIGNS Dictator fees Kinshasa; Kabila's rebels at gate." Pet. 31; Ex. 1010, xxxvi. Although the words in the Active Channel element are not identical to those in the browser pane, they describe the same news article. This confirms that selecting an Active Channel element (first tile) will affect what is shown on the browser pane. *See* Ex. 1003 ¶ 137; Ex. 1010, 694 ("The top-level notification page is the Web page users see when they click on the top-level Channel bar. By default, notification pages appear in the browser window . . . ."), 696 ("When users select the channel

on the Channel bar or in the Favorites menu, the summary page appears in the browser's right pane." (emphasis omitted)). Or, stated differently, the content of the Browser Pane (second tile) depends on the content of the selected Active Channel element (first tile). Ex. 1003 ¶¶ 137–138. Moreover, MSIE Kit describes how the content in the Browser Pane can be changed based on clicking an element in an Active Channel item. *See* Ex. 1010, 212 ("When a user clicks an item in the Channel bar hierarchy, the corresponding Web page displays in the browser.").

Patent Owner argues that MSIE Kit does not disclose this limitation. *See* PO Resp. 40–47; PO Sur-reply 10–11. As discussed below, we do not agree with those arguments.

First, Patent Owner argues that what Petitioner identifies as the first and second tile do not display the same summary notification page. PO Resp. 41–46. We find this argument inapposite. Nothing in the claim requires that the content be identical. All that is required is that the content of the second tile depends on the content of the first tile. And, as discussed above, a user can select the content of the Browser Pane (second tile) by selecting either an Active Channel item (first tile) or a portion of the content of the Active Channel item (first tile). *See* Ex. 1010, 212, 694, 696; Ex. 1003 ¶ 137. Thus, the content of the Browser Pane depends on the content of the Active Channel element.

Second, Patent Owner argues the content of the Browser Pane "always depends on the content of the Web page URL, not on the content displayed in an Active Channel element (the alleged first tile)." PO Resp. 42 (citing Ex. 1010, 108; Ex. 2001 ¶¶ 140–146); *see also* PO Sur-reply 10. According to Patent Owner, "[w]hile a user may select a hyperlink in the Active Channel element to navigate the browser pane to a URL, the content

of that URL is *not* displayed by the Active Channel element." PO Resp. 42
(citing Ex. 1010, 108; Ex. 2001 ¶¶ 140–146). "Rather," Patent Owner
argues, relying on the testimony of Mr. Weadock, "the content displayed by
the Active Channel element is defined by a different source." PO Resp. 42
(citing Ex. 1010, 108; Ex. 2001 ¶¶ 140–146).

We do not agree with the conclusions of Patent Owner or
Mr. Weadock. The claim does not require that the content of the first tile is
used to generate the content of the second tile. Instead, the claim simply
requires that the "content of a second tile . . . depends upon content of a first
tile." Because the content of the Browser Pane (second tile) depends on
what the user selects for the Active Channel element, MSIE Kit discloses the
limitation. It does not matter that the content of the browser pane comes
directly from a website and not the Active Channel element. Nothing in the
claim requires it to do so.

Third, Patent Owner makes various arguments regarding the CDF,
title tags, and how they operated. *See* PO Resp. 42–43, 46–47; PO Sur-reply
10–11. Those arguments are inapposite as we do not rely on either the CDF
or title tags in reaching our findings.

Importantly, neither Patent Owner nor Mr. Weadock address the clear
disclosure of MSIE Kit pages 212, 694, and 696 which describe how a user
selecting either the Active Channel element (first tile) or an item in the
Active Channel element (first tile) controls what is displayed in the browser
pane (second tile). *See* Ex. 2001 ¶¶ 141–146; PO Resp. 40–47;
PO Resp. 10–11. That unrebutted evidence, cited at Petition pages 30 and
31 and by Dr. Houh in paragraph 137, is sufficiently persuasive to show that
MSIE Kit discloses the limitation.

IPR2022-00590
Patent 9,043,712

e) *Limitation 1.e: "Assigning a First Update Rate to the First Tile"*

Claim 1 further recites "assigning a first update rate to the first tile."
Ex. 1001, 30:33. Petitioner argues MSIE Kit discloses that limitation.

Pet. 31–32. Specifically, Petitioner argues that MSIE Kit discloses that

each Active Channel element may be updated based on a
programmed subscription schedule, EX1010, 185, 200, 211, 213,
215, 223, when the user indicates the Channel should be updated,
EX1010, 133, 140, 220, 558, 694, or when the user clicks on the
Channel and thereby expands the element to display a detailed
map of the Channel, EX1010, 220, 212, xxxvi; EX1003, ¶151.

Pet. 31–32.

After reviewing Petitioner's arguments and information regarding this
limitation, including the Houh Declaration, which Patent Owner does not
address separately (*see* PO Resp.), we are persuaded that Petitioner
sufficiently demonstrates that MSIE Kit discloses this limitation.

f) *Limitations 1.f and 1.g: Updating Tiles*

Claim 1 recites "updating information from a first information source
in the plurality of information sources presented to the first tile in
accordance with the first update rate" and "updating content of the second
tile based on the information updated to the first tile." Ex. 1001, 30:34–38.
Petitioner argues that MSI Kit discloses these limitations. Pet. 32–33;
Pet. Reply 16–19.

With regard to the first tile, as discussed above in Sections
II.D.2.(b)(1) and II.D.2.(e), a user can assign an update rate to each Active
Channel Element. *See also* Ex. 1003 ¶¶ 116, 150–151, 155 (citing relevant
portions of MSIE Kit). This will result in the Active Channel element
obtaining updated information. Ex. 1003 ¶ 155; Ex. 1010, 211 (describing
examples with updated displays), 213 (discussing updates), 215 (scheduling

updates), 223 ("All subchannels and items in a CDF file are updated according to this schedule"), 694 ("Since only top-level channel shows the update gleam, you should use top-level notification pages to provide a summary of all available updated. The top-level notification page is the Web page users see when they click on the top-level Channel bar. . . . The summary page could provide a brief description of available updates and provide the hyperlinks to the corresponding notification page for each update.").

As discussed above in the claim construction section, nothing in these limitations requires that the updated information presented to the first tile be displayed. *See* Section II.C.3. That said, although not required by the claim, MSIE Kit discloses displaying the updated information. *See* Ex. 1010, 213 (providing a red gleam), 694 (discussing updates to the summary page). Additionally, the updated information can be displayed by clicking an Active Channel element and causing it to expand, thus displaying the updated information. Ex. 1001 ¶ 156; Ex. 1010, 220 ("When expanded, this channel appears in the Internet Explorer Channel bar with the following structure."), 212 ("When a user clicks the top-level channel, the lower-level items appear."), 694 ("The top-level notification page is the Web page users see when they click on the top-level Channel bar.").

With regard to the second tile, MSIE Kit discloses that the content displayed by the second tile (Browser Pane) is updated based on the updated content in the first tile (Active Channel element). *See* Ex. 1003 ¶¶ 159–161. Specifically, a user clicking an Active Channel element will expand the element to show the notification or summary page. Ex. 1003 ¶ 159; Ex. 1010, xxxvi (showing expanded notification page for the "news" element), 212 ("When a user clicks the top-level channel, the lower-level

IPR2022-00590
Patent 9,043,712

items appear."), 220, 221 ("Keep in mind that the Channel bar displays a navigable outline of the URLs you specify in a CDF file. The exposed hierarchy of the channel helps users efficiently navigate through a channel to find the content that most interests them."), 694. Doing so causes the Browser Pane to be updated to also display the notification page associated with the expanded Active Channel element. *See* Ex. 1003 ¶¶ 160–161; Ex. 1010, xxxvi, 212, 694, 696.

Patent Owner argues that MSIE Kit does not disclose these limitations. PO Resp. 47–51; PO Sur-reply 12–13. For the reasons set forth below, we do not agree with Patent Owner's arguments.

First Patent Owner argues that we erred in the Institution Decision when we held that the claim limitation did not require the tile to display the updated information. PO Resp. 47–48; PO Sur-reply 13; *see also* Inst. Dec. 27 ("Moreover, although the claim requires updating information to the first tile, the claim does not recite displaying the updated information." (citing Ex. 1001, 30:34–36)). However, we addressed and rejected those arguments in the claim construction section.

Regardless, although we hold that the claims do not require the first tile to display the updated information, as discussed above, we find that MSIE Kit discloses the Active Channel element (the first tile) displaying the updated information.

Second, Patent Owner argues that "expanding an Active Channel element simply displays more of the table of contents and does not update the element with information from a website." PO Resp. 50; *see also* PO Resp. 48–50, PO Sur-reply 12–13. However, Patent Owner misunderstands Petitioner's arguments, which we adopt in this Decision. We do not find that simply expanding the Active Channel element updates

39

the element. Instead, as discussed above, we rely on MSIE Kit's explicit disclosure of updating the information based on a schedule. We simply point to expanding of the Active Channel element as one way of displaying that updated information. *See*, *e.g.*, Ex. 1010, xxxvi, 212, 694.

Third, Patent Owner argues that "the Active Channel element (allegedly the first tile) is not updated by clicking a hyperlink." PO Resp. 50 (citing Pet. 26–27). But that has nothing to do with our findings, which are not based on clicking a hyperlink.

Fourth, Patent Owner argues that although MSIE Kit discloses that updates are done, "the graphical Active Channel element is not updated with and does not display this website information." PO Resp. 50 (citing Ex. 1010, 213, 216, 450). Instead, Patent Owner argues that the only update is a red gleam, which is not information from a website. PO Resp. 50–51 (citing Ex. 1010, 213; Ex. 2001 ¶¶ 138–139, 142–143).

Although the specific pages cited by Patent Owner do not discuss the updated information being displayed, other pages do. *See*, *e.g.*, Ex. 1010, 212, 694; Ex. 1003 ¶¶ 160–161. Patent Owner does not address those disclosures, which we have relied on.

Fifth, Patent Owner argues that because the first tile is not updated, the updates to the second tile cannot be based on updates to the first tile. PO Resp. 51. However, as discussed above, the foundation of Patent Owner's argument is incorrect. Contrary to Patent Owner's assertion, for the reasons discussed above, the Active Channel element (first tile) is updated.

Sixth, relying on its argument that Petitioner has not shown that MSIE Kit discloses the limitation "wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles,"

IPR2022-00590
Patent 9,043,712

Patent Owner argues that at most, "[Petitioner] has shown that CDF Files specify the content displayed in the browser pane separately and independently from the content displayed in the Active Channel elements." PO Sur-reply 13 (incorporating arguments for "wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles"). We do not agree with those arguments for the reason set forth in Section II.D.2.(c).

> g)  *Conclusion Regarding Claim 1*

For the reasons set forth above, Petitioner has shown by a preponderance of the evidence that claim 1 is anticipated by MSIE Kit.

> 3.  *Analysis of Claims 2–4*

Petitioner has demonstrated that MSIE Kit discloses all of the limitations set forth in claims 2–4. *See* Pet. 34–37.

Besides the arguments discussed above with regard to claim 1, Patent Owner does not dispute in this proceeding Petitioner's argument regarding claims 2–4. *See* PO Resp. 33–51.

Based on the evidence and arguments presented in the Petition, which are not otherwise disputed by Patent Owner, we determine that Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claims 2–4 was anticipated by MSIE Kit. *See Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1375 (Fed. Cir. 2023) ("Where a party 'does not raise any arguments with respect to any other claim limitation, nor does it separately argue [the] dependent claim,' '[the] dependent claim . . . stands or falls together with [the] independent claim.'" (quoting *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1340 (Fed. Cir. 2020))).

IPR2022-00590
Patent 9,043,712

### E. Other Grounds

In addition to the ground discussed above based on anticipation by MSIE Kit, Petitioner argues the claims are unpatentable under additional grounds. Pet. 8–9. Some of those grounds are based on the claims being obvious over MSIE Kit with additional references. Pet. 8. Others are based on Excel97 with or without an additional reference. Pet. 8–9. Because we determine that claims 1–4 are anticipated by MSIE Kit, we do not address the parties' arguments regarding those alternate grounds. *See Boston Scientific Scimed, Inc. v. Cook Gp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

### III. CONCLUSION[21]

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1–4 of the '712 patent as anticipated by MSIE Kit.

---

[21] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00590
Patent 9,043,712

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–4 | 102(a), (b) | MSIE Kit | 1–4 | |
| 1–4 | 103(a) | MSIE Kit, Jones[22] | | |
| 1–4 | 103(a) | MSIE Kit, Miklos[23] | | |
| 1–4 | 103(a) | MSIE Kit, Miklos, Jones[24] | | |
| 1–4 | 102(a), (b) | Excel97[25] | | |
| 1–4 | 103(a) | Excel97[26] | | |
| 1–4 | 103(a) | Excel97, Bhansali[27] | | |

---

[22] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[23] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[24] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[25] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[26] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[27] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

IPR2022-00590
Patent 9,043,712

| 1–4 | 103(a) | Excel97, Igra[28] | | |
| 1–4 | 103(a) | Excel97, Igra, Bhansali[29] | | |
| **Overall Outcome** | | | 1–4 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, Petitioner has shown by a preponderance of the evidence that claims 1–4 of the '712 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[28] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[29] As explained above, because we determine that claims 1–4 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

IPR2022-00590
Patent 9,043,712

FOR PETITIONER:

Joseph Micallef
SIDLEY AUSTIN LLP
jmicallerf@sidley.com


FOR PATENT OWNER:

Shaun Gregory
Jason Houdek
TAFT STETTINIUS & HOLLISTER LLP
sgregory@taftlaw.com
jhoudek@taftlaw.com

45

Trials@uspto.gov                                                    Paper 22
571-272-7822                                          Date: October 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MICROSOFT CORP.,
Petitioner,

v.

SURFCAST, INC.,
Patent Owner.

———————

IPR2022-00423
Patent 9,032,317 B2

———————

Before SCOTT B. HOWARD, JASON W. MELVIN, and
MICHAEL T. CYGAN, *Administrative Patent Judges.*

HOWARD, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00423
Patent 9,032,317 B2

# I.   INTRODUCTION

## A.   Background and Summary

Microsoft Corp. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–19 of U.S. Patent No. 9,032,317 B2 (Ex. 1001, "the '317 patent"). Surfcast, Inc. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6. We instituted an *inter partes* review of claims 1–19 of the '317 patent on all grounds of unpatentability alleged in the Petition. Paper 9 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 14, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 15, "PO Sur-reply").

An oral hearing[1] was held on July 12, 2023, and the record contains a transcript of this hearing. Paper 21 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all of the challenged claims are unpatentable.

## B.   Real Parties in Interest

Petitioner identifies itself as the real party in interest. Pet. 2.

Patent Owner identifies itself as the real party in interest. Paper 3, 2 (Patent Owner's Mandatory Notices).

## C.   Related Matters

The parties identify the following district court proceedings: *SurfCast, Inc. v. Microsoft Corporation*, No. 6:21-cv-01018-ADA (W.D.

---

[1]   A single consolidated oral hearing was held for IPR2022-00423, IPR2022-00590, IPR2022-00591, and IPR2022-00592. Tr. 1, 3:2–5.

IPR2022-00423
Patent 9,032,317 B2

Tex.) and *SurfCast, Inc. v. Microsoft Corporation*, No. 2:12-cv-00333-DBH
(D. Me.) ("Maine Proceeding"). Pet. 3; Paper 3, 2. Additionally, Petitioner
identifies various *inter partes* review proceedings, including a series of *inter
partes* review proceedings in which the claims of a related patent were found
unpatentable.[2] Pet. 1, 3.

### D. The '317 Patent

The '317 patent is entitled "System and Method for Simultaneous
Display of Multiple Information Sources" and is directed to a graphical user
interface that organizes content from a variety of information sources into a
grid of tiles, each of which can refresh its content independently of the
others. Ex. 1001, codes (54), (57). As described in the "Background," at the
time of the invention, display technologies lacked a user interface capable of
presenting any type of information in a consistent manner and in such a way
that all open channels could indicate their activity on a continual basis.
Ex. 1001, 4:39–47. In response to this need, the '317 patent describes a
graphical user interface comprising a grid of tiles that resides on the user's
computer desktop. Ex. 1001, 4:54–55. "The grid of tiles provides a
uniform[] graphical environment in which a user can access, operate, and/or
control multiple data sources on electronic devices." Ex. 1001, 4:55–58.
Figure 1 is reproduced below.

---

[2] *Microsoft Corporation v. SurfCast, Inc.*, IPR2013-00292 is representative
of those proceedings. A copy of the Final Written Decision ("the 403
FWD") is Exhibit 1017.

IPR2022-00423
Patent 9,032,317 B2



Figure 1 illustrates "a user interface comprising a grid of tiles as might be depicted on a display screen." Ex. 1001, 6:25–27; *see also* Ex. 1001, 7:27–39 (describing the various tiles).

*E. Illustrative Claims*

Claims 1, 5, 12, and 16 are independent. Claims 1 and 5, reproduced below with the disputed limitations italicized, are illustrative of the claimed invention.[3]

      1. [1.a] A system for communicating with multiple data sources, the system comprising:

      [1.b] a client device adapted for communication with a server device, [1.c] wherein the client device includes a display device, a processor configured to execute instructions, and a memory connected to the processor, [1.d] wherein the processor executes instructions to:

---

[3] For ease of reference, we use Petitioner's claim numbering scheme.

display, using the display device, *a grid of tiles*, [1.e] wherein a first tile of said grid of tiles is associated with a first data source residing on the server device, and a second tile of said grid of tiles is associated with a second data source, [1.f] and wherein the first tile displays a current content from the first data source and the second tile displays a current content from the second data source; and

[1.g] *check whether content in the first data source is updated relative to the current content of the first tile and, if so, display updated information from the first data source on the first tile.*

5.    [5.a] A method executed by a client device under control of a program, the client device including a processor, a display device for rendering a visual display, and a memory for storing the program, the method comprising:

[5.b] *partitioning* by the client device *at least a portion of the visual display into an array of tiles*, [5.c] a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;

[5.d] assigning by the client device a first update rate to the first tile;

[5.e] at a first update time in accordance with the first update rate*, sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update*;

[5.f] receiving at the client device a response to the conditional request from the first server device; and

[5.g] determining whether to update the first tile in accordance with the response from the first server device.

Ex. 1001, 30:21–39, 30:49–31:2 (emphases added).

IPR2022-00423
Patent 9,032,317 B2

*F.  Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–19 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s)/Basis |
|---|---|---|
| 1–19 | 102(a), (b) | MSIE Kit[5] |
| 1–19 | 103(a) | MSIE Kit |
| 1–19 | 103(a) | MSIE Kit, Jones[6] |
| 5–11 | 103(a) | MSIE Kit, RFC2068[7] |
| 5–11 | 103(a) | MSIE Kit, RFC2068, Jones |
| 1–19[8] | 103(a) | Excel97,[9] Bhansali[10] |
| 12–19 | 103(a) | Excel97, Bhansali, Perez[11] |

Petitioner relies on the testimony of Henry Houh, Ph.D.  Ex. 1003; Ex. 1065.  Dr. Houh was cross-examined after his initial testimony.  Ex. 2003.[12]  Dr. Houh was not cross-examined after his reply testimony.

---

[4]  The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013.  Because the application that issued as the '317 patent was filed before March 16, 2013, we apply the pre-AIA versions of the statutory bases for unpatentability.  *See* Ex. 1001, code (22).

[5]  Microsoft Press. (1998).  *Microsoft Internet Explorer Resource Kit.* (Ex. 1010).  All citations are to the native pagination.

[6]  U.S. Patent No. 6,819,345 B1, filed Feb. 17, 1998 (Ex. 1011).

[7]  Network Working Group, Request for Comment 2068, January 1997 (Ex. 1012).

[8]  Petitioner presents two theories/grounds for claims 12–19.  *See* Pet. 8.  We have consolidated them as a single ground.

[9]  Person, R. (1997).  *Special Edition Using Microsoft Excel 97* (Ex. 1005).

[10]  U.S. Patent No. 6,006,239, filed Mar. 15, 1996 (Ex. 1006).

[11]  U.S. Patent No. 5,319,777, issued June 7, 1994 (Ex. 1013).

[12]  Contrary to our rules, Patent Owner only filed excerpts of the cross-examination testimony.  *See* 37 C.F.R. § 42.53(f)(7) (2021) ("The testimony

IPR2022-00423
Patent 9,032,317 B2

Patent Owner relies on the testimony of Glenn E. Weadock.

Ex. 2001.  Mr. Weadock was not cross-examined in this proceeding.

## II.  ANALYSIS

### A.  *Legal Standards*

#### 1.  *Anticipation*

A patent claim is unpatentable under 35 U.S.C. § 102 if "the four

corners of a single, prior art document describe every element of the claimed

invention, either expressly or inherently, such that a person of ordinary skill

in the art could practice the invention without undue experimentation."

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed.

Cir. 2000).  "A single prior art reference may anticipate without disclosing a

feature of the claimed invention if such feature is necessarily present, or

inherent, in that reference."  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958

(Fed. Cir. 2014).  Moreover, the reference must also "disclose[] within the

four corners of the document not only all of the limitations claimed but also

all of the limitations arranged or combined in the same way as recited in the

claim."  *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir.

2008).  However, "the reference need not satisfy an *ipsissimis verbis* test."

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

#### 2.  *Obviousness*

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the

Supreme Court set out a framework for assessing obviousness under

35 U.S.C. § 103(a) that requires consideration of four factors: (1) the "level

---

*must* be filed as an exhibit" (emphasis added)).  Accordingly, we only
consider the filed pages and do not, because we cannot, consider other pages
even if cited by the parties. *See* Pet. Reply 15 (citing Ex. 2003, 191:5–18);
PO Sur-reply 11 (citing Ex. 2003, 180:10–181:21).

7

IPR2022-00423
Patent 9,032,317 B2

of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) if in evidence, "secondary considerations" of non-obviousness such as "commercial success, long felt but unsolved needs, failure of others, etc." *Id.* at 17–18. "While the sequence of these questions might be reordered in any particular case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the U.S. Court of Appeals for the Federal Circuit has repeatedly emphasized that "it is error to reach a conclusion of obviousness until all those factors are considered," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). [13]

B. *Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and

---

[13] Because neither party addresses objective evidence of non-obviousness, we focus solely on the first three *Graham* factors.

(6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

Petitioner argues that a person having ordinary skill in the art would have had "a Master's degree in software engineering or computer science (or equivalent experience working in industry) and several years of experience designing, writing or implementing software products, either at the application or operating system level." Pet. 11 (quoting Ex. 1003 ¶ 66). Petitioner further argues that a person having ordinary skill in the art "would have been familiar with various technological concepts, including those relating to user interfaces, operating systems and software applications, basic computer functionality, networking and data processing." Pet. 11 (citing Ex. 1003 ¶ 66).

Patent Owner does not address the level of skill or Petitioner's description of what a person having ordinary skill in the art would have been familiar with. *See* PO Resp.

Because Petitioner's formulation of the level of ordinary skill in the art is consistent with the '317 patent and the asserted prior art, and is not challenged by Patent Owner, we adopt it and apply it in our analysis below.

*C. Claim Construction*

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is

IPR2022-00423
Patent 9,032,317 B2

articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2021). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

Petitioner argues that the following claim limitations need to be construed: (1) "tile," (2) "data source"/"information source," (3) "partitioning . . . at least a portion of the visual display into an array of tiles," and (4) "update rate." Pet. 12–17. Patent Owner also identifies "grid" and "sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update" as limitations that we should construe. PO Resp. 6–29.

In IPR2013-00292, the Board construed a number of terms in the '403 patent,[14] which is the "ultimate parent" of the '434 patent through a chain of continuations and continuations in part. IPR2013-00292, Paper 93 (Ex. 1017, the "403 FWD").[15] *See* Pet. 1. Because the '403 patent is the '434 patent's "ultimate parent," Petitioner submits that the 403 FWD constructions drive the proper constructions here. Pet. 10–19; Pet. Reply 1–

---

[14]  U.S. Patent No. 6,724,403.

[15]  The Federal Circuit affirmed the 403 FWD's unpatentability determinations. *SurfCast, Inc. v. Microsoft Corp.*, 639 F. App'x 651 (Fed. Cir. 2016).

11. Moreover, Petitioner argues, collateral estoppel bars Patent Owner from contesting constructions of the same terms in the '434 patent.[16]  Pet. Reply 1 (citing *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294–95 (Fed. Cir. 2018)).  Patent Owner argues that because the 403 FWD applied the "broadest reasonable interpretations," it does not have preclusive effect here, where we construe claims using the *Phillips* standard.  PO Sur-Reply 1 (citing *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016)).  We need not resolve that dispute, because we conclude that to the extent the 403 FWD construed terms applicable in this proceeding, those constructions comport with the *Philips* standard.

Below, we address the construction of all of the disputed terms except "data source"/"information source" and "update rate."  No other claim limitations need to be construed in order to address the parties' arguments.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*1. "Tile"*

Petitioner argues that a "tile" is "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source."  Pet. 12–15; Pet. Reply 1–8.  The 403 FWD construed "tile" the same as Petitioner's proposed construction here.  Ex. 1017, 7–10.

---

[16] Patent Owner does not dispute that the '403 patent and '434 patent specifications substantively match.

IPR2022-00423
Patent 9,032,317 B2

Patent Owner submits that a "tile" is "a graphical representation of an associated information source capable of displaying refreshed content, the graphical representation being persistent and selectable to provide access to underlying information of the associated information source, but providing a representation of the underlying information that is more limited than that provided by an associated information source." PO Resp. 7 (underlining omitted); *see also* PO Sur-Reply 1–6.

Claim 1 recites "display, using the display device, a grid of *tiles*." Ex. 1001, 30:28 (emphasis added). The context of the use of "tile" in the claims does not provide any assistance in determining its meaning.

The specification discusses "Tile Objects" at some length. Ex. 1001, 10:28–14:7. It states that "[a] tile presents content from any information source." Ex. 1001, 10:31–32. Further, "[t]iles are selectable and live" and the specification explains that "tiles are live in that each contains real-time or near real-time information" and, when selected, "the tile instantly provides the user with access to the underlying information." Ex. 1001, 12:3–11.

The specification frames tiles as contrasting with two other graphical user interface elements—icons and windows. Ex. 1001, 10:33–11:8. It presents tiles as "a third graphical representation of programs and files" and explains that "each tile is a viewer of a single information source." Ex. 1001, 10:62–11:2. To distinguish tiles, the specification states that, unlike icons, a tile "contains continually refreshed content" and compared to windows, "a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired." Ex. 1001, 11:3–8. Significantly, that comparison to windows uses exemplary characteristics

IPR2022-00423
Patent 9,032,317 B2

without defining aspects applicable to all tiles. The specification asserts that "many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do." Ex. 1001, 11:13–16. That said, the specification also gives an example of "expanding tile 406 to occupy the full area of the display" (Ex. 1001, 11:49–51), demonstrating that size does not define a tile or distinguish a tile from a window.

According to Patent Owner, a tile is a "graphical representation of an associated information source," not merely a graphical user interface element. PO Resp. 8–11. Patent Owner submits that "a graphical user interface element," as Petitioner proposes, "does not require a tile to be graphically displayed and does not require it to be a representation of anything." PO Resp. 9. In Patent Owner's view, while such an element is used for user interaction, it "need not be a representation of an information source or its underlying information." PO Resp. 10. As Petitioner points out, however, other claim language requires tiles be displayed. Pet. Reply 2. We therefore do not agree with Patent Owner that Petitioner's construction is deficient.

Moreover, in light of Petitioner's unpatentability contentions for MSIE Kit discussed below, the graphical representation aspect of Patent Owner's construction would not impact our conclusion. Patent Owner contends otherwise, in a general way, but does not explain that contention. *See* PO Resp. 11 ("These differences impact the prior art analysis."), 39–45 (the cited discussion, which distinguishes MSIE Kit's asserted tiles based only on providing the same representation "as any Internet Explorer window").

IPR2022-00423
Patent 9,032,317 B2

Next, Patent Owner argues that a tile must provide "a representation of the underlying information that is more limited than the representation provided by a window." PO Resp. 7, 11–15; *see also* Tr. 53:10–54:8. We do not agree.

While, as described above, the specification purports to distinguish tiles from windows, it does so with permissive terms rather than a restrictive definition. *See* Ex. 1001, 11:5–8. During the hearing, Patent Owner was unable to describe particular restrictions that would embody the limited representation. For example, Patent Owner asserted that degraded resolution would satisfy its proposed construction (Tr. 64:24–65:11) but that does not comport with a distinction from a window. A window may depict content at a variety of zooms, some of which would show an image with degraded resolution. *See* Tr. 68:6–15 (Patent owner discussing how pixels can be lost on a zoomed image). Patent Owner asserts that a window with zoom functionality lacks "a fundamentally or different in nature likeness or image." Tr. 68:11–15. But that assertion is detached from Patent Owner's proposed construction and unsupported by the specification. We conclude that the specification does not sufficiently distinguish a tile from a window to support Patent Owner's proposed construction.

In fact, Patent Owner admits that the specification does not have a clear definition but insists that it nonetheless defines a tile "as something other than either an icon or a window." Tr. 48:20–25. We do not agree. When identifying features that the specification describes to distinguish tiles from windows, Patent Owner points to other claim limitations, such as "[s]electability to provide access to the underlying information." Tr. 49:7–10; *see also* Tr. 50:3–8 (asserting a tile must be refreshable). Although such

14

limitations may capture aspects that the specification uses to distinguish tiles from other graphical interface elements, they do not support further construing "tile" narrowly as Patent Owner asserts. Stated otherwise, the specification's distinctions for tiles over icons or windows already appear as claim limitations and do not counsel in favor of further limiting "tile."

Further, Patent Owner's construction is unclear whether a tile must provide a graphical representation of its associated information source or of the information underlying that source. The proposed construction first requires a tile represent the source but then additionally requires it "provid[e] a representation of the underlying information," seemingly allowing no room for a tile that represents only the information source. PO Resp. 11. Those competing requirements would not comport with the specification. The exemplary tiles do not necessarily represent a source's underlying information, but instead may relate to the source itself. *See* Ex. 1001, Fig. 4 (tile 410, displaying the name of a broadcast signal; tile 408, displaying an icon indicating "New Mail!"), 11:51–55 (describing tile 408), 11:61–63 (describing tile 410). Thus, Patent Owner's proposed addition regarding the nature of a tile's representation would create an internal inconsistency in the meaning of a tile. We do not adopt Patent Owner's proposed restriction on the nature of a tile's representation.

Next, Patent Owner attempts to distinguish a tile "whose content may be refreshed" from one "capable of displaying refreshed content." PO Resp. 15–16. In this regard, Patent Owner distinguishes Petitioner's construction, which Patent Owner asserts "does not require that [tile] element to be capable of displaying the refreshed content." PO Resp. 15–16. We agree with Petitioner that the parties' different language regarding

refreshed content does not implicate any aspect of our unpatentability analysis. *See* Pet. Reply 5.

Finally, Patent Owner contends that a tile must be "selectable to provide access to underlying information of the associated information source," not just an element that, "when selected, provides access to an information source." PO Resp. 16–19. As Patent Owner explains, it seeks a distinction that "tiles themselves are selectable to provide access to underlying information of associated information sources, rather than access being provided by selecting the contents of a tile." PO Resp. 16. Patent Owner argues that Petitioner's construction, referring to an element "that, when selected, provides access to an information source," does not require the tile itself be selectable. PO Resp. 18–19. Patent Owner relies primarily on the specification's description that "[t]iles are selectable and live" and that, "[w]hen a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information." PO Resp. 16 (quoting Ex. 1001, 12:3–5). Petitioner relies on that same specification disclosure to argue that we should not restrict the manner of selecting a tile. Pet. Reply 6. The specification indicates that a tile may be selected "by mouse click or otherwise." Ex. 1001, 12:3–4.

Petitioner points out that the 403 FWD concluded that when "a user selects a link *included* in an Active Desktop item, the user necessarily selects the Active Desktop item." Ex. 1017, 36. That conclusion, which was part of a decision affirmed on appeal, *Surfcast*, 639 F. App'x 651, indicates that Patent Owner's proposed claim construction here would not preclude the claims from reading on MSIE Kit because selecting a link within an item selects the item itself. Thus, Patent Owner's construction would not affect

IPR2022-00423
Patent 9,032,317 B2

the outcome here. Regardless, we agree with Petitioner that, when the specification discloses a tile may be selected "by mouse click or otherwise," it indicates a broader range of selection mechanisms than proposed by Patent Owner. *See* Pet. Reply 6–7.

Although Patent Owner asserts that its proposed construction alone focuses on tiles themselves being selectable, we do not view the two constructions as supporting that distinction. As Petitioner points out, its proposed construction requires that a tile, "when selected, provides access to an information source" and therefore requires "that tiles can be selected." Pet. Reply 5, 8. Although Patent Owner seeks a construction that would not permit selection through activation of a link within a tile, we do not read the specification as so restrictive.

Based on the foregoing, and consistent with the Board's prior construction, we construe "tile" as "a graphical user interface element whose content may be refreshed and that, when selected, provides access to an information source."

    2. *"Grid"*

        a) *Patent Owner's Arguments*

Patent Owner argues that the term "grid" means "a regular arrangement of rows and columns, which may, but need not, allow a single tile to occupy more than one row and/or column." PO Resp. 19. According to Patent Owner, "regular" in its construction means "that the 'arrangement' enforces conformity to an established rule or standard continuously." PO Resp. 19. Patent Owner argues this is in contrast with "a *non-regular* arrangement [which] may happen to appear aligned with an established rule or standard at some point in time, but may at other times deviate from that

arrangement because it is not required to maintain conformity with the rule or standard continuously." PO Resp. 19 (emphasis in original).

In support of its construction, Patent Owner directs us to the claim construction order in the Maine proceeding. PO Reps. 20 (citing Ex. 1018, 76–77). Patent Owner also directs us to the section of the specification describing the "Grid Object":

> "Grid Object" section of the specification addresses "[t]he arrangement, layout and independent functioning of the tiles on the display . . ." (EX1001, 14:8–10.) "The grid controls the layout and priorities of the tiles." (EX1001, 14:22.) "The grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display." (EX1001, 15:61-63.) The grid's ability to control the layout and function of tiles and to contain tiles requires enforcing conformity to the positions delimited by the rows and columns.

> The specification also shows that conformity to the grid is maintained continuously. For example, when a "preconfigured" or "standard" grid can be "customized" by a user, for example, by using a "'drag and drop' technique" to add tiles to the grid. (EX1001, 19:9-39; *also see* 14:58-61.) Thus, conformity is maintained continuously while the user is interacting with and reconfiguring the grid.

PO Resp. 21; *see also* PO Sur-reply 7. Patent Owner also argues that although the software is exemplary, the object of "grid object" is not. PO Sur-reply 7.

Additionally, Patent Owner argues that continuously does not mean unalterable. PO Sur-reply 7–8. Instead, according to Patent Owner, the grid "enforce[s] conformity with the rows and columns of the grid when the tiles are positioned in the grid object." PO Sur-reply 8.

Patent Owner also argues that its construction is consistent with dictionary definitions of the term "regular":

IPR2022-00423
Patent 9,032,317 B2

The continuous regularity of a grid is also consistent with dictionary definitions of the term regular, for example, "lasting or happening over a long period" (EX2019, 2 (definition 7)), "conforming in form, build, or arrangement to a rule, principle, type, standard, etc." (EX2020, 1 (definition 1)), and "conforming in form, build, or arrangement to a rule, principle, type, standard, etc.; orderly; symmetrical [regular features]" (EX2014, 3 (definition 1)).

PO Resp. 22.

Patent Owner further argues that Petitioner's own proposed construction supports Patent Owner's understanding of "regular." According to Patent Owner, because "'two sets of lines or linear elements' only form a grid when they are 'at right angles to each other,' . . . the defined grid only remains a grid when 'two set of lines or linear elements' are maintained or enforced to conform continuously to positions 'at right angles to each other.'" PO Sur-reply 6–7.

   *b)  Petitioner's Arguments*

Petitioner argues that "[a] 'grid' is 'two sets of lines or linear elements at right angles to each other.'" Pet. Reply 8 (citing Ex. 2028, 7 (Microsoft Computer Dictionary, Fourth Ed. (1999))). Petitioner further argues that its construction "is consistent with how the word is used in the specification, which for example describes the row and columns arrangement of tiles depicted in Figure 1 as a 'grid of tiles'." Pet. Reply 8–9 (citing Ex. 1001, 6:25–27, 6:47–48, 7:27–30, Fig, 1). According to Petitioner, this construction is also consistent with how the words are used in the claim and "not as some type of active element in the system that 'continuously enforce[es] conformity' or otherwise controls the operations of the system." Pet. Reply 9. Petitioner further argues that "nowhere does the intrinsic

record suggest that the claimed 'grid' must be unalterable, so that the tiles can never deviate from their original arrangement." Pet. Reply 9.

Petitioner further argues that the claim construction in the Maine proceeding does not support Patent Owner's proposed construction. Pet Reply 9. According to Petitioner, "that Court never suggested that the word 'regular' had some type of special meaning, or that the claimed grid, however construed, must 'continuously enforce conformity to the positions delimited by the rows and columns continuously.'" Pet. Reply 9.

Petitioner further argues that although the specification mentions the grid controlling the layout and priorities of the tiles, "that passage is described as part of 'exemplary software,' so it is not definitional." Pet. Reply 10 (citing Ex. 1001, 14:9–11). According to Petitioner, just because the specification shows the tiles displayed as a grid, "[t]hat does not mean that the tiles must be forever anchored at such positions." Pet. Reply 10.

Petitioner further argues that "every use of an invention described in the specification need not be found in the claims" and that Patent Owner's construction is inconsistent with the findings in the 403 FWD. Pet. Reply 10–11.

Finally, Petitioner argues that the final portion of Patent Owner's proposed construction—"may, but need not, allow a single tile to occupy more than one row and/or column"—is completely optional and therefore places no limitation on a grid. Pet. Reply 11.

> c) *Our Analysis*

We focus our analysis on the dispute between the parties. However, we see no real dispute between the proposed constructions. For example, both constructions require an arrangement of rows and columns.

IPR2022-00423
Patent 9,032,317 B2

Additionally, both constructions would allow, but not require, a single tile to occupy more than a single row or column. This is explicit in Patent Owner's construction and implicit in Petitioner's.[17] Nor is there any real dispute that the grid must be regular. That is explicitly part of Patent Owner's proposed construction. And it is consistent with Petitioner's construction.

Instead, the dispute between the parties is not about the construction of the term "grid," but the meaning of the word "regular" in that construction. Based on the full record and for the reasons given below, we do not agree with Patent Owner that "regular" requires a special construction limiting the claims to an arrangement that enforces conformity to an established rule or standard *continuously*.

Claim 1 recites "display, using the display device, a *grid of tiles*." Ex. 1001, 30:28 (emphasis added). Besides indicating that there are multiple tiles in a grid, the context of the use of "grid of tiles" in the claims does not provide any assistance in determining its meaning.

The cited portions of the specification do not support Patent Owner's construction. According to the specification, "[t]he grid controls the layout and priorities of the tiles." Ex. 1001, 14:22. Similarly, the "Grid Object" section of the specification addresses "[t]he arrangement, layout, and independent functioning of the tiles on the display." Ex. 1001, 14:8–11; *see also* Ex. 1001, 14:17–20 ("Grid 700 comprises a matrix or array of tiles

---

[17] We note that the district court in the Maine proceeding added the optional language to give guidance to the jury that spanning—a tile located in multiple rows and/or columns—is permissible. Ex. 1018, 74. Because there is no jury and spanning is not an issue, there is no need to include the optional language explicitly in the construction. Regardless, because it describes an optional feature, that construction has no bearing on the outcome of this proceeding.

IPR2022-00423
Patent 9,032,317 B2

. . . .").  Although the specification clearly links the grid to the arrangement or look of the tiles, nothing in those sections indicates that the arrangement must be maintained continuously.  To the contrary, the specification is silent as to any temporal requirement.

Moreover, the continuous requirement is inconsistent with other portions of the specification.  Specifically, the specification describes how tiles can be moved and, while being moved, may overlap other tiles.  *See* Ex 1001, 11:17–20 ("Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another.").  Because the specification describes how the tiles can be moved out of their location in the grid and overlap tiles still on the grid, the grid cannot "enforce[e] conformity to the positions . . . continuously" as Patent Owner argues.

We also do not agree with Patent Owner that even if the grid is alterable, it is still continuous.  *See* PO Sur-reply 7–8.  Continuous means "marked by uninterrupted extension in space, time, or sequence." Ex. 3001.[18]  Uninterrupted extension is the antithesis of alterable.  Thus, a grid cannot be both alterable and continuous.

Finally, Patent Owner's argument is premised not on construing the term "grid," but on reading its construction into the word "regular" in its proposed construction.  But that is not consistent with the ordinary meaning of the word grid, which simply describes the arrangement of the elements

---

[18]  Exhibit 3001 is the Merriam-Webster definition of "continuous." *See* https://www.merriam-webster.com/dictionary/continuous, downloaded July 17, 2023.

without imposing a temporal requirement. *See* Ex. 1028, 208 (defining grid as "[t]wo sets of lines or linear elements at right angles to each other.").

Nor is the construction consistent with the dictionary definitions Patent Owner has added to the record. We acknowledge that the seventh definition of the word "regular" in the Oxford Learners Dictionary refers to a temporal period. *See* Ex. 2019, 2. But, the first definition of regular is "following a pattern, especially with the same time and space between each thing and the next." Ex. 2019, 1. That definition is most consistent with the other dictionary definition to which the Patent Owner cites and the specification in describing an orderly arrangement of the tiles. *See* Ex. 2020 (defining "regular" as "conforming in form, build, or arrangement to a rule, principle, type, standard, etc.; orderly; symmetrical regular features") (Collins English Dictionary); Ex. 1001, 14:9–11 ("The arrangement, layout, and independent functioning of the tiles on the display . . . ."), 14:22 ("The grid controls the layout and priorities of the tiles."). In light of the specification's silence regarding a temporal component and, instead, its focus on the arrangement of tiles, we see insufficient support for Patent Owner's temporal component.

Accordingly, for the reasons given above, "grid" as used in the claims of the '317 patent means "a regular arrangement of rows and columns." However, we do not adopt Patent Owner's understanding of the word "regular" and instead use the everyday meaning as reflected in the dictionary definitions cited approvingly above.

IPR2022-00423
Patent 9,032,317 B2

> 3. *"Partitioning . . . at Least a Portion of the Visual Display into an Array of Tiles"*
>
>    a) *Arguments of the Parties*

Petitioner argues that "partitioning . . . at least a portion of the visual display into an array of tiles" means "dividing a display or window into two or more tiles." Pet. 16 (quoting Ex. 1016, 12–13). According to Petitioner, this construction "represents the ordinary meaning of the term, as it is consistent with the description of tiles in the specification." Pet. 16 (citing Ex. 1001, 7:27–39, Fig. 1).

Patent Owner argues that the phrase means "dividing some or all of a display into multiple tiles displayed in an orderly fashion." PO Resp. 23. Specifically, Patent Owner argues "that 'partitioning' and 'arranging' mean 'dividing[]' and 'array of tiles' means 'multiple tiles displayed in an orderly fashion.'" PO Resp. 23.

Patent Owner further argues that "Petitioner's attempt[] to redefine the 'visual display' recited by the claims to refer to 'a display or window' is inconsistent with the specification." PO Resp. 23–24 (emphasis omitted); *see also* PO Sur-reply 8 (citing Ex. 1001, 3:48–49). Patent Owner further argues that the '317 patent draws a distinction between a window and a portion of the visual display:

> The specification also distinguishes between a window and an area of a visual display. For example, "while a window may be resized as appropriate, it will frequently occupy the full display area . . ." (EX1001, 3:48-49; EX2001, ¶¶ 83, 142.) This distinction is important to the tile technology introduced by the '317 Patent.

PO Resp. 24. According to Patent Owner, placing tiles in a window "will fail to provide the uniformity of appearance realized by dividing a visual

IPR2022-00423
Patent 9,032,317 B2

display into an array of tiles" and "cannot provide a replacement for a desktop." PO Resp. 24–25 (citing Ex. 1001, 4:7–43, 4:65–5:10, 6:3–11, 11:23–27, 14:15–17, 15:17–19; Ex. 2001 ¶¶ 54, 56, 90–92, 99–101, 104, 107, 142–142); *see also* PO Sur-reply 8–9.  Patent Owner also argues that the fact that a window can occupy some or all of the visual display reinforces the idea that they are separate elements.  PO Sur-reply 9–10.

With regard to "array," Patent Owner argues it must mean something more than two or more tiles, as that is already captured in the use of the term "tiles."  PO Resp. 25.  According to Patent Owner, in order "[f]or different tiles to be first *in an array* and second *in an array* and to display information from different sources, they must be ordered, *i.e.*, displayed in an orderly fashion."  PO Resp. 25.  Patent Owner also argues this is consistent with the specification, which shows tiles displayed in an orderly fashion.  PO Resp. 25–26 (citing Ex. 1001, 11:49–51, 14:17–19, 16:7–59, Figs. 7–11).  Patent Owner also argues that "[c]onstruing an array to merely refer to tiles without also requiring the tiles to be displayed in an orderly fashion, would recreate the problems criticized by the specification."  PO Resp. 26.

Petitioner responds by pointing out that the Board's construction in the Institution Decision[19] essentially adopted the construction from the Maine proceeding.  Pet. Reply 11 (citing Inst. Dec. 14–15; Pet. 15).  However, Petitioner argues that adopting Patent Owner's position that the claim "cannot be satisfied by dividing the area ***within a window*** into

---

[19]  In the Institution Decision, we adopted Patent Owner's proposed construction of "dividing some or all of a display into multiple tiles displayed in an orderly fashion."  Inst. Dec. 14–15.  We further noted that "[i]n doing so, any array that is similar to that shown in a figure of the '317 patent would be orderly."  Inst. Dec. 15.

IPR2022-00423
Patent 9,032,317 B2

multiple tiles" would be legal error. Pet. Reply 11–12. According to Petitioner, because "[a] window displayed on a computer display obviously occupies some or all of that display, as the 317 Patent itself recognizes, . . . dividing some or all of the window is necessarily dividing some or all of the display." Pet. Reply 12 (citing Ex. 1001, 3:48–49). Petitioner also argues it is inconsistent with the Board's prior decision in the 403 FWD. Pet. Reply 12–14.

> b) *Our Analysis*

As noted in footnote 19, we preliminarily construed this limitation to mean "dividing some or all of a display into multiple tiles displayed in an orderly fashion" and that "any array that is similar to that shown in a figure of the '317 patent would be orderly." Inst. Dec. 14–15. Although Petitioner proposed a different construction in the Petition, Petitioner did not maintain its construction in its Reply or argue that we erred. Accordingly, for the reasons given in the Institution Decision, which we incorporate by reference, we reach the same construction in this Decision.

However, the real dispute between the parties does not focus explicitly on our construction, but whether it implicitly excludes placing the array of tiles in a window.[20] Based on the record, we agree with Petitioner that the claim limitation does not preclude having the array of tiles located within a window on the video display.

---

[20] This issue is not relevant to the instant proceeding. However, it is relevant to IPR2022-00590, decided concurrently. Because the parties agree that the terms should have the same construction in all four pending proceedings (Tr. 11:1–8 (Petitioner), 54:11–17 (Patent Owner)), we address the dispute here.

IPR2022-00423
Patent 9,032,317 B2

We begin, as always, "with the words of the claim themselves."
*Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019)
(quoting *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301
(Fed. Cir. 2006)). The claim is silent as to which part of the visual display
will contain the array of tiles. *See* Ex. 1001, 30:53–54. It is not limited to,
as Patent Owner argues (PO Resp. 24), a replacement for a desktop. Nor, as
Patent Owner also argues (PO Resp. 24), is there anything in the claim or
our construction of tiles that requires the tiles to be presented "in a consistent
manner" and be capable of "run[ning] on any device." Rather, the claim
simply states "partitioning . . . a portion of the visual display into an array of
tiles" without any other limitations. *See* Ex. 1001, 30:53–54.

Our construction is further supported by the specification of the '317
patent. The specification makes it clear that windows are a part of the visual
display. For example, the background section describes how a window is on
the visual display: "Thus, while a window may be resized, it will frequently
occupy the full display area, effectively limiting the user to a view of a
single program." Ex. 1001, 3:48–50; *see also* Ex. 1001, 10:49–50.
Additionally, the '317 patent describes how a window has "a display area
354." Ex. 1001, 10:50–51. Thus, so long as the window is shown on the
video display, the claim limitation is broad enough to encompass
partitioning the portion of the video display where there is a window into an
array of tiles.

Although we agree with Patent Owner that the video display and the
window are two different elements (PO Resp. 24; PO Sur-reply 9–10), that
fact does not require us to adopt Patent Owner's construction. Because the

IPR2022-00423
Patent 9,032,317 B2

window is shown on the video display, partitioning a window is necessarily also partitioning a video display.

Moreover, the portion of the specification cited by Patent Owner does not support its construction. The specification simply states "[t]hus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program." Ex. 1001, 3:48–50 (citied by PO Resp. 24). That section provides no guidance as to whether there is a difference between partitioning a display and partitioning a window.

Accordingly, for the reasons discussed above, "partitioning . . . at least a portion of the visual display into an array of tiles" means dividing some or all of a display into multiple tiles displayed in an orderly fashion and that any array that is similar to that shown in a figure of the '317 patent would be orderly. Additionally, the claim is broad enough to encompass partitioning a window that is located on the video display.

### 4. "Sending a Conditional Request"

Claim 5 recites, *inter alia*, "at a first update time in accordance with the first update rate, sending a conditional request from the first client device to the first server device for an update of information in the first tile *if the information from the first information source currently displayed in the first tile has not changed since a last update*." Ex. 1001, 30:60–65 (emphasis added). The focus of the parties' dispute is whether the emphasized "if clause" (condition) applies to when the request is sent (Patent Owner) or the content of the request (Petitioner).

IPR2022-00423
Patent 9,032,317 B2

### a) Patent Owner's Arguments

Patent Owner argues that the term "impos[es] a condition precedent that must be satisfied before sending the conditional request or sending the update message, which is the ordinary meaning of the language 'sending . . . if.'"  PO Resp. 27–28.[21]

Patent Owner argues that Petitioner "misinterprets this claim language to encompass a mere coincidence rather than imposing a condition precedent."  PO Resp. 28.  According to Patent Owner, if the applicant intended a meaning consistent with Petitioner's interpretation, the applicant would have used the term "while" instead of "if," as the applicant did elsewhere.  PO Resp. 28 (citing Ex. 1001, 26:21–45); *see also* PO Sur-reply 13.  Patent Owner also argues that Petitioner's construction is inconsistent with the dictionary definition of "if."  PO Resp. 28 (citing Ex. 2021, 1 (Cambridge English Dictionary); Ex. 2022, 1 (Merriam-Webster Dictionary)).  Patent Owner also argues that treating the clause as covering a mere coincidence would render the clause superfluous.  PO Resp. 28–29.

Patent Owner further argues that because Petitioner's proposed construction asks whether there is no need for an update, it "makes no sense."  PO Sur-reply 13.  Patent Owner also argues that there is no intrinsic evidence to support Petitioner's construction.  PO Sur-reply 13–14.

Patent Owner further argues that the specification of the '317 patent refers to the HTTP1.1 specification, which "explains that '[a] conditional GET method requests that the entity be transferred only under the circumstances described by the conditional header field(s).'"  PO Resp. 29 (quoting Ex. 1012, 50).  Patent Owner also argues that the conditional GET

---

[21]  We sometimes refer to this as the "condition precedent" construction.

IPR2022-00423
Patent 9,032,317 B2

is not the only support for this claim language. PO Sur-reply 12–13. Instead, Patent Owner argues, it is supported by the discussion of tiles having conditional content based on communication with other tiles. PO Sur-reply 12 (citing Ex. 1001, 13:21–32). According to Patent Owner, a person having ordinary skill in the art would have understood "'if . . . has not changed' to mean that a device on which the tile resides makes a determination about this condition precedent." PO Sur-reply 12–13.

Patent Owner further argues that there is no inconsistency between its construction and dependent claim 9. PO Sur-reply 11–12. Specifically, Patent Owner argues that "[i]n claim 9, the client device is simply responding to an additional determination supplied by the server in response to the conditional request." PO Sur-reply 12.

Patent Owner further argues that its construction does not always result in the claim language being satisfied. PO Sur-reply 14. Instead, Patent Owner argues, the condition is not satisfied if the content has been changed, such as by the user changing the content of a tile or explicitly requesting an update/refresh. PO Sur-reply 14 (citing Ex. 1001, 28:43–45).

b) *Petitioner's Arguments*

Petitioner argues that the limitation "require[s] that the conditional request is asking for an update if the copy of the tile-displayed information that is stored at the server 'has not changed.'" Pet. Reply 17; *see also* Pet. 29 (implicitly construing the limitation).[22]

Petitioner argues that Patent Owner's "interpretation is inconsistent with the claim language." Pet. Reply 15. Specifically, Petitioner argues that

---

[22] We sometimes refer to this as the "conditional request" construction.

IPR2022-00423
Patent 9,032,317 B2

dependent claim 9[23] only makes sense if the determination that the relevant information has not changed is only made after receiving the response to the request, not via a determination made prior to the request being sent. Pet. Reply 15–16.

Petitioner further argues that its construction is consistent with the specification. Pet. Reply 16. According to Petitioner, the specification "never discloses a client device making a determination that information displayed in a tile 'has not changed' before sending a conditional request." Pet. Reply 16. Instead, Petitioner argues, "the only plausible support for this claim language comes from a passage in the specification that refers to the two 'conditional gets' of HTTP1.1, neither of which entail a client making a determination that information displayed at a client 'has not changed' before sending a conditional request." Pet. Reply 16 (citing Pet. 28–29, 31; Ex. 1011, 123–24; Ex. 1003 ¶¶ 177–180, 222–224).

Petitioner further disputes Patent Owner's argument regarding the word "while." According to Petitioner, the applicant did not use "while" in claim language; instead, it was only used in pseudocode. Pet. Reply 16–17.

Petitioner also argues that the conditional request construction does not render the clause superfluous. Pet. Reply 17. To the contrary, Petitioner argues that it is the condition precedent construction which "render[s] the claim language a nullity because it would always be satisfied." Pet. Reply 17.

---

[23]  Claim 9 depends from claim 5 and recites "wherein no update of the first tile is performed if the response to the conditional request indicates that the information in the first tile has not changed since a previous update of the first tile." Ex. 1001, 31:12–15.

IPR2022-00423
Patent 9,032,317 B2

    *c)* *Our Analysis*

Based on the full record, and for the reasons given below, we do not agree with Patent Owner that the "if clause" imposes a condition precedent before the request is sent from the first client device to the server. Instead, we agree with Petitioner that the limitation simply requires sending a conditional request that asks if tile-displayed information that is stored at the server "has not changed since a last update."

We turn to the specification of the '317 patent. Both parties direct us to the specification's recitation of a conditional GET of HTTP1.1. *See* PO Resp. 29 (citing Ex. 1001, 25:15–17); Pet. Reply 16 ("Rather, as the petition pointed out, the only plausible support for this claim language comes from a passage in the specification that refers to the two 'conditional gets' of HTTP1.1, neither of which entail a client making a determination that information displayed at a client 'has not changed' before sending a conditional request."). That section of the specification states that "a pre-fetch utility such as URL pre-fetch manager 2208 can be implemented." Ex. 1001, 25:16–17. One strategy for performing the pre-fetch is the conditional GET:

> Another function of a pre-fetch utility is to periodically check the validity of the items in cache to make sure they are up to date. As would be familiar to one of ordinary skill in the art, some of the new HTTP1.1 methods would prove very useful for this, namely the conditional gets.

Ex. 1001, 25:24–16. According to the HTTP1.1 protocol (Ex. 1012), a GET request "retrieve[s] whatever information (in the form of an entity) is identified by the Request-URI." Ex. 1012, 50. Such a GET is called a "'conditional GET' if the request message includes an If-Modified-Since, If-Unmodified-Since, If-Match, If-None-Match, or If-Range header field. A

IPR2022-00423
Patent 9,032,317 B2

conditional GET method requests that the entity be transferred only under the circumstances described by the conditional header field(s)." Ex. 1012, 50.

That conditional GET, which both parties point to as support, is consistent with Petitioner's construction, which we adopt. The conditional GET has the condition in the request, not as a condition precedent to sending the request. *See* Ex. 1012, 50; Ex. 1003 ¶ 179.[24] The conditional GET in the HTTP1.1 protocol does not discuss a condition precedent to sending the request.

In its Sur-reply, Patent Owner also directs us to a different portion of the specification relating to conditional tile content. PO Sur-reply 12 (citing Ex. 1001, 13:21–32). We do not agree with Patent Owner's argument based on that portion of the specification. That section of the specification involves tiles communicating with each other and having "conditional content." *See* Ex. 1001, 13:21–22. Such conditional content refers to "the content of one tile depend[ing] upon the content of another." Ex. 1001, 13:22–23. This has nothing to do with conditional requests. *See* Ex. 1001, 13:21–32.

We have considered Patent Owner's remaining arguments and, for the reasons given below, do not find they support imposing a condition precedent.

First, we do not agree that the conditional request construction "encompass a mere coincidence." PO Resp. 28–29. In making that argument, Patent Owner does not accurately represent Petitioner's

---

[24] Exhibit 1003, paragraph 179 incorrectly identifies the HTTP1.1 protocol as Exhibit 1011. However, the quotes are from Exhibit 1012.

33

IPR2022-00423
Patent 9,032,317 B2

arguments. Petitioner never argues that the claim was broad enough to cover a mere coincidence. *See* Pet. 25–27. Instead, as discussed above, Petitioner's construction requires a specific type of request to be sent. *See* Pet. 26–27; Pet. Reply 16.

Second, we do not agree with Patent Owner's arguments relating to the difference between the words "while" and "if" or the definition of the word "if." *See* PO Resp. 28; PO Sur-reply 13. As with the prior argument, Patent Owner is not accurately representing Petitioner's claim construction, which focuses on the type of request that is sent as opposed to its timing. *See* Pet. 26–27; Pet. Reply 16.

Third, we agree with Patent Owner that its condition precedent construction does not always result in the claim language being satisfied. *See* PO Sur-reply 14. But we find Patent Owner's argument inapposite. For the reasons discussed above, we do not believe that the "if clause" imposes a condition precedent on when the conditional request is sent.

Accordingly, for the reasons set forth above, the "if clause" does not impose a condition precedent on when the conditional request is sent. Instead, the "if clause" describes the content of the conditional request.

D. *Asserted Anticipation by MSIE Kit*

1. *Summary of MSIE Kit*

MSIE Kit describes features of Microsoft Windows Internet Explorer 4, including Microsoft Active Desktop functionality in conjunction with Windows 98 or Windows NT. Ex. 1010, 174, 180, 183. Specifically, MSIE Kit describes Active Desktop items presented on a user's desktop. Ex. 1010, 175, 180, 183, 211. Each Active Desktop item is associated with an information source on the Web. Ex. 1010, 176–77, 180, 183, 211.

IPR2022-00423
Patent 9,032,317 B2

Additionally, each Active Desktop item is presented typically on the desktop in a borderless frame without a title bar or scrollbars. Ex. 1010, 176, 183. By default, the Active Desktop items are laid out in a 3x2 grid. Ex. 1010, 183.

Each Active Desktop item displays information from a URL and is updated periodically. Ex. 1010, 176–177, 180, 188, 201. The user may choose how frequently to update, or a content provider may specify the frequency in a CDF (Channel Definition Format) file. Ex. 1010, 176–77, 183, 188, 223. Users may select an Active Desktop item in order to move it on the desktop or may select a link within the item to open that link in a new browser window. Ex. 1010, 177, 183. MSIE Kit shows a sample desktop, which is reproduced below.



Ex. 1010, xxx. The figure shows an Active Desktop which includes a 2x2 grouping of Active Desktop items. Ex. 1010, xxx. We refer to the figure as Figure xxx.

APPX00142

IPR2022-00423
Patent 9,032,317 B2

### 2. Analysis of Claim 1

#### a) Limitation 1.d: "A Grid of Tiles"

Limitation [1.d] recites, *inter alia*, a "grid of tiles." Ex. 1001, 30:28. Petitioner maps the grid of tiles to the default arrangement of the Active Desktop items. Pet. 23. Specifically, Petitioner argues MSIE Kit explains that "[b]y default, Internet Explorer lays out new Active Desktop items on a 3 by 2 grid." Pet. 23 (quoting Ex. 1010, 183). For the reasons discussed below, we are persuaded by Petitioner's arguments. First, we will discuss whether the Active Desktop items are tiles. Second, we will discuss whether the Active Desktop items are arranged as a grid.

#### (1) Whether Active Desktop Items Are Tiles

Petitioner submits that Active Desktop items are each tiles because they "are rectangular, borderless frames on the display that a user may interact with," "can be refreshed at a specified rate," and "provide access to an information source when selected." Pet. 23–24 (citing Ex. 1010, xxx, 137, 174–77, 180–83, 740; Ex. 1003 ¶¶ 147–148, 150–158). As to selection, Petitioner relies on "clicking a link within the Item to open a browser window displaying the linked information," "clicking on a hot spot defined on the Item" to do the same thing, "dragging/resizing the Item," and "using keyboard navigation to and within the Item." Pet. 23–24.

Patent Owner argues that Active Desktop items are not "tiles" because they "provide the same representation of underlying Web page information as any Internet Explorer window." PO Resp. 37–38. Because, as discussed above, we do not agree that a "tile" may be distinguished based on comparing its representation to that of a window (*see* Section II.C.1), Patent Owner's argument is not persuasive.

IPR2022-00423
Patent 9,032,317 B2

Patent Owner argues that Active Desktop items are not "tiles" because clicking a link or hot spot within an Active Desktop item does not "select" the tile itself. PO Resp. 39–40. Because, as discussed above regarding claim construction, we do not agree that a "tile" limits how it may be selected (*see* Section II.C.1), Patent Owner's argument is not persuasive. We agree with Petitioner that clicking a link or hot spot in an Active Desktop item selects the item as claimed because doing so provides access to the item's information source. Pet. 23–24.

### (2) Whether Active Desktop Items Are Arranged in a Grid

Petitioner argues that the Active Desktop items (tiles) are arranged as a grid. Pet. 23, 24; Pet. Reply 19–20. For the reasons discussed below, we are persuaded by Petitioner's arguments.

MSIE Kit describes how it, by default, arranges "new Active Desktop items *on a 3 by 2 grid*." Ex. 1010, 183 (emphasis added). A person having ordinary skill in the art would understand MSIE Kit to be discussing a regular arrangement of rows (3) and columns (2). *See* Ex. 1010, 183; Ex. 1065 ¶¶ 8 ("[T]he fact that Active Desktop items may be arbitrarily positioned by the user does not change the fact that MSIE Kit also discloses a default grid layout that discloses 'dividing some or all of a display into multiple tiles displayed in an orderly fashion.'"), 9 ("While Active Desktop items may be placed at arbitrary x/y positions, when a default layout is used, they are arranged in an orderly fashion at selected ones of those x/y positions.").

This is confirmed by Figure xxx, which shows a grid of Active Desktop items. *See* Ex. 1010, xxx. Specifically, Figure xxx shows a

37

desktop with a 2 by 2 arrangement of Active Desktop items. Ex. 1010, xxx. That is a regular arrangement of rows (2) and columns (2).

We have considered Patent Owner's contrary arguments, but we do not agree with them. Specifically, Patent Owner's arguments are premised on its proposed claim construction. PO Resp. 41–44; PO Sur-reply 18–19. Because we rejected Patent Owner's proposed construction, *see* Section II.C.2.(c), those arguments are inapposite.

For example, Patent Owner focuses on whether MSIE Kit enforces conformity with the rows and column continuously. PO Resp. 41–44; PO Sur-reply 18–19. Specifically, Patent Owner focuses on the arbitrary location of the Active Desktop items and that the Active Desktop items can overlap each other. PO Resp. 41–44; PO Sur-reply 18–19. But such features are immaterial with our claim construction. Under our claim construction, all that is required is that a grid is displayed, not that it is forced to remain in place. When the grid of Active Desktop items is created, the location of the relative position of the Active Desktop items is not arbitrary; instead, by default the Active Desktop items are arranged in a 3 by 2 grid. *See* Ex. 1010, iii; Ex. 1065 ¶¶ 7, 10–11. Even if that changes in the future, with Active Desktop items being moved or enlarged such that Active desktop items overlap, MSIE Kit still describes creating a grid.

Moreover, although not required by our claim construction, MSIE Kit also discloses that the default grid arrangement can be kept. As Dr. Houh testified, "MSIE Kit discloses that administrators can install Active Desktop items on a user's desktop and prevent users from rearranging or removing Desktop Items, including locking down the 'default' Active Desktop layout

IPR2022-00423
Patent 9,032,317 B2

of a '3 by 2 grid' of Desktop Items."[25]  Ex. 1003 ¶ 165 (citing Ex. 1010, 235, 601); *see also* Ex. 1065 ¶ 7; Ex. 1010, 235 ("Once you've built your custom packages, you can use the IEAK Configuration Wizard to lock down channel options and restrict users from changing settings."), 601 ("You can control, or *lock down*, features and functions in these areas. . . .  More important, you can prevent users from adding or deleting channels that you have preset, or *from rearranging or adding Active Desktop items*." (first emphasis in original, second emphasis added)).  Because the default grid is locked and cannot change, it necessarily maintains the grid without any arbitrary movement or overlap.  *See* Ex. 1003 ¶ 165; Ex. 1065 ¶ 7.

### (3)  Conclusion Regarding "Grid of Tiles"

Accordingly, MSIE Kit discloses "a grid of tiles" as recited in claim 1.

### b)  Limitation 1.g:  Checking and Displaying Updating Information

Claim 1 further recites "[1.g] check whether content in the first data source is updated relative to the current content of the first tile and, if so, display updated information from the first data source on the first tile."  Ex. 1001, 30:36–39.  Petitioner argues MSIE Kit discloses this limitation.  Pet. 25–27; Pet. Reply 21–23.  For the reasons discussed below, we are persuaded by Petitioner's arguments.

MSIE Kit describes how Active Desktop items (tiles) can be updated according to a subscription schedule.  Specifically, MSIE Kit describes how to use subscriptions that check for updates and that the "updated content automatically appears in the desktop frame."  Ex. 1010, 213–14; *see also*

---

[25]  Petitioner underlines the names of references in its papers and Dr. Houh does so as well in his testimony.  We have eliminated the underlining in all quotations.

IPR2022-00423
Patent 9,032,317 B2

Ex. 1003 ¶ 175.[26]  MSIE Kit also describes how "Internet Explorer 4 provides a mechanism for end users to schedule recurring monitoring, or crawling, of Web sites and automatic downloading of updated information." Ex. 1010, xxxii; *see also* Ex. 1010, 190 (A benefit of Webcasting is "[a]utomated visiting and crawling of sites on a scheduled basis to check for updated content."), 186 ("Internet Explorer 4 then activates the Active Desktop Subscription Wizard on the user's computer and allows the user to receive updated information about this Active Desktop item."); Ex. 1003 ¶ 174.

MSIE Kit further describes how it checks to see if the information has been modified and if the Active Desktop item (tile) needs to be updated. Ex. 1010, 192; Ex. 1003 ¶ 179.  Specifically, MSIE Kit states that the site crawler compares the date of the information on the computer with the date of the file on the webserver.  Ex. 1010, 191–92.  "If the dates are different, it knows the page has been changed . . . ."  Ex. 1010, 192; *see also* Ex. 1003 ¶ 176.  A person having ordinary skill in the art would have understood that this could have been done using a conditional GET request based on the saved date.  Ex. 1003 ¶ 177; Ex. 1010, 192.  By checking to see if the saved date is different, the system determines whether the content has been updated and downloads and displays the updated information.  Ex. 1003 ¶ 178; Ex. 1010, 213–214.

Patent Owner argues that the conditional GET request "do[es] not check whether the file at the server is updated relative to the content of the first tile;" instead, the request "simply compare[s] two date/time values."

---

[26] Because Dr. Houh's testimony in this section is consistent with MSIE Kit, we give it significant weight.

IPR2022-00423
Patent 9,032,317 B2

PO Resp. 46–47 (citing Ex. 1010, 192, 746; Ex. 2001 ¶ 188). According to Patent Owner, this is important because the clocks might not by synchronized, resulting in the user being "erroneously notified of updated content where none exists." PO Resp. 47 (citing Ex. 1010, 192; Ex. 2001 ¶ 189); *see also* PO Resp. 47 (providing an example); PO Sur-reply 20–21 (arguing that checking dates is a weak validator).

We do not agree with Patent Owner's argument. Although Patent Owner has identified an outlier case in which the system incorrectly determines an update, Patent Owner does not address the situation where there is no clock error. In other words, at best, Patent Owner has shown that MSIE Kit may not always practice the claim limitation. However, so long as the prior art sometimes practices the claimed invention, that is enough for anticipation. "[A] prior art reference may anticipate or render obvious an apparatus claim—depending on the claim language—if the reference discloses an apparatus that is reasonably capable of operating so as to meet the claim limitations, even if it does not meet the claim limitations in all modes of operation." *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) For example, the Federal Circuit held that it was sufficient to show that a reference anticipated in "the process of startup," even if the reference did not show anticipation during "normal operation," reasoning that "[n]othing in the claims requires that the current threshold increase during the power supply's normal operation." *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 843 F.3d 1315, 1336 (Fed. Cir. 2016); *see also Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("Just as 'an accused product that sometimes, but not always, embodies a claimed method nonetheless

41

IPR2022-00423
Patent 9,032,317 B2

infringes,' a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." (quoting *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 622–623 (Fed. Cir. 1995))).  Because there is no dispute that MSIE Kit discloses a system that sometimes practices the claim limitation, it discloses that limitation.

    *c)  Remaining Limitations*

The preamble[27] of claim 1 recites "[1.a] [a] system for communicating with multiple data sources, the system comprising." Ex. 1001, 30:21–22. Petitioner argues that MSIE Kit discloses the preamble.  Pet. 20–21. According to Petitioner, MSIE Kit "discloses a system, such as a personal computer running Internet Explorer 4, that can communicate with multiple web sites." Pet. 20 (citing Ex. 1010, xxiv, xxxx, 4, 174–78, 180, 184–85; Ex. 1003 ¶ 110).  Petitioner further argues that "[e]ach web site may be associated with and displayed in an Active Desktop Item located on the user's desktop, and is therefore a 'data source' for its associated Item because it is a source of data for that Item." Pet. 20–21 (emphasis omitted) (citing Ex. 1010, 246; Ex. 1003 ¶ 111).

Claim 1 further recites "[1.b] a client device adapted for communication with a server device." Ex. 1001, 30:23–24.  Petitioner argues that MSIE Kit discloses this limitation.  Pet. 21.  According to Petitioner, the computer running Internet Explorer 4 (the client device) communicates with web sites—which Petitioner maps to shared resources

---

[27] Because Petitioner has sufficiently shown that the preamble is disclosed by MSIE Kit, we need not determine if the preamble is limiting.  *See Nidec*, 868 F.3d at 1017.

provided by a server device—for display in Active Desktop items. Pet. 21 (citing Ex. 1010, xvi, xxx, 88, 174–78, 180, 184–86, 192, 219–23, 246, 384, 391–94; Ex. 1003 ¶¶ 114–116).

Claim 1 further recites "[1.c] wherein the client device includes a display device, a processor configured to execute instructions, and a memory connected to the processor." Ex. 1001, 30:24–26. Petitioner argues that MSIE Kit discloses this limitation. Pet. 21–22. Specifically, Petitioner argues that MSIE Kit discloses "operation of the Active Desktop software on 'a display device' of a user's computer." Pet. 21–22 (emphasis omitted) (citing Ex. 1010, 131–132).

Claim 1 further recites "[1.d] wherein the processor executes instructions to: display, using the display device, *a grid of tiles.*" Ex. 1001, 30:26–28 (emphasis added).[28] Petitioner argues that MSIE Kit discloses this limitation. Pet. 22–25. Specifically, Petitioner argues that "[t]he Internet Explorer functionality described in MSIE Kit was necessarily implemented by a processor executing computer instructions." Pet. 23 (citing Ex. 1028, 115, 243–44, 359, 415; Ex. 1003 ¶ 142). Petitioner further argues that MSIE Kit "discloses the user's display device is divided/arranged/partitioned so as to display" items, including what we have found to be a grid of tiles. Pet. 23 (citing Ex. 1003 ¶ 144); Section II.D.2.(a).

Claim 1 further recites "[1.e] wherein a first tile of said grid of tiles is associated with a first data source residing on the server device, and a second tile of said grid of tiles is associated with a second data source."

---

[28] As discussed above in Section II.D.2.(a), Patent Owner disputes whether MSIE Kit discloses a "grid of tiles." However, Patent Owner's dispute is over what Petitioner identifies as a "grid of tiles," not whether the processor has instructions to display the item. *See* PO Resp. 36–44.

IPR2022-00423
Patent 9,032,317 B2

Ex. 1001, 30:28–32. Petitioner argues that MSIE Kit discloses this limitation. Pet. 25. Specifically, Petitioner argues MSIE Kit "discloses a 3x2 grid of Active Desktop Items" "and that each Item in the grid may be associated with a different data source, such as a website or page." Pet. 25 (citing Ex. 1010, xvi, xxx, xxxi, 174–78, 180, 183).

Claim 1 further recites "[1.f] and wherein the first tile displays a current content from the first data source and the second tile displays a current content from the second data source." Ex. 1001, 30:32–35. Petitioner argues MSIE Kit discloses this limitation. Pet. 25. Specifically, Petitioner argues that "Active Desktop Items are refreshed at a specified rate assigned to that item" and "display[] current content of their associated data source." *Id.* (citing Ex. 1010, xxx, 177, 180, 223; Ex. 1003 ¶ 172).

After reviewing Petitioner's arguments and information regarding the limitations identified above, including the Houh Declaration, which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that MSIE Kit discloses each of the limitations recited in this section.

> d) *Conclusion Regarding Claim 1*

For the reasons set forth above, Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claim 1 was anticipated by MSIE Kit.

> 3. *Analysis of Claims 2–4 and 12–15*

Petitioner has demonstrated that MSIE Kit discloses all of the limitations set forth in claims 2–4 and 12–15. Pet. 27–28, 33–36.

IPR2022-00423
Patent 9,032,317 B2

Besides the arguments discussed above with regard to claim 1, Patent Owner does not dispute in this proceeding Petitioner's argument regarding claims 2–4 and 12–15. *See* PO Resp. 36–49.

Based on the evidence and arguments presented in the Petition, which are not otherwise disputed by Patent Owner, we determine that Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claims 2–4 and 12–15 was anticipated by MSIE Kit. *See Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1375 (Fed. Cir. Aug. 16, 2023) ("Where a party 'does not raise any arguments with respect to any other claim limitation, nor does it separately argue [the] dependent claim,' '[the] dependent claim . . . stands or falls together with [the] independent claim.'" (quoting *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1340 (Fed. Cir. 2020))).

### 4. Analysis of Claim 5

#### a) Limitation [5.b]: "Partitioning at Least a Portion of the Visual Display into an Array of Tiles"

Claim 5 recites "[5.b] partitioning by the client device at least a portion of the visual display into an array of tiles." Ex. 1001, 30:53–54. Petitioner relies on its arguments for claim 1 relating to the "grid of tiles." Pet. 28. Petitioner further argues that although MSIE Kit indicates that "Active Desktop Items 'consist of' a tag that includes x- and y- positions, which tag permits the item to be placed anywhere on the screen," that is not inconsistent with the default placement of the Active Desktop items in a grid. Pet. Reply 21 (citing Ex. 1010, 175; Ex. 1003 ¶ 156; Ex. 1065 ¶¶ 7–11).

Patent Owner relies on its arguments regarding a "grid of tiles," discussed above for claim 1. *See* PO Resp. 36–44; PO Sur-reply 15–19.

IPR2022-00423
Patent 9,032,317 B2

Patent Owner further argues that MSIE Kit does not partition the visual display into an array of tiles because the items are placed in an arbitrary position and "[t]he arbitrary x- and y positions are antithetical to dividing a display into multiple tiles displayed in an orderly fashion." PO Resp. 45 (citing Ex. 1010, 175; Ex. 2001 ¶¶ 108, 112, 186); *see also* PO Sur-reply 20 ("Arbitrary positioning is inconsistent with dividing a display into multiple tiles displayed in an orderly fashion." (citing Ex. 2001 ¶¶ 108, 112, 186)).

Because the parties' arguments are substantially the same as those presented above for claim 1 regarding the "grid of tiles," for the same reasons we find that Petitioner has sufficiently shown that MSIE Kit discloses "partitioning by the client device at least a portion of the visual display into an array of tiles" as recited in claim 1.

We do not agree with Patent Owner's argument about the arbitrary position of the Active Display Items. First, even though the Active Display Items can be moved to an arbitrary position, MSIE Kit describes a default position in a 3 by 2 grid. Ex. 1010, 183. Such an arrangement is orderly. Second, as discussed above in Section II.D.2.a.(2), an administrator can lock the Active Display Items in that position so that they remain orderly.

> b) *Limitation [5.e]: Sending a Conditional Request*

Claim 5 further recites

> [5.e] at a first update time in accordance with the first update rate, sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update.

IPR2022-00423
Patent 9,032,317 B2

Ex. 1001, 30:60–65.  Petitioner argues that MSIE Kit discloses this limitation.  Pet. 29; Pet. Reply 23.  For the reasons discussed below, we are persuaded by Petitioner's arguments.

MSIE Kit discloses that the system can schedule a web crawl that allows for updating at a user determined rate.  Ex. 1003 ¶ 175; Ex. 1010, 180 ("Internet Explorer 4 will automatically update the desktop item on a schedule you choose."), 188 ("Using basic Webcasting, users can 'subscribe' to any existing Web site and have Internet Explorer automatically visit and 'crawl' the site on a scheduled basis to check for updated content."), 191–92 (discussing Link-Crawl architecture), 215–16 (same).  MSIE Kit also discloses that "Internet Explorer will examine a web page including its modification date to determine whether the page has changed."  Ex. 1003 ¶ 176 (citing Ex. 1010, 191–92, 215–16); *see also* Ex. 1010, 191 ("During the link crawls, Internet Explorer can check to see if the page has changed, based on the current file size and date. . . ."), 192 ("The sitecrawler compares the date of the file in the Temporary Internet Files folder to the date of the same file on the Web server on which it resides.  If the dates are different, it knows the page has changed.").  This includes checking the header portion of the web pages.  Ex. 1003 ¶ 176; Ex. 1010 191–92.  In order to determine whether the web page content should be downloaded, "Internet Explorer (i.e., the instructions executing on the client device) also uses a conditional GET request that causes the Web server to send back web page content only if the server determines such content has been updated since a prior update time."  Ex. 1003 ¶ 177 (citing Ex. 1010, 192); *see also* Ex. 1010, 192.  That "request for information is made conditional by consideration of a header field in the request—called

47

IPR2022-00423
Patent 9,032,317 B2

the 'If_Modified_Since header field'—indicating whether the information has been modified since the last time the client cached a copy of that web page." Ex. 1003 ¶ 177 (citing Ex. 1010, 191); *see also* Ex. 1010, 191. "If the page has not changed since that time, the response will indicate the page has not been modified, thereby updating the client on the status of the page." Ex. 1003 ¶ 177 (citing Ex. 1010, 192); *see also* Ex. 1010, 192. Specifically, MSIE Kit states:

> The sitecrawler compares the date of a file in the Temporary Internet Files folder to the date of the same file on the Web server on which it resides. If the dates are different it knows the page has changed. The file date from the server is sent in a special header field in an HTTP response.

> The If_Modified_Since header field is used with the GET method to make it conditional: if the requested page has not been modified since the time specified in this field, an item will not be returned from the server; instead, a 304 (not modified) response will be returned without any message-body.

Ex. 1010, 192.

Patent Owner argues that because MSIE Kit does not meet the condition precedent for sending a request, MSIE Kit does not disclose this limitation. PO Resp. 48–49; PO Sur-reply 21.

We do not agree. Because we did not adopt Patent Owner's proposed condition precedent claim construction and, instead, conclude that the claim simply required a conditional request, Patent Owner's argument is inapposite. *See* Section II.C.4.

IPR2022-00423
Patent 9,032,317 B2

### c) Remaining Undisputed Limitations

The preamble[29] of claim 5 recites "[5.a] [a] method executed by a client device under control of a program, the client device including a processor, a display device for rendering a visual display, and a memory for storing the program, the method comprising." Ex. 1001, 30:49–52. Petitioner argues that "because Internet Explorer 4.0 is a program and MSIE Kit describes its operation on a client device," MSIE Kit discloses the preamble. Pet. 28 (citation omitted).

Claim 5 further recites "[5.c] a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device." Ex. 1001, 30:54–57. Petitioner argues that MSIE Kit discloses this limitation for the same reason as discussed for claim 1. Pet. 28. Additionally, Petitioner argues that "MSIE Kit explains that each Active Desktop Item can be associated with a web page ("*a first information source*") stored on a web server ("*a first server device*") on the Internet." Pet. 28 (emphasis in original).

Claim 5 further recites "[5.d] assigning by the client device a first update rate to the first tile." Ex. 1001, 30:58–59. Petitioner argues that "MSIE Kit discloses that a user operating the client device may specify an update rate for each desktop item, e.g., daily." Pet. 28 (citing Ex. 1010, 196, 200–02, 230–34). Petitioner also argues that because MSIE Kit discloses that Internet Explorer will display multiple items and assign an update rate to each, "[a] 'first' update rate would therefore be assigned to a 'first' such Item." Pet. 28 (citing Ex. 1010, xxx, 177, 183; Ex. 1003 ¶ 203).

---

[29] Because there is no dispute that MSIE Kit discloses the preamble, we need not determine whether it is limiting. *See Nidec*, 868 F.3d at 1017).

IPR2022-00423
Patent 9,032,317 B2

Claim 5 further recites "[5.f] receiving at the client device a response to the conditional request from the first server device." Ex. 1001, 30:66–67. Petitioner argues that "MSIE Kit discloses that the client device will receive an update from the server in response to the GET request." Pet. 29 (citing Ex. 1003 ¶¶ 177, 235; Pet. 25–27.

Claim 5 further recites "[5.g] determining whether to update the first tile in accordance with the response from the first server device." Ex. 1001, 31:1–2. Petitioner argues that MSIE Kit discloses that the client determines whether to update based on the response to a conditional GET request; updating with update information if provided and not updating when no information is available. Pet. 29–30 (citing Ex. 1010, 120, 177, 192, 214; Ex. 1003 ¶¶ 205–236, 238–240).

After reviewing Petitioner's arguments and information regarding the limitations identified above, including the Houh Declaration, which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that MSIE Kit discloses each of the limitations recited in this section, with the exception of the tiles, which is disputed and discussed above.

> d)  *Conclusion Regarding Claim 5*

For the reasons set forth above, Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claim 5 was anticipated by MSIE Kit.

> 5.  *Analysis of Claims 6–11 and 16–19*

Petitioner argues that MSIE Kit discloses all of the limitations set forth in claims 6–11 and 16–19. *See* Pet. 30–33, 37.

IPR2022-00423
Patent 9,032,317 B2

Besides the arguments discussed above with regard to claims 1 and 5, Patent Owner does not dispute in this proceeding Petitioner's argument regarding claims 6–11 and 16–19. *See* PO Resp. 36–49.

Based on the evidence and arguments presented in the Petition, which are not otherwise disputed by Patent Owner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 6–11 and 16–19 are anticipated by MSIE Kit. *See Incept*, 77 F.4th at 1375.

E. *Other Grounds*

In addition to the ground discussed above based on anticipation by MSIE Kit, Petitioner argues the claims are unpatentable under alternate grounds. Pet. 8. Some of those grounds are based on the claims being obvious over MSIE Kit, with or without additional references. Pet. 8. Others are based on a combination of Excel97 and Bhansali, with or without an additional reference. Pet. 8. Because we determine that claims 1–19 were anticipated by MSIE Kit, we do not address the parties' arguments regarding those alternate grounds. *See Boston Sci. Scimed, Inc. v. Cook Gp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

III. CONCLUSION[30]

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1–19 of the '317 patent as anticipated by MSIE Kit.

---

[30] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or*

IPR2022-00423
Patent 9,032,317 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|--------|-------------|--------------------|--------------------------|-------------------------------|
| 1–19 | 102(a), (b) | MSIE Kit | 1–19 | |
| 1–19 | 103(a) | MSIE Kit[31] | | |
| 1–19 | 103(a) | MSIE Kit, Jones[32] | | |
| 5–11 | 103(a) | MSIE Kit, RFC2068[33] | | |
| 5–11 | 103(a) | MSIE Kit, RFC2068, Jones[34] | | |
| 1–19 | 103(a) | Excel97, Bhansali[35] | | |

---

*Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[31] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[32] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[33] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[34] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

[35] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

IPR2022-00423
Patent 9,032,317 B2

| 12–19 | 103(a) | Excel97, Bhansali, Perez[36] | | |
|---|---|---|---|---|
| **Overall Outcome** | | | 1–19 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, Petitioner has shown by a preponderance of the evidence that claims 1–19 of the '317 patent are unpatentable;

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[36] As explained above, because we determine that claims 1–19 are unpatentable as anticipated by MSIE Kit, we decline to address those claims on this ground.

IPR2022-00423
Patent 9,032,317 B2

FOR PETITIONER:

Joseph Micallef
SIDLEY AUSTIN LLP
jmicallerf@sidley.com


FOR PATENT OWNER:

Shaun Gregory
Jason Houdek
TAFT STETTINIUS & HOLLISTER LLP
sgregory@taftlaw.com
jhoudek@taftlaw.com

54



US009363338B2

(12) **United States Patent**
Santoro et al.

(10) **Patent No.: US 9,363,338 B2**
(45) **Date of Patent: Jun. 7, 2016**

(54) **SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES**

(71) Applicant: **Surfcast, Inc.**, Portland, ME (US)

(72) Inventors: **Ovid Santoro**, Lincolnville, ME (US); **Klaus Lagermann**, Copenhagen (DK); **Tom Dechaene**, Overijse (BE)

(73) Assignee: **SurfCast, Inc.**, Portland, ME (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/720,895**

(22) Filed: **May 25, 2015**

(65) **Prior Publication Data**

US 2015/0256652 A1      Sep. 10, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/163,257, filed on Jun. 17, 2011, now Pat. No. 9,043,712, which is a continuation of application No. 12/124,125, filed on May 20, 2008, now Pat. No. 7,987,431, which is a

(Continued)

(51) **Int. Cl.**
**G06F 13/00**      (2006.01)
**G06F 15/00**      (2006.01)

(Continued)

(52) **U.S. Cl.**
CPC .............. **H04L 67/42** (2013.01); **G06F 3/0481** (2013.01); **G06F 17/30876** (2013.01); **G09G 5/14** (2013.01); **H04L 67/10** (2013.01); **H04M 1/72544** (2013.01); **G09G 2370/027** (2013.01)

(58) **Field of Classification Search**
CPC ................................ G06F 3/0481; G09G 5/14

USPC ......... 715/763–765, 729, 738, 721, 740, 745, 715/840, 716
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,555,775 A    11/1985  Pike
4,653,020 A     3/1987  Cheselka et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0651544 A2    5/1995
WO    WO96/20470 A1    7/1996
WO    WO99/26127 A1    5/1999

OTHER PUBLICATIONS

Cisco-Quality of Service, "Fact Sheet Quality of Service Fact Sheet" Available Web Site: http://www.cisco.com/warp/public/cc/so/neso/vvdo/avvid/eeqos_ds.htm Accessed on Oct. 21, 2002.

(Continued)

*Primary Examiner* — Kevin Nguyen
(74) *Attorney, Agent, or Firm* — VLP Law Group LLP; Richard G. A. Bone

(57)      **ABSTRACT**

A computerized method of presenting information from a variety of sources on a display device. Specifically the present invention describes a graphical user interface for organizing the simultaneous display of information from a multitude of information sources. In particular, the present invention comprises a graphical user interface which organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. The grid functionality manages the refresh rates of the multiple information sources. The present invention is intended to operate in a platform independent manner.

**13 Claims, 27 Drawing Sheets**



Petitioner Microsoft Corporation - Ex. 1001, p. 1

## US 9,363,338 B2
Page 2

### Related U.S. Application Data

continuation-in-part of application No. 11/140,546, filed on May 27, 2005, now Pat. No. 7,376,907, which is a continuation of application No. 10/136,873, filed on Apr. 30, 2002, now Pat. No. 7,028,264, which is a continuation-in-part of application No. 09/702,325, filed on Oct. 30, 2000, now Pat. No. 6,724,403.

(60) Provisional application No. 60/162,522, filed on Oct. 29, 1999.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 29/06* | (2006.01) |
| *G06F 3/0481* | (2013.01) |
| *G09G 5/14* | (2006.01) |
| *H04M 1/725* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *H04L 29/08* | (2006.01) |

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,712,191 A | 12/1987 | Penna |
| 4,831,556 A | 5/1989 | Oono |
| 4,905,171 A | 2/1990 | Kiel et al. |
| 5,140,678 A | 8/1992 | Torres |
| 5,157,384 A | 10/1992 | Greanias et al. |
| 5,321,750 A | 6/1994 | Nadan |
| 5,321,808 A | 6/1994 | Rupp |
| 5,347,632 A | 9/1994 | Filepp |
| 5,371,847 A | 12/1994 | Hargrove |
| 5,394,521 A | 2/1995 | Henderson, Jr. et al. |
| 5,432,932 A | 7/1995 | Chen et al. |
| 5,473,745 A | 12/1995 | Berry et al. |
| 5,479,602 A | 12/1995 | Baecker et al. |
| 5,550,968 A | 8/1996 | Miller et al. |
| 5,572,643 A | 11/1996 | Judson |
| 5,635,980 A | 6/1997 | Lin et al. |
| 5,712,995 A | 1/1998 | Cohn |
| 5,721,951 A | 2/1998 | DorEl |
| 5,740,430 A | 4/1998 | Rosenberg et al. |
| 5,740,549 A | 4/1998 | Reilly et al. |
| 5,757,371 A | 5/1998 | Oran et al. |
| 5,764,972 A | 6/1998 | Crouse et al. |
| 5,778,181 A | 7/1998 | Hidary et al. |
| 5,793,368 A | 8/1998 | Beer |
| 5,796,383 A | 8/1998 | Henshaw et al. |
| 5,796,401 A | 8/1998 | Winer |
| 5,812,123 A * | 9/1998 | Rowe et al. ..................... 725/43 |
| 5,813,007 A | 9/1998 | Nielsen |
| 5,819,284 A | 10/1998 | Farber et al. |
| 5,831,664 A | 11/1998 | Wharton et al. |
| 5,838,326 A | 11/1998 | Card et al. |
| 5,841,418 A | 11/1998 | Bril et al. |
| 5,848,352 A | 12/1998 | Dougherty et al. |
| 5,848,356 A | 12/1998 | Jambhekar et al. |
| 5,901,228 A | 5/1999 | Crawford |
| 5,905,492 A | 5/1999 | Straub et al. |
| 5,918,237 A | 6/1999 | Montalbano |
| 5,929,854 A | 7/1999 | Ross |
| 5,959,621 A | 9/1999 | Nawaz et al. |
| 6,003,041 A | 12/1999 | Wugofski |
| 6,011,537 A | 1/2000 | Slotznick |
| 6,025,837 A * | 2/2000 | Matthews et al. ............. 715/721 |
| 6,028,602 A | 2/2000 | Weidenfeller et al. |
| 6,047,197 A | 4/2000 | Jarrad |
| 6,061,576 A | 5/2000 | Terrasson |
| 6,104,700 A | 8/2000 | Haddock et al. |
| 6,118,451 A | 9/2000 | Alexander |
| 6,118,493 A | 9/2000 | Duhault et al. |
| 6,141,007 A | 10/2000 | Lebling |
| 6,148,304 A | 11/2000 | de Vries et al. |
| 6,160,553 A | 12/2000 | Robertson et al. |
| 6,166,738 A | 12/2000 | Robertson et al. |
| 6,188,405 B1 | 2/2001 | Czerwinski et al. |
| 6,278,448 B1 | 8/2001 | Brown et al. |
| 6,322,502 B1 | 11/2001 | Schoenberg |
| 6,363,445 B1 | 3/2002 | Jeddeloh |
| 6,411,275 B1 | 6/2002 | Hedberg |
| 6,418,309 B1 | 7/2002 | Moon et al. |
| 6,430,405 B1 | 8/2002 | Jambhekar et al. |
| 6,456,334 B1 * | 9/2002 | Duhault ........................ 348/565 |
| 6,724,403 B1 | 4/2004 | Santoro |
| 6,807,558 B1 | 10/2004 | Hassett et al. |
| 6,832,355 B1 | 12/2004 | Duperrouzel et al. |
| 6,988,248 B1 | 1/2006 | Tang |
| 7,028,264 B2 | 4/2006 | Santoro |
| 7,376,907 B2 | 5/2008 | Santoro |
| 7,933,632 B2 | 4/2011 | Flynt |
| 7,987,431 B2 | 7/2011 | Santoro |
| 9,032,317 B2 | 5/2015 | Santoro |
| 9,043,712 B2 | 5/2015 | Santoro |

### OTHER PUBLICATIONS

IP Quality of Service: An Overview Available Web Site: http://www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm Accessed on Oct. 21, 2002.
Loyall et al., "Specifying and Measuring Quality of Service in Distributed Object Systems", IEEE, Published in the Proceedings of ISORC'98, Apr. 20-22, 1998 in Kyoto, Japan. Available web site: http://www.dist-systems.bbn.com/papers/1998/ISORC/isorcweb.html Accessed on Oct. 21, 2002.
White Paper, "The need for Qos: The Internet protocol's "best-effort" service has worked well so far, so why do we need to change it?" Available Web Site: http://www.sop.in-ria.fr/rodeo/rserban/Files/Need for QoS-v4.pdf Accessed on Oct. 21, 2002.
"User's Manual", Nokia Corporation, Jun. 7, 1998, pp. 1-190.
"User's Guide", Motorola Envoy Wireless Communicator, 1994, pp. 1-90.
"Simon Say's 'Here's Howl' Users Manual", Simon Mobile Communications Made Simple, 1994, pp. 1-41.
Baecker, et al., "Readings in Human-Computer Interaction: Toward the Year 2000, 2nd Edition", 1995, pp. 1-952.
Schneiderman, "Designing the User Interface: Human-Computer Interaction, 3rd Edition", 1998, pp. 1-640.
Cerami, "Delivering Push", 1998, pp. 1-428.
Myers, "The User Interface for Sapphire", Computer Graphics & Applications, vol. 4, No. 12, Dec. 1984, pp. 13-23.
Myers, "A Taxonomy of Window Manager User Interfaces", Computer Graphics & Applications, Sep. 1988, pp. 65-84.
Teitelman, "A Tour Through Cedar", Xerox Palo Alto Research Center, 1984, pp. 181-195.
"OpenStep User Interface Guidelines", Sun Microsystems, 1996, pp. 1-216.
Lane, et al., "Technical Research Report—User Interfaces for a Complex Robotic Task: A Comparison of Tiled vs. Overlapped Windows", Jan. 1997, pp. 1-13.
Bly, et al., "A Comparison of Tiled and Overlapping Windows", Human Factors in Computing Systems, Apr. 1996, pp. 101-106.
Isaacs, "Inside Dynamic HTML", Microsoft Press, 1997, pp. 1-28.
Cohen, et al., "Constraint-Based Tiled Windows", Computer Graphics & Applications, Nov. 1984, pp. 1-12.
Gancarz, "Uwm: A User Interface for X Windows", Summer Conference Proceedings, Usenix, Jan. 1986, pp. 429-440.
"Submission request to W3C", http://www.w3/org/submission/1997/5/ Accessed Web Site on May 17, 2013.
"Proposal for a Handheld Device Markup Language", http://www.w3.org/TR/NOTE-Submission-HDML Accessed Web Site on May 17, 2013.
"Handheld Device Markup Language FAQ", http://www.w3.org/TR/NOTE-Submission-HDML-FAW.html Accessed Web Site on May 17, 2013.
"Unwired Planet Will Publish Handheld Device Transport Protocol for Internet Access From Mobile Phones and Pagers", http://www.ncns.com/news/2/uwplanet.html Accessed Web Site May 17, 2013.
Wessels, "Web Caching. 1st Edition", Jun. 2001, p. 37.
Yeager, et al., "Web Server Technology, The Advanced Guide for World Wide Web Information Providers", 1996, p. 208.

Petitioner Microsoft Corporation - Ex. 1001, p. 2

# US 9,363,338 B2

Page 3

(56)    **References Cited**

OTHER PUBLICATIONS

Tibken, "Before Apple's iPad, there was the Intel IPAD. Seriously.", CNet News, Dec. 5, 2013 (http://news.cnet.com/8301-1035_3-57614579-94/before-apples-ipad-there-was-the-intel-ipad-seriously/) Accessed Web Site Jan. 23, 2014.

Non-Final Office Action mailed May 23, 2014 from the United States Patent Office in related U.S. Appl. No. 13/163,257.

IPR2013-0292: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, May 22, 2013.

IPR2013-0293: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, May 22, 2013.

IPR2013-0294: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, May 22, 2013.

IPR2013-0295: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, May 22, 2013.

IPR2014-0271: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, Dec. 19, 2013.

Final Written Decision entered Oct. 14, 2014 from the United States Patent Office in corresponding Inter Partes Review case IPR 2013-00292.

The HTML Writers Guild, Frames Frequently Asked Questions, www.hwg.org/resources/faqs/frameFAQ.html, Aug. 29, 1997 (last accessed May 22, 2012).

Methodology of Window Management, Hopgood et al., www.chilton-computing.org.uk/inf/literature/books/wm/overview.htm, Chapter 6, Myers, Apr. 29, 1985 (last accessed, Feb. 4, 2013).

Pages from www.pointcast.com, available from http://web.archive.org/web/19991013063544/http://pointcast.com/tour/tour9.html and http://web.archive.org/web/19990826155022/http://www.pointcast.com/tour/tour4.html?gt3, dated Aug. 26, 1999 and Oct. 13, 1999 (last accessed, Feb. 4, 2013).

Frames Frequently Asked Questions webpage: http://www.hwg.org/resources/faqs/frameFAQ.html, uploaded Feb. 9, 2011, 9 pages.

Available Web Site: www.dodots.com, Accessed on May 9, 2001.

Available Web Site: www.snippets.com, Accessed on May 9, 2001.

Martin S Matthews and Erik B. Poulsen, FrontPage 2000: The Complete Reference, May 1, 1999, McGraw-Hil Osborne Media, Chpater 19, pp. 1-12.

John Ross, ABCs of Internet Explore 4, Copyright 1997, Sybex, Chapter 13, pp. 1-3.

Paul McFedries, The Complete Idiot's Guide to Window 95, Mar. 1997, 2nd Edition, pp. 3-7, 97, 101, 105-107, 379.

PCT International Search Report, Application No. PCT/US00/29850, dated Jun. 25, 2001, 3 sheets.

Available Web Site: www.ububu.com Accessed on: May 9, 2001.

Available Web Site: www.chatb.com Accessed on: Nov. 7, 2000.

Duplex Multiplexer, Sensormatic, Samsung, . . . ireless communications,hand helds,maxon Available Web Site: www.mindspring.com/~stancom/multi.html Accessed on: Nov. 7, 2000.

Push technology. Available Web Site: www.whatis.com/WhatIs_Definition_Page/0,4152,213345,00.html Last Update: Jul. 7, 2000 Accessed on Nov. 7, 2000.

Clyman, John. Web Integration/Internet Explorer 4.0 Available Web Site: www.zdnet.com/pcmag/features/memphis/memphis1.htm Accessed on Nov. 7, 2000.

Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., ,Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., Corporate Portals Letter [ Online] 1(10), 1-3. Available Web Site: www.snippets.com/download/Corporate_Portal_Article.pdf Accessed on May 9, 2001.

"Microsoft Internet Explorer Resource Kit", (MSIE Resource Kit), Microsoft Press, A Division of Microsoft Corporation, 1998.

Civil Action No. 2:12-cv-00333-DBH in the United States District Court for the District of Maine filed on Oct. 30, 2012 in connection with U.S. Pat. No. 6,724,403.

* cited by examiner

Petitioner Microsoft Corporation - Ex. 1001, p. 3



Fig. 1

Petitioner Microsoft Corporation - Ex. 1001, p. 4



Fig. 2

Petitioner Microsoft Corporation - Ex. 1001, p. 5





Fig.3
(Prior Art)

Petitioner Microsoft Corporation - Ex. 1001, p. 6



**Fig. 4**

Petitioner Microsoft Corporation - Ex. 1001, p. 7

500



| | |
|---|---|
| 502 | Tile Address |
| 504 | Target Address |
| 506 | Name |
| 508 | Initialisation function |
| 510 | Refresh function |
| 512 | Fill-screen function |
| 514 | Alarm function |
| 516 | Display option |
| 518 | On mouseout function |
| 520 | On mouseover function |
| 522 | Toolbar function |
| 524 | Tile Level |

Fig. 5

Petitioner Microsoft Corporation - Ex. 1001, p. 8

```
<TD><A HREF="tile2_target.htm"
     TARGET="new"
     ONMOUSEOVER=action1(arg3)
     ONMOUSEOUT=action2(arg4)
     REFRESH=timeout(500)
     SOURCE=http://www.camelot.castle/swords/excalibur.til
     CLICKMAP=      { 0, 0,50,50, clickfunction1( clickargument1),
                      51, 0,50,50, clickfunction2( clickargument2),
                       0,51,50,10, clickfunction3( clickargument3) }
     TOOLBAR={"local/toolbars/radio.too" PLACEMENT="bottom" }
     ALARM="alarms/condition_rain=TRUE, condition_weekend=FALSE,
               alarmaction=blow_the_horn">

</TD>
```

Fig. 6

Petitioner Microsoft Corporation - Ex. 1001, p. 9



**Fig. 7**

Petitioner Microsoft Corporation - Ex. 1001, p. 10



Fig. 8

Petitioner Microsoft Corporation - Ex. 1001, p. 11



Fig. 9

Petitioner Microsoft Corporation - Ex. 1001, p. 12



**Fig. 10**

Petitioner Microsoft Corporation - Ex. 1001, p. 13



FIG. 11

Petitioner Microsoft Corporation - Ex. 1001, p. 14



| | | | | | | |
|---|---|---|---|---|---|---|
| 1202 | Parent Grid (address) | | | | | |
| 1204 | Address of self | | | | | |
| 1206 | Configuration Wizard | | | | | |
| 1208 | Tile creation function | | | | | |
| 1210 | Tile annihilation function | | | | | |
| 1212 | Number of rows | | | | | |
| 1214 | Number of columns | | | | | |
| 1216 Tile list | Address | Refresh rate | Position | Priority | Password | . . . |
| | Address | Refresh rate | Position | Priority | Password | . . . |
| | Address | Refresh rate | Position | Priority | Password | . . . |
| | Address | Refresh rate | Position | Priority | Password | . . . |
| | . . . | . . . | . . . | . . . | . . . | . . . |

Fig. 12

Petitioner Microsoft Corporation - Ex. 1001, p. 15

```
<HTML>
<HEAD>
<TITLE>Surfcast Grid Example</TITLE>
<META NAME= "Resource Manager"CONTENT= "RESMGR.EXE">
<META NAME= "Author" CONTENT= "Surfcast, Inc.">
</HEAD>
...
<BODY BACKGROUND= "surfback.gif">
<TABLE>
<TR>
<TD><A HREF= "http://www.somewhere.com/sometarget.html"
    TARGET= "new"
    ONMOUSEOVER=action1(arg1)
    ONMOUSEOUT=action2(arg2)
    REFRESH=timeout(200)
    SOURCE= "http://www.surfcast.com/tilelibrary/tile2.til">
</TD>

<TD><A HREF= "http://www.somewhereelse.com/someothertarget.html"
    TARGET= "new"
    ONMOUSEOVER=action3(arg3)
    ONMOUSEOUT=action4(arg4)
    REFRESH=timeout(500)
    SOURCE= "http://www.camelot.castle/swords/excalibur.til">
</TD>

<TD><A HREF= "local/document.htm"
    TARGET= "new"
    ONMOUSEOVER=action1(arg3)
    ONMOUSEOUT=action2(arg4)
    REFRESH=timeout(0)
    SOURCE= "local/documents/somedocument.til">
</TD>

</TR>

</TABLE>
</BODY>
</HTML>
```

Fig. 13

Petitioner Microsoft Corporation - Ex. 1001, p. 16



Fig. 14

Petitioner Microsoft Corporation - Ex. 1001, p. 17



Fig. 15

Petitioner Microsoft Corporation - Ex. 1001, p. 18



Fig. 16

Petitioner Microsoft Corporation - Ex. 1001, p. 19



Fig. 17

Petitioner Microsoft Corporation - Ex. 1001, p. 20



Fig. 18

Petitioner Microsoft Corporation - Ex. 1001, p. 21



**Fig. 19**

Petitioner Microsoft Corporation - Ex. 1001, p. 22



Fig. 20

Petitioner Microsoft Corporation - Ex. 1001, p. 23



Fig. 21

Petitioner Microsoft Corporation - Ex. 1001, p. 24



Fig. 22

Petitioner Microsoft Corporation - Ex. 1001, p. 25



**Fig. 23**

Petitioner Microsoft Corporation - Ex. 1001, p. 26



Fig. 24



Fig. 25

Petitioner Microsoft Corporation - Ex. 1001, p. 28



**Fig. 26**

Petitioner Microsoft Corporation - Ex. 1001, p. 29



**Fig. 27**

Petitioner Microsoft Corporation - Ex. 1001, p. 30

US 9,363,338 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SYSTEM AND METHOD FOR
SIMULTANEOUS DISPLAY OF MULTIPLE
INFORMATION SOURCES**

CLAIM OF PRIORITY

This application is a continuation of application Ser. No. 13/163,257, filed Jun. 17, 2011, now U.S. Pat. No. 9,043,712, which is a continuation of application Ser. No. 12/124,125, now U.S. Pat. No. 7,987,431, which is a continuation-in-part of application Ser. No. 11/140,546, now U.S. Pat. No. 7,376,907, which is a continuation of application Ser. No. 10/136,873, now U.S. Pat. No. 7,028,264, which is a continuation-in-part of application Ser. No. 09/702,325, now U.S. Pat. No. 6,724,403, which claims benefit of priority to provisional application Ser. No. 60/162,522, filed Oct. 29, 1999, all of which applications are incorporated by reference herein in their entireties.

RELATED APPLICATIONS

This application is related to application Ser. No. 13/759, 942, also incorporated herein by reference.

TECHNICAL FIELD

The present disclosure relates to methods of presenting information from a variety of sources on a display device. Specifically the present disclosure describes a graphical user interface for organizing simultaneous display of information from a multitude of sources.

BACKGROUND

The scope of the global communications capacity, comprising fixed link and wireless networks, continues to expand rapidly. The variety and complexity of communication devices proliferates and the number of users escalates. As a result, users are faced with increasingly complex systems and interfaces with which to manage multiple sources of information. At the same time, society has increased its demands on time and productivity so that users no longer have the luxury of focusing their attention on a single source of information or means of communication. Instead, the norm today is for people to carry out many tasks simultaneously.

As might be expected, these demands have exposed substantial problems in current communications technology. In particular, users are faced with insufficient resources to manage and access the volume and variety of information available to them in an efficient and productive manner. While a variety of tools designed to assist in accessing and managing these resources have been created, these tools remain unsatisfactory. Consequently, users are impeded by the myriad of information sources, each with its own method of use and often with its own login and password requirements, as well as by slow retrieval times to access the information. The result is an unacceptable delay for many operations, as well as inefficiencies in transferring information from one source to another.

Under the present art, for example, it is usually the case that a user lacks the bandwidth resources to receive multiple video signals simultaneously. If an individual were receiving one video signal, it is usually impractical to receive a second at the same time due to bandwidth constraints. Thus, the user could not, for example, monitor multiple video data streams of sporting or news events; instead, the user could monitor only one video data stream at a time.

To address such bandwidth resource limitations, the current art only accesses information when the user requests it. As a result, there is an inevitable delay between the user's request for information and the communications device's presentation of it. For example, if a user wants to monitor sources of news information on the Internet using current browser technology, the user must continuously and manually request the news data from its source to determine whether the data has been updated. Prior to requesting and subsequently receiving the data, the user has no way of knowing whether the data has been updated. In any case, the user is unlikely to want to refresh the status of each application by manual intervention himself at the frequency necessary to ensure that the information is up to date. Additionally, if a user wishes to view two or more webpages simultaneously, (s)he must run two or more copies of the web-browser program. The act of manually refreshing the content of alternate programs in order to ascertain which have any new material to offer is fundamentally inefficient.

Similarly, the user's access to such data is not in real-time or even near real-time because each time the user wants to view the information, (s)he must request it from its source and wait for the source to transmit it to him. Thereafter, (s)he must wait until his/her communications device has received and processed the information before it is presented. For complex information such as a video signal, this can take longer than a minute to occur; and, even for simple information, this process can take many seconds. Thus, the user is denied real-time or near real-time access to the information.

Present technology that locally stores or "caches" previously accessed information to make it available to the user more rapidly does not solve this problem, because the cached information is necessarily old. The user's communications device must still verify the accuracy of the information with the source before the system displays the cached information. As a result, the user is denied real-time or near real-time access to updated information.

Similarly, if a user wishes to make two or more simultaneous downloads there is no control over the relative rates at which the respective downloads would occur. So-called "push technologies" attempt to address this problem by organizing information from a number of related sources and sending it periodically to a user. While this arrangement frees a user from actively participating in the download, the price is that the user has little control over the organization of the information and can only practically handle a small number of such transmissions at any one time. Each transmission is subject to the bandwidth available.

Of course, not all tasks require the same allocation of resources and, correspondingly, not all tasks have equal priorities for a given user. In particular, a user may wish to customize the information environment in such a way that many processes are occurring synchronously, yet each is communicating with the user at a rate that is acceptable. For example, a television viewer may wish to know what is being broadcast on several channels at the same time but only care to watch one of them closely. An Internet user may wish to be continually in touch with sources of data from audio, video, chat-room, video-conferencing and e-mail checker utilities, but not wish all of them to update at the same frequency; the user would be satisfied merely to see at a glance a recent status of each. Some of these processes, such as chat-room activities entail very little data transmission and can, indeed, be effectively updated on a continuous basis, whereas others require a great deal of bandwidth but could usefully be sampled at a lower rate. The current art lacks any technology for controlling the respective refresh rates of several simultaneous infor-

Petitioner Microsoft Corporation - Ex. 1001, p. 31

US 9,363,338 B2

**3**

mation sources. Furthermore, the current art lacks technology that can automatically design an appropriate refresh rate based on the type of data that is received.

At the same time that users are limited by system resources, they are also finding that they have no effective way of managing the multiplicity of available data types and information sources. It is difficult both to conduct two or more different types of computing activities at the same time or to monitor two or more different information sources simultaneously because the tools available are confusing, inflexible, and/or otherwise difficult to implement. Users require immediate access to a wide variety of up to date content presented in a flexible, easily customized interface.

In addition to restrictions in the capacity of today's networks, there is very little conformity amongst the information content. A typical communication device, such as a personal computer, television or mobile telephone, comprises a display unit connected to a processing unit that can accept information from many different sources. As described above, the signals, data and/or datastreams that are available to such a device are diverse, including, for example, HTML content, e-mail, or streaming audio and video. Correspondingly, the software tools that interpret and process the different information sources present each in a different way to the user. From a user's perspective, distinctions between the different types of information could usefully be removed so that each is viewed in a similar way and such that the current presentation associated with any information source gives an immediate indication of its current content. The present reality is different, however. The user must contend with a wide range of icons and program windows that may occupy space on a user's display screen. Another lack of conformity is the different mode of behavior for programs that address different types of information. An effort to standardize the ways in which different types of information are presented to the user would be advantageous. Equally, unification of the way in which those types of information are managed would save time and increase user productivity, for productivity is reduced when users must cope with different attributes of different programs and learn distinct paradigms for different types of information. And, furthermore, a way of conforming the way in which information about multiple datastreams can be communicated between users would be desirable.

The nature of the application program windows and their respective icons predominantly found on today's computer displays is restrictive. The application window typically displays the current content or output of only a single program and program icons convey nothing of the program's current state or content. Often, an icon is a static image which is merely characteristic of the program or data represented thereby rather than the program's current state or its information content. In the present art, there is no intermediate between a window or an icon.

Thus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program. It may have active area around its borders, such as menu bars, scroll bars, or tool bars, designed to allow the user to control aspects of the window's appearance or to set parameters specific to the operation of the program controlling it. Icons, in contrast, offer ease of display when multiple programs are active, but they do not permit viewing or control of the underlying program or data represented thereby. Instead, icons require user intervention, typically in the form of a mouse-click on an icon of interest, to view or control the program or information. Consequently, the user's viewing options are limited to a choice between one presenting very limited information about a multitude of pro-

**4**

grams and information and one presenting full information, but of only a single program or data source.

The fact that the GUI's of the present art are largely restricted to icons and windows diminishes the capacity to organize, manage, and access available information. With the Internet representing an ever expanding view of currently accessible global information, the need for flexible information management tools has become crucial. Similarly, with the current expansion of television programming available, for example, through cable television and satellite broadcasting, the need to manage this audiovisual content becomes acute. The convergence of television programming and computers increases these management needs all the more.

Current computer operating system software utilizes bookmarking schemes for managing Internet locations and complex database technologies for managing specialist information. Neither provides visual immediacy or ease of layout. Bookmark hierarchies are presented as cascading textual menus, and database technologies arrange information into rigidly defined structures. The missing capability is a visual categorization in which an area of the display unit itself becomes the bookmark and the arrangement on the display becomes the categorization, independent of the type of content.

While the most common way of accessing information sources is via a personal computer, present day technology exists to communicate via a television or set-top box, handheld computing device, mobile and cellular telephones, all manner of "hybrid" devices such as an internet-accessible games player, camera phones, the "Blackberry", or even in-car navigation and security systems, in which case Internet content and other data can be displayed as some portion of the screen. There is a growing convergence of technologies: televisions are beginning to find application as viewers of non-television data, (for example through use of "Vertical Blanking Interval" technology in which a signal is inserted into the main video signal or through set-top boxes providing limited computer and communications functionality); computers are already finding application for the display of movies, real-time data streams, and the playing of audio data; handheld computing devices and mobile telephones can also access the Internet and other information sources; and other devices are becoming able to access a variety of signals, e.g., digital signals from satellites such as digital radio broadcasts.

To summarize the current state of the art, display technologies currently lack an interface which is capable of organizing any type of information, and presenting such information to the user in a consistent manner, in such a way that all currently open channels are able to indicate their activity on a continual basis, and which could run on any device. Furthermore the current art is deficient in respect of organizing multiple sources of information in a relevant manner that takes into account relationships between the various sources.

## SUMMARY

Accordingly, the present disclosure provides an easy to use graphical interface that facilitates the organization and management of multiple data sources corresponding to a user's needs and interests. The present disclosure comprises a grid of tiles that resides on the user's computer desktop. The grid of tiles provides a uniform, graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices. Additionally, the disclosure provides for automatic control of the refresh rates of multiple data sources, based on the character of the data or on "quality of service tags" that accompany the data. Such automatic con-

Petitioner Microsoft Corporation - Ex. 1001, p. 32

US 9,363,338 B2

5

trol may operate in conjunction with one or more user preferences for the refresh rates of certain data. Both the grids and the tiles can be transferred, e.g., by e-mail, from one user to another, or between multiple different devices belonging to a single user. The graphical environment is uniform with respect to the source of accessed information and can manage multiple streams of content, entirely of the user's choice. For example, the technology presents video clips, e-mail messages, television shows, Internet sites, application programs, data files and folders, live video streams, music, radio shows, and any other form of analog signal, digital data or electronically stored information, to the user uniformly and simultaneously, regardless of whether the information is stored locally or available via modem, T1 line, infrared, or any other form of communication. The user's impression of the interface is also independent of the type of electronic device upon which it is implemented.

The present disclosure comprises a method executed by a computer under the control of a program stored in computer memory, said method comprising the steps of: partitioning a visual display of a computer into an array of tiles, such as into a non-overlapping configuration; assigning a first refresh rate to a first tile of said array of tiles and a second refresh rate to a second tile of said array of tiles; updating information presented to said first tile in accordance with said first refresh rate; and updating information presented to said second tile in accordance with said second refresh rate. The manner of assigning the first and second refresh rates may depend upon the type of information received by each tile, including but not limited to the information content or an identifier contained in, or associated with, the information.

The present disclosure additionally includes an electronic readable memory to direct an electronic device to function in a specified manner, comprising: a first set of instructions to control simultaneous communication with a plurality of datastreams; a second set of instructions to partition data into an array of tiles; a third set of instructions to associate a first datastream of said plurality of datastreams with a first tile of said array of tiles and a second datastream of said plurality of datastreams with a second tile of said array of tiles; a fourth set of instructions to retrieve data from said first datastream in accordance with a first retrieval rate and retrieve data from said second datastream in accordance with a second retrieval rate; and a fifth set of instructions to present data to said first tile in accordance with said first retrieval rate and present data to said second tile in accordance with said second retrieval rate. The first and second retrieval rates may be automatically assigned by the fourth and fifth set of instructions respectively, based upon the type of datastream or an identifier that accompanies each datastream, with or without the additional use of one or more user-specified retrieval rates.

The present disclosure additionally includes a system for facilitating the organization and management of multiple data sources, comprising: a device that includes a processor configured to execute instructions, a memory connected to the processor to store at least one program that includes a graphical user interface, and an input device that includes a display, wherein the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least

6

one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

The application program described herein runs on, and the grids and tiles of which are transferable between, many different devices, including, but not limited to set-top box, personal computer, mobile phone, and other hand-held device. The grid and tiles retain the same characteristics, regardless of operating device. For example, the tiles remain individually configurable and can offer near real-time views of their data content. The application therefore permits the user's interaction with a range of electronic devices to be unified.

Additionally it is to be understood that the application program or programs described herein may be distributed between a client device and a server in such a way that certain data storage and intensive functions are carried out on a server.

BRIEF DESCRIPTION OF THE DRAWINGS

Additional objects and features of the disclosure will be more readily apparent from the following detailed description and appended claims when taken in conjunction with the drawings, in which:

FIG. **1** shows a representative embodiment of a user interface comprising a grid of tiles as might be depicted on a display screen.

FIG. **2** depicts a system that accepts data in at least one form through at least one port and which additionally displays data to a user.

FIG. **3** shows stylized examples of an icon and an application window as are commonly found in computer display systems of the background art.

FIG. **4** shows several tiles as might be found in a typical embodiment of the present technology.

FIG. **5** shows an exemplary data structure of the tile object within a graphical user interface.

FIG. **6** shows one embodiment of a tile in markup language.

FIG. **7** shows the hierarchy of software objects underlying the instant technology, comprising a grid object, tile objects and files or application software.

FIG. **8** shows an exemplary layout of a display produced by the technology described herein.

FIG. **9** shows an alternative exemplary layout of the display produced by the technology described herein.

FIG. **10** shows an exemplary layout of a display wherein a tile contains another instantiation of a grid.

FIG. **11** shows an exemplary layout of a display including specific examples of tile contents.

FIG. **12** shows the data structure of the grid object which forms part of a graphical user interface.

FIG. **13** shows one embodiment of a grid in markup language.

FIG. **14** shows a sequence of windows that demonstrate how a grid might be set up for initial use by a "wizard" tool.

FIG. **15** shows an example of the architecture of a computer program in a preferred embodiment of the present technology.

Petitioner Microsoft Corporation - Ex. 1001, p. 33

US 9,363,338 B2

7                                                  8

FIG. **16** shows the architecture of the application program and its components in a preferred embodiment of the present technology.

FIG. **17** shows the architecture of components of the computer program in a preferred embodiment of the present technology.

FIG. **18** shows an outline of the widget-set used in a preferred embodiment of the present technology.

FIG. **19** shows an outline of the metabase according to a preferred embodiment of the present technology.

FIG. **20** shows an outline of the XP Core and its interaction with the operating system library in a preferred embodiment of the present technology.

FIG. **21** shows an overview of the event system utilized in a preferred embodiment of the present technology.

FIG. **22** shows an overview of the connection layers that are responsible for controlling the download of multiple webpages from the world wide web.

FIG. **23** shows a number of functions used by the bandwidth controller.

FIG. **24** is a schematic representation of the relationship between a server and a client device.

FIG. **25** shows a series of interactions between a client device and a server.

FIG. **26** shows how a user, a server and third party content providers communicate in accordance with an embodiment of the technology.

FIG. **27** shows an embodiment in which the application program communicates with one or more wireless devices.

DETAILED DESCRIPTION OF THE TECHNOLOGY

FIG. **1** shows an illustrative configuration of the graphical user interface of the present disclosure. A grid **1** consisting of a 3 by 3 matrix of nine tiles demonstrates some of the different contents that tiles can display. Tile **10** points to a database of stock quotes. Tile **20** displays the active folders in an electronic mail utility. Tile **30** displays a portion of an alphabetical list of quoted companies. Tiles **40**, **50**, **60**, **70** and **80** point to websites displaying, respectively, high technology news, electronic goods for sale, categories of business news, items available by auction and the Wall Street Journal. Tile **90** points to the file-viewer of a windows-based operating system, such as Microsoft Windows™, and displays the currently accessible disc drives or partitions.

Within the scope of the present invention, an information source may comprise any analog signal, source of digital data or a datastream, including, but not limited to one or more of, video, audio, text, and graphics. The information may be in any format, including but not limited to ASCII, bitmap, MP3, JPEG, GIF, TIFF, a mark-up language such as HTML, XML, VRML, HDML, formatted text such as rich text format, or binary. Preferably the software of the present disclosure is able to recognize the type or format of the information source and assign properties to tiles according to the type. In another preferred embodiment, the information source contains or is accompanied by an identifier that indicates a priority to be attached to the information when displayed by the graphical user interface. Such an identifier may be referred to as a "quality of service", (QoS) tag.

FIG. **2** is a general representation of a data display system **100** within which the present invention may be implemented. System **100** comprises a processor such as central processing unit **104**, an input device **106**, data connection ports **108-1** through **108-N**, a display **110** and a main memory **112**, all connected via bus **116**. Residing in the memory **112** is an operating system **120**, a file system **122**, a cache **124** for temporary storage of information, application programs **128-1** through **128-N** and a graphical user interface (GUI) program **126** that is responsible for presenting information on to display **110**. Information may enter and/or leave the system through any one of the ports **108-1** through **108-N** which may themselves be connected to a tuner **114**, or via a network interface **134** to a communications network. If a tuner **114** is employed, it may channel input from a wireless signal **130** or a cable network **132**.

In some embodiments of the present disclosure, system **100** is a personal computer such as a desktop workstation, a portable notebook or laptop computer, or a wearable computer. In that case the input device **106** may be a keyboard, mouse, voice-activated device, trackpad, trackball, or any combination thereof and the display **110** may be a conventional cathode ray tube (CRT) or flat-screen display such as an active matrix LCD, or an OLED. The network interface **134** may then be a connection to the Internet or to a local area network via a cable and modem or a digital subscriber line or ISDN, or via a wireless connection, such as WiFi, Bluetooth, or a wireless connection, for example, using 802.11a/b/g to the Internet.

In another embodiment of the present invention, system **100** is a mobile or cellular phone or personal digital assistant and the input device **106** may consist of several buttons on a keypad, a touch-sensitive screen with or without a touching device such as a stylus, or a microphone and voice-recognition software. In this embodiment, the display **110** is preferably an LCD screen or an electroluminescent display, and ports **108** receive data from radio signals or a portable or wireless modem. Consistent with this embodiment, it is also possible that system **100** is, or comprises part of, a hybrid device such as an internet-ready entertainment device that also has a games playing function or the ability to display an electronic book, or has a digital audio function as does an MP3 player. It is also possible that system **100** is a portable navigation system, such as a GPS device especially one that has an additional functionality such as cellular telephone communication capability or the ability to pick up broadcast radio or TV signals.

In yet another embodiment of the present disclosure, system **100** comprises a set-top box wherein display **110** is a TV screen or monitor, and tuner **114** accepts input in the form of a wireless signal **130** from broadcast transmissions or cable signals from the cable network **132**.

It is consistent with the present disclosure that, as discussed hereinbelow, system **100** comprises a client device that communicates with a server.

It is also envisaged that the present disclosure can comprise a device that accepts digital signals from a satellite, such as an "XM" radio transmission. It is further contemplated that the present invention can interface to an in-car navigation and security system that utilizes GPS technology or satellite communication means, such as the "OnStar" system. Accordingly, the present disclosure may also find application in conjunction with an in-car entertainment and display system.

Input device **106** may be a hand-held remote control apparatus or buttons located on the set-top box or touch-sensitive areas of display **110**. Accordingly, the display **110** and the input device **106** need not be part of the same physical device as the device that contains processor **104**.

According to the present disclosure, the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of

Petitioner Microsoft Corporation - Ex. 1001, p. 34

US 9,363,338 B2

**9**

tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

As is known to those skilled in the art, a graphical user interface is a computer program that resides in memory **112** of some data processing system and that provides means for presenting information, input to, and output from, application programs **128** or content of datastreams from ports **108** on an associated display. In the background art each datastream is associated with a window. The graphical user interface allows a user to control the arrangement and display format of the data content in each window. Usually a graphical user interface permits a user to specify and alter operating parameters of application programs running on the system, though at any given time a particular application program will take priority, meaning that a particular window will be displaying continually updating content. Typical operating parameters that may be changed depend upon the application program but include the number of buttons on a tool bar and number of visible toolbars, the size of the text displayed and the color of the background.

By contrast, the graphical user interface of the current disclosure not only permits a user to control the layout of the data content but to prioritize each application program running on the system and each datastream of interest. A novel feature of the present disclosure is that the data content of any number of the programs can vary in real time and the rate at which the display of each—on a respective tile—is updated can be controlled by the user. Furthermore, in another embodiment, in the absence of initial preferences specified by the user, the present technology is able to assign a rate at which the display of a tile is refreshed according to the type of data or according, for example, to an identifier that is presented with each datastream or source of information, and may take into account the available bandwidth.

When the present technology assigns a refresh rate to a tile according to the type of data, it is envisaged that the type of the data is automatically recognized or ascertained. For example, according to this embodiment the present technology distinguishes between types of data such as video, audio and web-based content, based on the format of the datastream in question and preferably assigns a higher priority to types of data that vary in real time, such as video or audio content.

When the present technology assigns a refresh rate to a tile according to an identifier presented with each source of information, the nature of the identifier may vary according to the type of data or the protocol that is employed for its transmission. In preferred embodiments, the identifier is a tag that is associated with a "Quality of Service" (QoS) implementation. As is known to one of skill in the art, QoS refers to the ability of a data communications system to define and differentiate levels of performance. For example, in internet protocol (IP), QoS tags are presented as specific pre-set bits in packet headers. When the packets are received, a priority can be assigned according to the bits that have been set. For a description of QoS in the IP context, see, for example,

**10**

www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm. A finer granularity of QoS is possible using Resource Reservation Protocol ("RSVP"). For a description of QoS in wide area networks (WAN), see for example, www.cisco.com/warp/public/cc/so/neso/vvda/avvid/eeqos_ds.pdf. In networks that communicate via Asynchronous Transfer Mode (ATM), each distinct datastream has an identifier, often called a "virtual channel identifier," that accompanies each of its packets (or cells). In a preferred embodiment, the identifier is contained within a header attached to each packet or cell. QoS is achieved by discriminating between datastreams according to their different identifiers. QoS may be controlled by adjusting parameters that include a packet loss ratio, a packet cell delay variation, a maximum packet loss transfer delay and a mean packet transfer delay. A user's desire in respect of the priority to be accorded to a particular datastream is communicated amongst the various nodes in the network. A more detailed description can be found in, for example, *High Performance Communication Networks*, Walrand, J. and Varaiya, P., Morgan Kaufmann Publishers, Inc., (1996).

Accordingly, an identifier suitable for use by the present technology for assigning a refresh rate to a tile includes a bit or bits in a packet header, or a tag that accompanies or is in the header of a cell or packet.

Consistent with altering refresh rates according to a QoS concept is that the level of packet loss can be adjusted according to the priority level associated with different types of data. Furthermore, a fully-implemented QoS capability permits prioritization based on criteria other than the type of the data. For example, traffic can be prioritized according to the IP address of a source or destination device. Traffic can also be differentiated based on whether or not they are real-time, such as voice or video.

Tile Objects

In the ensuing discussion, tile objects are introduced and described and contrasted with existing elements of graphical user interfaces. A tile presents content from any information source.

Conventional graphical user interfaces of the background art provide two distinct representations of programs, files, and datastreams, as shown in FIG. **3**. One representation is an icon **320**, the other is a window **340**. An icon typically occupies only a relatively small proportion of the available display area and comprises an easily recognizable depiction of the program or file, either through its logo **322** or some characteristic picture with the name **324** of the program visible. An icon can be selected by, for example, a touch screen pointer, a cursor controlled by a mouse with a button, or by a keyboard stroke or a combination of keyboard strokes, or any combination of the foregoing. In response to a further selection operation on an icon, for example a double-click of a mouse button, the graphical user interface will provide a window that can be used to communicate further information to the program or review the associated datastream.

A window **340** may occupy a substantial percentage of available screen space, usually 90-100%. The window **340** usually comprises a title bar **348** and a display area **354**. The window **340** can commonly be resized by the user for example by using buttons **352** or a draggable area **356** and has a format which contains many active areas around its borders. Examples of active areas include a menu bar **342**, a vertical scroll bar **344**, a horizontal scroll bar **350** and one or more tool bars **346**. Each active area may be used to control aspects of the window's appearance or to set parameters specific to the operation of the program associated with it such as text formatting options in a word-processing package or redirection of a web-browser to its stored home location.

Petitioner Microsoft Corporation - Ex. 1001, p. 35

US 9,363,338 B2

**11**

In the present disclosure, a third graphical representation of programs and files, herein called a tile, is introduced. Tiles permit "dynamic bookmarking" of information in that each tile is a viewer of a single information source—including streaming data sources—and can be customized with the user's choice of content as well as initialized with sets of options that are pre-determined by the software of the present disclosure according to the type of data that the tile displays.

A tile is different from an icon because it provides a real-time or near real-time view of the underlying information in that it contains continually refreshed content. A tile is different from a window because a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired.

A tile provides an at-a-glance view of the current status of the program or file associated with it but does not necessarily have the large number of active areas associated with windows such as title bar, menu bar, toolbars, and scroll bars. Therefore tiles lead to a reduction in clutter on the display screen because many tiles may be displayed simultaneously without overlapping one another in the way that windows must necessarily do. Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another. Tiles are superior to icons because they give an immediate indication of the current state of the file or program and have utility functions associated with them, as described hereinbelow. Another advantage of using tiles is a uniformity of appearance between tiles which correspond to different programs and datastreams. The display content of a tile will differ from application to application though its size and format need not.

A tile is associated with a program, file or datastream, similar to the way in which an icon and a window are. A tile may present data in any of a number of ways. For example, in a preferred embodiment, the tiles may present a miniaturized, "thumbnail" view of the underlying information; a "porthole" view of a portion of the underlying information as viewed at full size; a symbol indicating whether the information has been updated since it was last viewed; or a custom interface designed to allow rapid access to the underlying information. The way in which a tile displays content may be independently configured for each tile and may be set up in a default manner that depends upon the type of information being displayed.

FIG. 4 illustrates representative tiles. Tile **402** displays a picture or graphic such as may be stored in a bit-map, JPEG, TIFF or GIF file, or on a word-wide web page. The content of tile **402** is typically a miniaturized representation of a graphic or still-frame from a datastream. Tile **404** displays a portion of a text document or text of a world-wide web page. In this sense the tile functions as a transparent panel placed on top of a document, thus permitting a portion of the document to be displayed. Tile **406** displays a further array of tiles that may be displayed in full by expanding tile **406** to occupy the full area of the display. Tile **408** has been configured to link to an electronic mail program. An exemplary alarm setting associated with tile **408** has been configured so that the tile displays an envelope and the message "New Mail!" when an unread message has been received by the mail program. It would be understood that other alarm or alert settings may be associated with a tile, for example, configurable by a user. Thus, a tile could be established to broadcast a particular alert when the datastream to which it is connected encounters a particular condition, or transmits a particular signal.

Tile **410** displays a name, "FM 101", denoting the title of a broadcast signal, in this case audio, that is associated with the

**12**

tile. Tile **412** displays a "thumbnail" of the document viewed in a window such as **340**. A "thumbnail", as used herein, is a miniaturized representation of an image that retains sufficient characteristics to permit easy recognition of the image. For example, if the document displayed in a window were a document with multiple pages, tile **412** may display a thumbnail of the first page of the document.

Tiles are selectable and live. When a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information, whether that data be a hierarchical menuing system leading the user to a different level or tiles, a word processing file stored on a local area network, a spreadsheet stored locally on a user's computer, HTML file on the Internet, or a television signal. The tiles are live in that each contains real-time or near real-time information.

In a preferred embodiment a selection operation is associated with a tile. For example, clicking on a tile will cause it to immediately refresh its contents. Selecting tile **402** causes the most recent frame of the video stream to be displayed by the tile, or, if the picture were obtained from a static graphic file, causes the most recent version of the file to be displayed by the tile. Selecting tile **404** or tile **412** causes the most recent version of the document to be displayed.

In a preferred embodiment, a second selection operation is associated with a tile. For example, double-clicking a tile causes that tile to occupy a substantial fraction of the whole display area. In this embodiment, double clicking tile **402** or **412** causes the image to be expanded to fit the whole display area. In an alternate embodiment, selecting a tile causes it to occupy an area in the middle of the display that is larger in area than a single tile but does not occupy the full display. If tile **404** were double-clicked, as much of the document as could be displayed in the enlarged tile in regular font size becomes visible. Double-clicking tile **408** causes the mailbox window of the e-mail utility to be sufficiently enlarged to allow new messages to be selected and read. Double-clicking tile **410** causes the audio stream to become audible over the appropriate channel of the system and need not necessarily cause the tile to occupy a substantial fraction of the display area.

A representative tile data structure **500** is shown in FIG. **5**. It is important to understand that the tile itself is an image that at any given instant is resident on the tile system. This image is separate and distinct from the application program or file associated with the tile. The tile data structure **500** comprises two addresses: a tile address **502** that defines the location on the file system where the tile image is stored; and a target address **504** that is the location at which the file or application program associated with the tile can be found. Additionally, the tile data structure contains a name **506** that may be displayed on the tile in certain circumstances (for example the title of a broadcast signal, as in Tile **410**).

Tiles of the present disclosure may be assigned at least seven functions, including but not limited to: an initialization function **508** that is responsible for establishing a connection with the target address **504**; a refresh function **510** that handles updates to the tile image stored at the tile address **502**; a screen-size function **512** that stores the dimensions of the display area filled by the tile upon receipt of a request; an alarm function **514** that permits the tile to display an alarm or warning when the application program associated with the tile encounters a designated event; an on mouseover function **518** and an on mouseout function **520** which control the behavior of the tile when a selection tool such as a mouse-controlled cursor is placed respectively on and off the tile; and a toolbar function **522** which may permit an array of special

Petitioner Microsoft Corporation - Ex. 1001, p. 36

US 9,363,338 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

buttons to appear on or adjacent to the tile for the purposes of adjusting properties of the tile.

Refresh function **510** is able to indicate a retrieval rate at which information is retrieved from a source of information so that the information is displayed and refreshed in the tile. Preferably refresh function **510** is able to interpret an identifier that accompanies the information displayed by the tile. In some embodiments, a tile is configured so that a right-click of a 2- or 3-button mouse while the cursor is over the tile would activate the tool-bar function. In a preferred embodiment, right-clicking on a tile can reveal a menu of options that enables the user to ascertain properties of the tile, such as the bandwidth it is consuming.

In some embodiments of the present disclosure, the tile is itself a document created in a markup language such as HTML or XML as shown in FIG. **6** and is suitable for display in a web-browser. In this embodiment, a tile occupies a position in a table defined with elements of mark-up language which will be familiar to one skilled in the art. Tile-specific attributes are introduced which control the way in which a web-browser displays the tile. In the example in FIG. **6**, the tile has a clickable map, i.e., separate areas of the tile produce separate results when clicked. Also, this tile has a toolbar, which in some embodiments may appear if the mouse is right-clicked when the cursor is over the tile.

In another embodiment of the present disclosure, tiles communicate with one another and have conditional content. That is, the content of one tile depends upon the content of another. Such conditional content enables more than one tile to be refreshed simultaneously, or nearly simultaneously, by requesting a given tile to be refreshed. Alternatively, a tile may be set up to specify one or more other tiles whose contents are linked to it. For example, a first tile may show a web-based listing for the Nasdaq Stock index, and one or more conditionally dependent tiles may link to web pages that show the weekly, and yearly fluctuations of the index and the performance of previously chosen stocks.

In some embodiments, tiles should be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a tile, such as selecting a "send" option in a selection menu accessed by right-clicking on a tile, or by activating a button on the tile, send a tile that has already been configured to another user. The tile could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the tile from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the tile, i.e., send the tile from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously.

A tile could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a tile to a removable medium such as a CD-R, or a USB-drive, and transfer the file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable tiles would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a tile to another member of the community from within the online environment.

In a preferred embodiment, tiles are categorized into a number of levels, arranged hierarchically so that tiles in each level have priority over those in other levels. Such a priority indicates that tiles with highest priority will refresh most frequently. Accordingly, each tile has a tile level **524** in this embodiment. In one aspect of this preferred embodiment, priorities are assigned according to the type of data that is displayed by the tile. According to such an aspect, the highest priority is assigned to a video or web-based conference, for example; the next priority is assigned to a videostream such as a movie or broadcast TV signal; a third priority is attached to a media player such as RealPlayer; and lower priority tiles handle local applications and files. Tiles within a given level can be set up to compete equally for available system resources and bandwidth.

Grid Object

The arrangement, layout and independent functioning of the tiles on the display and exemplary software for their control is now described with respect to FIGS. **7-13**.

The overall hierarchy of a graphical user interface embodied by the present technology is summarized in FIG. **7**. The Grid **700** is the top level functionality to which application programs are subordinate. The grid can replace the functionality of a user's computer desktop and offers similar and additional features. Grid **700** comprises a matrix or array of tiles of which tiles **702**, **704**, **706**, **708** and **710** are representative. The user can control the grid in such a way that the tiles **702**, **704**, **706**, **708**, and **710** present simultaneous information content from a plurality of sources independently of one another. The grid controls the layout and priorities of the tiles. Each tile is associated with a data stream or application program thereby permitting a number of different images to be displayed simultaneously. In particular, different tiles can be—and typically are—associated with different contents. For example, tile **702** is connected to a web-page viewer **712** such as a browser. Tile **704** is connected to a source of streaming video **714**, such as Real Player. Tile **706** is connected to an audio player **716** such as a CD-player program or a source of streaming audio such as Real Audio. Tile **708** is connected to a file viewer **718** such as a text-editor or a word-processing package. Tile **710** is associated with another grid object **720**, thereby permitting a "layering" of information hierarchies. In a preferred embodiment, a grid embodies a similar underlying data structure to a tile.

Each tile is separately associated with a source of information, for example, an application program, datastream or file, any one of which may be another grid object. Such a hierarchical structure permits a user to organize programs and information through the graphical user interface. For example, separate categories of information can be displayed on separate grids allowing each grid to be associated with a theme. In some embodiments, a grid can be configured to be populated with a fixed number of popular web pages based on, say, most recently visited URL's, or most frequently visited URL's over a period of time such as a week or a month.

In some embodiments, a source of information has an identifier, such as a quality of service tag, associated with it. The grid assigns a priority to a tile based upon the identifier, or based upon the type of data that the source of information comprises. Where tiles are ranked into levels, the grid assigns an information source to a tile in a level that is appropriate for the type of data or the identifier associated with the information source. In this way, a tile can be automatically given a priority that is appropriate for the type of information that it is to display.

By using the native attributes of a tile, a user may specify a presentation of the grid, consisting of its dimensions, (i.e., the number of tiles to display and their arrangement), and the programs or files to be associated with each tile. A single grid,

Petitioner Microsoft Corporation - Ex. 1001, p. 37

US 9,363,338 B2

**15**

composed of multiple tiles, may therefore present a number of information sources simultaneously.

Together, the grid and tiles comprise the application through which a user can view simultaneously information from a multitude of available sources including multiple sites on the Internet or some other distributed computer network, receive signals from multiple broadcast channels, and open and view multiple files. In some embodiments, the application may be run through ordinarily available computer operating systems, whereupon the application overlays the user's desktop and acts as if it were a "borderless browser". Therefore the application resides over existing applications without replacing any of them; rather it enables those applications to be called from the grid itself. The application, therefore, becomes a graphical file manager in which the content of continuously changing files, e.g., datastreams, is being displayed in real-time or near real-time, depending on the respective assigned priorities. Effectively, the application can be used instead of the user's computer "desktop" because it has a more visually intuitive dynamic menuing system than a traditional desktop.

In a preferred embodiment, a grid of tiles replaces the functionality of the computer "desktop" utilized by many computer operating systems. Whereas a desktop is typically populated by static icons and tool bars, a grid of tiles instead presents to the user an array of snapshots of current programs and files. The essence of the grid is that its content is dynamic and informative. As previously discussed, icons are inherently limited in the information that they can present and windows clutter the entire desktop without permitting more than one to be readily displayed simultaneously. By contrast, each tile on the grid can show the current status of the data or datastream associated with it. The fact that a tile may refer to a separate grid permits nesting of grids and consequently a hierarchy of organized information sources.

The grid also understands the interests of the user and acts as a repository for passwords and identifiers to subscription services. In this way, it is not necessary for a user to remember and enter a user name and password to access data requiring such a log-in. In this same vein, Internet sites of interest can be "bookmarked" and stored by the grid, each such site possessing its own tile. The grid is also nestable in that a tile in one grid may point to a separate grid and tiles in the separate grid may point back to the first grid or to yet more grids. If desired, a user can impose a "theme" on a grid and thereby categorize, group, and/or otherwise manage his/her data sources. In this manner, the user can group tiles relating to particular subject matters, Internet sites, documents, or otherwise in a grid according to some speciality. A tile in such a grid could link to another grid to provide a connection between related categories. Equally, a tile on one grid can point to the same information source as a tile on another grid.

In some embodiments, the application program is provided with a number, such as one or more, 'out of the box' grids. In such embodiments, a user is offered a repository of pre-made grids that are pre-configured with a particular layout of tiles, and links to particular datastreams. Such a grid can be used as a starting point for a user who first opens the program, and may contain, for example, a tile configured to provide content for each of several commonly used programs or websites. By way of example, a pre-configured grid may contain an array of 4 tiles, that include: a tile configured to link to a home-page of an Internet search engine, such as Google; a tile configured to link to an information archive such as Wikipedia; a tile configured to link to a user's e-mail program; and a tile configured to access the local file-system on the user's device.

**16**

The grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display.

In a preferred embodiment, the grid permits a regular layout of tiles on the display screen such that the tiles are uniform in size and shape, as depicted in FIGS. **8-11**. Each tile is indexed by its position on the grid. For example **802-2-1** is the first tile in the second row. Tiles in the first row of the grid are **802-1-1, 802-1-2, 802-1-3** and so on, to **802-1**-N. Tiles on the second row are **802-2-1, 802-2-2, 802-2-3** and so on, to **802-2**-N. And, tiles on the bottom row are **802-M-1, 802-M-2, 802-M-3** and so on to **802-M-N**. There are no gaps between the tiles, the tiles are not permitted to overlap and the whole grid is covered by tiles. FIG. **8** shows one embodiment in which all tiles are the same size and are presented in an array comprising M rows and N columns. There is no particular requirement that the arrangement consists of more than one row and more than one column. On the display of a mobile telephone or smart phone, for example, a single row of tiles may be apposite. In a preferred embodiment, a display of a smart, cellular or mobile telephone presents a single tile at any one time but it is possible to scroll from tile to tile across the grid, by using, for example, buttons on the phone, or other methods of control.

FIG. **9** shows an arrangement in which there is a unit tile size, that of tile **802-1-1**, but tile **802-1-2** and tile **802-M-1** have each been configured to occupy regions of the grid equal to exact multiples of the unit tile size. Such an arrangement may be useful and important if one or more datastreams is of particular interest but the others are also to be monitored at the same time.

In some embodiments, a grid comprises instructions for assigning tile size intelligently when a user specifies, or receives, a number of tiles. The instructions can comprise a learning algorithm that learns the preferred sizes of the most active tiles and does its best to keep the user happy without the user having to manually assign, resize, or move tiles around. Thus, for example, a user may wish to set up a grid quickly, and specify seven tiles. Seven does not neatly partition into a square or rectangular array, but the program understands that particular applications benefit from being displayed in tiles that are greater than the unit tile size, and therefore automatically assigns such applications to larger tiles without the user's intervention.

FIG. **10** shows an arrangement of tiles in which Tile **802-M-1** is associated with a further grid **1000**. The lower half of the Fig. shows an enlarged perspective of that tile showing a grid with Y columns and X rows.

FIG. **11** shows an arrangement of tiles in which are depicted different application programs associated with three of the tiles. Tile **802-2-2** links to a file viewer displaying a specific file; tile **802-M-1** presents streaming video; Tile **802-M-N** depicts a page of information on the world wide web.

In some embodiments, a grid can be configured with a foreground option such that, when a user's display has already been configured to contained a number of tiles, upon selecting a tile in a particular way, e.g., middle-clicking on it, the tile would expand in size and be displayed in the foreground relative to the rest of the grid.

FIG. **12** shows a schematic data structure of the attributes of some embodiments of grid object **700**. The architecture shown in FIG. **12** applies to any grid, including a top-level grid **700** shown in FIG. **7** as well as to a grid that is contained within a tile.

Significantly, the grid manages the flow of information to the tiles. For example, the grid can communicate with the display device in order to determine its current configuration

Petitioner Microsoft Corporation - Ex. 1001, p. 38

US 9,363,338 B2

**17**

and allocation of resources. In some embodiments, using a so-called "carousel" approach, the grid continually cycles around the currently displayed tiles, one by one, refreshing the content of a tile each time it is accessed. When a given tile is refreshed, the refresh operation is completed before refreshing the next tile in sequence. In this way, the cycling rate may be set so that the current content of all tiles are reasonably up to date. The cycling can be interrupted by a user selecting a given tile, so that that tile alone becomes continuously updated. In this way, the user does not need to worry about manually refreshing multiple tiles.

In a preferred embodiment, according to priorities that may be applied to individual tiles on a tile by tile basis if desired, the grid manages the refresh rate of each tile in the grid. For example, for locally stored word processing or spread-sheet files, the user might configure the tiles to refresh only when the underlying data is written to the local hard drive. Similarly, a user might configure tiles containing infrequently updated Hyper-Text Markup Language ("HTML") data from the Internet to refresh at a certain time each day. At the other extreme, a user might configure an active tile to display a television channel at a refresh rate of 29 frames per second, while at the same time configuring inactive tiles to display different channels at a refresh rate of once every five seconds. In this way, a user could monitor many channels until program content of interest appeared in one of the tiles without the burden of actively refreshing each tile.

In other embodiments, the grid itself assigns priorities to the tiles based on identifiers such as quality of service tags that are associated with the information source itself. In still another embodiment, the grid automatically assigns priorities to the tiles based upon its recognition of the type of data that is presented to it. In this way, the grid can associate information sources with tiles that occupy different levels of priorities in a hierarchy of levels, if present. It is to be understood that an identifier such as a QoS tag can be used to assign to a tile a priority that is higher than that of another tile that would display the same type of data, and would have the same priority in the absence of such an identifier. Thus, for example, QoS tags can be used not only to assign two video-streams a higher priority than a web-browser tile, but can be used to prioritize one videostream over another. It is also to be understood that not all information sources need be accompanied by identifiers for the grid to be able to assign priorities itself. In the absence of an identifier for a particular information source, the grid can assign a priority based on the type of data, a user preference or some arbitrarily low priority based on other considerations such as bandwidth and availability of other system resources.

The grid itself has an address **1204** that specifies its location within the file system of the device in which the application program runs. The grid has associated with it several utility programs: a configuration wizard **1206** that may be called by the user when setting up a new grid; a tile creation function **1208** utilized by the configuration wizard when initializing new tiles; a tile annihilation function **1210** utilized in case of error or when resizing the grid.

The grid object stores the number of rows **1212** and the number of columns **1214** of tiles that are present. The grid also stores a tile list **1216** containing attributes of each respective tile. In particular, the address of each tile, its priority and its refresh rate are stored by the grid program. The grid also stores other attributes of tiles such as their respective positions on the grid as given by their column and row number. The priority of a tile may be used to determine its refresh rate in some embodiments of the present technology. A tile can have a password feature built into it if it is desired to restrict

**18**

access to the tile's content. The grid itself can have a toolbar by which its attributes may be accessed and modified.

Much as in the manner in which tiles may be sendable, in some embodiments, grids should also be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a grid, such as selecting a "send" option in a selection menu accessed by right-clicking on the grid, or by activating a button on the grid, send a grid that has already been configured to another user. The grid could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the grid from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the grid, i.e., send the grid from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously. When sending a grid, the key attributes that would be sent would include the grid configuration, such as its size, and the locations of datastreams associated with the respective tiles.

A grid could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a grid as a file to a removable medium such as a CD-R, or a USB-drive, and transfer the grid-file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable grids would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a grid to another member of the community from within the online environment.

In a preferred embodiment, a grid is a special form of a tile. It is a tile that can create and manage an array of other tiles. Accordingly, its data structure also comprises those elements of a tile data structure shown in FIG. **5** in addition to those shown in FIG. **12**. If the grid has a parent grid, the address of the parent grid **1202** is stored. For example, grid **1000**, associated with tile **802-M-1** of FIG. **10**, has grid **700** as its parent.

In some embodiments of the present technology, the grid is a document created in a markup language, such as HTML, SGML or XML, and is therefore suitable for display via a web-browser. In this embodiment, the addresses of the parent grid, the grid itself and each of the tiles are expressed as Uniform Resource Locators (URL's). The various functions controlled by the grid are accessible through function calls devised according to methods familiar to one skilled in the art. For example, "dynamic HTML", java applets or simple CGI-scripts can provide the technological basis for enabling various grid utilities. FIG. **13** is illustrative code for establishing a grid.

In some embodiments, a grid can provide a sub-layer of functionality around "favorites" and history, thereby allowing users to see what data streams have been recently accessed by any one or more of the tiles, as well as to create lists of sites as favorites.

The application program may be downloaded from a predetermined web-site and preferably operates in a client-server mode. Users may download preconfigured grids from the predetermined server. A grid configuration "wizard" program which guides a user through a step by step set up of a custom-grid may also be downloaded. Other web hosts are able to deliver content to end-users via the predetermined server. Some basic functions of the grid can be carried out on the predetermined server and provided to the user. According

Petitioner Microsoft Corporation - Ex. 1001, p. 39

US 9,363,338 B2

<table>
<tr><td>19</td><td>20</td></tr>
</table>

to the capabilities of the device on which the grid is displayed, the server may take on more demanding functions.

A grid can also be offered as a web-based service, for example one that provides single-sign-on to chosen services (where possible) that are accessible via a user's pre-determined tiles.

Grid Configuration Wizard

In some embodiments of the present technology, the set up of a particular grid is achieved through a grid configuration program ("wizard") that is downloaded to the display device from a remote site. The grid configuration program permits a user to define and install one or more grids on the client system. When a tile is partitioned into a further array of tiles, the grid configuration program can also be used. Some embodiments of the user interface of the grid configuration wizard are shown in FIG. 14.

A first screen displayed by the grid configuration wizard comprises an application program logo 1404, button 1406 to guide the user to the next screen and a number of choices, such as 1408. The user is offered the choice of preconfigured, or "standard" grid configurations, selected from a list. Examples of such grids include grids themed by content such as sport-related grids or by type of data such as grids whose content is video-based.

Additionally, the user is permitted to configure "customized" grids in which each tile can be taken from a list of predefined samples or can be initialized according to the user's wishes. For example, a user can assign a priority to a tile, or can select a tile from a hierarchical scheme of predefined priorities, or can specify that a tile set its own default priority by recognizing the type of data that it receives or an identifier such as a QoS tag associated with that data. In a second screen 1412 displayed by the grid configuration wizard, a tiled area 1416 represents the grid that the user is building. Sample tile categories 1418 such as "weather", "news", "stocks", or "sports" are listed. In an alternate embodiment, a grid can be filled by the "drag and drop" technique in which a selected document 1414 is moved on to the display area of the grid configuration program and automatically becomes a tile. In some embodiments, as described elsewhere herein, the grid is able to intelligently and automatically assign a size and location of such a tile in the grid. A button 1410 offers the user the chance to go back one screen.

In a third screen 1420 displayed by the grid configuration wizard, the user can name the grid and, optionally, store it for future reference, for example in an archive of preferred grids. The user can elect to finish grid construction by clicking the "Finish" button 1412, or launch the grid immediately by activating button 1422. When launching the grid immediately, the grid is automatically constructed on the fly according to the content and tile types specified by the user during the set up procedure.

Architecture of Application Program Software

The hierarchy of the software in a preferred embodiment of the present technology, the Surfcast System (see, e.g., www-.surfcast.com, the textual and graphical contents of the various pages of which as of the filing date of the instant application are incorporated herein by reference in their entirety), is illustrated in FIG. 15. It is understood that the Surfcast System is merely an exemplary embodiment and that other software products can be developed that fulfill the functions of the present technology. It is further understood that the Surfcast System or other equivalent systems, may be distributed between a client and one or more servers and that all parts of it need not reside on a single device. It is also to be

understood that such software may be offered as a web-based service without needing to be downloaded or installed on a user's local device.

The Surfcast System software comprises a number of modules. In FIG. 15, an arrow connecting two modules means that one module uses an interface of the other. The arrow comes from the module invoking the interface towards the module whose interface is being invoked. An interface may simply be a function call between the two modules or, for example, a call to a dynamic linked library (DLL).

The Surfcast application program 1500 takes its underlying data from two sources, a metabase 1506 and a system library 1514 that preferably resides on the device on which the application program is running. For example, the application program 1500 may be required to call functions from the system library while it is running. Actual tiles that a user visualizes can be spawned from the metabase 1506.

Data structures for user tiles 1502 are obtained from the XP core 1504 which itself also utilizes components from the system library 1514. In a preferred embodiment there are different data structures for tiles of different priorities. The XP core is an abstraction layer for the operating system environment. Tiles that utilize components such as buttons take these components from the widget set 1508. A widget is a basic user interface element such as a button or a text input box. The metabase also uses an interface of the widget set 1508, and can therefore use functions within the widget set. The widget set requests functions from the XP core.

Objects in the metabase 1506 that retrieve content from remote sources such as world wide web pages utilize a connection manager and bandwidth controller 1512. A URL loader 1510 decides whether content should be obtained afresh by contacting the connection manager 1512, or from content previously stored in cache. Effectively, the URL loader manages the connection manager, and calls functions within it.

Underlying all of the Surfcast application program's operations are functions from the operating system library 1516 that is supplied with the device on which the application program is running.

Each of the objects shown in FIG. 15 is now described in further detail by reference to FIGS. 16-21.

The Surfcast application program 1500, in FIG. 16, comprises a launcher 1618 and a framework 1620. The launcher opens the program from scratch whereas the framework is responsible for managing grids and tiles. The user interacts directly with the framework to set up a preferred arrangement of tiles on the display. In some embodiments, the framework initially contains a prescribed set of tiles. The framework controls communication between tiles, for example, in the case of conditional content.

Tiles 1502, FIG. 16, are the equivalent of an application in a conventional GUI system. They can be built in C++ using the Surfcast tile builder application program interface (API) using XP core classes, or via a utility such as a custom tile editor or via a script file. Some predefined tiles are included with the basic Surfcast system including a web browser tile called a surftile 1602, tiles for contacts and communications such as a chat tile 1604 and an e-mail tile 1608. Media-player tiles such as a video tile 1606 are also supplied, as are tiles that interface to commonly used desktop programs. A word tile 1610 interfaces to a word processor; excel tile 1612 interfaces to a spreadsheet program. A general content viewer that can compose pieces of content clipped from a variety of sources, layout tile 1616, is also provided. Reg tile 1614 is a general purpose tile that permits a user to define his/her own tile type.

Petitioner Microsoft Corporation - Ex. 1001, p. 40

US 9,363,338 B2

**21**

In a preferred embodiment, all tiles have a common base class, and each specialized type of tile has its own class that builds upon the base class. There are many ways in which specific tile classes can be derived from the common base class. In a preferred embodiment, tiles are categorized into a hierarchy. There may be a tile class specific to each level in the hierarchy. Functions for specific tile classes are readily apparent to one of skill in the art. Tiles may additionally be represented by markup language files and viewed within a web-browser environment.

The data classes in XP core **1504**, FIG. **16**, comprise base classes and utility classes with which tiles and widgets are built. In general, classes within the XP core describe how tiles can communicate with one another and with the overall application program framework **1620**. In particular, XP core classes are generic and portable, thereby permitting cross-platform capability.

XP core classes include: tilebase **1622** for the generic class that underlies all tiles; tile base view **1624**; tile controller **1626**; canvas **1628**; and event classes **1630** for event handling. A view is what a tile uses to draw itself. Tile base view **1624** is the base class for all views associated with a visual object. A controller processes events **1630**, for example mouse moves, clicks, keyboard events and external events. Tile controller **1626** is the base class for controllers associated with a tile. A canvas **1628** is an area of screen on which to render some image, for example a tile.

The metabase **1506**, FIG. **17**, is a local store for platform-specific implementations of the descriptions of tiles, grids and other objects. Tiles, grids and content are created, saved and restored via the metabase. The metabase contains tile type and content type registries such as tile registry **1732**, and a local database of grids and content such as content store **1734** and grid store **1736**. Unknown tile and content types can be obtained from remote servers. Tile types are abstracted so that if a grid contains a particular type of tile, for example an e-mail tile, the metabase provides whatever is appropriate for the device the application is running on. Items in the metabase are "persistent", that is they are not saved explicitly but are preserved from session to session.

The widget set **1508**, FIG. **17**, comprises a platform-specific set of visual components that tiles can use. Widget set contains the predefined widgets that are included with the system. It can be extended with new widgets. It includes such useful widgets as a button **1738**, a label **1740**, an edit widget **1742** that enables a user to enter text into an editable field and a list widget **1744** that enables a user to select from a set of options. Items within the widget set can be used with tile types such as text input tiles, web browser tiles, and a streaming video tile. The term widget can also include more complex objects such as a video player that can be inserted into a tile as easily as a button.

The URL loader **1510**, FIG. **17**, provides a mechanism for retrieving content. The URL loader **1510** interacts with connection manager **1512** for tiles which need to make a network connection. Tiles and the metabase ask for content for a given URL and the content manager will attempt to retrieve it. The metabase also contacts the connection manager through the URL loader to ascertain whether there is sufficient bandwidth for the transfer. In particular, the connection manager decides whether the URL loader should furnish tile content from the cache **1746**, as would be the case if the content has been recently displayed and stored locally. Alternatively, if the content is not cached, the URL loader supervises loading of content from the location specified by the URL.

The URL loader **1510** also comprises a file manager **1748** for organizing the cached content. The URL loader addition-

**22**

ally comprises a DOM (data object model) renderer **1750** that administers the parsing of pages in markup languages such as XML and HTML. The URL loader may also comprise an implementation of an API for XML rendering such as SAX. In an alternate embodiment, such an API may reside in the XP core module.

The system library **1514** comprises commonly used utilities within the application program, including, but not limited to, code for string manipulations, file handling and server communication. The system library module comprises generic code and can be compiled for any operating system.

The operating system library **1516**, FIG. **17**, comprises utilities that differ in their implementation from system to system but are needed for operation of the application program. For example, utilities that may be found in system library **1516** are those that provide support for threads and synchronization **1752**, debugging tools **1754**, graphics libraries **1756**, further basic string manipulations **1760** and connections **1762**. Additionally, not shown in FIG. **17**, useful items in the operating system library include utilities that permit definitions of objects, sockets, input devices and hardware devices. Items in the operating system library are accessible through classes with documented public interfaces.

The operation of the widget set **1508** is further described with respect to FIG. **18**. As previously mentioned, the widget set contains widgets for various functions such as buttons, text labels, etc. Illustrated in FIG. **18** is a set of widgets for buttons.

FIG. **18** shows the class hierarchy for the button widget. In FIG. **18**, a solid line with an arrow head indicates a relationship of inherency between two classes. Base classes for widgets are grouped together in box **1809**. Widget class **1810** is a container for other classes. All widgets use the base class widget **1810** stored in the XP core module and further described later. Accordingly, button **1800** is a specific class inherited from widget **1810**.

Widget view **1812** is a class, also stored in XP core, that defines the look and feel of the widget. Button view **1802** inherits from widget view and controls how a button draws itself.

In the scheme of FIG. **18**, user tile **1816** comprises three objects, tile controller **1626**, the base class tile **1622** and tile base view **1624**, each of which is found in XP core and is further described later. Tile base view **1624** is responsible for drawing the tile and can employ one or more widgets.

A button is something that a user can click on. A button provides button events to a button event consumer. A button event consumer is also known as a client, i.e., clients that use buttons implement button event consumer **1808** to be notified of button events. For example, a button event consumer may be a "play" function in a video tile. The button event consumer interacts with a control structure tile controller **1626** associated with a user tile **1816** by telling the tile that the button has been activated. Button event consumer **1808** is itself a class that inherits from an event consumer class, described later.

Button controller **1804** controls how button events **1806** are processed, for example mouse and keyboard events. It inherits its class structure from widget controller **1814** stored in XP core. Not all button events **1806** are recognized by the button controller **1804**: for example, a particular keystroke may have no effect on the state of the button.

Other widgets follow a similar pattern. They include: textedit, for inputting text; textlabel, for displaying text; textspinner, for selecting from a choice of options; datewidget, for entering a date; list, for selecting from a choice of options; titlebar; and a toolbar.

Petitioner Microsoft Corporation - Ex. 1001, p. 41

US 9,363,338 B2

23                                                                                          24

Metabase **1506** is further described with respect to FIG. **19**. Arrows between the components in FIG. **19** denote interfaces. The metabase comprises a registry **1900** and store **1902** of tile and grid types, a content store **1918** and a content and tile link database **1920**.

The tile type registry **1900** contains a list of tile and widget types along with information about how to create them and what they are called, as well as other information such as pointers to objects from which tiles are created. In a preferred embodiment, the list of tile types includes tiles in a hierarchy of categories. The tile and grid store **1902** contains a library of stored grids and tiles. Tiles can save themselves or be restored. In a preferred embodiment, grids are just special cases of tiles. Tiles from the tile library can be called and displayed on the screen by asking the registry to load tiles. The tile and grid store interfaces to an XML library **1906**.

Tiles from the tile and grid store can also be saved outside the metabase in a library of markup language files, e.g., an XML library **1906**.

Also in the metabase **1506** is metabase tile **1904** which utilizes tile base **1622** from the XP core module. All tiles inherit from this class.

DLL's can contain additional tiles and widgets that can be created by independent third parties. These can be implemented within the metabase through the tile factory **1916** and tile creator **1914**, both of which interface to the tile type registry **1900**. The tile factory **1916** contains the description and classes necessary for someone to register a new tile type. Tile creator **1914** is the code that does the tile creation at runtime. In general, independent creation of tiles is facilitated by supplying a tile toolkit to third parties.

Inquiry utility **1912** is an optional means for an outside user to interface to the metabase, for example to ascertain the class structures of stored tile classes.

Content store **1918** is a cache that contains content of tiles for the previous session. The content store **1918** follows a similar pattern to the tile type registry and the tile store. The content and tile link database **1920** is a database of information about how tiles and grids are related, and how content is related between them. Content tile link database **1920** copes with descriptions of relationships between tiles and also themes of content for related tiles. This database can also be used in the context of "knowledge management", i.e., those operations that monitor a user's activities and attempt to suggest further sources of content based on it. Both content store **1918** and the database **1920** interface with tile type registry **1900**.

FIG. **20** shows a further description of classes found in the XP core and their interaction with the operating system library **1516**. As discussed below, some arrows between objects within XP core denote inheritance of classes.

Canvas **1628** describes an area of screen that can be drawn to. GfxContext **2002** is a set of graphics primitives, for example for line-drawing, colors and space filling. It is a generic version that encapsulates and abstracts operating system-specific features inherited from GfxContextFactory **2032** in the operating system library **1516**. Win32 GfxContext **2034** is an example of a graphics context used with the Windows operating system. Other GfxContext **2036** includes alternative platform dependent graphics contexts.

The foundation classes are tile base **1622**, tile base view **1624** and tile base controller **2008**. Tile base **1622** is the base class for all visual objects such as tiles, widgets and grids. The tile class **2010**, and widget base class **2016**, inherit from tile base. Where tiles are in a hierarchy of categories, there may be several tile classes that inherit from tile base.

A widget effectively functions as a special kind of tile that can be placed inside a tile. Widget base **2016** is not meant to be instantiated on its own but is a foundation for the widget class **1810**, FIG. **18**, used by a generic widget.

Tile base view **1624** is the base class for all views associated with a visual object. A view is what a tile uses to draw itself. Inheriting from tile base view are tile view **2012**, the base class for all views associated with tiles, and widget view **1812**, the base class for all views associated with widgets. Tile base view and tile base also interface with canvas **1628**.

Tile base controller **2008** is the base class for all controllers associated with a visual object. Inheriting from tile base controller are tile controller **1626**, the base class for controllers associated with a tile, and widget controller **2020**, the base class for all controllers associated with widgets. A controller processes all events. Tile base interfaces with both tile base view **1624** and tile base controller **2008**. Tile base controller interfaces to event system **2022**. Finally, event system **2022** also communicates between the operating system library **1516** and the tile base controller **2008**.

Event system **2022** is further described with respect to FIG. **21**. An event can be any one of a mouse movement event, another mouse event such as a mouse-click, or a keyboard event such as a keystroke. In FIG. **21**, event **2112** is the base class. Other classes such as mouse movement event **2106**, mouse event **2108** and keyboard event **2110** derive from the base class by inheritance. The event consumer **2104** is a class responsible for directing events to the controller. The event producer **2102** interprets system events into Surfcast events for an event consumer. The boxes **2122**, **2124**, **2126**, **2128**, **2130** and **2132** are multiplexers handling the case where multiple clients are affected by multiple types of events. An event is communicated to tile base controller **2008**.

Managing Connections to More than One Datastream

When two or more tiles connect to sources of data available over a network, communication must be established in such a way that the rate at which updated data is transmitted to the grid can be controlled. In practice, for an embodiment of the application which resides on a user's computer, a flow control protocol such as TCP is required. In this way, each tile can communicate with the remote datastream to which it is linked and a determination can be made of available bandwidth at the time of data transfer. Alternatively, in a client-server mode, flow control is not necessary because communication with the server suffices, as is described below.

It is not practical to fire up a separate browser program from each tile that wishes to download data from a site on the world wide web. A web-browser is very greedy on memory and resources and the user would have little or no control over the respective rates at which data was downloaded from different sites.

Instead, in a preferred embodiment of the present technology, a hierarchy of layers manages the simultaneous connection and allocation of resources to different world wide web sites, as shown in FIG. **22**. The layer structure applies to the way in which any given tile downloads content.

At the highest level there exists a widget, referred to as "SurfWidget" **2200**, which is the basic browser control within the application program of the present technology. Ideally, this widget operates in conjunction with any commonly used world wide web browser. It is typically associated with a tile type such as surftile **1602**.

The surf widget communicates with a surf widget controller **2202** in a control layer **2201**. Also in the control layer is a web browser application program **2204**. Examples of such a program include Microsoft's Internet Explorer and Netscape's Navigator software. The surf widget controller

Petitioner Microsoft Corporation - Ex. 1001, p. 42

US 9,363,338 B2

**25**

2202 handles the interaction between the surf widget 2200 and the web-browser 2204. The surf widget controller also passes on requests from the browser to the URL Manager 2206 in the next layer, the URL layer 2205. The surf widget controller then pipes back the results to be rendered to surf widget. A typical example of this process in operation would be: a user clicks on a hyper-link in a web-page; the web-browser makes a request for that page to surf widget controller 2202; the request gets handed to the URL manager 2206; once the page is loaded, the URL manager 2206 notifies the surf widget controller, which in turn sends the information to the web-browser for rendering.

The responsibility for obtaining pages of content is that of the URL layer 2205. When a URL is requested, the URL manager 2206 issues a request for the page and any subsequent media to the connection manager 2210. The URL manager keeps track of the requested URL for future use, if it is requested again. The URL manager also queues up URL's that have been requested according to their focus, i.e., the tile that a user has currently selected and according to the respective priorities of the active tiles.

In a preferred embodiment, a pre-fetch utility such as URL pre-fetch manager 2208 can be implemented. It saves the user time if items can be pre-fetched instead of waiting for their download. Several strategies can be used to obtain pre-fetch items for the user. Using a history of a user's previous browsing habits, it is possible to predict what the user will probably want next. Another function of a pre-fetch utility is to periodically check the validity of items in the cache to make sure they are up to date. As would be familiar to one skilled in the art, some of the new HTTP1.1 methods would prove very useful for this, namely the conditional gets. Another strategy is to start loading links from the page that a user is browsing, regardless of whether the user has selected the links. Although such an approach could be very wasteful of resources if there are a lot of links and very few are ultimately accessed and also because a lot of links tend to be advertisers, this approach could be effective in situations where very high capacity bandwidth exists.

The connection layer 2209 handles each individual request for download passed to it through the URL manager, regardless of whether it is an HTML page, a graphic or sound file. The connection manager 2210 understands the total bandwidth available for allocation, for example, whether the device is connected to a modem or a T-1 line. It will also manage the connection to the requested site and maintain its own cache. Before making a network request for an item, connection manager 2210 first checks its cache, the connection manager cache 2212. If the item is not in the cache, the connection manager then passes the request off to the HTTP protocol socket 2214 in the protocol layer 2215. The way in which HTTP protocols and caches work is familiar to one skilled in the art.

The protocol layer 2215 consists of a suite of different socket types, 2214, 2216 and 2218, intended to support different communication protocols, such as HTTP, FTP and also a client server protocol specific to the application program via the surfcast protocol socket 2218. Preferably protocols employed are able to recognize QoS tags in the headers of packets that are passed through the layer.

The socket layer 2219 comprises at least one socket 2220. The socket layer wraps up all the system implementation specifics for a given platform and allows generic socket types to be built on top. The socket keeps track of its bandwidth usage, which can then be queried at the connection layer. The socket layer then facilitates bandwidth management.

**26**

With all communications going through the same socket layer it is possible to easily collect data about a socket's bandwidth usage. If, at the connection layer, it is noticed that the total bandwidth allocation has been exceeded, it is a simple case of blocking further data transfer until such time as total bandwidth usage falls back under what has been allocated.

As a user switches focus from one tile to another, priorities can be dynamically re-allocated to ensure the fastest possible loading of the selected page. Such an allocation can take into account priorities that have been assigned to the tiles based on their content, as well as based on identifiers associated with the information such as quality of service tags. All other communications can then abide by the same rules, allowing for complete control.

The sequence of events and functions in a "dynamic bandwidth allocation" feature of the present technology are described as follows. The dynamic bandwidth allocation feature involves a URL loader, the connection manager 2210 and a bandwidth controller.

The tiles that need access to the network resource for downloading content from a URL, pass certain parameters to the URL loader which manages all such requests from the tiles. These parameters include the URL itself, the priority of the tile, the minimum bandwidth requirement if any, and the maximum bandwidth requirement, if any.

The URL loader detects the need for a connection to a network resource, as would be notified to it by the connection manager. In the case of dial-up connections, the connection manager is responsible for allocating the modem resource and making the dial-up. Once a connection is made and the network resource is available, the URL loader asks the bandwidth controller to start delivering the required content, taking into account the additional parameters for each request.

The bandwidth controller 2300 is an object that comprises a number of functions, as shown in FIG. 23. AddURL 2302 is a function used by the URL loader to add an additional connection request to those already considered. RemoveURL 2304 is used by URL loader when cancelling or aborting a request. GetURLStatus 2306 is used by URL loader to obtain a status report for a given request. GetStatus 2308 is used to obtain a general status report for the overall bandwidth. The bandwidth controller 2300 is additionally able to execute a main cycle loop over the outstanding URL requests for the purposes of managing the bandwidth among them. The following pseudocode describes steps within the main cycle loop, according to some embodiments of the present technology.

```
while ( uncompleted requests outstanding )
{
    calculate bandwidth obtained per request;
    check for need to postpone, stall or cancel lower priority requests;
    check for need to increase higher priority requests;
    detect completed requests and notify requestor;
    detect undeliverable requests and reissue or cancel if necessary;
    carry out other service and statistics functions, as required;
}
```

Each of these steps is explained, as follows. One or more of the steps may be performed in a different order from that presented above without departing from the scope of the present disclosure.

The step of calculating the bandwidth obtained per request utilizes a function that calculates obtained bandwidth for each of the managed requests, including requests that are stalled

Petitioner Microsoft Corporation - Ex. 1001, p. 43

US 9,363,338 B2

**27**

(or postponed) due to priority issues. This calculation takes place frequently because of the nature of the network. The bandwidth obtained can vary drastically even during the course of the individual network transaction, and therefore a priority based dynamic system must continuously accommodate such fluctuations. The result of calculating the bandwidth obtained is used both for feedback to users and for making decisions in the subsequent steps within the main cycle loop.

The step of checking for the need to postpone, stall or cancel lower priority requests is another precautionary mechanism to use for the purposes of adjusting the currently active connections. If outstanding requests are not achieving the desired minimum bandwidth, or an actual bandwidth in line with the priority of a given request is not achieved, bandwidth must be made available to the higher priority requests, by stalling, cancelling or postponing lower priority requests. A throttle feature implemented consistent with the layer nature of the stack can be applied wherein the frequency of issuing requests can be decreased. A complete cancellation of a request followed by reload from cache is usually the last resort.

The step of checking for the need to increase higher priority requests has the opposite effect. If applied, higher priority requests are increased by means of spawning additional simultaneous requests, or by increasing the throttle mentioned above.

Both the steps of checking the need to postpone and checking the need to increase a priority can provide feedback to the user in terms of their success or failure. Status parameters can additionally be collected and calculated.

The step of detecting completed requests and notifying the requestor utilizes a function for handling successful completed requests. Conversely, the step of detecting undeliverable requests followed by reissuing or canceling the request if necessary is the mechanism for avoiding undeliverable requests, or retrying temporarily unavailable requests.

Other service and statistics functions may also be called, as may be necessary for supplying information to the layers above the connection layer.

Client-Server Interaction

It is envisaged that the methods of the present disclosure can be carried out using software that is distributed between a client and at least one server. At one extreme, as discussed hereinabove, the software runs entirely on a server. At another extreme, the client only hosts a browser that displays the grid and bandwidth allocation decisions are processed by a server. It is preferred that the server undertake more resource and bandwidth intensive tasks than the client.

In some embodiments of the present disclosure, FIG. **24**, the user at client device **2400** interacts with server software on a server **2402**. The server stores locally a profile comprising user-specific content **2406** that can feed customized data to the user. For example, the user may store pre-defined grid configurations on the server. Additionally, passwords for specific web-sites can be stored along with the user's profile. A grid generator **2404** on the server creates a grid of tiles according to user-specified content. Each tile has been created on the server by producing an image from the location specified. For example, tile creator **2408-1** produces a tile from content **2410-1**. Thus, when a user logs on to the server, for example through a conventional web-browser, a grid of tiles is downloaded to the user's system. Where an identifier is present in content such as **2410-1**, tile creator **2408-1** can preferably recognize such an identifier and ascribe a priority to the tile that it creates based on that identifier. In an alternate

**28**

embodiment, the tile creator automatically assigns a priority to the tile based on the type of the information content.

The client-server embodiment provides a number of advantages. For example, individual users and the devices they use may be differentiated. Therefore, the tile-content that the server delivers can be customized according to the rendering device of a particular user.

Turning next to FIG. **25**, each time a user logs on to the server **2402**, a "session" is initiated, step **2500**. The server verifies the user's identity, step **2502** and acknowledges the log-in, step **2506**. The client registers one or more resources, such as connection bandwidth, cost per transmission unit and properties of local playback device, step **2504**. From this information, the server identifies the client device type, for example, set-top box or personal computer, step **2508**. At step **2510**, the server retrieves grid settings specific to the user, if appropriate. In preferred embodiments the server adjust grid settings according to the type of device, for example the size of its display. In preferred embodiments, the server adjusts grid settings according to the type of device, for example according to the size of its display. Details of a session, as defined by tile content and priorities can be held over from one session to another, both for the purposes of permitting a user to continue with ongoing work and in order to protect against the adverse consequences of abnormal disconnections. Additionally, targeted advertising and messaging can be delivered to subsets of users via the predetermined server.

Having rendered a grid, step **2512**, and delivered it to the client device, the user can request sources of information such as datastreams, step **2518**. Any number of datastreams can be requested at once, the corresponding stream request information which defines parameters for each stream is communicated to the server which verifies and calculates parameters for each stream, step **2516**. In some embodiments the server allocates a priority to each stream according to the type of content, e.g., video, audio, static web-page content. In a preferred embodiment, the server uses an identifier associated with a datastream and allocates a priority based on that identifier. Such an identifier may be a quality of service tag.

Upon completion of these steps, the server **2402** knows the client characteristics and is able to distribute bandwidth available to the client among multiple content servers using for example a bandwidth controller **2300**. In this example, if the client has an incoming bandwidth of say 56 Kbits/second, and is requesting datastreams from three sources with equal priority, then the server will respond for each request that a bandwidth of $56/3=18.7$ Kbits/sec is available for each datastream.

The requested datastreams are displayed on the client device, step **2520** and, if the user changes the content of a tile or explicitly requests an update or refresh operation on the tile, step **2522**, an update request is sent to the server, step **2524**. Once the new content has been received, the grid is rendered anew, step **2526**. Preferably the refresh rates of tiles on the client are allocated according to priorities associated with each tile.

Intensive operations on each displayed tile are also channeled through the predetermined server. For example, refresh operations on a tile generate a refresh request that is sent to the predetermined server. Similarly, requests to thumbnail a given image can be carried out, by request, on the predetermined server and the resulting compressed image transmitted to the user.

In the foregoing embodiment, the server component may reside locally on the client machine, in which case the server is known as the "Resource Manager", or it may be a remote server.

Petitioner Microsoft Corporation - Ex. 1001, p. 44

US 9,363,338 B2

**29**

In a preferred embodiment of client server operation, shown in FIG. **26**, aspects of a user's grid profile are transmitted to third parties so that the third parties may then communicate tile based content directly to the user. For example, a user's custom grid may contain a tile that points to a third party web-site **2604**. Content **2606** from the 3rd party web-site is typically transferred to the server for dissemination to the user. The server **2602** notifies the 3rd party web-site that the user requires tiled data by, for example, transmitting user information **2608**. The third party then permits the tile based content of its web-site to be transmitted directly to the user. The third party may attach an identifier to its information so that the server can assign a priority to the data.

The use of servers also allows for the latest versions of tiles to be downloaded and installed across all devices. Users are then able to share grids and tiles with other users. The server side technology provides users of all client devices, from desktop PC's to mobile telephones with a consistent experience.

The majority of the server side code is preferably written in Java, with C++ being used where appropriate. The methods and apparatus of the present disclosure are not dependent on the particular programming language employed. Inter-server communication also preferably utilizes XML to provide consistency with other aspects of the disclosure.

In a preferred embodiment, either Oracle 8i or SQL "Server 2000" are used to provide a relational database (RDB) functionality of the server. Both of these RDB's now provide direct SQL to XML transformations. Databases are preferably developed using the ANSI 92 SQL standard, which is usable by either of the RDB's.

Thin Client Technology

An object of the application program of the present disclosure is that it should operate on a variety of devices, including mobile telecommunications devices such as cellular phones, handheld web-browsers, palm pilots, personal digital assistants and other devices that can communicate by protocols such as wireless application protocol (WAP).

Accordingly, because most handheld or mobile devices do not have the same amount of local storage and processing power as desktop computers and set-top boxes, a special version of the application program of the present disclosure is envisaged for mobile devices. The special version embodies so-called 'thin client' technology in which a lot of the operations are performed by a server instead of the device itself.

An "n-tier" architecture is one that is designed generically for a multitude of platforms, for example PC's, PDA's, WAP phones, and UNIX systems. Accordingly, in order to maximize the use of mobile devices, the application program of the present disclosure employs an n-tier architecture allowing the majority of the processing to be carried out on the server with the results being sent to the device for rendering. This model allows for a reduced size system to be stored on mobile devices, with the system logic residing on remote servers. Preferably the server, which usually has a much wider bandwidth connection than does a given client, carries out the role of monitoring datastreams for updates, prior to transmitting refreshed content to the client.

The features that are moved from client to server will be dependent upon the device in question. For example, it is possible to provide the client with more features on a personal digital assistant such as a Palm pilot than on a WAP Phone.

When using thin client technology, it becomes especially important for the refresh rates of the tiles to be sensibly allocated according to a priority scheme. Accordingly the thin-client implementation preferably allows for the automatic allocation of tile priorities based on the type of infor-

**30**

mation content being transmitted. The thin client implementation also preferably permits the allocation of tile priorities based on recognition of an identifier such as a "quality of service tag" associated with a source of information.

In order to provide a level of consistency between the devices and the servers, the markup language XML is preferably used to wrap the data that is being transmitted. As previously described, the system of the present disclosure uses a metabase to store information about the user's current grid and tile configurations. A synchronization procedure allows the metabase to be stored on a server and queried by any device. In this way it is possible to provide consistent grid and tile implementations independent of the device and its location. Such an embodiment would permit a variant of "peer to peer" communication.

FIG. **27** provides an example of the way in which wireless devices can interact with a server. A personal digital assistant (PDA) **2700** or a WAP phone **2702** communicates in a wireless manner with a dial-in bank **2704**. The dial-in bank communicates data to a server farm **2706** which is connected to the internet **2710**, optionally through a firewall **2708**. Alternatively, another personal digital assistant such as **2714** can communicate with an internet service provider such as **2712**, also connected to the internet **2710**. The server farm **2706** is able to provide content directly to a PDA such as **2700** or indirectly, over the internet, to a PDA such as **2714**.

What is claimed is:

**1**. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

   a first set of instructions to partition at least a portion of a visual display of a client device into an array of tiles, a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;

   a second set of instructions for the client device to assign a first update rate to the first tile;

   a third set of instructions to, at a first update time in accordance with the first update rate, send a conditional request from the client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;

   a fourth set of instructions for the client device to receive a response to the conditional request from the first server device; and

   a fifth set of instructions for determining whether the client device updates the first tile in accordance with the response from the first server device.

**2**. The electronic readable memory of claim **1**, further comprising instructions for the client device to associate the first information source with the first tile.

**3**. The electronic readable memory of claim **1**, further comprising instructions for the client device to partition the at least a portion of the visual display under control of a user of the client device.

**4**. The electronic readable memory of claim **1**, further comprising:

   instructions for the client device to update the first tile with information received in response to the conditional request if the response to the conditional request includes updated information.

**5**. The electronic readable memory of claim **1**, wherein no update of the first tile is performed if the response to the conditional request indicates that the information in the first tile has not changed since a previous update of the first tile.

Petitioner Microsoft Corporation - Ex. 1001, p. 45

US 9,363,338 B2

31

**6**. The electronic readable memory of claim **1**, further comprising:

instructions for the client device to assign a second update rate to a second tile in the array of tiles;

instructions for, at a second update time in accordance with the second update rate, the client device to send a conditional request from a second server device for an update of information in the second tile if the information from the second information source currently displayed in the second tile has not changed since a last update;

instructions for the client device to receive a response to the conditional request from the second server device; and

instructions for determining whether the client device updates the second tile in accordance with the response from the second server device.

**7**. The electronic readable memory of claim **1**, wherein information from the first information source contains an identifier that is used in the assigning of the first update rate to the first tile.

**8**. The electronic readable memory of claim **1**, wherein the array comprises more than one row and more than one column.

**9**. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

a first set of instructions to partition by a first device at least a portion of a visual display into an array of tiles, a first information source being associated with a first tile in the array of tiles, the first information source being located on a second device, wherein the visual display is rendered according to instructions executed on the first device;

32

a second set of instructions for the second device to assign first update rate for updating information from the first information source;

a third set of instructions for the second device to, at a time for updating the information from the first information source in accordance with the first update rate, determine whether the information from the first information source has changed since the last update time and to send to the first device an update message including the updated information in accordance with the determination;

a fourth set of instructions for the first device to receive an update message from the second device including updated information for updating the first tile; and

a fifth set of instructions for the first device to update the first tile in accordance with the updated information.

**10**. The electronic readable memory of claim **9**, further including instructions for the first device to assign the first information source to the first tile.

**11**. The electronic readable memory of claim **9**, further including instructions for the first device to partition the at least a portion of the visual display under control of a user of the first device.

**12**. The electronic readable memory of claim **9**, wherein information from the first information source contains an identifier that is used to assign the first update rate.

**13**. The electronic readable memory of claim **9**, wherein the array comprises more than one row and more than one column.

\*   \*   \*   \*   \*

Petitioner Microsoft Corporation - Ex. 1001, p. 46



US009946434B2

(12) **United States Patent**
Santoro et al.

(10) **Patent No.:** **US 9,946,434 B2**
(45) **Date of Patent:** **Apr. 17, 2018**

(54) **SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES**

(71) Applicant: **Surfcast, Inc.**, Portland, ME (US)

(72) Inventors: **Ovid Santoro**, Lincolnville, ME (US); **Klaus Lagermann**, Copenhagen (DK); **Tom Dechaene**, Overijse (BE)

(73) Assignee: **Surfcast, Inc.**, Portland, ME (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/173,645**

(22) Filed: **Jun. 4, 2016**

(65) **Prior Publication Data**

US 2016/0299638 A1    Oct. 13, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/720,895, filed on May 25, 2015, now Pat. No. 9,363,338, which is a (Continued)

(51) **Int. Cl.**
**G06F 15/00** (2006.01)
**G06F 13/00** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... **G06F 3/0481** (2013.01); **G06F 17/30876** (2013.01); **G09G 5/14** (2013.01); (Continued)

(58) **Field of Classification Search**
CPC ................................ G06F 15/00; G06F 3/0481
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,555,775 A    11/1985    Pike
4,653,020 A    3/1987    Cheselka et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP    0651544 A2    5/1995
WO    WO06/20470 A1    7/1996
WO    WO99/26127 A1    5/1999

OTHER PUBLICATIONS

Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., ;Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., Corpotate Portals Letter &lsqb Online&rsqb 1(10), 1-3. Available Web Site: www.snippets.com/download/Corporate_Portal_Article.pdf Accessed on May 9, 2001
(Continued)

*Primary Examiner* — Cao "Kevin" Nguyen
(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP; Richard G. A. Bone

(57) **ABSTRACT**

A computerized method of presenting information from a variety of sources on a display device. Specifically the present invention describes a graphical user interface for organizing the simultaneous display of information from a multitude of information sources. In particular, the present invention comprises a graphical user interface which organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. The grid functionality manages the refresh rates of the multiple information sources. The present invention is intended to operate in a platform independent manner.

**24 Claims, 27 Drawing Sheets**



Petitioner Microsoft Corporation - Ex. 1001, p. 1

**US 9,946,434 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 13/163,257, filed on Jun. 17, 2011, now Pat. No. 9,043,712, which is a continuation of application No. 12/124,125, filed on May 20, 2008, now Pat. No. 7,987,431, which is a continuation-in-part of application No. 11/140,546, filed on May 27, 2005, now Pat. No. 7,376,907, which is a continuation of application No. 10/136,873, filed on Apr. 30, 2002, now Pat. No. 7,028,264, which is a continuation-in-part of application No. 09/702,325, filed on Oct. 30, 2000, now Pat. No. 6,724,403.

(60) Provisional application No. 60/162,522, filed on Oct. 29, 1999.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 3/0481* | (2013.01) |
| *G09G 5/14* | (2006.01) |
| *H04M 1/725* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *H04L 29/08* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *H04L 67/10* (2013.01); *H04L 67/42* (2013.01); *H04M 1/72544* (2013.01); *G09G 2370/027* (2013.01)

(58) **Field of Classification Search**
USPC ................ 715/729, 764, 790, 841, 863, 856
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,712,191 | A | 12/1987 | Penna |
| 4,831,556 | A | 5/1989 | Oono |
| 4,905,171 | A | 2/1990 | Kiel et al. |
| 5,140,678 | A | 8/1992 | Torres |
| 5,157,384 | A | 10/1992 | Greanias et al. |
| 5,321,750 | A | 6/1994 | Nadan |
| 5,321,808 | A | 6/1994 | Rupp |
| 5,347,632 | A | 9/1994 | Filepp |
| 5,371,847 | A | 12/1994 | Hargrove |
| 5,394,521 | A | 2/1995 | Henderson, Jr. et al. |
| 5,432,932 | A | 7/1995 | Chen et al. |
| 5,473,745 | A | 12/1995 | Berry et al. |
| 5,479,602 | A | 12/1995 | Baecker et al. |
| 5,550,968 | A | 8/1996 | Miller et al. |
| 5,572,643 | A | 11/1996 | Judson |
| 5,635,980 | A | 6/1997 | Lin et al. |
| 5,712,995 | A | 1/1998 | Cohn |
| 5,721,951 | A | 2/1998 | DorEl |
| 5,740,430 | A | 4/1998 | Rosenberg et al. |
| 5,740,549 | A | 4/1998 | Reilly et al. |
| 5,757,371 | A | 5/1998 | Oran et al. |
| 5,764,972 | A | 6/1998 | Crouse et al. |
| 5,778,181 | A | 7/1998 | Hidary et al. |
| 5,793,368 | A | 8/1998 | Beer |
| 5,796,383 | A | 8/1998 | Henshaw et al. |
| 5,796,401 | A | 8/1998 | Winer |
| 5,812,123 | A | * | 9/1998 | Rowe ................... G06F 3/0482 |
| | | | 348/E5.105 |
| 5,813,007 | A | 9/1998 | Nielsen |
| 5,819,284 | A | 10/1998 | Farber et al. |
| 5,831,664 | A | 11/1998 | Wharton et al. |
| 5,838,326 | A | 11/1998 | Card et al. |
| 5,841,418 | A | 11/1998 | Bril et al. |
| 5,848,352 | A | 12/1998 | Dougherty et al. |
| 5,848,356 | A | 12/1998 | Jambhekar et al. |
| 5,901,228 | A | 5/1999 | Crawford |
| 5,905,492 | A | 5/1999 | Straub et al. |
| 5,918,237 | A | 6/1999 | Montalbano |

| | | | |
|---|---|---|---|
| 5,929,854 | A | 7/1999 | Ross |
| 5,959,621 | A | 9/1999 | Nawaz et al. |
| 6,003,041 | A | 12/1999 | Wugofski |
| 6,011,537 | A | 1/2000 | Slotznick |
| 6,025,837 | A | * | 2/2000 | Matthews, III .... H04N 5/44543 |
| | | | 348/E5.105 |
| 6,028,602 | A | 2/2000 | Weidenfeller et al. |
| 6,047,197 | A | 4/2000 | Jarrad |
| 6,061,576 | A | 5/2000 | Terrasson |
| 6,104,700 | A | 8/2000 | Haddock et al. |
| 6,118,451 | A | 9/2000 | Alexander |
| 6,118,493 | A | * | 9/2000 | Duhault ............. H04N 5/44591 |
| | | | 348/563 |
| 6,141,007 | A | 10/2000 | Lebling |
| 6,148,304 | A | 11/2000 | de Vries et al. |
| 6,160,553 | A | 12/2000 | Robertson et al. |
| 6,166,738 | A | 12/2000 | Robertson et al. |
| 6,188,405 | B1 | 2/2001 | Czerwinski et al. |
| 6,278,448 | B1 | 8/2001 | Brown et al. |
| 6,322,502 | B1 | 11/2001 | Schoenberg |
| 6,363,445 | B1 | 3/2002 | Jeddeloh |
| 6,411,275 | B1 | 6/2002 | Hedberg |
| 6,418,309 | B1 | 7/2002 | Moon et al. |
| 6,430,405 | B1 | 8/2002 | Jambhekar et al. |
| 6,456,334 | B1 | 9/2002 | Duhault |
| 6,724,403 | B1 | 4/2004 | Santoro |
| 6,807,558 | B1 | 10/2004 | Hassett et al. |
| 6,832,355 | B1 | 12/2004 | Duperrouzel et al. |
| 6,988,248 | B1 | 1/2006 | Tang |
| 7,028,264 | B2 | 4/2006 | Santoro |
| 7,376,907 | B2 | 5/2008 | Santoro |
| 7,933,632 | B2 | 4/2011 | Flynt |
| 7,987,431 | B2 | 7/2011 | Santoro |
| 9,032,317 | B2 | 5/2015 | Santoro |
| 9,043,712 | B2 | 5/2015 | Santoro |
| 9,363,338 | B2 | 6/2016 | Santoro et al. |

#### OTHER PUBLICATIONS

"Microsoft Internet Explorer Resource Kit", (MSIE Resource Kit), Microsoft Press, A Division of Microsoft Corporation, 1998.
Civil Action No. 2:12-cv-00333-DBH in the United States District Court for the District of Maine filed on Oct. 30, 2012 in connection with U.S. Pat. No. 6,724,403.
Cisco-Quality of Service, "Fact Sheet Quality of Service Fact Sheet" Available Web Site: http://www.cisco.com/warp/public/cc/so/neso/vvdo/avvid/eeqos_ds.htm Accessed on October 21, 2002.
IP Quality of Service: An Overview Available Web Site: http://www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm Accessed on Oct. 21, 2002.
Loyall et al., "Specifying and Measuring Quality of Service in Distributed Object Systems", IEEE, Published in the Proceedings of ISORC'98, Apr. 20-22, 1998 in Kyoto, Japan. Available web site: http://www.dist-systems.bbn.com/papers/1998/ISORC/isorcweb. html Accessed on October 21, 2002.
White Paper, "The need for Qos: The Internet protocol's "best-effort" service has worked well so far, so why do we need to change it?" Available Web Site: http://www.sop.in-ria.fr/rodeo/rserban/Files/Need for QoS-v4.pdf Accessed on Oct. 21, 2002.
"User's Manual", Nokia Corporation, Jun. 7, 1998, pp. 1-190.
"User's Guide", Motorola Envoy Wireless Communicator, 1994, pp. 1-90.
"Simon Say's 'Here's How!' Users Manual", Simon Mobile Communications Made Simple, 1994, pp. 1-41.
Baecker, et al., "Readings in Human-Computer Interaction: Toward the Year 2000, 2nd Edition", 1995, pp. 1-952.
Schneiderman, "Designing the User Interface: Human-Computer Interaction, 3rd Edition", 1998, pp. 1-640.
Cerami, "Delivering Push", 1998, pp. 1-428.
Myers, "The User Interface for Sapphire", Computer Graphics & Applications, vol. 4, No. 12, Dec. 1984, pp. 13-23.
Myers, "A Taxonomy of Window Manager User Interfaces", Computer Graphics & Applications, Sep. 1988, pp. 65-84.
Teitelman, "A Tour Through Cedar", Xerox Palo Alto Research Center, 1984, pp. 181-195.

Petitioner Microsoft Corporation - Ex. 1001, p. 2

US 9,946,434 B2

Page 3

(56)　　　　**References Cited**

OTHER PUBLICATIONS

"OpenStep User Interface Guidelines", Sun Microsystems, 1996, pp. 1-216.
Lane, et al., "Technical Research Report—User Interfaces for a Complex Robotic Task:A Comparison of Tiled vs. Overlapped Windows", Jan. 1997, pp. 1-13.
Bly, et al., "A Comparison of Tiled and Overlapping Windows", Human Factors in Computing Systems, Apr. 1996, pp. 101-106.
Isaacs, "Inside Dynamic HTML", Microsoft Press, 1997, pp. 1-28.
Cohen, et al., "Constraint-Based Tiled Windows", Computer Graphics & Applications, Nov. 1984, pp. 1-12.
Gancarz, "Uwm: A User Interface for X Windows", Summer Conference Proceedings, Usenix, Jan. 1986, pp. 429-440.
"Submission request to W3C", http://www.w3.org/submission/1997/5/ Accessed Web Site on May 17, 2013.
"Proposal for a Handheld Device Markup Language", http://www.w3.orgfTR/NOTE-Submission-HDML Accessed Web Site on May 17, 2013.
"Handheld Device Markup Language FAQ", http://www.w3.org/TR/NOTE-Submission-HDML-FAW.html Accessed Web Site on May 17, 2013.
"Unwired Planet Will Publish Handheld Device Transport Protocol for Internet Access From Mobile Phones and Pagers", http://www.ncns.com/news/2/uwplanet.html Accessed Web Site May 17, 2013.
Wessels, "Web Caching. 1st Edition", Jun. 2001, p. 37.
Yeager, et al., "Web Server Technology, The Advanced Guide for World Wide Web Information Providers", 1996, p. 208.
Tibken, "Before Apple's iPad, there was the Intel IPAD. Seriously.", CNet News, Dec. 5, 2013 (http://news.cnet.com/8301-1035_3-57614579-94/before-apples-ipad-there-was-the-intel-ipad-seriously/) Accessed Web Site Jan. 23, 2014.
Non-Final Office Action dated May 23, 2014 from the United States Patent Office in related U.S. Appl. No. 13/163,257.
IPR2013-0292: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, dated May 22, 2013.
IPR2013-0293: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, dated May 22, 2013.
IPR2013-0294: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, dated May 22, 2013.

IPR2013-0295: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, dated May 22, 2013.
IPR2014-0271: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, dated Dec. 19, 2013.
Final Written Decision entered Oct. 14, 2014 from the United States Patent Office in corresponding Inter Partes Review case IPR 2013-00292.
The HTML Writers Guild, Frames Frequently Asked Questions, www.hwg.org/resources/faqs/frameFAQ.html, Aug. 29, 1997 (last accessed May 22, 2012).
Methodology of Window Management, Hopgood et al., www.chilton-computing.org.uk/inf/literature/books/wm/overview.htm, Chapter 6, Myers, Apr. 29, 1985 (last accessed, Feb. 4, 2013).
Pages from www.pointcast.com, available from http://web.archive.org/web/19991013063544/http://pointcast.com/tour/tour9.html and http://web.archive.org/web/19990826155022/http://www.pointcast.com/tour/tour4.html?gt3, dated Aug. 26, 1999 and Oct. 13, 1999 (la.
Frames Frequently Asked Questions webpage: http://www.hwg.org/resources/faqs/frameFAQ.html, uploaded Feb. 9, 2011, 9 pages.
Available Web Site: www.dodots.com, Accessed on May 9, 2001.
Available Web Site: www.snippets.com, Accessed on May 9, 2001.
Martin S Matthews and Erik B. Poulsen, FrontPage 2000: The Complete Reference, May 1, 1999, McGraw-Hil Osborne Media, Chpater 19, pp. 1-12.
John Ross, ABCs of Internet Explore 4, Copyright 1997, Sybex, Chapter 13, pp. 1-3.
Paul McFedries, The Complete Idiot's Guide to Window 95, Mar. 1997, 2nd Edition, pp. 3-7, 97, 101, 105-107, 379.
PCT International Search Report, Application No. PCT/US00/29850, dated Jun. 25, 2001, 3 sheets.
Available Web Site: www.ububu.com Accessed on: May 9, 2001.
Available Web Site: www.chatb.com Accessed on: Nov. 7, 2000.
Duplex Multiplexer, Sensormatic, Samsung, . . . ireless communications,hand helds,maxon Available Web Site: www.mindspring.com/~stancom/multi.html Accessed on: Nov. 7, 2000.
Push technology. Available Web Site: www.whatis.com/WhatIs_Definition_Page/0,4152,213345,00.html Last Update: Jul. 7, 200.
Clyman, John. Web Integration/Internet Explorer 4.0 Available Web Site: www.zdnet.com/pcmag/features/memphis/memphis1.htm Accessed on Nov. 7, 2000.

* cited by examiner

Petitioner Microsoft Corporation - Ex. 1001, p. 3



Fig. 1

Petitioner Microsoft Corporation - Ex. 1001, p. 4



**Fig. 2**

Petitioner Microsoft Corporation - Ex. 1001, p. 5

320



322

324

340



Fig.3
(Prior Art)

Petitioner Microsoft Corporation - Ex. 1001, p. 6



Fig. 4

Petitioner Microsoft Corporation - Ex. 1001, p. 7

500



502 — Tile Address

504 — Target Address

506 — Name

508 — Initialisation function

510 — Refresh function

512 — Fill-screen function

514 — Alarm function

516 — Display option

518 — On mouseout function

520 — On mouseover function

522 — Toolbar function

524 — Tile Level

**Fig. 5**

Petitioner Microsoft Corporation - Ex. 1001, p. 8

```
<TD><A HREF="tile2_target.htm"
    TARGET="new"
    ONMOUSEOVER=action1(arg3)
    ONMOUSEOUT=action2(arg4)
    REFRESH=timeout(500)
    SOURCE=http://www.camelot.castle/swords/excalibur.til
    CLICKMAP=       {  0, 0,50,50, clickfunction1( clickargument1),
                      51, 0,50,50, clickfunction2( clickargument2),.
                       0,51,50,10, clickfunction3( clickargument3) }
    TOOLBAR=("local/toolbars/radio.too" PLACEMENT="bottom" }
    ALARM="alarms/condition_rain=TRUE, condition_weekend=FALSE,
             alarmaction=blow_the_horn">

</TD>
```

Fig. 6

Petitioner Microsoft Corporation - Ex. 1001, p. 9



Fig. 7

Petitioner Microsoft Corporation - Ex. 1001, p. 10



FIG. 8

Petitioner Microsoft Corporation - Ex. 1001, p. 11



FIG. 9

Petitioner Microsoft Corporation - Ex. 1001, p. 12



Fig. 10



FIG. 11

Petitioner Microsoft Corporation - Ex. 1001, p. 14



Fig. 12

Petitioner Microsoft Corporation - Ex. 1001, p. 15

```
<HTML>
<HEAD>
<TITLE>Surfcast Grid Example</TITLE>
<META NAME= "Resource Manager"CONTENT= "RESMGR.EXE">
<META NAME= "Author" CONTENT= "Surfcast, Inc.">
</HEAD>
...
<BODY BACKGROUND= "surfback.gif">
<TABLE>
<TR>
<TD><A HREF= "http://www.somewhere.com/sometarget.html"
    TARGET= "new"
    ONMOUSEOVER=action1(arg1)
    ONMOUSEOUT=action2(arg2)
    REFRESH=timeout(200)
    SOURCE= "http://www.surfcast.com/tilelibrary/tile2.til">
</TD>

<TD><A HREF= "http://www.somewhereelse.com/someothertarget.html"
    TARGET= "new"
    ONMOUSEOVER=action3(arg3)
    ONMOUSEOUT=action4(arg4)
    REFRESH=timeout(500)
    SOURCE= "http://www.camelot.castle/swords/excalibur.til">
</TD>

<TD><A HREF= "local/document.htm"
    TARGET= "new"
    ONMOUSEOVER=action1(arg3)
    ONMOUSEOUT=action2(arg4)
    REFRESH=timeout(0)
    SOURCE= "local/documents/somedocument.til">
</TD>

</TR>

</TABLE>
</BODY>
</HTML>
```

Fig. 13

Petitioner Microsoft Corporation - Ex. 1001, p. 16



Fig. 14

Petitioner Microsoft Corporation - Ex. 1001, p. 17



Fig. 15

Petitioner Microsoft Corporation - Ex. 1001, p. 18



Fig. 16

Petitioner Microsoft Corporation - Ex. 1001, p. 19



Fig. 17

Petitioner Microsoft Corporation - Ex. 1001, p. 20



Fig. 18

Petitioner Microsoft Corporation - Ex. 1001, p. 21

APPX00228



Fig. 19

Petitioner Microsoft Corporation - Ex. 1001, p. 22



Fig. 20

Petitioner Microsoft Corporation - Ex. 1001, p. 23

APPX00230



Fig. 21

Petitioner Microsoft Corporation - Ex. 1001, p. 24



Fig. 22

Petitioner Microsoft Corporation - Ex. 1001, p. 25



**Fig. 23**

Petitioner Microsoft Corporation - Ex. 1001, p. 26



**Fig. 24**

Petitioner Microsoft Corporation - Ex. 1001, p. 27



Fig. 25

Petitioner Microsoft Corporation - Ex. 1001, p. 28



**Fig. 26**

Petitioner Microsoft Corporation - Ex. 1001, p. 29



**Fig. 27**

Petitioner Microsoft Corporation - Ex. 1001, p. 30

US 9,946,434 B2

1

# SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES

## CLAIM OF PRIORITY

This application is a continuation of application Ser. No. 14/720,895, filed May 25, 2015, now U.S. Pat. No. 9,363, 338, which is a continuation of application Ser. No. 13/163, 257, now U.S. Pat. No. 9,043,712, which is a continuation of application Ser. No. 12/124,125, now U.S. Pat. No. 7,987,431, which is a continuation-in-part of application Ser. No. 11/140,546, now U.S. Pat. No. 7,376,907, which is a continuation of application Ser. No. 10/136,873, now U.S. Pat. No. 7,028,264, which is a continuation-in-part of application Ser. No. 09/702,325, now U.S. Pat. No. 6,724,403, which claims benefit of priority to provisional application Ser. No. 60/162,522, filed Oct. 29, 1999, all of which applications are incorporated by reference herein in their entireties.

## RELATED APPLICATIONS

This application is related to application Ser. No. 13/759, 942, also incorporated herein by reference.

## TECHNICAL FIELD

The present disclosure relates to methods of presenting information from a variety of sources on a display device. Specifically the present disclosure describes a graphical user interface for organizing simultaneous display of information from a multitude of sources.

## BACKGROUND

The scope of the global communications capacity, comprising fixed link and wireless networks, continues to expand rapidly. The variety and complexity of communication devices proliferates and the number of users escalates. As a result, users are faced with increasingly complex systems and interfaces with which to manage multiple sources of information. At the same time, society has increased its demands on time and productivity so that users no longer have the luxury of focusing their attention on a single source of information or means of communication. Instead, the norm today is for people to carry out many tasks simultaneously.

As might be expected, these demands have exposed substantial problems in current communications technology. In particular, users are faced with insufficient resources to manage and access the volume and variety of information available to them in an efficient and productive manner. While a variety of tools designed to assist in accessing and managing these resources have been created, these tools remain unsatisfactory. Consequently, users are impeded by the myriad of information sources, each with its own method of use and often with its own login and password requirements, as well as by slow retrieval times to access the information. The result is an unacceptable delay for many operations, as well as inefficiencies in transferring information from one source to another.

Under the present art, for example, it is usually the case that a user lacks the bandwidth resources to receive multiple video signals simultaneously. If an individual were receiving one video signal, it is usually impractical to receive a second at the same time due to bandwidth constraints. Thus, the user

2

could not, for example, monitor multiple video data streams of sporting or news events; instead, the user could monitor only one video data stream at a time.

To address such bandwidth resource limitations, the current art only accesses information when the user requests it. As a result, there is an inevitable delay between the user's request for information and the communications device's presentation of it. For example, if a user wants to monitor sources of news information on the Internet using current browser technology, the user must continuously and manually request the news data from its source to determine whether the data has been updated. Prior to requesting and subsequently receiving the data, the user has no way of knowing whether the data has been updated. In any case, the user is unlikely to want to refresh the status of each application by manual intervention himself at the frequency necessary to ensure that the information is up to date. Additionally, if a user wishes to view two or more webpages simultaneously, (s)he must run two or more copies of the web-browser program. The act of manually refreshing the content of alternate programs in order to ascertain which have any new material to offer is fundamentally inefficient.

Similarly, the user's access to such data is not in real-time or even near real-time because each time the user wants to view the information, (s)he must request it from its source and wait for the source to transmit it to him. Thereafter, (s)he must wait until his/her communications device has received and processed the information before it is presented. For complex information such as a video signal, this can take longer than a minute to occur, and, even for simple information, this process can take many seconds. Thus, the user is denied real-time or near real-time access to the information.

Present technology that locally stores or "caches" previously accessed information to make it available to the user more rapidly does not solve this problem, because the cached information is necessarily old. The user's communications device must still verify the accuracy of the information with the source before the system displays the cached information. As a result, the user is denied real-time or near real-time access to updated information.

Similarly, if a user wishes to have two or more simultaneous downloads there is no control over the relative rates at which the respective downloads would occur. So-called "push technologies" attempt to address this problem by organizing information from a number of related sources and sending it periodically to a user. While this arrangement frees a user from actively participating in the download, the price is that the user has little control over the organization of the information and can only practically handle a small number of such transmissions at any one time. Each transmission is subject to the bandwidth available.

Of course, not all tasks require the same allocation of resources and, correspondingly, not all tasks have equal priorities for a given user. In particular, a user may wish to customize the information environment in such a way that many processes are occurring synchronously, yet each is communicating with the user at a rate that is acceptable. For example, a television viewer may wish to know what is being broadcast on several channels at the same time but only care to watch one of them closely. An Internet user may wish to be continually in touch with sources of data from audio, video, chat-room, video-conferencing and e-mail checker utilities, but not wish all of them to update at the same frequency; the user would be satisfied merely to see at a glance a recent status of each. Some of these processes, such as chat-room activities entail very little data transmis-

Petitioner Microsoft Corporation - Ex. 1001, p. 31

US 9,946,434 B2

3

sion and can, indeed, be effectively updated on a continuous basis, whereas others require a great deal of bandwidth but could usefully be sampled at a lower rate. The current art lacks any technology for controlling the respective refresh rates of several simultaneous information sources. Furthermore, the current art lacks technology that can automatically design an appropriate refresh rate based on the type of data that is received.

At the same time that users are limited by system resources, they are also finding that they have no effective way of managing the multiplicity of available data types and information sources. It is difficult both to conduct two or more different types of computing activities at the same time or to monitor two or more different information sources simultaneously because the tools available are confusing, inflexible, and/or otherwise difficult to implement. Users require immediate access to a wide variety of up to date content presented in a flexible, easily customized interface.

In addition to restrictions in the capacity of today's networks, there is very little conformity amongst the information content. A typical communication device, such as a personal computer, television or mobile telephone, comprises a display unit connected to a processing unit that can accept information from many different sources. As described above, the signals, data and/or datastreams that are available to such a device are diverse, including, for example, HTML content, e-mail, or streaming audio and video. Correspondingly, the software tools that interpret and process the different information sources present each in a different way to the user. From a user's perspective, distinctions between the different types of information could usefully be removed so that each is viewed in a similar way and such that the current presentation associated with any information source gives an immediate indication of its current content. The present reality is different, however. The user must contend with a wide range of icons and program windows that may occupy space on a user's display screen. Another lack of conformity is the different mode of behavior for programs that address different types of information. An effort to standardize the ways in which different types of information are presented to the user would be advantageous. Equally, unification of the way in which those types of information are managed would save time and increase user productivity, for productivity is reduced when users must cope with different attributes of different programs and learn distinct paradigms for different types of information. And, furthermore, a way of conforming the way in which information about multiple datastreams can be communicated between users would be desirable.

The nature of the application program windows and their respective icons predominantly found on today's computer displays is restrictive. The application window typically displays the current content or output of only a single program and program icons convey nothing of the program's current state or content. Often, an icon is a static image which is merely characteristic of the program or data represented thereby rather than the program's current state or its information content. In the present art, there is no intermediate between a window or an icon.

Thus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program. It may have active areas around its borders, such as menu bars, scroll bars, or tool bars, designed to allow the user to control aspects of the window's appearance or to set parameters specific to the operation of the program controlling it. Icons, in contrast, offer ease of display when multiple programs are

4

active, but they do not permit viewing or control of the underlying program or data represented thereby. Instead, icons require user intervention, typically in the form of a mouse-click on an icon of interest, to view or control the program or information. Consequently, the user's viewing options are limited to a choice between one presenting very limited information about a multitude of programs and information and one presenting full information, but of only a single program or data source.

The fact that the GUI's of the present art are largely restricted to icons and windows diminishes the capacity to organize, manage, and access available information. With the Internet representing an ever expanding view of currently accessible global information, the need for flexible information management tools has become crucial. Similarly, with the current expansion of television programming available, for example, through cable television and satellite broadcasting, the need to manage this audiovisual content becomes acute. The convergence of television programming and computers increases these management needs all the more.

Current computer operating system software utilizes bookmarking schemes for managing Internet locations and complex database technologies for managing specialist information. Neither provides visual immediacy or ease of layout. Bookmark hierarchies are presented as cascading textual menus, and database technologies arrange information into rigidly defined structures. The missing capability is a visual categorization in which an area of the display unit itself becomes the bookmark and the arrangement on the display becomes the categorization, independent of the type of content.

While the most common way of accessing information sources is via a personal computer, present day technology exists to communicate via a television or set-top box, handheld computing device, mobile and cellular telephones, all manner of "hybrid" devices such as an internet-accessible games player, camera phones, the "Blackberry", or even in-car navigation and security systems, in which case Internet content and other data can be displayed as some portion of the screen. There is a growing convergence of technologies: televisions are beginning to find application as viewers of non-television data, (for example through use of "Vertical Blanking Interval" technology in which a signal is inserted into the main video signal or through set-top boxes providing limited computer and communications functionality); computers are already finding application for the display of movies, real-time data streams, and the playing of audio data; handheld computing devices and mobile telephones can also access the Internet and other information sources; and other devices are becoming able to access a variety of signals, e.g., digital signals from satellites such as digital radio broadcasts.

To summarize the current state of the art, display technologies currently lack an interface which is capable of organizing any type of information, and presenting such information to the user in a consistent manner, in such a way that all currently open channels are able to indicate their activity on a continual basis, and which could run on any device. Furthermore the current art is deficient in respect of organizing multiple sources of information in a relevant manner that takes into account relationships between the various sources.

SUMMARY

Accordingly, the present disclosure provides an easy to use graphical interface that facilitates the organization and

Petitioner Microsoft Corporation - Ex. 1001, p. 32

US 9,946,434 B2

5

management of multiple data sources corresponding to a user's needs and interests. The present disclosure comprises a grid of tiles that resides on the user's computer desktop. The grid of tiles provides a uniform, graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices. Additionally, the disclosure provides for automatic control of the refresh rates of multiple data sources, based on the character of the data or on "quality of service tags" that accompany the data. Such automatic control may operate in conjunction with one or more user preferences for the refresh rates of certain data. Both the grids and the tiles can be transferred, e.g., by e-mail, from one user to another, or between multiple different devices belonging to a single user. The graphical environment is uniform with respect to the source of accessed information and can manage multiple streams of content, entirely of the user's choice. For example, the technology presents video clips, e-mail messages, television shows, Internet sites, application programs, data files and folders, live video streams, music, radio shows, and any other form of analog signal, digital data or electronically stored information, to the user uniformly and simultaneously, regardless of whether the information is stored locally or available via modem, T1 line, infrared, or any other form of communication. The user's impression of the interface is also independent of the type of electronic device upon which it is implemented.

The present disclosure comprises a method executed by a computer under the control of a program stored in computer memory, said method comprising the steps of: partitioning a visual display of a computer into an array of tiles, such as into a non-overlapping configuration; assigning a first refresh rate to a first tile of said array of tiles and a second refresh rate to a second tile of said array of tiles; updating information presented to said first tile in accordance with said first refresh rate; and updating information presented to said second tile in accordance with said second refresh rate. The manner of assigning the first and second refresh rates may depend upon the type of information received by each tile, including but not limited to the information content or an identifier contained in, or associated with, the information.

The present disclosure additionally includes an electronic readable memory to direct an electronic device to function in a specified manner, comprising: a first set of instructions to control simultaneous communication with a plurality of datastreams: a second set of instructions to partition a display into an array of tiles; a third set of instructions to associate a first datastream of said plurality of datastreams with a first tile of said array of tiles and a second datastream of said plurality of datastreams with a second tile of said array of tiles; a fourth set of instructions to retrieve data from said first datastream in accordance with a first retrieval rate and retrieve data from said second datastream in accordance with a second retrieval rate; and a fifth set of instructions to present data to said first tile in accordance with said first retrieval rate and present data to said second tile in accordance with said second retrieval rate. The first and second retrieval rates may be automatically assigned by the fourth and fifth set of instructions respectively, based upon the type of datastream or an identifier that accompanies each datastream, with or without the additional use of one or more user-specified retrieval rates.

The present disclosure additionally includes a system for facilitating the organization and management of multiple data sources, comprising: a device that includes a processor configured to execute instructions, a memory connected to

6

the processor to store at least one program that includes a graphical user interface, and an input device that includes a display, wherein the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

The application program described herein runs on, and the grids and tiles of which are transferable between, many different devices, including, but not limited to set-top box, personal computer, mobile phone, and other hand-held device. The grid and tiles retain the same characteristics, regardless of operating device. For example, the tiles remain individually configurable and can offer near real-time views of their data content. The application therefore permits the user's interaction with a range of electronic devices to be unified.

Additionally it is to be understood that the application program or programs described herein may be distributed between a client device and a server in such a way that certain data storage and intensive functions are carried out on a server.

BRIEF DESCRIPTION OF THE DRAWINGS

Additional objects and features of the disclosure will be more readily apparent from the following detailed description and appended claims when taken in conjunction with the drawings, in which:

FIG. **1** shows a representative embodiment of a user interface comprising a grid of tiles as might be depicted on a display screen.

FIG. **2** depicts a system that accepts data in at least one form through at least one port and which additionally displays data to a user.

FIG. **3** shows stylized examples of an icon and an application window as are commonly found in computer display systems of the background art.

FIG. **4** shows several tiles as might be found in a typical embodiment of the present technology.

FIG. **5** shows an exemplary data structure of the tile object within a graphical user interface.

FIG. **6** shows one embodiment of a tile in markup language.

FIG. **7** shows the hierarchy of software objects underlying the instant technology, comprising a grid object, tile objects and files or application software.

FIG. **8** shows an exemplary layout of a display produced by the technology described herein.

FIG. **9** shows an alternative exemplary layout of the display produced by the technology described herein.

FIG. **10** shows an exemplary layout of a display wherein a tile contains another instantiation of a grid.

Petitioner Microsoft Corporation - Ex. 1001, p. 33

US 9,946,434 B2

7 8

FIG. **11** shows an exemplary layout of a display including specific examples of tile contents.

FIG. **12** shows the data structure of the grid object which forms part of a graphical user interface.

FIG. **13** shows one embodiment of a grid in markup language.

FIG. **14** shows a sequence of windows that demonstrate how a grid might be set up for initial use by a "wizard" tool.

FIG. **15** shows an example of the architecture of a computer program in a preferred embodiment of the present technology.

FIG. **16** shows the architecture of the application program and its components in a preferred embodiment of the present technology.

FIG. **17** shows the architecture of components of the computer program in a preferred embodiment of the present technology.

FIG. **18** shows an outline of the widget-set used in a preferred embodiment of the present technology.

FIG. **19** shows an outline of the metabase according to a preferred embodiment of the present technology.

FIG. **20** shows an outline of the XP Core and its interaction with the operating system library in a preferred embodiment of the present technology.

FIG. **21** shows an overview of the event system utilized in a preferred embodiment of the present technology.

FIG. **22** shows an overview of the connection layers that are responsible for controlling the download of multiple web-pages from the world wide web.

FIG. **23** shows a number of functions used by the bandwidth controller.

FIG. **24** is a schematic representation of the relationship between a server and a client device.

FIG. **25** shows a series of interactions between a client device and a server.

FIG. **26** shows how a user, a server and third party content providers communicate in accordance with an embodiment of the technology.

FIG. **27** shows an embodiment in which the application program communicates with one or more wireless devices.

DETAILED DESCRIPTION OF THE
TECHNOLOGY

FIG. **1** shows an illustrative configuration of the graphical user interface of the present disclosure. A grid **1** consisting of a 3 by 3 matrix of nine tiles demonstrates some of the different contents that tiles can display. Tile **10** points to a database of stock quotes. Tile **20** displays the active folders in an electronic mail utility. Tile **30** displays a portion of an alphabetical list of quoted companies. Tiles **40**, **50**, **60**, **70** and **80** point to websites displaying, respectively, high technology news, electronic goods for sale, categories of business news, items available by auction and the Wall Street Journal. Tile **90** points to the file-viewer of a windows-based operating system, such as Microsoft Windows™, and displays the currently accessible disc drives or partitions.

Within the scope of the present invention, an information source may comprise any analog signal, source of digital data or a datastream, including, but not limited to one or more of, video, audio, text, and graphics. The information may be in any format, including but not limited to ASCII, bitmap, MP3, JPEG, GIF, TIFF, a mark-up language such as HTML, XML, VRML, HDML, formatted text such as rich text format, or binary. Preferably the software of the present disclosure is able to recognize the type or format of the information source and assign properties to tiles according to the type. In another preferred embodiment, the information source contains or is accompanied by an identifier that indicates a priority to be attached to the information when displayed by the graphical user interface. Such an identifier may be referred to as a "quality of service", (QoS) tag.

FIG. **2** is a general representation of a data display system **100** within which the present invention may be implemented. System **100** comprises a processor such as central processing unit **104**, an input device **106**, data connection ports **108-1** through **108-N**, a display **110** and a main memory **112**, all connected via bus **116**. Residing in the memory **112** is an operating system **120**, a file system **122**, a cache **124** for temporary storage of information, application programs **128-1** through **128-N** and a graphical user interface (GUI) program **126** that is responsible for presenting information on to display **110**. Information may enter and/or leave the system through any one of the ports **108-1** through **108-N** which may themselves be connected to a tuner **114**, or via a network interface **134** to a communications network. If a tuner **114** is employed, it may channel input from a wireless signal **130** or a cable network **132**.

In some embodiments of the present disclosure, system **100** is a personal computer such as a desktop workstation, a portable notebook or laptop computer, or a wearable computer. In that case the input device **106** may be a keyboard, mouse, voice-activated device, trackpad, trackball, or any combination thereof and the display **110** may be a conventional cathode ray tube (CRT) or flat-screen display such as an active matrix LCD, or an OLED. The network interface **134** may then be a connection to the Internet or to a local area network via a cable and modem or a digital subscriber line or ISDN, or via a wireless connection, such as WiFi, Bluetooth, or a wireless connection, for example, using 802.11a/b/g to the Internet.

In another embodiment of the present invention, system **100** is a mobile or cellular phone or personal digital assistant and the input device **106** may consist of several buttons on a keypad, a touch-sensitive screen with or without a touching device such as a stylus, or a microphone and voice-recognition software. In this embodiment, the display **110** is preferably an LCD screen or an electroluminescent display, and ports **108** receive data from radio signals or a portable or wireless modem. Consistent with this embodiment, it is also possible that system **100** is, or comprises part of, a hybrid device such as an internet-ready entertainment device that also has a games playing function or the ability to display an electronic book, or has a digital audio function as does an MP3 player. It is also possible that system **100** is a portable navigation system, such as a GPS device especially one that has an additional functionality such as cellular telephone communication capability or the ability to pick up broadcast radio or TV signals.

In yet another embodiment of the present disclosure, system **100** comprises a set-top box wherein display **110** is a TV screen or monitor, and tuner **114** accepts input in the form of a wireless signal **130** from broadcast transmissions or cable signals from the cable network **132**.

It is consistent with the present disclosure that, as discussed hereinbelow, system **100** comprises a client device that communicates with a server.

It is also envisaged that the present disclosure can comprise a device that accepts digital signals from a satellite, such as an "XM" radio transmission. It is further contemplated that the present invention can interface to an in-car navigation and security system that utilizes GPS technology or satellite communication means, such as the "OnStar"

Petitioner Microsoft Corporation - Ex. 1001, p. 34

US 9,946,434 B2

9

system. Accordingly, the present disclosure may also find application in conjunction with an in-car entertainment and display system.

Input device **106** may be a hand-held remote control apparatus or buttons located on the set-top box or touch-sensitive areas of display **110**. Accordingly, the display **110** and the input device **106** need not be part of the same physical device as the device that contains processor **104**.

According to the present disclosure, the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

As is known to those skilled in the art, a graphical user interface is a computer program that resides in memory **112** of some data processing system and that provides means for presenting information, input to, and output from, application programs **128** or content of datastreams from ports **108** on an associated display. In the background art each datastream is associated with a window. The graphical user interface allows a user to control the arrangement and display format of the data content in each window. Usually a graphical user interface permits a user to specify and alter operating parameters of application programs running on the system, though at any given time a particular application program will take priority, meaning that a particular window will be displaying continually updating content. Typical operating parameters that may be changed depend upon the application program but include the number of buttons on a tool bar and number of visible toolbars, the size of the text displayed and the color of the background.

By contrast, the graphical user interface of the current disclosure not only permits a user to control the layout of the data content but to prioritize each application program running on the system and each datastream of interest. A novel feature of the present disclosure is that the data content of any number of the programs can vary in real time and the rate at which the display of each—on a respective tile—is updated can be controlled by the user. Furthermore, in another embodiment, in the absence of initial preferences specified by the user, the present technology is able to assign a rate at which the display of a tile is refreshed according to the type of data or according, for example, to an identifier that is presented with each datastream or source of information, and may take into account the available bandwidth.

When the present technology assigns a refresh rate to a tile according to the type of data, it is envisaged that the type of the data is automatically recognized or ascertained. For example, according to this embodiment the present technology distinguishes between types of data such as video, audio and web-based content, based on the format of the

10

datastream in question and preferably assigns a higher priority to types of data that vary in real time, such as video or audio content.

When the present technology assigns a refresh rate to a tile according to an identifier presented with each source of information, the nature of the identifier may vary according to the type of data or the protocol that is employed for its transmission. In preferred embodiments, the identifier is a tag that is associated with a "Quality of Service" (QoS) implementation. As is known to one of skill in the art, QoS refers to the ability of a data communications system to define and differentiate levels of performance. For example, in internet protocol (IP), QoS tags are presented as specific pre-set bits in packet headers. When the packets are received, a priority can be assigned according to the bits that have been set. For a description of QoS in the IP context, see, for example, www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm. A finer granularity of QoS is possible using Resource Reservation Protocol ("RSVP"). For a description of QoS in wide area networks (WAN), see for example, www.cisco-.com/warp/public/cc/so/neso/vvda/avvid/eeqos_ds.pdf. In networks that communicate via Asynchronous Transfer Mode (ATM), each distinct datastream has an identifier, often called a "virtual channel identifier," that accompanies each of its packets (or cells). In a preferred embodiment, the identifier is contained within a header attached to each packet or cell. QoS is achieved by discriminating between datastreams according to their different identifiers. QoS may be controlled by adjusting parameters that include a packet loss ratio, a packet cell delay variation, a maximum packet loss transfer delay and a mean packet transfer delay. A user's desire in respect of the priority to be accorded to a particular datastream is communicated amongst the various nodes in the network. A more detailed description can be found in, for example, *High Performance Communication Networks*, Walrand, J. and Varaiya, P., Morgan Kaufmann Publishers, Inc., (1996).

Accordingly, an identifier suitable for use by the present technology for assigning a refresh rate to a tile includes a bit or bits in a packet header, or a tag that accompanies or is in the header of a cell or packet.

Consistent with altering refresh rates according to a QoS concept is that the level of packet loss can be adjusted according to the priority level associated with different types of data. Furthermore, a fully-implemented QoS capability permits prioritization based on criteria other than the type of the data. For example, traffic can be prioritized according to the IP address of a source or destination device. Traffic can also be differentiated based on whether or not they are real-time, such as voice or video.

Tile Objects

In the ensuing discussion, tile objects are introduced and described and contrasted with existing elements of graphical user interfaces. A tile presents content from any information source.

Conventional graphical user interfaces of the background art provide two distinct representations of programs, files, and datastreams, as shown in FIG. 3. One representation is an icon **320**, the other is a window **340**. An icon typically occupies only a relatively small proportion of the available display area and comprises an easily recognizable depiction of the program or file, either through its logo **322** or some characteristic picture with the name **324** of the program visible. An icon can be selected by, for example, a touch screen pointer, a cursor controlled by a mouse with a button, or by a keyboard stroke or a combination of keyboard strokes, or any combination of the foregoing. In response to

Petitioner Microsoft Corporation - Ex. 1001, p. 35

US 9,946,434 B2

11

a further selection operation on an icon, for example a double-click of a mouse button, the graphical user interface will provide a window that can be used to communicate further information to the program or review the associated datastream.

A window 340 may occupy a substantial percentage of available screen space, usually 90-100%. The window 340 usually comprises a title bar 348 and a display area 354. The window 340 can commonly be resized by the user for example by using buttons 352 or a draggable area 356 and has a format which contains many active areas around its borders. Examples of active areas include a menu bar 342, a vertical scroll bar 344, a horizontal scroll bar 350 and one or more tool bars 346. Each active area may be used to control aspects of the window's appearance or to set parameters specific to the operation of the program associated with it such as text formatting options in a word-processing package or redirection of a web-browser to its stored home location.

In the present disclosure, a third graphical representation of programs and files, herein called a tile, is introduced. Tiles permit "dynamic bookmarking" of information in that each tile is a viewer of a single information source—including streaming data sources—and can be customized with the user's choice of content as well as initialized with sets of options that are pre-determined by the software of the present disclosure according to the type of data that the tile displays.

A tile is different from an icon because it provides a real-time or near real-time view of the underlying information in that it contains continually refreshed content. A tile is different from a window because a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired.

A tile provides an at-a-glance view of the current status of the program or file associated with it but does not necessarily have the large number of active areas associated with windows such as title bar, menu bar, toolbars, and scroll bars. Therefore tiles lead to a reduction in clutter on the display screen because many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do. Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another. Tiles are superior to icons because they give an immediate indication of the current state of the file or program and have utility functions associated with them, as described hereinbelow. Another advantage of using tiles is a uniformity of appearance between tiles which correspond to different programs and datastreams. The display content of a tile will differ from application to application though its size and format need not.

A tile is associated with a program, file or datastream, similar to the way in which an icon and a window are. A tile may present data in any of a number of ways. For example, in a preferred embodiment, the tiles may present a miniaturized, "thumbnail" view of the underlying information; a "porthole" view of a portion of the underlying information as viewed at full size; a symbol indicating whether the information has been updated since it was last viewed; or a custom interface designed to allow rapid access to the underlying information. The way in which a tile displays content may be independently configured for each tile and may be set up in a default manner that depends upon the type of information being displayed.

FIG. 4 illustrates representative tiles. Tile 402 displays a picture or graphic such as may be stored in a bit-map, JPEG,

12

TIFF or GIF file, or on a world-wide web page. The content of tile 402 is typically a miniaturized representation of a graphic or still-frame from a datastream. Tile 404 displays a portion of a text document or text of a world-wide web page. In this sense the tile functions as a transparent panel placed on top of a document, thus permitting a portion of the document to be displayed. Tile 406 displays a further array of tiles that may be displayed in full by expanding tile 406 to occupy the full area of the display. Tile 408 has been configured to link to an electronic mail program. An exemplary alarm setting associated with tile 408 has been configured so that the tile displays an envelope and the message "New Mail!" when an unread message has been received by the mail program. It would be understood that other alarm or alert settings may be associated with a tile, for example, configurable by a user. Thus, a tile could be established to broadcast a particular alert when the datastream to which it is connected encounters a particular condition, or transmits a particular signal.

Tile 410 displays a name, "FM 101", denoting the title of a broadcast signal, in this case audio, that is associated with the tile. Tile 412 displays a "thumbnail" of the document viewed in a window such as 340. A "thumbnail", as used herein, is a miniaturized representation of an image that retains sufficient characteristics to permit easy recognition of the image. For example, if the document displayed in a window were a document with multiple pages, tile 412 may display a thumbnail of the first page of the document.

Tiles are selectable and live. When a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information, whether that data be a hierarchical menuing system leading the user to a different level or tiles, a word processing file stored on a local area network, a spreadsheet stored locally on a user's computer, HTML file on the Internet, or a television signal. The tiles are live in that each contains real-time or near real-time information.

In a preferred embodiment a selection operation is associated with a tile. For example, clicking on a tile will cause it to immediately refresh its contents. Selecting tile 402 causes the most recent frame of the video stream to be displayed by the tile, or, if the picture were obtained from a static graphic file, causes the most recent version of the file to be displayed by the tile. Selecting tile 404 or tile 412 causes the most recent version of the document to be displayed.

In a preferred embodiment, a second selection operation is associated with a tile. For example, double-clicking a tile causes that tile to occupy a substantial fraction of the whole display area. In this embodiment, double clicking tile 402 or 412 causes the image to be expanded to fit the whole display area. In an alternate embodiment, selecting a tile causes it to occupy an area in the middle of the display that is larger in area than a single tile but does not occupy the full display. If tile 404 were double-clicked, as much of the document as could be displayed in the enlarged tile in regular font size becomes visible. Double-clicking tile 408 causes the mailbox window of the e-mail utility to be sufficiently enlarged to allow new messages to be selected and read. Double-clicking tile 410 causes the audio stream to become audible over the appropriate channel of the system and need not necessarily cause the tile to occupy a substantial fraction of the display area.

A representative tile data structure 500 is shown in FIG. 5. It is important to understand that the tile itself is an image that at any given instant is resident on the file system. This image is separate and distinct from the application program

Petitioner Microsoft Corporation - Ex. 1001, p. 36

US 9,946,434 B2

**13**

or file associated with the tile. The tile data structure **500** comprises two addresses: a tile address **502** that defines the location on the file system where the tile image is stored; and a target address **504** that is the location at which the file or application program associated with the tile can be found. Additionally, the tile data structure contains a name **506** that may be displayed on the tile in certain circumstances (for example the title of a broadcast signal, as in Tile **410**).

Tiles of the present disclosure may be assigned at least seven functions, including but not limited to: an initialization function **508** that is responsible for establishing a connection with the target address **504**; a refresh function **510** that handles updates to the tile image stored at the tile address **502**; a screen-size function **512** that stores the dimensions of the display area filled by the tile upon receipt of a request; an alarm function **514** that permits the tile to display an alarm or warning when the application program associated with the tile encounters a designated event; an on mouseover function **518** and an on mouseout function **520** which control the behavior of the tile when a selection tool such as a mouse-controlled cursor is placed respectively on and off the tile; and a toolbar function **522** which may permit an array of special buttons to appear on or adjacent to the tile for the purposes of adjusting properties of the tile.

Refresh function **510** is able to indicate a retrieval rate at which information is retrieved from a source of information so that the information is displayed and refreshed in the tile. Preferably refresh function **510** is able to interpret an identifier that accompanies the information displayed by the tile. In some embodiments, a tile is configured so that a right-click of a 2- or 3-button mouse while the cursor is over the tile would activate the tool-bar function. In a preferred embodiment, right-clicking on a tile can reveal a menu of options that enables the user to ascertain properties of the tile, such as the bandwidth it is consuming.

In some embodiments of the present disclosure, the tile is itself a document created in a markup language such as HTML or XML as shown in FIG. **6** and is suitable for display in a web-browser. In this embodiment, a tile occupies a position in a table defined with elements of mark-up language which will be familiar to one skilled in the art. Tile-specific attributes are introduced which control the way in which a web-browser displays the tile. In the example in FIG. **6**, the tile has a clickable map, i.e., separate areas of the tile produce separate results when clicked. Also, this tile has a toolbar, which in some embodiments may appear if the mouse is right-clicked when the cursor is over the tile.

In another embodiment of the present disclosure, tiles communicate with one another and have conditional content. That is, the content of one tile depends upon the content of another. Such conditional content enables more than one tile to be refreshed simultaneously, or nearly simultaneously, by requesting a given tile to be refreshed. Alternatively, a tile may be set up to specify one or more other tiles whose contents are linked to it. For example, a first tile may show a web-based listing for the Nasdaq Stock index, and one or more conditionally dependent tiles may link to web pages that show the weekly, and yearly fluctuations of the index and the performance of previously chosen stocks.

In some embodiments, tiles should be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a tile, such as selecting a "send" option in a selection menu accessed by right-clicking on a tile, or by activating a button on the tile, send a tile that has already been configured to another user. The tile could be sent via e-mail, via a mobile device such

**14**

as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the tile from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the tile, i.e., send the tile from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously.

A tile could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a tile to a removable medium such as a CD-R, or a USB-drive, and transfer the file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable tiles would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a tile to another member of the community from within the online environment.

In a preferred embodiment, tiles are categorized into a number of levels, arranged hierarchically so that tiles in each level have priority over those in other levels. Such a priority indicates that tiles with highest priority will refresh most frequently. Accordingly, each tile has a tile level **524** in this embodiment. In one aspect of this preferred embodiment, priorities are assigned according to the type of data that is displayed by the tile. According to such an aspect, the highest priority is assigned to a video or web-based conference, for example; the next priority is assigned to a video-stream such as a movie or broadcast TV signal; a third priority is attached to a media player such as RealPlayer; and lower priority tiles handle local applications and files. Tiles within a given level can be set up to compete equally for available system resources and bandwidth.

Grid Object

The arrangement, layout and independent functioning of the tiles on the display and exemplary software for their control is now described with respect to FIGS. **7**-**13**.

The overall hierarchy of a graphical user interface embodied by the present technology is summarized in FIG. **7**. The Grid **700** is the top level functionality to which application programs are subordinate. The grid can replace the functionality of a user's computer desktop and offers similar and additional features. Grid **700** comprises a matrix or array of tiles of which tiles **702**, **704**, **706**, **708** and **710** are representative. The user can control the grid in such a way that the tiles **702**, **704**, **706**, **708**, and **710** present simultaneous information content from a plurality of sources independently of one another. The grid controls the layout and priorities of the tiles. Each tile is associated with a data stream or application program thereby permitting a number of different images to be displayed simultaneously. In particular, different tiles can be—and typically are—associated with different contents. For example, tile **702** is connected to a web-page viewer **712** such as a browser. Tile **704** is connected to a source of streaming video **714**, such as Real Player. Tile **706** is connected to an audio player **716** such as a CD-player program or a source of streaming audio such as Real Audio. Tile **708** is connected to a file viewer **718** such as a text-editor or a word-processing package. Tile **710** is associated with another grid object **720**, thereby permitting a "layering" of information hierarchies. In a preferred embodiment, a grid embodies a similar underlying data structure to a tile.

Each tile is separately associated with a source of information, for example, an application program, datastream or file, any one of which may be another grid object. Such a

Petitioner Microsoft Corporation - Ex. 1001, p. 37

US 9,946,434 B2

15                                          16

hierarchical structure permits a user to organize programs and information through the graphical user interface. For example, separate categories of information can be displayed on separate grids allowing each grid to be associated with a theme. In some embodiments, a grid can be configured to be populated with a fixed number of popular web pages based on, say, most recently visited URL's, or most frequently visited URL's over a period of time such as a week or a month.

In some embodiments, a source of information has an identifier, such as a quality of service tag, associated with it. The grid assigns a priority to a tile based upon the identifier, or based upon the type of data that the source of information comprises. Where tiles are ranked into levels, the grid assigns an information source to a tile in a level that is appropriate for the type of data or the identifier associated with the information source. In this way, a tile can be automatically given a priority that is appropriate for the type of information that it is to display.

By using the native attributes of a tile, a user may specify a presentation of the grid, consisting of its dimensions, (i.e., the number of tiles to display and their arrangement), and the programs or files to be associated with each tile. A single grid, composed of multiple tiles, may therefore present a number of information sources simultaneously.

Together, the grid and tiles comprise the application through which a user can view simultaneously information from a multitude of available sources including multiple sites on the Internet or some other distributed computer network, receive signals from multiple broadcast channels, and open and view multiple files. In some embodiments, the application may be run through ordinarily available computer operating systems, whereupon the application overlays the user's desktop and acts as if it were a "borderless browser". Therefore the application resides over existing applications without replacing any of them; rather it enables those applications to be called from the grid itself. The application, therefore, becomes a graphical file manager in which the content of continuously changing files, e.g., datastreams, is being displayed in real-time or near real-time, depending on the respective assigned priorities. Effectively, the application can be used instead of the user's computer "desktop" because it has a more visually intuitive dynamic menuing system than a traditional desktop.

In a preferred embodiment, a grid of tiles replaces the functionality of the computer "desktop" utilized by many computer operating systems. Whereas a desktop is typically populated by static icons and tool bars, a grid of tiles instead presents to the user an array of snapshots of current programs and files. The essence of the grid is that its content is dynamic and informative. As previously discussed, icons are inherently limited in the information that they can present and windows clutter the entire desktop without permitting more than one to be readily displayed simultaneously. By contrast, each tile on the grid can show the current status of the data or datastream associated with it. The fact that a tile may refer to a separate grid permits nesting of grids and consequently a hierarchy of organized information sources.

The grid also understands the interests of the user and acts as a repository for passwords and identifiers to subscription services. In this way, it is not necessary for a user to remember and enter a user name and password to access data requiring such a log-in. In this same vein, Internet sites of interest can be "bookmarked" and stored by the grid, each such site possessing its own tile. The grid is also nestable in that a tile in one grid may point to a separate grid and tiles in the separate grid may point back to the first grid or to yet more grids. If desired, a user can impose a "theme" on a grid and thereby categorize, group, and/or otherwise manage his/her data sources. In this manner, the user can group tiles relating to particular subject matters, Internet sites, documents, or otherwise in a grid according to some speciality. A tile in such a grid could link to another grid to provide a connection between related categories. Equally, a tile on one grid can point to the same information source as a tile on another grid.

In some embodiments, the application program is provided with a number, such as one or more, 'out of the box' grids. In such embodiments, a user is offered a repository of pre-made grids that are pre-configured with a particular layout of tiles, and links to particular datastreams. Such a grid can be used as a starting point for a user who first opens the program, and may contain, for example, a tile configured to provide content for each of several commonly used programs or websites. By way of example, a pre-configured grid may contain an array of 4 tiles, that include: a tile configured to link to a home-page of an Internet search engine, such as Google; a tile configured to link to an information archive such as Wikipedia; a tile configured to link to a user's e-mail program; and a tile configured to access the local file-system on the user's device.

The grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display.

In a preferred embodiment, the grid permits a regular layout of tiles on the display screen such that the tiles are uniform in size and shape, as depicted in FIGS. **8-11**. Each tile is indexed by its position on the grid. For example **802-2-1** is the first tile in the second row. Tiles in the first row of the grid are **802-1-1**, **802-1-2**, **802-1-3** and so on, to **802-1-N**. Tiles on the second row are **802-2-1**, **802-2-2**, **802-2-3** and so on, to **802-2-N**. And, tiles on the bottom row are **802-M-1**, **802-M-2**, **802-M-3** and so on to **802-M-N**. There are no gaps between the tiles, the tiles are not permitted to overlap and the whole grid is covered by tiles. FIG. **8** shows one embodiment in which all tiles are the same size and are presented in an array comprising M rows and N columns. There is no particular requirement that the arrangement consists of more than one row and more than one column. On the display of a mobile telephone or smart phone, for example, a single row of tiles may be apposite. In a preferred embodiment, a display of a smart, cellular or mobile telephone presents a single tile at any one time but it is possible to scroll from tile to tile across the grid, by using, for example, buttons on the phone, or other methods of control.

FIG. **9** shows an arrangement in which there is a unit tile size, that of tile **802-1-1**, but tile **802-1-2** and tile **802-M-1** have each been configured to occupy regions of the grid equal to exact multiples of the unit tile size. Such an arrangement may be useful and important if one or more datastreams is of particular interest but the others are also to be monitored at the same time.

In some embodiments, a grid comprises instructions for assigning tile size intelligently when a user specifies, or receives, a number of tiles. The instructions can comprise a learning algorithm that learns the preferred sizes of the most active tiles and does its best to keep the user happy without the user having to manually assign, resize, or move tiles around. Thus, for example, a user may wish to set up a grid quickly, and specify seven tiles. Seven does not neatly partition into a square or rectangular array, but the program understands that particular applications benefit from being displayed in tiles that are greater than the unit tile size, and

Petitioner Microsoft Corporation - Ex. 1001, p. 38

US 9,946,434 B2

17

therefore automatically assigns such applications to larger tiles without the user's intervention.

FIG. **10** shows an arrangement of tiles in which Tile **802-M-1** is associated with a further grid **1000**. The lower half of the Fig. shows an enlarged perspective of that tile showing a grid with Y columns and X rows.

FIG. **11** shows an arrangement of tiles in which are depicted different application programs associated with three of the tiles. Tile **802-2-2** links to a file viewer display-ing a specific file; tile **802-M-1** presents streaming video; Tile **802-M-N** depicts a page of information on the world wide web.

In some embodiments, a grid can be configured with a foreground option such that, when a user's display has already been configured to contained a number of tiles, upon selecting a tile in a particular way, e.g., middle-clicking on it, the tile would expand in size and be displayed in the foreground relative to the rest of the grid.

FIG. **12** shows a schematic data structure of the attributes of some embodiments of grid object **700**. The architecture shown in FIG. **12** applies to any grid, including a top-level grid **700** shown in FIG. **7** as well as to a grid that is contained within a tile.

Significantly, the grid manages the flow of information to the tiles. For example, the grid can communicate with the display device in order to determine its current configuration and allocation of resources. In some embodiments, using a so-called "carousel" approach, the grid continually cycles around the currently displayed tiles, one by one, refreshing the content of a tile each time it is accessed. When a given tile is refreshed, the refresh operation is completed before refreshing the next tile in sequence. In this way, the cycling rate may be set so that the current content of all tiles are reasonably up to date. The cycling can be interrupted by a user selecting a given tile, so that that tile alone becomes continuously updated. In this way, the user does not need to worry about manually refreshing multiple tiles.

In a preferred embodiment, according to priorities that may be applied to individual tiles on a tile by tile basis if desired, the grid manages the refresh rate of each tile in the grid. For example, for locally stored word processing or spread-sheet files, the user might configure the tiles to refresh only when the underlying data is written to the local hard drive. Similarly, a user might configure tiles containing infrequently updated Hyper-Text Markup Language ("HTML") data from the Internet to refresh at a certain time each day. At the other extreme, a user might configure an active tile to display a television channel at a refresh rate of 29 frames per second, while at the same time configuring inactive tiles to display different channels at a refresh rate of once every five seconds. In this way, a user could monitor many channels until program content of interest appeared in one of the tiles without the burden of actively refreshing each tile.

In other embodiments, the grid itself assigns priorities to the tiles based on identifiers such as quality of service tags that are associated with the information source itself. In still another embodiment, the grid automatically assigns priori-ties to the tiles based upon its recognition of the type of data that is presented to it. In this way, the grid can associate information sources with tiles that occupy different levels of priorities in a hierarchy of levels, if present. It is to be understood that an identifier such as a QoS tag can be used to assign to a tile a priority that is higher than that of another tile that would display the same type of data, and would have the same priority in the absence of such an identifier. Thus, for example, QoS tags can be used not only to assign two

18

video-streams a higher priority than a web-browser tile, but can be used to prioritize one videostream over another. It is also to be understood that not all information sources need be accompanied by identifiers for the grid to be able to assign priorities itself. In the absence of an identifier for a particular information source, the grid can assign a priority based on the type of data, a user preference or some arbitrarily low priority based on other considerations such as bandwidth and availability of other system resources.

The grid itself has an address **1204** that specifies its location within the file system of the device in which the application program runs. The grid has associated with it several utility programs: a configuration wizard **1206** that may be called by the user when setting up a new grid; a tile creation function **1208** utilized by the configuration wizard when initializing new tiles; a tile annihilation function **1210** utilized in case of error or when resizing the grid.

The grid object stores the number of rows **1212** and the number of columns **1214** of tiles that are present. The grid also stores a tile list **1216** containing attributes of each respective tile. In particular, the address of each tile, its priority and its refresh rate are stored by the grid program. The grid also stores other attributes of tiles such as their respective positions on the grid as given by their column and row number. The priority of a tile may be used to determine its refresh rate in some embodiments of the present tech-nology. A tile can have a password feature built into it if it is desired to restrict access to the tile's content. The grid itself can have a toolbar by which its attributes may be accessed and modified.

Much as in the manner in which tiles may be sendable, in some embodiments, grids should also be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a grid, such as selecting a "send" option in a selection menu accessed by right-clicking on the grid, or by activating a button on the grid, send a grid that has already been configured to another user. The grid could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the grid from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the grid, i.e., send the grid from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously. When sending a grid, the key attributes that would be sent would include the grid configuration, such as its size, and the locations of datastreams associated with the respective tiles.

A grid could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a grid as a file to a removable medium such as a CD-R, or a USB-drive, and transfer the grid-file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable grids would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a grid to another member of the community from within the online environment.

In a preferred embodiment, a grid is a special form of a tile. It is a tile that can create and manage an array of other tiles. Accordingly, its data structure also comprises those elements of a tile data structure shown in FIG. **5** in addition to those shown in FIG. **12**. If the grid has a parent grid, the

Petitioner Microsoft Corporation - Ex. 1001, p. 39

US 9,946,434 B2

**19**

address of the parent grid **1202** is stored. For example, grid **1000**, associated with tile **802-M-1** of FIG. **10**, has grid **700** as its parent.

In some embodiments of the present technology, the grid is a document created in a markup language, such as HTML, SGML or XML, and is therefore suitable for display via a web-browser. In this embodiment, the addresses of the parent grid, the grid itself and each of the tiles are expressed as Uniform Resource Locators (URL's). The various functions controlled by the grid are accessible through function calls devised according to methods familiar to one skilled in the art. For example, "dynamic HTML", java applets or simple CGI-scripts can provide the technological basis for enabling various grid utilities. FIG. **13** is illustrative code for establishing a grid.

In some embodiments, a grid can provide a sub-layer of functionality around "favorites" and history, thereby allowing users to see what data streams have been recently accessed by any one or more of the tiles, as well as to create lists of sites as favorites.

The application program may be downloaded from a pre-determined web-site and preferably operates in a client-server mode. Users may download preconfigured grids from the predetermined server. A grid configuration "wizard" program which guides a user through a step by step set up of a custom-grid may also be downloaded. Other web hosts are able to deliver content to end-users via the predetermined server. Some basic functions of the grid can be carried out on the predetermined server and provided to the user. According to the capabilities of the device on which the grid is displayed, the server may take on more demanding functions.

A grid can also be offered as a web-based service, for example one that provides single-sign-on to chosen services (where possible) that are accessible via a user's pre-determined tiles.

Grid Configuration Wizard

In some embodiments of the present technology, the set up of a particular grid is achieved through a grid configuration program ("wizard") that is downloaded to the display device from a remote site. The grid configuration program permits a user to define and install one or more grids on the client system. When a tile is partitioned into a further array of tiles, the grid configuration program can also be used. Some embodiments of the user interface of the grid configuration wizard are shown in FIG. **14**.

A first screen displayed by the grid configuration wizard comprises an application program logo **1404**, button **1406** to guide the user to the next screen and a number of choices, such as **1408**. The user is offered the choice of preconfigured, or "standard" grid configurations, selected from a list. Examples of such grids include grids themed by content such as sport-related grids or by type of data such as grids whose content is video-based.

Additionally, the user is permitted to configure "customized" grids in which each tile can be taken from a list of predefined samples or can be initialized according to the user's wishes. For example, a user can assign a priority to a tile, or can select a tile from a hierarchical scheme of pre-defined priorities, or can specify that a tile set its own default priority by recognizing the type of data that it receives or an identifier such as a QoS tag associated with that data. In a second screen **1412** displayed by the grid configuration wizard, a tiled area **1416** represents the grid that the user is building. Sample tile categories **1418** such as "weather", "news", "stocks", or "sports" are listed. In an alternate embodiment, a grid can be filled by the "drag and

**20**

drop" technique in which a selected document **1414** is moved on to the display area of the grid configuration program and automatically becomes a tile. In some embodiments, as described elsewhere herein, the grid is able to intelligently and automatically assign a size and location of such a tile in the grid. A button **1410** offers the user the chance to go back one screen.

In a third screen **1420** displayed by the grid configuration wizard, the user can name the grid and, optionally, store it for future reference, for example in an archive of preferred grids. The user can elect to finish grid construction by clicking the "Finish" button **1412**, or launch the grid immediately by activating button **1422**. When launching the grid immediately, the grid is automatically constructed on the fly according to the content and tile types specified by the user during the set up procedure.

Architecture of Application Program Software

The hierarchy of the software in a preferred embodiment of the present technology, the Surfcast System (see, e.g., www.surfcast.com, the textual and graphical contents of the various pages of which as of the filing date of the instant application are incorporated herein by reference in their entirety), is illustrated in FIG. **15**. It is understood that the Surfcast System is merely an exemplary embodiment and that other software products can be developed that fulfill the functions of the present technology. It is further understood that the Surfcast System or other equivalent systems, may be distributed between a client and one or more servers and that all parts of it need not reside on a single device. It is also to be understood that such software may be offered as a web-based service without needing to be downloaded or installed on a user's local device.

The Surfcast System software comprises a number of modules. In FIG. **15**, an arrow connecting two modules means that one module uses an interface of the other. The arrow comes from the module invoking the interface towards the module whose interface is being invoked. An interface may simply be a function call between the two modules or, for example, a call to a dynamic linked library (DLL).

The Surfcast application program **1500** takes its underlying data from two sources, a metabase **1506** and a system library **1514** that preferably resides on the device on which the application program is running. For example, the application program **1500** may be required to call functions from the system library while it is running. Actual tiles that a user visualizes can be spawned from the metabase **1506**.

Data structures for user tiles **1502** are obtained from the XP core **1504** which itself also utilizes components from the system library **1514**. In a preferred embodiment there are different data structures for tiles of different priorities. The XP core is an abstraction layer for the operating system environment. Tiles that utilize components such as buttons take these components from the widget set **1508**. A widget is a basic user interface element such as a button or a text input box. The metabase also uses an interface of the widget set **1508**, and can therefore use functions within the widget set. The widget set requests functions from the XP core.

Objects in the metabase **1506** that retrieve content from remote sources such as world wide web pages utilize a connection manager and bandwidth controller **1512**. A URL loader **1510** decides whether content should be obtained afresh by contacting the connection manager **1512**, or from content previously stored in cache. Effectively, the URL loader manages the connection manager, and calls functions within it.

Petitioner Microsoft Corporation - Ex. 1001, p. 40

US 9,946,434 B2

21

Underlying all of the Surfcast application program's operations are functions from the operating system library **1516** that is supplied with the device on which the application program is running.

Each of the objects shown in FIG. **15** is now described in further detail by reference to FIGS. **16-21**.

The Surfcast application program **1500**, in FIG. **16**, comprises a launcher **1618** and a framework **1620**. The launcher opens the program from scratch whereas the framework is responsible for managing grids and tiles. The user interacts directly with the framework to set up a preferred arrangement of tiles on the display. In some embodiments, the framework initially contains a prescribed set of tiles. The framework controls communication between tiles, for example, in the case of conditional content.

Tiles **1502**, FIG. **16**, are the equivalent of an application in a conventional GUI system. They can be built in C++ using the Surfcast tile builder application program interface (API) using XP core classes, or via a utility such as a custom tile editor or via a script file. Some predefined tiles are included with the basic Surfcast system including a web browser tile called a surftile **1602**, tiles for contacts and communications such as a chat tile **1604** and an e-mail tile **1608**. Media-player tiles such as a video tile **1606** are also supplied, as are tiles that interface to commonly used desktop programs. A controller processes events **1630**, for example mouse moves, clicks, keyboard events and external example mouse moves, clicks, keyboard events and external gram. A general content viewer that can compose pieces of content clipped from a variety of sources, layout tile **1616**, is also provided. Reg tile **1614** is a general purpose tile that permits a user to define his/her own tile type.

In a preferred embodiment, all tiles have a common base class, and each specialized type of tile has its own class that builds upon the base class. There are many ways in which specific tile classes can be derived from the common base class. In a preferred embodiment, tiles are categorized into a hierarchy. There may be a tile class specific to each level in the hierarchy. Functions for specific tile classes are readily apparent to one of skill in the art. Tiles may additionally be represented by markup language files and viewed within a web-browser environment.

The data classes in XP core **1504**, FIG. **16**, comprise base classes and utility classes with which tiles and widgets are built. In general, classes within the XP core describe how tiles can communicate with one another and with the overall application program framework **1620**. In particular, XP core classes are generic and portable, thereby permitting cross-platform capability.

XP core classes include: tilebase **1622** for the generic class that underlies all tiles; tile base view **1624**; tile controller **1626**; canvas **1628**; and event classes **1630** for event handling. A view is what a tile uses to draw itself. Tile base view **1624** is the base class for all views associated with a visual object. A controller processes events **1630**, for example mouse moves, clicks, keyboard events and external events. Tile controller **1626** is the base class for controllers associated with a tile. A canvas **1628** is an area of screen on which to render some image, for example a tile.

The metabase **1506**, FIG. **17**, is a local store for platform-specific implementations of the descriptions of tiles, grids and other objects. Tiles, grids and content are created, saved and restored via the metabase. The metabase contains tile type and content type registries such as tile registry **1732**, and a local database of grids and content such as content store **1734** and grid store **1736**. Unknown tile and content types can be obtained from remote servers. Tile types are abstracted so that if a grid contains a particular type of tile,

22

for example an e-mail tile, the metabase provides whatever is appropriate for the device the application is running on. Items in the metabase are "persistent", that is they are not saved explicitly but are preserved from session to session.

The widget set **1508**, FIG. **17**, comprises a platform-specific set of visual components that tiles can use. Widget set contains the predefined widgets that are included with the system. It can be extended with new widgets. It includes such useful widgets as a button **1738**, a label **1740**, an edit widget **1742** that enables a user to enter text into an editable field and a list widget **1744** that enables a user to select from a set of options. Items within the widget set can be used with tile types such as text input tiles, web browser tiles, and a streaming video tile. The term widget can also include more complex objects such as a video player that can be inserted into a tile as easily as a button.

The URL loader **1510**, FIG. **17**, provides a mechanism for retrieving content. The URL loader **1510** interacts with connection manager **1512** for tiles which need to make a network connection. Tiles and the metabase ask for content for a given URL and the content manager will attempt to retrieve it. The metabase also contacts the connection manager through the URL loader to ascertain whether there is sufficient bandwidth for the transfer. In particular, the connection manager decides whether the URL loader should furnish tile content from the cache **1746**, as would be the case if the content has been recently displayed and stored locally. Alternatively, if the content is not cached, the URL loader supervises loading of content from the location specified by the URL.

The URL loader **1510** also comprises a file manager **1748** for organizing the cached content. The URL loader additionally comprises a DOM (data object model) renderer **1750** that administers the parsing of pages in markup languages such as XML and HTML. The URL loader may also comprise an implementation of an API for XML rendering such as SAX. In an alternate embodiment, such an API may reside in the XP core module.

The system library **1514** comprises commonly used utilities within the application program, including, but not limited to, code for string manipulations, file handling and server communication. The system library module comprises generic code and can be compiled for any operating system.

The operating system library **1516**, FIG. **17**, comprises utilities that differ in their implementation from system to system but are needed for operation of the application program. For example, utilities that may be found in system library **1516** are those that provide support for threads and synchronization **1752**, debugging tools **1754**, graphics libraries **1756**, further basic string manipulations **1760** and connections **1762**. Additionally, not shown in FIG. **17**, useful items in the operating system library include utilities that permit definitions of objects, sockets, input devices and hardware devices. Items in the operating system library are accessible through classes with documented public interfaces.

The operation of the widget set **1508** is further described with respect to FIG. **18**. As previously mentioned, the widget set contains widgets for various functions such as buttons, text labels, etc. Illustrated in FIG. **18** is a set of widgets for buttons.

FIG. **18** shows the class hierarchy for the button widget. In FIG. **18**, a solid line with an arrow head indicates a relationship of inherency between two classes. Base classes for widgets are grouped together in box **1809**. Widget class **1810** is a container for other classes. All widgets use the base

Petitioner Microsoft Corporation - Ex. 1001, p. 41

US 9,946,434 B2

23

class widget **1810** stored in the XP core module and further described later. Accordingly, button **1800** is a specific class inherited from widget **1810**.

Widget view **1812** is a class, also stored in XP core, that defines the look and feel of the widget. Button view **1802** inherits from widget view and controls how a button draws itself.

In the scheme of FIG. **18**, user tile **1816** comprises three objects, tile controller **1626**, the base class tile **1622** and tile base view **1624**, each of which is found in XP core and is further described later. Tile base view **1624** is responsible for drawing the tile and can employ one or more widgets.

A button is something that a user can click on. A button provides button events to a button event consumer. A button event consumer is also known as a client, i.e., clients that use buttons implement button event consumer **1808** to be notified of button events. For example, a button event consumer may be a "play" function in a video tile. The button event consumer interacts with a control structure tile controller **1626** associated with a user tile **1816** by telling the tile that the button has been activated. Button event consumer **1808** is itself a class that inherits from an event consumer class, described later.

Button controller **1804** controls how button events **1806** are processed, for example mouse and keyboard events. It inherits class structure from widget controller **1814** stored in XP core. Not all button events **1806** are recognized by the button controller **1804**: for example, a particular keystroke may have no effect on the state of the button.

Other widgets follow a similar pattern. They include: textedit, for inputting text; textlabel, for displaying text; textspinner, for selecting from a choice of options; datewidget, for entering a date; titlebar, for selecting from a choice of options; titlebar; and a toolbar.

Metabase **1506** is further described with respect to FIG. **19**. Arrows between the components in FIG. **19** denote interfaces. The metabase comprises a registry **1900** and tile store **1902** of tile and grid types, a content store **1918** and a content and tile link database **1920**.

The tile type registry **1900** contains a list of tile and widget types along with information about how to create them and what they are called, as well as other information such as pointers to objects from which tiles are created. In a preferred embodiment, the list of tile types includes tiles in a hierarchy of categories. The tile and grid store **1902** contains a library of stored grids and tiles. Tiles can save themselves or be restored. In a preferred embodiment, grids are just special cases of tiles. Tiles from the tile library can be called and displayed on the screen by asking the registry to load tiles. The tile and grid store interfaces to an XML library **1906**.

Tiles from the tile and grid store can also be saved outside the metabase in a library of markup language files, e.g., an XML library **1906**.

Also in the metabase **1506** is metabase tile **1904** which utilizes tile base **1622** from the XP core module. All tiles inherit from this class.

DLL's can contain additional tiles and widgets that can be created by independent third parties. These can be implemented within the metabase through the tile factory **1916** and tile creator **1914**, both of which interface to the tile type registry **1900**. The tile factory **1916** contains the description and classes necessary for someone to register a new tile type. Tile creator **1914** is the code that does the tile creation at runtime. In general, independent creation of tiles is facilitated by supplying a tile toolkit to third parties.

24

Inquiry utility **1912** is an optional means for an outside user to interface to the metabase, for example to ascertain the class structures of stored tile classes.

Content store **1918** is a cache that contains content of tiles for the previous session. The content store **1918** follows a similar pattern to the tile type registry and the tile store. The content and tile link database **1920** is a database of information about how tiles and grids are related, and how content is related between them. Content tile link database **1920** copes with descriptions of relationships between tiles and also themes of content for related tiles. This database can also be used in the context of "knowledge management", i.e., those operations that monitor a user's activities and attempt to suggest further sources of content based on it. Both content store **1918** and the database **1920** interface with tile type registry **1900**.

FIG. **20** shows a further description of classes found in the XP core and their interaction with the operating system library **1516**. As discussed below, some arrows between objects within XP core denote inheritance of classes.

Canvas **1628** describes an area of screen that can be drawn to. GfxContext **2002** is a set of graphics primitives, for example for line-drawing, colors and space filling. It is a generic version that encapsulates and abstracts operating system-specific features inherited from GfxContextFactory **2032** in the operating system library **1516**. Win32 GfxContext **2034** is an example of a graphics context used with the Windows operating system. Other GfxContent **2036** includes alternative platform dependent graphics contexts.

The foundation classes are tile base **1622**, tile base view **1624** and tile base controller **2008**. Tile base **1622** is the base class for all visual objects such as tiles, widgets and grids. The tile class **2010**, and widget base class **2016**, inherit from tile base. Where tiles are in a hierarchy of categories, there may be several tile classes that inherit from tile base.

A widget effectively functions as a special kind of tile that can be placed inside a tile. Widget base **2016** is not meant to be instantiated on its own but is a foundation for the widget class **1810**, FIG. **18**, used by a generic widget.

Tile base view **1624** is the base class for all views associated with a visual object. A view is what a tile uses to draw itself. Inheriting from tile base view are tile view **2012**, the base class for all views associated with tiles, and widget view **1812**, the base class for all views associated with widgets. Tile base view and tile base also interface with canvas **1628**.

Tile base controller **2008** is the base class for all controllers associated with a visual object. Inheriting from tile base controller are tile controller **1626**, the base class for controllers associated with a tile, and widget controller **2020**, the base class for all controllers associated with widgets. A controller processes all events. Tile base interfaces with both tile base view **1624** and tile base controller **2008**. Tile base controller interfaces to event system **2022**. Finally, event system **2022** also communicates between the operating system library **1516** and the tile base controller **2008**.

Event system **2022** is further described with respect to FIG. **21**. An event can be any one of a mouse movement event, another mouse event such as a mouse-click, or a keyboard event such as a keystroke. In FIG. **21**, event **2112** is the base class. Other classes such as mouse movement event **2106**, mouse event **2108** and keyboard event **2110** derive from the base class by inheritance. The event consumer **2104** is a class responsible for directing events to the controller. The event producer **2102** interprets system events into Surfcast events for an event consumer. The boxes **2122**, **2124**, **2126**, **2128**, **2130** and **2132** are multiplexers handling

Petitioner Microsoft Corporation - Ex. 1001, p. 42

US 9,946,434 B2

25                                          26

the case where multiple clients are affected by multiple types of events. An event is communicated to tile base controller **2008**.

Managing Connections to More than One Datastream

When two or more tiles connect to sources of data available over a network, communication must be established in such a way that the rate at which updated data is transmitted to the grid can be controlled. In practice, for an embodiment of the application which resides on a user's computer, a flow control protocol such as TCP is required. In this way, each tile can communicate with the remote datastream to which it is linked and a determination can be made of available bandwidth at the time of data transfer. Alternatively, in a client-server mode, flow control is not necessary because communication with the server suffices, as is described below.

It is not practical to fire up a separate browser program from each tile that wishes to download data from a site on the world wide web. A web-browser is very greedy on memory and resources and the user would have little or no control over the respective rates at which data was downloaded from different sites.

Instead, in a preferred embodiment of the present technology, a hierarchy of layers manages the simultaneous connection and allocation of resources to different world wide web sites, as shown in FIG. **22**. The layer structure applies to the way in which any given tile downloads content.

At the highest level there exists a widget, referred to as "SurfWidget" **2200**, which is the basic browser control within the application program of the present technology. Ideally, this widget operates in conjunction with any commonly used world wide web browser. It is typically associated with a tile type such as surftile **1602**.

The surf widget communicates with a surf widget controller **2202** in a control layer **2201**. Also in the control layer is a web browser application program **2204**. Examples of such a program include Microsoft's Internet Explorer and Netscape's Navigator software. The surf widget controller **2202** handles the interaction between the surf widget **2200** and the web-browser **2204**. The surf widget controller also passes on requests from the browser to the URL Manager **2206** in the next layer, the URL layer **2205**. The surf widget controller then pipes back the results to be rendered to surf widget. A typical example of this process in operation would be: a user clicks on a hyper-link in a web-page; the web-browser makes a request for that page to surf widget controller **2202**; the request gets handed to the URL manager **2206**; once the page is loaded, the URL manager **2206** notifies the surf widget controller, which in turn sends the information to the web-browser for rendering.

The responsibility for obtaining pages of content is that of the URL layer **2205**. When a URL is requested, the URL manager **2206** issues a request for the page and any subsequent media to the connection manager **2210**. The URL manager keeps track of the requested URL for future use, if it is requested again. The URL manager also queues up URL's that have been requested according to their focus, i.e., the tile that a user has currently selected and according to the respective priorities of the active tiles.

In a preferred embodiment, a pre-fetch utility such as URL pre-fetch manager **2208** can be implemented. It saves the user time if items can be pre-fetched instead of waiting for their download. Several strategies can be used to obtain pro-fetch items for the user. Using a history of a user's previous browsing habits, it is possible to predict what the user will probably want next. Another function of a pre-fetch

utility is to periodically check the validity of items in the cache to make sure they are up to date. As would be familiar to one skilled in the art, some of the new HTTP1.1 methods would prove very useful for this, namely the conditional gets. Another strategy is to start loading links from the page that a user is browsing, regardless of whether the user has selected the links. Although such an approach could be very wasteful of resources if there are a lot of links and very few are ultimately accessed and also because a lot of links tend to be advertisers, this approach could be effective in situations where very high capacity bandwidth exists.

The connection layer **2209** handles each individual request for download passed to it through the URL processor, regardless of whether it is an HTML page, a graphic or sound file. The connection manager **2210** understands the total bandwidth available for allocation, for example, whether the device is connected to a modem or a T-1 line. It will also manage the connection to the requested site and maintain its own cache. Before making a network request for an item, connection manager **2210** first checks its cache, the connection manager cache **2212**. If the item is not in the cache, the connection manager then passes the request off to the HTTP protocol socket **2214** in the protocol layer **2215**. The way in which HTTP protocols and caches work is familiar to one skilled in the art.

The protocol layer **2215** consists of a suite of different socket types, **2214**, **2216** and **2218**, intended to support different communication protocols, such as HTTP, FTP and also a client server protocol specific to the application program via the surfcast protocol socket **2218**. Preferably protocols employed are able to recognize QoS tags in the headers of packets that are passed through the layer.

The socket layer **2219** comprises at least one socket **2220**. The socket layer wraps up all the system implementation specifics for a given platform and allows generic socket types to be built on top. The socket keeps track of its bandwidth usage, which can then be queried at the connection layer. The socket layer then facilitates bandwidth management.

With all communications going through the same socket layer it is possible to easily collect data about a socket's bandwidth usage. If, at the connection layer, it is noticed that the total bandwidth allocation has been exceeded, it is a simple case of blocking further data transfer until such time as total bandwidth usage falls back under what has been allocated.

As a user switches focus from one tile to another, priorities can be dynamically re-allocated to ensure the fastest possible loading of the selected page. Such an allocation can take into account priorities that have been assigned to the tiles based on their content, as well as based on identifiers associated with the information such as quality of service tags. All other communications can then abide by the same rules, allowing for complete control.

The sequence of events and functions in a "dynamic bandwidth allocation" feature of the present technology are described as follows. The dynamic bandwidth allocation feature involves a URL loader, the connection manager **2210** and a bandwidth controller.

The tiles that need access to the network resource for downloading content from a URL, pass certain parameters to the URL loader which manages all such requests from the tiles. These parameters include the URL itself, the priority of the tile, the minimum bandwidth requirement if any, and the maximum bandwidth requirement, if any.

The URL loader detects the need for a connection to a network resource, as would be notified to it by the connec-

Petitioner Microsoft Corporation - Ex. 1001, p. 43

US 9,946,434 B2

27                                                    28

tion manager. In the case of dial-up connections, the connection manager is responsible for allocating the modem resource and making the dial-up. Once a connection is made and the network resource is available, the URL loader requests the bandwidth controller to start delivering the required content, taking into account the additional parameters for each request.

The bandwidth controller **2300** is an object that comprises a number of functions, as shown in FIG. **23**. AddURL **2302** is a function used by the URL loader to add an additional connection request to those already received. RemoveURL **2304** is used by URL loader when cancelling or aborting a request. GetURLStatus **2306** is used by URL loader to obtain a status report for a given request. GetStatus **2308** is used to obtain a general status report for the overall bandwidth. The bandwidth controller **2300** is additionally able to execute a main cycle loop over the outstanding URL requests for the purposes of managing the bandwidth among them. The following pseudocode describes steps within the main cycle loop, according to some embodiments of the present technology.

```
while (uncompleted requests outstanding)
{
calculate bandwidth obtained per request;
check for need to postpone, stall or cancel lower priority
    requests;
check for need to increase higher priority requests;
detect completed requests and notify requestor;
detect undeliverable requests and reissue or cancel if
    necessary;
carry out other service and statistics functions, as
    required;
}
```

Each of these steps is explained, as follows. One or more of the steps may be performed in a different order from that presented above without departing from the scope of the present disclosure.

The step of calculating the bandwidth obtained per request utilizes a function that calculates obtained bandwidth for each of the managed requests, including requests that are stalled (or postponed) due to priority issues. This calculation takes place frequently because of the nature of the network. The bandwidth obtained can vary drastically even during the course of the individual network transaction, and therefore a priority based dynamic system must continuously accommodate such fluctuations. The result of calculating the bandwidth obtained is used both for feedback to users and for making decisions in the subsequent steps within the main cycle loop.

The step of checking for the need to postpone, stall or cancel lower priority requests is another precautionary mechanism to use for the purposes of adjusting the currently active connections. If outstanding requests are not achieving the desired minimum bandwidth, or an actual bandwidth in line with the priority of a given request is not achieved, bandwidth must be made available to the higher priority requests, by stalling, cancelling or postponing lower priority requests. A throttle feature implemented consistent with the layer nature of the stack can be applied wherein the frequency of issuing requests can be decreased. A complete cancellation of a request followed by reload from cache is usually the last resort.

The step of checking for the need to increase higher priority requests has the opposite effect. If applied, higher priority requests are increased by means of spawning additional simultaneous requests, or by increasing the throttle mentioned above.

Both the steps of checking the need to postpone and checking the need to increase a priority can provide feedback to the user in terms of their success or failure. Status parameters can additionally be collected and calculated.

The step of detecting completed requests and notifying the requestor utilizes a function for handling successful completed requests. Conversely, the step of detecting undeliverable requests followed by reissuing or canceling the request if necessary is the mechanism for avoiding undeliverable requests, or retrying temporarily unavailable requests.

Other service and statistics functions may also be called, as may be necessary for supplying information to the layers above the connection layer.

Client-Server Interaction

It is envisaged that the methods of the present disclosure can be carried out using software that is distributed between a client and at least one server. At one extreme, as discussed hereinabove, the software runs entirely on a server. At another extreme, the client only hosts a browser that displays the grid and bandwidth allocation decisions are processed by a server. It is preferred that the server undertake more resource and bandwidth intensive tasks than the client.

In some embodiments of the present disclosure, FIG. **24**, the user at client device **2400** interacts with server software on a server **2402**. The server stores locally a profile comprising user-specific content **2406** that can feed customized data to the user. For example, the user may store pre-defined grid configurations on the server. Additionally, passwords for specific web-sites can be stored along with the user's profile. A grid generator **2404** on the server creates a grid of tiles according to user-specified content. Each tile has been created on the server by producing an image from the location specified. For example, tile creator **2408-1** produces a tile from content **2410-1**. Thus, when a user logs on to the server, for example through a conventional web-browser, a grid of tiles is downloaded to the user's system. Where an identifier is present in content such as **2410-1**, tile creator **2408-1** can preferably recognize such an identifier and ascribe a priority to the tile that it creates based on that identifier. In an alternate embodiment, the tile creator automatically assigns a priority to the tile based on the type of the information content.

The client-server embodiment provides a number of advantages. For example, individual users and the devices they use may be differentiated. Therefore, the tile-content that the server delivers can be customized according to the rendering device of a particular user.

Turning next to FIG. **25**, each time a user logs on to the server **2402**, a "session" is initiated, step **2500**. The server verifies the user's identity, step **2502** and acknowledges the log-in, step **2506**. The client registers one or more resources, such as connection bandwidth, cost per transmission unit and properties of local playback device, step **2504**. From this information, the server identifies the client device type, for example, set-top box or personal computer, step **2508**. At step **2510**, the server retrieves grid settings specific to the user, if appropriate. In preferred embodiments the server adjust grid settings according to the type of device, for example the size of its display. In preferred embodiments, the server adjusts grid settings according to the type of device, for example according to the size of its display. Details of a session, as defined by tile content and priorities can be held over from one session to another, both for the purposes of permitting a user to continue with ongoing work and in order to protect against the adverse consequences of

Petitioner Microsoft Corporation - Ex. 1001, p. 44

US 9,946,434 B2

29

abnormal disconnections. Additionally, targeted advertising and messaging can be delivered to subsets of users via the predetermined server.

Having rendered a grid, step **2512**, and delivered it to the client device, the user can request sources of information such as datastreams, step **2518**. Any number of datastreams can be requested at once, the corresponding stream request information which defines parameters for each stream is communicated to the server which verifies and calculates parameters for each stream, step **2516**. In some embodiments the server allocates a priority to each stream according to the type of content, e.g., video, audio, static web-page content. In a preferred embodiment, the server uses an identifier associated with a datastream and allocates a priority based on that identifier. Such an identifier may be a quality of service tag.

Upon completion of these steps, the server **2402** knows the client characteristics and is able to distribute bandwidth available to the client among multiple content servers using for example a bandwidth controller **2300**. In this example, if the client has an incoming bandwidth of say 56 Kbits/second, and is requesting datastreams from three sources with equal priority, then the server will respond for each request that a bandwidth of 56/3=18.7 Kbits/sec is available for each datastream.

The requested datastreams are displayed on the client device, step **2520** and, if the user changes the content of a tile or explicitly requests an update or refresh operation on the tile, step **2522**, an update request is sent to the server, step **2524**. Once the new content has been received, the grid is rendered anew, step **2526**. Preferably the refresh rates of tiles on the client are allocated according to priorities associated with each tile.

Intensive operations on each displayed tile are also channeled through the predetermined server. For example, refresh operations on a tile generate a refresh request that is sent to the predetermined server. Similarly, requests to thumbnail a given image can be carried out, by request, on the predetermined server and the resulting compressed image transmitted to the user.

In the foregoing embodiment, the server component may reside locally on the client machine, in which case the server is known as the "Resource Manager", or it may be a remote server.

In a preferred embodiment of client server operation, shown in FIG. **26**, aspects of a user's grid profile are transmitted to third parties so that the third parties may then communicate tile based content directly to the user. For example, a user's custom grid may contain a tile that points to a third party web-site **2604**. Content **2606** from the 3rd party web-site is typically transferred to the server for dissemination to the user. The server **2602** notifies the 3rd party web-site that the user requires tiled data by, for example, transmitting user information **2608**. The third party then permits the tile based content of its web-site to be transmitted directly to the user. The third party may attach an identifier to its information so that the server can assign a priority to the tile.

The use of servers also allows for the latest versions of tiles to be downloaded and installed across all devices. Users are then able to share grids and tiles with other users. The server side technology provides users of all client devices, from desktop PC's to mobile telephones with a consistent experience.

The majority of the server side code is preferably written in Java, with C++ being used where appropriate. The methods and apparatus of the present disclosure are not depen-

30

dent on the particular programming language employed. Inter-server communication also preferably utilizes XML to provide consistency with other aspects of the disclosure.

In a preferred embodiment, either Oracle 8i or SQL "Server 2000" are used to provide a relational database (RDB) functionality of the server. Both of these RDB's now provide direct SQL to XML transformations. Databases are preferably developed using the ANSI 92 SQL standard, which is usable by either of the RDB's.

Thin Client Technology

An object of the application program of the present disclosure is that it should operate on a variety of devices, including mobile telecommunications devices such as cellular phones, handheld web-browsers, palm pilots, personal digital assistants and other devices that can communicate by protocols such as wireless application protocol (WAP).

Accordingly, because most handheld or mobile devices do not have the same amount of local storage and processing power as desktop computers and set-top boxes, a special version of the application program of the present disclosure is envisaged for mobile devices. The special version embodies so-called 'thin client' technology in which a lot of the operations are performed by a server instead of the device itself.

An "n-tier" architecture is one that is designed generically for a multitude of platforms, for example PC's, PDA's, WAP phones, and UNIX systems. Accordingly, in order to maximize the use of mobile devices, the application program of the present disclosure employs an n-tier architecture allowing the majority of the processing to be carried out on the server with the results being sent to the device for rendering. This model allows for a reduced size system to be stored on mobile devices, with the system logic residing on remote servers. Preferably the server, which usually has a much wider bandwidth connection than does a given client, carries out the role of monitoring datastreams for updates, prior to transmitting refreshed content to the client.

The features that are moved from client to server will be dependent upon the device in question. For example, it is possible to provide the client with more features on a personal digital assistant such as a Palm pilot than on a WAP Phone.

When using thin client technology, it becomes especially important for the refresh rates of the tiles to be sensibly allocated according to a priority scheme. Accordingly the thin-client implementation preferably allows for the automatic allocation of tile priorities based on the type of information content being transmitted. The thin client implementation also preferably permits the allocation of tile priorities based on recognition of an identifier such as a "quality of service tag" associated with a source of information.

In order to provide a level of consistency between the devices and the servers, the markup language XML is preferably used to wrap the data that is being transmitted. As previously described, the system of the present disclosure uses a metabase to store information about the user's current grid and tile configurations. A synchronization procedure allows the metabase to be stored on a server and queried by any device. In this way it is possible to provide consistent grid and tile implementations independent of the device and its location. Such an embodiment would permit a variant of "peer to peer" communication.

FIG. **27** provides an example of the way in which wireless devices can interact with a server. A personal digital assistant (PDA) **2700** or a WAP phone **2702** communicates in a wireless manner with a dial-in bank **2704**. The dial-in bank

Petitioner Microsoft Corporation - Ex. 1001, p. 45

US 9,946,434 B2

31

communicates data to a server farm **2706** which is connected to the internet **2710**, optionally through a firewall **2708**. Alternatively, another personal digital assistant such as **2714** can communicate with an internet service provider such as **2712**, also connected to the internet **2710**. The server farm **2706** is able to provide content directly to a PDA such as **2700** or indirectly, over the internet, to a PDA such as **2714**.

What is claimed is:

1. A system for simultaneous display of multiple application programs, the system comprising:

a computing device having a memory;

a display; and

a processor configured to execute instructions stored in the memory, to:

arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent;

associate a first application program of the plurality of application programs with a first tile of a first grid of the one or more grids of tiles and a second application program of the plurality of application programs with a second tile of the first grid of tiles;

assign a first refresh rate to the first tile and a second refresh rate to the second tile; and

simultaneously update content displayed in the first tile in accordance with the first refresh rate, and update content displayed in the second tile in accordance with the second refresh rate;

wherein each tile has:

a first selection operation that calls the application program associated with the tile, the associated application program being different from a program that arranges the display into the one or more grids of tiles, and

a second selection operation that provides a menu of options for a user to ascertain or adjust properties of the tile; and

wherein the associated application program for the first tile and the associated application program for the second tile are different application programs selected from among the group consisting of a web browser, a word processing application, an electronic mail application, a chat application, a weather application, a news application, a spreadsheet application, a music application, and a streaming video player.

2. The system of claim 1, wherein at least one tile in the first grid of tiles is positioned via a drag-and-drop action by a user.

3. The system of claim 1, wherein each of two grids is associated with a separate theme.

4. The system of claim 1, wherein each tile in a grid of tiles is a uniform size and shape.

5. The system of claim 1, wherein a unit tile size is associated with a grid of tiles, and wherein each tile in the grid of tiles has a fixed size that is equal to the unit tile size, or a multiple thereof.

6. The system of claim 1, wherein the first refresh rate is different from the second refresh rate.

7. The system of claim 1, wherein the menu of options for a tile includes options selected from: causing the tile to be shared with another user; adjusting the size of the tile; and refreshing the tile's content.

8. The system of claim 1, wherein the computing device is selected from: mobile telephone, desktop computer, and notebook computer.

32

9. A method for simultaneous display of multiple application programs on a computing device, wherein the method comprises:

arranging a portion of a display of the device into one or more grids of non-overlapping tiles, each grid of tiles being persistent;

associating a first application program of the plurality of application programs with a first tile of a first grid of the one or more grids of tiles, and a second application program of the plurality of application programs with a second tile of the first grid of tiles;

assigning a first refresh rate to the first tile and a second refresh rate to the second tile; and

simultaneously updating content displayed in the first tile in accordance with the first refresh rate and updating content displayed in the second tile in accordance with the second refresh rate;

wherein each tile has:

a first selection operation that calls the application program associated with the tile, the associated application program being different from a program that arranges the display into the one or more grids of tiles, and

a second selection operation that provides a menu of options for a user to ascertain or adjust properties of the tile;

and

wherein the associated application program for the first tile and the associated application program for the second tile are different application programs selected from among the group consisting of: a web browser, a word processing application, an electronic mail application, a chat application, a weather application, a news application, a spreadsheet application, a music application, and a streaming video player.

10. The method of claim 9, wherein at least one tile in the first grid of tiles is positioned via a drag-and-drop action by a user.

11. The method of claim 9, wherein each of two grids is associated with a separate theme.

12. The method of claim 9, wherein each tile in a grid of tiles is a uniform size and shape.

13. The method of claim 9, wherein a unit tile size is associated with a grid of tiles, and wherein each tile in the grid of tiles has a fixed size that is equal to the unit tile size, or a multiple thereof.

14. The method of claim 9, wherein the first refresh rate is different from the second refresh rate.

15. The method of claim 9, wherein the menu of options for a tile includes options selected from: causing the tile to be shared with another user; adjusting the size of the tile; and refreshing the tile's content.

16. The method of claim 9, wherein the computing device is selected from: mobile telephone, desktop computer, and notebook computer.

17. An electronic readable memory to direct a computing device to function in a specified manner, comprising:

a first set of instructions to arrange a portion of a display into one or more grids of non-overlapping tiles, each grid of tiles being persistent;

a second set of instructions to associate a first application program of the plurality of application programs with a first tile of a first grid of the one or more grids of tiles and

a second application program of the plurality of application programs with a second tile of the first grid of tiles;

Petitioner Microsoft Corporation - Ex. 1001, p. 46

US 9,946,434 B2

**33**

a third set of instructions to assign a first refresh rate to the first tile and a second refresh rate to the second tile; and

a fourth set of instructions to simultaneously update content displayed in the first tile in accordance with the first refresh rate, and update content displayed in the second tile in accordance with the second refresh rate;

wherein each tile has:

a first selection operation that calls the application program associated with the tile, the associated application program being different from a program that arranges the display into the one or more grids of tiles, and

a second selection operation that provides a menu of options for a user to ascertain or adjust properties of the tile;

and

wherein the associated application program for the first tile and the associated application program for the second tile are different application programs selected from among the group consisting of a web browser, a word processing application, an electronic mail application, a chat application, a weather application, a news

**34**

application, a spreadsheet application, a music application, and a streaming video player.

**18.** The memory of claim **17**, further comprising instructions to position at least one tile in the first grid of tiles via a drag-and-drop action by a user.

**19.** The memory of claim **17**, further comprising instructions to associate each of two grids with a separate theme.

**20.** The memory of claim **17**, wherein each tile in a grid of tiles is a uniform size and shape.

**21.** The memory of claim **17**, wherein a unit tile size is associated with a grid of tiles, and wherein each tile in the grid of tiles has a fixed size that is equal to the unit tile size, or a multiple thereof.

**22.** The memory of claim **17**, wherein the first refresh rate is different from the second refresh rate.

**23.** The memory of claim **17**, wherein the menu of options for a tile includes options selected from: causing the tile to be shared with another user; adjusting the size of the tile; and refreshing the tile's content.

**24.** The memory of claim **17**, wherein the computing device is selected from: mobile telephone, desktop computer, and notebook computer.

\* \* \* \* \*

Petitioner Microsoft Corporation - Ex. 1001, p. 47



US009043712B2

(12) **United States Patent**
Santoro et al.

(10) **Patent No.:** **US 9,043,712 B2**
(45) **Date of Patent:** **May 26, 2015**

(54) **SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES**

(75) Inventors: **Ovid Santoro**, Lincolnville, ME (US); **Klaus Lagermann**, Copenhagen (DK); **Tom Dechaene**, Overijse (BE)

(73) Assignee: **SurfCast, Inc.**, Portland, ME (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 772 days.

(21) Appl. No.: **13/163,257**

(22) Filed: **Jun. 17, 2011**

(65) **Prior Publication Data**

US 2012/0124498 A1     May 17, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/124,125, filed on May 20, 2008, now Pat. No. 7,987,431, which is a continuation-in-part of application No. 11/140,546, filed on May 27, 2005, now Pat. No. 7,376,907, which

(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 15/00* | (2006.01) |
| *G06F 13/00* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *G06F 3/0481* | (2013.01) |
| *G09G 5/14* | (2006.01) |
| *H04M 1/725* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *H04L 67/42* (2013.01); *G06F 3/0481* (2013.01); *G09G 5/14* (2013.01); *G09G 2370/027* (2013.01); *H04M 1/72544* (2013.01)

(58) **Field of Classification Search**
CPC .............................. H04L 67/42; G06F 3/0481

USPC ......... 715/763–765, 729, 738, 716, 790, 853, 715/740, 840
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,555,775 A | 11/1985 | Pike |
| 4,653,020 A | 3/1987 | Cheselka et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0651544 A2 | 5/1995 |
| WO | WO2006/020470 A1 | 7/1996 |
| WO | W099/26127 A1 | 5/1999 |

OTHER PUBLICATIONS

"Microsoft Internet Explorer Resource Kit", (MSIE Resource Kit), Microsoft Press, A Division of Microsoft Corporation, 1998.

(Continued)

*Primary Examiner* — Kevin Nguyen
(74) *Attorney, Agent, or Firm* — VLP Law Group LLP; Richard G. A. Bone

(57) **ABSTRACT**

A computerized method of presenting information from a variety of sources on a display device. Specifically the present invention describes a graphical user interface for organizing the simultaneous display of information from a multitude of information sources. In particular, the present invention comprises a graphical user interface which organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. The grid functionality manages the refresh rates of the multiple information sources. The present invention is intended to operate in a platform independent manner.

**4 Claims, 27 Drawing Sheets**



Petitioner Microsoft Corporation - Ex. 1001, p. 1

APPX00255

**US 9,043,712 B2**

Page 2

**Related U.S. Application Data**

is a continuation of application No. 10/136,873, filed on Apr. 30, 2002, now Pat. No. 7,028,264, which is a continuation-in-part of application No. 09/702,325, filed on Oct. 30, 2000, now Pat. No. 6,724,403.

(60) Provisional application No. 60/162,522, filed on Oct. 29, 1999.

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,712,191 A | * | 12/1987 | Penna ............................ 715/853 |
| 4,831,556 A | | 5/1989 | Oono |
| 4,905,171 A | | 2/1990 | Kiel et al. |
| 5,140,678 A | | 8/1992 | Torres |
| 5,157,384 A | | 10/1992 | Greanias et al. |
| 5,321,750 A | | 6/1994 | Nadan |
| 5,321,808 A | | 6/1994 | Rupp |
| 5,347,632 A | | 9/1994 | Filepp |
| 5,371,847 A | | 12/1994 | Hargrove |
| 5,394,521 A | | 2/1995 | Henderson, Jr. et al. |
| 5,432,932 A | | 7/1995 | Chen et al. |
| 5,473,745 A | | 12/1995 | Berry et al. |
| 5,479,602 A | | 12/1995 | Baecker et al. |
| 5,550,968 A | | 8/1996 | Miller et al. |
| 5,572,643 A | | 11/1996 | Judson |
| 5,635,980 A | | 6/1997 | Lin et al. |
| 5,712,995 A | | 1/1998 | Cohn |
| 5,721,951 A | | 2/1998 | DorEl |
| 5,740,430 A | | 4/1998 | Rosenberg et al. |
| 5,740,549 A | | 4/1998 | Reilly et al. |
| 5,757,371 A | | 5/1998 | Oran et al. |
| 5,764,972 A | | 6/1998 | Crouse et al. |
| 5,778,181 A | | 7/1998 | Hidary et al. |
| 5,793,368 A | | 8/1998 | Beer |
| 5,796,383 A | | 8/1998 | Henshaw et al. |
| 5,796,401 A | | 8/1998 | Winer |
| 5,812,123 A | * | 9/1998 | Rowe et al. .................... 725/43 |
| 5,813,007 A | | 9/1998 | Nielsen |
| 5,819,284 A | | 10/1998 | Farber et al. |
| 5,831,664 A | | 11/1998 | Wharton et al. |
| 5,838,326 A | | 11/1998 | Card et al. |
| 5,841,418 A | | 11/1998 | Bril et al. |
| 5,848,352 A | | 12/1998 | Dougherty et al. |
| 5,848,356 A | | 12/1998 | Jambhekar et al. |
| 5,901,228 A | | 5/1999 | Crawford |
| 5,905,492 A | * | 5/1999 | Straub et al. ................ 715/744 |
| 5,918,237 A | | 6/1999 | Montalbano |
| 5,929,854 A | | 7/1999 | Ross |
| 5,959,621 A | | 9/1999 | Nawaz et al. |
| 6,003,041 A | | 12/1999 | Wugofski |
| 6,011,537 A | | 1/2000 | Slotznick |
| 6,025,837 A | * | 2/2000 | Matthews et al. ............. 715/721 |
| 6,028,602 A | | 2/2000 | Weidenfeller et al. |
| 6,047,197 A | | 4/2000 | Jarrad |
| 6,061,576 A | | 5/2000 | Terrasson |
| 6,104,700 A | | 8/2000 | Haddock et al. |
| 6,118,451 A | | 9/2000 | Alexander |
| 6,118,493 A | * | 9/2000 | Duhault et al. ............... 348/564 |
| 6,141,007 A | | 10/2000 | Lebling |
| 6,148,304 A | | 11/2000 | de Vries et al. |
| 6,160,553 A | | 12/2000 | Robertson et al. |
| 6,166,738 A | | 12/2000 | Robertson et al. |
| 6,188,405 B1 | | 2/2001 | Czerwinski et al. |
| 6,278,448 B1 | | 8/2001 | Brown et al. |
| 6,322,502 B1 | | 11/2001 | Schoenberg |
| 6,363,445 B1 | | 3/2002 | Jeddeloh |
| 6,411,275 B1 | | 6/2002 | Hedberg |
| 6,418,309 B1 | | 7/2002 | Moon et al. |
| 6,430,405 B1 | | 8/2002 | Jambhekar et al. |
| 6,456,334 B1 | | 9/2002 | Duhault |
| 6,724,403 B1 | | 4/2004 | Santoro |
| 6,807,558 B1 | | 10/2004 | Hassett et al. |
| 6,832,355 B1 | | 12/2004 | Duperrouzel et al. |
| 6,988,248 B1 | | 1/2006 | Tang |
| 7,028,264 B2 | | 4/2006 | Santoro |
| 7,376,907 B2 | | 5/2008 | Santoro |
| 7,933,632 B2 | | 4/2011 | Flynt |
| 7,987,431 B2 | | 7/2011 | Santoro |

OTHER PUBLICATIONS

Civil Action No. 2:12-cv-00333-DBH in the United States District Court for the District of Maine filed on Oct. 30, 2012 in connection with U.S. Pat. No. 6,724,403.
IPR2013-00292, May 22, 2013, Microsoft Corporation.
IPR2013-00293, May 22, 2013, Microsoft Corporation.
IPR2013-00294, May 22, 2013, Microsoft Corporation.
IPR2013-00295, May 22, 2013, Microsoft Corporation.
The HTML Writers Guild, Frames Frequently Asked Questions, www.hwg.org/resources/faqs/frameFAQ.html, Aug. 29, 1997 (last accessed May 22, 2012).
Methodology of Window Management, Hopgood et al., www.chilton-computing.org.uk/inf/literature/books/wm/overview.htm, Chapter 6, Myers, Apr. 29, 1985 (last accessed, Feb. 4, 2013).
Pages from www.pointcast.com, available from http://web.archive.org/web/19991013063544/http://pointcast.com/tour/tour9.html and http://web.archive.org/web/19990826155022/http://www.pointcast.com/tour/tour4.html?gt3, dated Aug. 26, 1999 and Oct. 13, 1999 (last accessed, Feb. 4, 2013).
Frames Frequently Asked Questions webpage: http://www.hwg.org/resources/faqs/frameFAQ.html, uploaded Feb. 9, 2011, 9 pages.
Available Web Site: www.dodots.com, Accessed on May 9, 2001.
Available Web Site: www.snippets.com, Accessed on May 9, 2001.
Martin S Matthews and Erik B. Poulsen, FrontPage 2000: The Complete Reference, May 1, 1999, McGraw-Hil Osborne Media, Chapter 19, pp. 1-12.
John Ross, ABCs of Internet Explore 4, Copyright 1997, Sybex, Chapter 13, pp. 1-3.
Paul McFedries, The Complete Idiot's Guide to Window 95, Mar. 1997, 2nd Edition, pp. 3-7, 97, 101, 105-107, 379.
PCT International Search Report, Application No. PCT/US00/29850, dated Jun. 25, 2001, 3 sheets.
Available Web Site: www.ububu.com Accessed on: May 9, 2001.
Available Web Site: www.chatb.com Accessed on: Nov. 7, 2000.
Duplex Multiplexer, Sensormatic, Samsung, . . . ireless communications,hand helds,maxon Available Web Site: www.mindspring.com˜stancom/multi.html Accessed on: Nov. 7, 2000.
Push technology: Available Web Site: www.whatis.com/WhatIs_Definition_Page/0,4152,213345,00.html Last Update: Jul. 7, 2000 Accessed on Nov. 7, 2000.
Clyman, John. Web Integration/Internet Explorer 4.0 Available Web Site: www.zdnet.com/pcmag/features/memphis/memphis1.htm Accessed on Nov. 7, 2000.
Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., ;Oct. 2000, Product Spotlight: Non-browser based portal solution from Snippets Software, Inc., Corporate Portals Letter &Isqb Online] 1(10), 1-3. Available Web Site: www.snippets.com/download/Corporate_Portal_Article.pdf Accessed on May 9, 2001.
Cisco—Quality of Service, "Fact Sheet Quality of Service Fact Sheet" Available Web Site: http://www.cisco.com/warp/public/cc/so/neso/vvdo/avvid/eeqos_ds.htm Accessed on Oct. 21, 2002.
IP Quality of Service: An Overview Available Web Site: http://www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm Accessed on Oct. 21, 2002.
Loyall et al., "Specifying and Measuring Quality of Service in Distributed Object Systems", IEEE, Published in the Proceedings of ISORC'98, Apr. 20-22, 1998 in Kyoto, Japan. Available web site: http://www.dist-systems.bbn.com/papers/1998/ISORC/isorcweb.html Accessed on Oct. 21, 2002.
White Paper, "The need for Qos: The Internet protocol's "best-effort" service has worked well so far, so why do we need to change it?" Available Web Site: http://www.sop.in-ria.fr/rodeo/rserban/Files/Need for QoS-v4.pdf Accessed on Oct. 21, 2002.
"User's Manual", Nokia Corporation, Jun. 7, 1998, pp. 1-190.
"User's Guide", Motorola Envoy Wireless Communicator, 1994, pp. 1-90.

Petitioner Microsoft Corporation - Ex. 1001, p. 2

US 9,043,712 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

"Simon Say's 'Here's How!' Users Manual", Simon Mobile Communications Made Simple, 1994, pp. 1-41.

Baecker, et al., "Readings in Human-Computer Interaction: Toward the Year 2000, 2nd Edition", 1995, pp. 1-952.

Schneiderman, "Designing the User Interface: Human-Computer Interaction, 3rd Edition", 1998, pp. 1-640.

Cerami, "Delivering Push", 1998, pp. 1-428.

Myers, "The User Interface for Sapphire", Computer Graphics & Applications, vol. 4, No. 12, Dec. 1984, pp. 13-23.

Myers, "A Taxonomy of Window Manager User Interfaces", Computer Graphics & Applications, Sep. 1988, pp. 65-84.

Teitelman, "A Tour Through Cedar", Xerox Palo Alto Research Center, 1984, pp. 181-195.

"OpenStep User Interface Guidelines", Sun Microsystems, 1996, pp. 1-216.

Lane, et al., "Technical Research Report—User Interfaces for a Complex Robotic Task: A Comparison of Tiled vs. Overlapped Windows", Jan. 1997, pp. 1-13.

Bly, et al., "A Comparison of Tiled and Overlapping Windows", Human Factors in Computing Systems, Apr. 1996, pp. 101-106.

Isaacs, "Inside Dynamic HTML", Microsoft Press, 1997, pp. 1-28.

Cohen, et al., "Constraint-Based Tiled Windows", Computer Graphics & Applications, Nov. 1984, pp. 1-12.

Gancarz, "Uwm: A User Interface for X Windows", Summer Conference Proceedings, Usenix, Jan. 1986, pp. 429-440.

"Submission request to W3C", http://www.w3.org/submission/1997/5/ Accessed Web Site on May 17, 2013.

"Proposal for a Handheld Device Markup Language", http://www.w3.org/TR/NOTE-Submission-HDML. Accessed Web Site on May 17, 2013.

"Handheld Device Markup Language FAQ", http://www.w3.org/TR/NOTE-Submission-HDML-FAW.html Accessed Web Site on May 17, 2013.

"Unwired Planet Will Publish Handheld Device Transport Protocol for Internet Access From Mobile Phones and Pagers", http://www.ncns.com/news/2/uwplanet.html Accessed Web Site May 17, 2013.

Wessels, "Web Caching. 1st Edition", Jun. 2001, p. 37.

Yeager, et al., "Web Server Technology, The Advanced Guide for World Wide Web Information Providers", 1996, p. 208.

Tibken, "Before Apples iPad, there was the Intel Ipad. Seriously.", CNet News, Dec. 5, 2013 (http://news.cnet.com/8301-1035_3-57614579-94/before-apples-ipad-there-was-the-intel-ipad-seriously/) Accessed Web Site Jan. 23, 2014.

Non-Final Office Action mailed Aug. 15, 2014 from the USPTO in related U.S. Appl. No. 13/759,942.

Final Written Decision entered Oct. 14, 2014 from the United States Patent Office in corresponding Inter Partes Review case IPR 2013-00292.

Cisco-Quality of Service, "Fact Sheet Quality of Service Fact Sheet" Available Web Site: http://www.cisco.com/warp/public/cc/so/neso/vvdo/avvid/eeqos_ds.htm Accessed on Oct. 21, 2002.

* cited by examiner

Petitioner Microsoft Corporation - Ex. 1001, p. 3



Fig. 1

Petitioner Microsoft Corporation - Ex. 1001, p. 4



**Fig. 2**

Petitioner Microsoft Corporation - Ex. 1001, p. 5





Fig.3
(Prior Art)

Petitioner Microsoft Corporation - Ex. 1001, p. 6



Fig. 4

Petitioner Microsoft Corporation - Ex. 1001, p. 7



Fig. 5

Petitioner Microsoft Corporation - Ex. 1001, p. 8

```
<TD><A HREF="tile2_target.htm"
     TARGET="new"
     ONMOUSEOVER=action1(arg3)
     ONMOUSEOUT=action2(arg4)
     REFRESH=timeout(500)
     SOURCE=http://www.camelot.castle/swords/excalibur.til
     CLICKMAP=       { 0, 0,50,50, clickfunction1( clickargument1),
                      51, 0,50,50, clickfunction2( clickargument2),
                       0,51,50,10, clickfunction3( clickargument3) }
     TOOLBAR=("local/toolbars/radio.too" PLACEMENT="bottom" }
     ALARM="alarms/condition_rain=TRUE, condition_weekend=FALSE,
             alarmaction=blow_the_horn">

</TD>
```

**Fig. 6**

Petitioner Microsoft Corporation - Ex. 1001, p. 9



Fig. 7

Petitioner Microsoft Corporation - Ex. 1001, p. 10



Fig. 8

Petitioner Microsoft Corporation - Ex. 1001, p. 11



Fig. 9

Petitioner Microsoft Corporation - Ex. 1001, p. 12



Fig. 10



FIG. 11

Petitioner Microsoft Corporation - Ex. 1001, p. 14



Fig. 12

Petitioner Microsoft Corporation - Ex. 1001, p. 15

```
<HTML>
<HEAD>
<TITLE>Surfcast Grid Example</TITLE>
<META NAME= "Resource Manager "CONTENT= "RESMGR.EXE">
<META NAME= "Author" CONTENT= "Surfcast, Inc.">
</HEAD>
...
<BODY BACKGROUND= "surfback.gif">
<TABLE>
<TR>
<TD><A HREF= "http://www.somewhere.com/sometarget.html"
    TARGET= "new"
    ONMOUSEOVER=action1(arg1)
    ONMOUSEOUT=action2(arg2)
    REFRESH=timeout(200)
    SOURCE= "http://www.surfcast.com/tilelibrary/tile2.til">
</TD>

<TD><A HREF= "http://www.somewhereelse.com/someothertarget.html"
    TARGET= "new"
    ONMOUSEOVER=action3(arg3)
    ONMOUSEOUT=action4(arg4)
    REFRESH=timeout(500)
    SOURCE= "http://www.camelot.castle/swords/excalibur.til">
</TD>

<TD><A HREF= "local/document.htm"
    TARGET= "new"
    ONMOUSEOVER=action1(arg3)
    ONMOUSEOUT=action2(arg4)
    REFRESH=timeout(0)
    SOURCE= "local/documents/somedocument.til">
</TD>

</TR>

</TABLE>
</BODY>
</HTML>
```

Fig. 13

Petitioner Microsoft Corporation - Ex. 1001, p. 16



Fig. 14

Petitioner Microsoft Corporation - Ex. 1001, p. 17



**Fig. 15**

Petitioner Microsoft Corporation - Ex. 1001, p. 18



Fig. 16

Petitioner Microsoft Corporation - Ex. 1001, p. 19



Fig. 17

Petitioner Microsoft Corporation - Ex. 1001, p. 20



Fig. 18

Petitioner Microsoft Corporation - Ex. 1001, p. 21



Fig. 19

Petitioner Microsoft Corporation - Ex. 1001, p. 22



Fig. 20

Petitioner Microsoft Corporation - Ex. 1001, p. 23



Fig. 21

Petitioner Microsoft Corporation - Ex. 1001, p. 24



Fig. 22

Petitioner Microsoft Corporation - Ex. 1001, p. 25



**Fig. 23**

Petitioner Microsoft Corporation - Ex. 1001, p. 26



Fig. 24

Petitioner Microsoft Corporation - Ex. 1001, p. 27



Fig. 25

Petitioner Microsoft Corporation - Ex. 1001, p. 28

APPX00282



Fig. 26

Petitioner Microsoft Corporation - Ex. 1001, p. 29



**Fig. 27**

Petitioner Microsoft Corporation - Ex. 1001, p. 30

US 9,043,712 B2

1

## SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES

### CLAIM OF PRIORITY

This application is a continuation of application Ser. No. 12/124,125, now U.S. Pat. No. 7,987,431, which is a continuation-in-part of application Ser. No. 11/140,546, now U.S. Pat. No. 7,376,907, which is a continuation of application Ser. No. 10/136,873, now U.S. Pat. No. 7,028,264, which is a continuation-in-part of application Ser. No. 09/702,325, now U.S. Pat. No. 6,724,403, which claims benefit of priority to provisional application Ser. No. 60/162,522, filed Oct. 29, 1999, all of which applications are incorporated by reference herein in their entirety.

### TECHNICAL FIELD

The present disclosure relates to methods of presenting information from a variety of sources on a display device. Specifically the present disclosure describes a graphical user interface for organizing simultaneous display of information from a multitude of sources.

### BACKGROUND

The scope of the global communications capacity, comprising fixed link and wireless networks, continues to expand rapidly. The variety and complexity of communication devices proliferates and the number of users escalates. As a result, users are faced with increasingly complex systems and interfaces with which to manage multiple sources of information. At the same time, society has increased its demands on time and productivity so that users no longer have the luxury of focusing their attention on a single source of information or means of communication. Instead, the norm today is for people to carry out many tasks simultaneously.

As might be expected, these demands have exposed substantial problems in current communications technology. In particular, users are faced with insufficient resources to manage and access the volume and variety of information available to them in an efficient and productive manner. While a variety of tools designed to assist in accessing and managing these resources have been created, these tools remain unsatisfactory. Consequently, users are impeded by the myriad of information sources, each with its own method of use and often with its own login and password requirements, as well as by slow retrieval times to access the information. The result is an unacceptable delay for many operations, as well as inefficiencies in transferring information from one source to another.

Under the present art, for example, it is usually the case that a user lacks the bandwidth resources to receive multiple video signals simultaneously. If an individual were receiving one video signal, it is usually impractical to receive a second at the same time due to bandwidth constraints. Thus, the user could not, for example, monitor multiple video data streams of sporting or news events; instead, the user could monitor only one video data stream at a time.

To address such bandwidth resource limitations, the current art only accesses information when the user requests it. As a result, there is an inevitable delay between the user's request for information and the communications device's presentation of it. For example, if a user wants to monitor sources of news information on the Internet using current browser technology, the user must continuously and manu-

2

ally request the news data from its source to determine whether the data has been updated. Prior to requesting and subsequently receiving the data, the user has no way of knowing whether the data has been updated. In any case, the user is unlikely to want to refresh the status of each application by manual intervention himself at the frequency necessary to ensure that the information is up to date. Additionally, if a user wishes to view two or more webpages simultaneously, (s)he must run two or more copies of the web-browser program. The act of manually refreshing the content of alternate programs in order to ascertain which have any new material to offer is fundamentally inefficient.

Similarly, the user's access to such data is not in real-time or even near real-time because each time the user wants to view the information, (s)he must request it from its source and wait for the source to transmit it to him. Thereafter, (s)he must wait until his/her communications device has received and processed the information before it is presented. For complex information such as a video signal, this can take longer than a minute to occur; and, even for simple information, this process can take many seconds. Thus, the user is denied real-time or near real-time access to the information.

Present technology that locally stores or "caches" previously accessed information to make it available to the user more rapidly does not solve this problem, because the cached information is necessarily old. The user's communications device must still verify the accuracy of the information with the source before the system displays the cached information. As a result, the user is denied real-time or near real-time access to updated information.

Similarly, if a user wishes to make two or more simultaneous downloads there is no control over the relative rates at which the respective downloads would occur. So-called "push technologies" attempt to address this problem by organizing information from a number of related sources and sending it periodically to a user. While this arrangement frees a user from actively participating in the download, the price is that the user has little control over the organization of the information and can only practically handle a small number of such transmissions at any one time. Each transmission is subject to the bandwidth available.

Of course, not all tasks require the same allocation of resources and, correspondingly, not all tasks have equal priorities for a given user. In particular, a user may wish to customize the information environment in such a way that many processes are occurring synchronously, yet each is communicating with the user at a rate that is acceptable. For example, a television viewer may wish to know what is being broadcast on several channels at the same time but only care to watch one of them closely. An Internet user may wish to be continually in touch with sources of data from audio, video, chat-room, video-conferencing and e-mail checker utilities, but not wish all of them to update at the same frequency; the user would be satisfied merely to see at a glance a recent status of each. Some of these processes, such as chat-room activities entail very little data transmission and can, indeed, be effectively updated on a continuous basis, whereas others require a great deal of bandwidth but could usefully be sampled at a lower rate. The current art lacks any technology for controlling the respective refresh rates of several simultaneous information sources. Furthermore, the current art lacks technology that can automatically design an appropriate refresh rate based on the type of data that is received.

At the same time that users are limited by system resources, they are also finding that they have no effective way of managing the multiplicity of available data types and information sources. It is difficult both to conduct two or more different

Petitioner Microsoft Corporation - Ex. 1001, p. 31

US 9,043,712 B2

**3**

types of computing activities at the same time or to monitor two or more different information sources simultaneously because the tools available are confusing, inflexible, and/or otherwise difficult to implement. Users require immediate access to a wide variety of up to date content presented in a flexible, easily customized interface.

In addition to restrictions in the capacity of today's networks, there is very little conformity amongst the information content. A typical communication device, such as a personal computer, television or mobile telephone, comprises a display unit connected to a processing unit that can accept information from many different sources. As described above, the signals, data and/or datastreams that are available to such a device are diverse, including, for example, HTML content, e-mail, or streaming audio and video. Correspondingly, the software tools that interpret and process the different information sources present each in a different way to the user. From a user's perspective, distinctions between the different types of information could usefully be removed so that each is viewed in a similar way and such that the current presentation associated with any information source gives an immediate indication of its current content. The present reality is different, however. The user must contend with a wide range of icons and program windows that may occupy space on a user's display screen. Another lack of conformity is the different mode of behavior for programs that address different types of information. An effort to standardize the ways in which different types of information are presented to the user would be advantageous. Equally, unification of the way in which those types of information are managed would save time and increase user productivity, for productivity is reduced when users must cope with different attributes of different programs and learn distinct paradigms for different types of information. And, furthermore, a way of conforming the way in which information about multiple datastreams can be communicated between users would be desirable.

The nature of the application program windows and their respective icons predominantly found on today's computer displays is restrictive. The application window typically displays the current content or output of only a single program and program icons convey nothing of the program's current state or content. Often, an icon is a static image which is merely characteristic of the program or data represented thereby rather than the program's current state or its information content. In the present art, there is no intermediate between a window or an icon.

Thus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program. It may have active areas around its borders, such as menu bars, scroll bars, or tool bars, designed to allow the user to control aspects of the window's appearance or to set parameters specific to the operation of the program controlling it. Icons, in contrast, offer ease of display when multiple programs are active, but they do not permit viewing or control of the underlying program or data represented thereby. Instead, icons require user intervention, typically in the form of a mouse-click on an icon of interest, to view or control the program or information. Consequently, the user's viewing options are limited to a choice between one presenting very limited information about a multitude of programs and information and one presenting full information, but of only a single program or data source.

The fact that the GUI's of the present art are largely restricted to icons and windows diminishes the capacity to organize, manage, and access available information. With the Internet representing an ever expanding view of currently accessible global information, the need for flexible informa-

**4**

tion management tools has become crucial. Similarly, with the current expansion of television programming available, for example, through cable television and satellite broadcasting, the need to manage this audiovisual content becomes acute. The convergence of television programming and computers increases these management needs all the more.

Current computer operating system software utilizes bookmarking schemes for managing Internet locations and complex database technologies for managing specialist information. Neither provides visual immediacy or ease of layout. Bookmark hierarchies are presented as cascading textual menus, and database technologies arrange information into rigidly defined structures. The missing capability is a visual categorization in which an area of the display unit itself becomes the bookmark and the arrangement on the display becomes the categorization, independent of the type of content.

While the most common way of accessing information sources is via a personal computer, present day technology exists to communicate via a television or set-top box, handheld computing device, mobile and cellular telephones, all manner of "hybrid" devices such as an internet-accessible games player, camera phones, the "Blackberry", or even in-car navigation and security systems, in which case Internet content and other data can be displayed as some portion of the screen. There is a growing convergence of technologies: televisions are beginning to find application as viewers of non-television data, (for example through use of "Vertical Blanking Interval" technology in which a signal is inserted into the main video signal or through set-top boxes providing limited computer and communications functionality); computers are already finding application for the display of movies, real-time data streams, and the playing of audio data; handheld computing devices and mobile telephones can also access the Internet and other information sources; and other devices are becoming able to access a variety of signals, e.g., digital signals from satellites such as digital radio broadcasts.

To summarize the current state of the art, display technologies currently lack an interface which is capable of organizing any type of information, and presenting such information to the user in a consistent manner, in such a way that all currently open channels are able to indicate their activity on a continual basis, and which could run on any device. Furthermore the current art is deficient in respect of organizing multiple sources of information in a relevant manner that takes into account relationships between the various sources.

## SUMMARY

Accordingly, the present disclosure provides an easy to use graphical interface that facilitates the organization and management of multiple data sources corresponding to a user's needs and interests. The present disclosure comprises a grid of tiles that resides on the user's computer desktop. The grid of tiles provides a uniform, graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices. Additionally, the disclosure provides for automatic control of the refresh rates of multiple data sources, based on the character of the data or on "quality of service tags" that accompany the data. Such automatic control may operate in conjunction with one or more user preferences for the refresh rates of certain data. Both the grids and the tiles can be transferred, e.g., by e-mail, from one user to another, or between multiple different devices belonging to a single user. The graphical environment is uniform with respect to the source of accessed information and can manage multiple streams of content, entirely of the user's choice. For

Petitioner Microsoft Corporation - Ex. 1001, p. 32

US 9,043,712 B2

5

example, the technology presents video clips, e-mail messages, television shows, Internet sites, application programs, data files and folders, live video streams, music, radio shows, and any other form of analog signal, digital data or electronically stored information, to the user uniformly and simultaneously, regardless of whether the information is stored locally or available via modem, T1 line, infrared, or any other form of communication. The user's impression of the interface is also independent of the type of electronic device upon which it is implemented.

The present disclosure comprises a method executed by a computer under the control of a program stored in computer memory, said method comprising the steps of: partitioning a visual display of a computer into an array of tiles, such as into a non-overlapping configuration; assigning a first refresh rate to a first tile of said array of tiles and a second refresh rate to a second tile of said array of tiles; updating information presented to said first tile in accordance with said first refresh rate; and updating information presented to said second tile in accordance with said second refresh rate. The manner of assigning the first and second refresh rates may depend upon the type of information received by each tile, including but not limited to the information content or an identifier contained in, or associated with, the information.

The present disclosure additionally includes an electronic readable memory to direct an electronic device to function in a specified manner, comprising: a first set of instructions to control simultaneous communication with a plurality of datastreams: a second set of instructions to partition a display into an array of tiles; a third set of instructions to associate a first datastream of said plurality of datastreams with a first tile of said array of tiles and a second datastream of said plurality of datastreams with a second tile of said array of tiles; a fourth set of instructions to retrieve data from said first datastream in accordance with a first retrieval rate and retrieve data from said second datastream in accordance with a second retrieval rate; and a fifth set of instructions to present data to said first tile in accordance with said first retrieval rate and present data to said second tile in accordance with said second retrieval rate. The first and second retrieval rates may be automatically assigned by the fourth and fifth set of instructions respectively, based upon the type of datastream or an identifier that accompanies each datastream, with or without the additional use of one or more user-specified retrieval rates.

The present disclosure additionally includes a system for facilitating the organization and management of multiple data sources, comprising: a device that includes a processor configured to execute instructions, a memory connected to the processor to store at least one program that includes a graphical user interface, and an input device that includes a display, wherein the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first

6

retrieval rate and present information to the second tile in accordance with the second retrieval rate.

The application program described herein runs on, and the grids and tiles of which are transferable between, many different devices, including, but not limited to set-top box, personal computer, mobile phone, and other hand-held device. The grid and tiles retain the same characteristics, regardless of operating device. For example, the tiles remain individually configurable and can offer near real-time views of their data content. The application therefore permits the user's interaction with a range of electronic devices to be unified.

Additionally it is to be understood that the application program or programs described herein may be distributed between a client device and a server in such a way that certain data storage and intensive functions are carried out on a server.

BRIEF DESCRIPTION OF THE DRAWINGS

Additional objects and features of the disclosure will be more readily apparent from the following detailed description and appended claims when taken in conjunction with the drawings, in which:

FIG. **1** shows a representative embodiment of a user interface comprising a grid of tiles as might be depicted on a display screen.

FIG. **2** depicts a system that accepts data in at least one form through at least one port and which additionally displays data to a user.

FIG. **3** shows stylized examples of an icon and an application window as are commonly found in current display systems of the background art.

FIG. **4** shows several tiles as might be found in a typical embodiment of the present technology.

FIG. **5** shows an exemplary data structure of the tile object within a graphical user interface.

FIG. **6** shows one embodiment of a tile in markup language.

FIG. **7** shows the hierarchy of software objects underlying the instant technology, comprising a grid object, tile objects and files or application software.

FIG. **8** shows an exemplary layout of a display produced by the technology described herein.

FIG. **9** shows an alternative exemplary layout of the display produced by the technology described herein.

FIG. **10** shows an exemplary layout of a display wherein a tile contains another instantiation of a grid.

FIG. **11** shows an exemplary layout of a display including specific examples of tile contents.

FIG. **12** shows the data structure of the grid object which forms part of a graphical user interface.

FIG. **13** shows one embodiment of a grid in markup language.

FIG. **14** shows a sequence of windows that demonstrate how a grid might be set up for initial use by a "wizard" tool.

FIG. **15** shows an example of the architecture of a computer program in a preferred embodiment of the present technology.

FIG. **16** shows the architecture of the application program and its components in a preferred embodiment of the present technology.

FIG. **17** shows the architecture of components of the computer program in a preferred embodiment of the present technology.

FIG. **18** shows an outline of the widget-set used in a preferred embodiment of the present technology.

Petitioner Microsoft Corporation - Ex. 1001, p. 33

7

FIG. **19** shows an outline of the metabase according to a preferred embodiment of the present technology.

FIG. **20** shows an outline of the XP Core and its interaction with the operating system library in a preferred embodiment of the present technology.

FIG. **21** shows an overview of the event system utilized in a preferred embodiment of the present technology.

FIG. **22** shows an overview of the connection layers that are responsible for controlling the download of multiple web-pages from the world wide web.

FIG. **23** shows a number of functions used by the band-width controller.

FIG. **24** is a schematic representation of the relationship between a server and a client device.

FIG. **25** shows a series of interactions between a client device and a server.

FIG. **26** shows how a user, a server and third party content providers communicate in accordance with an embodiment of the technology.

FIG. **27** shows an embodiment in which the application program communicates with one or more wireless devices.

DETAILED DESCRIPTION OF THE
TECHNOLOGY

FIG. **1** shows an illustrative configuration of the graphical user interface of the present disclosure. A grid **1** consisting of a 3 by 3 matrix of nine tiles demonstrates some of the different contents that tiles can display. Tile **10** points to a database of stock quotes. Tile **20** displays the active folders in an electronic mail utility. Tile **30** displays a portion of an alphabetical list of quoted companies. Tiles **40**, **50**, **60**, **70** and **80** point to websites displaying, respectively, high technology news, electronic goods for sale, categories of business news, items available by auction and the Wall Street Journal. Tile **90** points to the file-viewer of a windows-based operating system, such as Microsoft Windows™, and displays the currently accessible disc drives or partitions.

Within the scope of the present invention, an information source may comprise any analog signal, source of digital data or a datastream, including, but not limited to one or more of, video, audio, text, and graphics. The information may be in any format, including but not limited to ASCII, bitmap, MP3, JPEG, GIF, TIFF, a mark-up language such as HTML, XML, VRML, HDML, formatted text such as rich text format, or binary. Preferably the software of the present disclosure is able to recognize the type or format of the information source and assign properties to tiles according to the type. In another preferred embodiment, the information source contains or is accompanied by an identifier that indicates a priority to be attached to the information when displayed by the graphical user interface. Such an identifier may be referred to as a "quality of service", (QoS) tag.

FIG. **2** is a general representation of a data display system **100** within which the present invention may be implemented. System **100** comprises a processor such as central processing unit **104**, an input device **106**, data connection ports **108-1** through **108-**N, a display **110** and a main memory **112**, all connected via bus **116**. Residing in the memory **112** is an operating system **120**, a file system **122**, a cache **124** for temporary storage of information, application programs **128-1** through **128-**N and a graphical user interface (GUI) program **126** that is responsible for presenting information on to display **110**. Information may enter and/or leave the system **100** through any one of the ports **108-1** through **108-**N which may themselves be connected to a tuner **114**, or via a network

8

interface **134** to a communications network. If a tuner **114** is employed, it may channel input from a wireless signal **130** or a cable network **132**.

In some embodiments of the present disclosure, system **100** is a personal computer such as a desktop workstation, a portable notebook or laptop computer, or a wearable computer. In that case the input device **106** may be a keyboard, mouse, voice-activated device, trackpad, trackball, or any combination thereof and the display **110** may be a conventional cathode ray tube (CRT) or flat-screen display such as an active matrix LCD, or an OLED. The network interface **134** may then be a connection to the Internet or to a local area network via a cable and modem or a digital subscriber line or ISDN, or via a wireless connection, such as WiFi, Bluetooth, or a wireless connection, for example, using 802.11a/b/g to the Internet.

In another embodiment of the present invention, system **100** is a mobile or cellular phone or personal digital assistant and the input device **106** may consist of several buttons on a keypad, a touch-sensitive screen with or without a touching device such as a stylus, or a microphone and voice-recognition software. In this embodiment, the display **110** is preferably an LCD screen or an electroluminescent display, and ports **108** receive data from radio signals or a portable or wireless modem. Consistent with this embodiment, it is also possible that system **100** is, or comprises part of, a hybrid device such as an internet-ready entertainment device that also has a games playing function or the ability to display an electronic book, or has a digital audio function as does an MP3 player. It is also possible that system **100** is a portable navigation system, such as a GPS device especially one that has an additional functionality such as cellular telephone communication capability or the ability to pick up broadcast radio or TV signals.

In yet another embodiment of the present disclosure, system **100** comprises a set-top box wherein display **110** is a TV screen or monitor, and tuner **114** accepts input in the form of a wireless signal **130** from broadcast transmissions or cable signals from the cable network **132**.

It is consistent with the present disclosure that, as discussed hereinbelow, system **100** comprises a client device that communicates with a server.

It is also envisaged that the present disclosure can comprise a device that accepts digital signals from a satellite, such as an "XM" radio transmission. It is further contemplated that the present invention can interface to an in-car navigation and security system that utilizes GPS technology or satellite communication means, such as the "OnStar" system. Accordingly, the present disclosure may also find application in conjunction with an in-car entertainment and display system.

Input device **106** may be a hand-held remote control apparatus or buttons located on the set-top box or touch-sensitive areas of display **110**. Accordingly, the display **110** and the input device **106** need not be part of the same physical device as the device that contains processor **104**.

According to the present disclosure, the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first

Petitioner Microsoft Corporation - Ex. 1001, p. 34

US 9,043,712 B2

9

information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

As is known to those skilled in the art, a graphical user interface is a computer program that resides in memory 112 of some data processing system and that provides means for presenting information, input to, and output from, application programs 128 or content of datastreams from ports 108 on an associated display. In the background art each datastream is associated with a window. The graphical user interface allows a user to control the arrangement and display format of the data content in each window. Usually a graphical user interface permits a user to specify and alter operating parameters of application programs running on the system, though at any given time a particular application program will take priority, meaning that a particular window will be displaying continually updating content. Typical operating parameters that may be changed depend upon the application program but include the number of buttons on a tool bar and number of visible toolbars, the size of the text displayed and the color of the background.

By contrast, the graphical user interface of the current disclosure not only permits a user to control the layout of the data content but to prioritize each application program running on the system and each datastream of interest. A novel feature of the present disclosure is that the data content of any number of the programs can vary in real time and the rate at which the display of each—on a respective tile—is updated can be controlled by the user. Furthermore, in another embodiment, in the absence of initial preferences specified by the user, the present technology is able to assign a rate at which the display of a tile is refreshed according to the type of data or according, for example, to an identifier that is presented with each datastream or source of information, and may take into account the available bandwidth.

When the present technology assigns a refresh rate to a tile according to the type of data, it is envisaged that the type of the data is automatically recognized or ascertained. For example, according to this embodiment the present technology distinguishes between types of data such as video, audio and web-based content, based on the format of the datastream in question and preferably assigns a higher priority to types of data that vary in real time, such as video or audio content.

When the present technology assigns a refresh rate to a tile according to an identifier presented with each source of information, the nature of the identifier may vary according to the type of data or the protocol that is employed for its transmission. In preferred embodiments, the identifier is a tag that is associated with a "Quality of Service" (QoS) implementation. As is known to one of skill in the art, QoS refers to the ability of a data communications system to define and differentiate levels of performance. For example, in internet protocol (IP), QoS tags are presented as specific pre-set bits in packet headers. When the packets are received, a priority can be assigned according to the bits that have been set. For a description of QoS in the IP context, see, for example, www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm. A finer granularity of QoS is possible using Resource Reservation Protocol ("RSVP"). For a description of QoS in wide area networks (WAN), see for example, www.cisco.com/warp/public/cc/so/neso/vvda/avvid/eeqos_ds.pdf. In networks that communicate via Asynchronous Transfer Mode (ATM), each distinct datastream has an identifier, often called a "virtual

10

channel identifier," that accompanies each of its packets (or cells). In a preferred embodiment, the identifier is contained within a header attached to each packet or cell. QoS is achieved by discriminating between datastreams according to their different identifiers. QoS may be controlled by adjusting parameters that include a packet loss ratio, a packet cell delay variation, a maximum packet loss transfer delay and a mean packet transfer delay. A user's desire in respect of the priority to be accorded to a particular datastream is communicated amongst the various nodes in the network. A more detailed description can be found in, for example, *High Performance Communication Networks*, Walrand, J. and Varaiya, P., Morgan Kaufmann Publishers, Inc., (1996).

Accordingly, an identifier suitable for use by the present technology for assigning a refresh rate to a tile includes a bit or bits in a packet header, or a tag that accompanies or is in the header of a packet or packet.

Consistent with altering refresh rates according to a QoS concept is that the level of packet loss can be adjusted according to the priority level associated with different types of data. Furthermore, a fully-implemented QoS capability permits prioritization based on criteria other than the type of the data. For example, traffic can be prioritized according to the IP address of a source or destination device. Traffic can also be differentiated based on whether or not they are real-time, such as voice or video.

Tile Objects

In the ensuing discussion, tile objects are introduced and described and contrasted with existing elements of graphical user interfaces. A tile presents content from any information source.

Conventional graphical user interfaces of the background art provide two distinct representations of programs, files, and datastreams, as shown in FIG. 3. One representation is an icon 320, the other is a window 340. An icon typically occupies only a relatively small proportion of the available display area and comprises an easily recognizable depiction of the program or file, either through its logo 322 or some characteristic picture with the name 324 of the program visible.

An icon can be selected by, for example, a touch screen pointer, a cursor controlled by a mouse with a button, or by a keyboard stroke or a combination of keyboard strokes, or any combination of the foregoing. In response to a further selection operation on an icon, for example a double-click of a mouse button, the graphical user interface will provide a window that can be used to communicate further information to the program or review the associated datastream.

A window 340 may occupy a substantial percentage of available screen space, usually 90-100%. The window 340 usually comprises a title bar 348 and a display area 354. The window 340 can commonly be resized by the user for example by using buttons 352 or a draggable area 356 and has a format which contains many active areas around its borders. Examples of active areas include a menu bar 342, a vertical scroll bar 344, a horizontal scroll bar 350 and one or more tool bars 346. Each active area may be used to control aspects of the window's appearance or to set parameters specific to the operation of the program associated with it such as text formatting options in a word-processing package or redirection of a web-browser to its stored home location.

In the present disclosure, a third graphical representation of programs and files, herein called a tile, is introduced. Tiles permit "dynamic bookmarking" of information in that each tile is a viewer of a single information source—including streaming data sources—and can be customized with the user's choice of content as well as initialized with sets of

Petitioner Microsoft Corporation - Ex. 1001, p. 35

US 9,043,712 B2

**11**

options that are pre-determined by the software of the present disclosure according to the type of data that the tile displays.

A tile is different from an icon because it provides a real-time or near real-time viewing of information in that it contains continually refreshed content. A tile is different from a window because a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired.

A tile provides an at-a-glance view of the current status of the program or file associated with it but does not necessarily have the large number of active areas associated with windows such as title bar, menu bar, toolbars, and scroll bars. Therefore tiles lead to a reduction in clutter on the display screen because many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do. Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another. Tiles are superior to icons because they give an immediate indication of the current state of the file or program and have utility functions associated with them, as described hereinbelow. Another advantage of using tiles is a uniformity of appearance between tiles which correspond to different programs and datastreams. The display content of a tile will differ from application to application though its size and format need not.

A tile is associated with a program, file or datastream, similar to the way in which an icon and a window are. A tile may present data in any of a number of ways. For example, in a preferred embodiment, the tiles may present a miniaturized, "thumbnail" view of the underlying information; a "porthole" view of a portion of the underlying information as viewed at full size; a symbol indicating whether the information has been updated since it was last viewed; or a custom interface designed to allow rapid access to the underlying information. The way in which a tile displays content may be independently configured for each tile and may be set up in a default manner that depends upon the type of information being displayed.

FIG. **4** illustrates representative tiles. Tile **402** displays a picture or graphic such as may be stored in a bit-map, JPEG, TIFF or GIF file, or on a world-wide web page. The content of tile **402** is typically a miniaturized representation of a graphic or still-frame from a datastream. Tile **404** displays a portion of a text document or text of a world-wide web page. In this sense the tile functions as a transparent panel placed on top of a document, thus permitting a portion of the document to be displayed. Tile **406** displays a further array of tiles that may be displayed in full by expanding tile **406** to occupy the full area of the display. Tile **408** has been configured to link to an electronic mail program. An exemplary alarm setting associated with tile **408** has been configured so that the tile displays an envelope and the message "New Mail!" when an email message has been received by the mail program. It would be understood that other alarm or alert settings may be associated with a tile, for example, configurable by a user. Thus, a tile could be established to broadcast a particular alert when the datastream to which it is connected encounters a particular condition, or transmits a particular signal.

Tile **410** displays a name, "FM **101**", denoting the title of a broadcast signal, in this case audio, that is associated with the tile. Tile **412** displays a "thumbnail" of the document viewed in a window such as **340**. A "thumbnail", as used herein, is a miniaturized representation of an image that retains sufficient characteristics to permit easy recognition of the image. For example, if the document displayed in a window were a

**12**

document with multiple pages, tile **412** may display a thumbnail of the first page of the document.

Tiles are selectable and live. When a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information, whether that data be a hierarchical menuing system leading the user to a different level or tiles, a word processing file stored on a local area network, a spreadsheet stored locally on a user's computer, HTML file on the Internet, or a television signal. The tiles are live in that each contains real-time or near real-time information.

In a preferred embodiment a selection operation is associated with a tile. For example, clicking on a tile will cause it to immediately refresh its contents. Selecting tile **402** causes the most recent frame of the video stream to be displayed by the tile, or, if the picture were obtained from a static graphic file, causes the most recent version of the file to be displayed by the tile. Selecting tile **404** or tile **412** causes the most recent version of the document to be displayed.

In a preferred embodiment, a second selection operation is associated with a tile. For example, double-clicking a tile causes that tile to occupy a substantial fraction of the whole display area. In this embodiment, double clicking tile **402** or **412** causes the image to be expanded to fit the whole display area. In an alternate embodiment, selecting a tile causes it to occupy an area in the middle of the display that is larger in area than a single tile but does not occupy the full display. If tile **404** were double-clicked, as much of the document as could be displayed in the enlarged tile in regular font size becomes visible. Double-clicking tile **408** causes the mailbox window of the e-mail utility to be sufficiently enlarged to allow new messages to be selected and read. Double-clicking tile **410** causes the audio stream to become audible over the appropriate channel of the system and need not necessarily cause the tile to occupy a substantial fraction of the display area.

A representative tile data structure **500** is shown in FIG. **5**. It is important to understand that the tile itself is an image that at any given instant is resident on the file system. This image is separate and distinct from the application program or file associated with the tile. The tile data structure **500** comprises two addresses: a tile address **502** that defines the location on the file system where the tile image is stored; and a target address **504** that is the location at which the file or application program associated with the tile can be found. Additionally, the tile data structure contains a name **506** that may be displayed on the tile in certain circumstances (for example the title of a broadcast signal, as in Tile **410**).

Tiles of the present disclosure may be assigned at least seven functions, including but not limited to: an initialization function **508** that is responsible for establishing a connection with the target address **504**; a refresh function **510** that handles updates to the tile image stored at the tile address **502**; a screen-size function **512** that stores the dimensions of the display area filled by the tile upon receipt of a request; an alarm function **514** that permits the tile to display an alarm or warning when the application program associated with the tile encounters a designated event; an on mouseover function **518** and an on mouseout function **520** which control the behavior of the tile when a selection tool such as a mouse-controlled cursor is placed respectively on and off the tile; and a toolbar function **522** which may permit an array of special buttons to appear on or adjacent to the tile for the purposes of adjusting properties of the tile.

Refresh function **510** is able to indicate a retrieval rate at which information is retrieved from a source of information so that the information is displayed and refreshed in the tile.

Petitioner Microsoft Corporation - Ex. 1001, p. 36

US 9,043,712 B2

**13**

Preferably refresh function **510** is able to interpret an identifier that accompanies the information displayed by the tile. In some embodiments, a tile is configured so that a right-click of a 2- or 3-button mouse while the cursor is over the tile would activate the tool-bar function. In a preferred embodiment, right-clicking on a tile can reveal a menu of options that enables the user to ascertain properties of the tile, such as the bandwidth it is consuming.

In some embodiments of the present disclosure, the tile is itself a document created in a markup language such as HTML or XML as shown in FIG. **6** and is suitable for display in a web-browser. In this embodiment, a tile occupies a position in a table defined with elements of mark-up language which will be familiar to one skilled in the art. Tile-specific attributes are introduced which control the way in which a web-browser displays the tile. In the example in FIG. **6**, the tile has a clickable map, i.e., separate areas of the tile produce separate results when clicked. Also, this tile has a toolbar, which in some embodiments may appear if the mouse is right-clicked when the cursor is over the tile.

In another embodiment of the present disclosure, tiles communicate with one another and have conditional content. That is, the content of one tile depends upon the content of another. Such conditional content enables more than one tile to be refreshed simultaneously, or nearly simultaneously, by requesting a given tile to be refreshed. Alternatively, a tile may be set up to specify one or more other tiles whose contents are linked to it. For example, a first tile may show a web-based listing for the Nasdaq Stock index, and one or more conditionally dependent tiles may link to web pages that show the weekly, and yearly fluctuations of the index and the performance of previously chosen stocks.

In some embodiments, tiles should be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a tile, such as selecting a "send" option in a selection menu accessed by right-clicking on a tile, or by activating a button on the tile, send a tile that has already been configured to another user. The tile could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the tile from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the tile, i.e., send the tile from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously.

A tile could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a tile to a removable medium such as a CD-R, or a USB-drive, and transfer the file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable tiles would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a tile to another member of the community from within the online environment.

In a preferred embodiment, tiles are categorized into a number of levels, arranged hierarchically so that tiles in each level have priority over those in other levels. Such a priority indicates that tiles with highest priority will refresh most frequently. Accordingly, each tile has a tile level **524** in this embodiment. In one aspect of this preferred embodiment, priorities are assigned according to the type of data that is displayed by the tile. According to such an aspect, the highest

**14**

priority is assigned to a video or web-based conference, for example; the next priority is assigned to a videostream such as a movie or broadcast TV signal; a third priority is attached to a media player such as RealPlayer; and lower priority tiles handle local applications and files. Tiles within a given level can be set up to compete equally for available system resources and bandwidth.

Grid Object

The arrangement, layout and independent functioning of the tiles on the display and exemplary software for their control is now described with respect to FIGS. **7-13**.

The overall hierarchy of a graphical user interface embodied by the present technology is summarized in FIG. **7**. The Grid **700** is the top level functionality to which application programs are subordinate. The grid can replace the functionality of a user's computer desktop and offers similar and additional features. Grid **700** comprises a matrix or array of tiles of which tiles **702**, **704**, **706**, **708** and **710** are representative. The user can control the grid in such a way that the tiles **702**, **704**, **706**, **708**, and **710** present simultaneous information content from a plurality of sources independently of one another. The grid controls the layout and priorities of the tiles. Each tile is associated with a data stream or application program thereby permitting a number of different images to be displayed simultaneously. In particular, different tiles can be—and typically are—associated with different contents. For example, tile **702** is connected to a web-page viewer **712** such as a browser. Tile **704** is connected to a source of streaming video **714**, such as Real Player. Tile **706** is connected to an audio player **716** such as a CD-player program or a source of streaming audio such as Real Audio. Tile **708** is connected to a file viewer **718** such as a text-editor or a word-processing package. Tile **710** is associated with another grid object **720**, thereby permitting a "layering" of information hierarchies. In a preferred embodiment, a grid embodies a similar underlying data structure to a tile.

Each tile is separately associated with a source of information, for example, an application program, datastream or file, any one of which may be another grid object. Such a hierarchical structure permits a user to organize programs and information through the graphical user interface.

For example, separate categories of information can be displayed on separate grids allowing each grid to be associated with a theme. In some embodiments, a grid can be configured to be populated with a fixed number of popular web pages based on, say, most recently visited URL's, or most frequently visited URL's over a period of time such as a week or a month.

In some embodiments, a source of information has an identifier, such as a quality of service tag, associated with it. The grid assigns a priority to a tile based upon the identifier, or based upon the type of data that the source of information comprises. Where tiles are ranked into levels, the grid assigns an information source to a tile in a level that is appropriate for the type of data or the identifier associated with the information source. In this way, a tile can be automatically given a priority that is appropriate for the type of information that it is to display.

By using the native attributes of a tile, a user may specify a presentation of the grid, consisting of its dimensions, (i.e., the number of tiles to display and their arrangement), and the programs or files to be associated with each tile. A single grid, composed of multiple tiles, may therefore present a number of information sources simultaneously.

Together, the grid and tiles comprise the application through which a user can view simultaneously information from a multitude of available sources including multiple sites

Petitioner Microsoft Corporation - Ex. 1001, p. 37

US 9,043,712 B2

15

16

on the Internet or some other distributed computer network, receive signals from multiple broadcast channels, and open and view multiple files. In some embodiments, the application may be run through ordinarily available computer operating systems, whereupon the application overlays the user's desktop and acts as if it were a "borderless browser". Therefore the application resides over existing applications without replacing any of them; rather it enables those applications to be called from the grid itself. The application, therefore, becomes a graphical file manager in which the content of continuously changing files, e.g., datastreams, is being displayed in real-time or near real-time, depending on the respective assigned priorities. Effectively, the application can be used instead of the user's computer "desktop" because it has a more visually intuitive dynamic menuing system than a traditional desktop.

In a preferred embodiment, a grid of tiles replaces the functionality of the computer "desktop" utilized by many computer operating systems. Whereas a desktop is typically populated by static icons and tool bars, a grid of tiles presents to the user an array of snapshots of current programs and files. The essence of the grid is that its content is dynamic and informative. As previously discussed, icons are inherently limited in the information that they can present and windows clutter the entire desktop without permitting more than one to be readily displayed simultaneously. By contrast, each tile on the grid can show the current status of the data or datastream associated with it. The fact that a tile may refer to a separate grid permits nesting of grids and consequently a hierarchy of organized information sources.

The grid also understands the interests of the user and acts as a repository for passwords and identifiers to subscription services. In this way, it is not necessary for a user to remember and enter a user name and password to access data requiring such a log-in. In this same vein, Internet sites of interest can be "bookmarked" and stored by the grid, each such site possessing its own tile. The grid is also nestable in that a tile in one grid may point to a separate grid and tiles in the separate grid may point back to the first grid or to yet more grids. If desired, a user can impose a "theme" on a grid and thereby categorize, group, and/or otherwise manage his/her data sources. In this manner, the user can group tiles relating to particular subject matters, Internet sites, documents, or otherwise in a grid according to some speciality. A tile in such a grid could link to another grid to provide a connection between related categories. Equally, a tile on one grid can point to the same information source as a tile on another grid.

In some embodiments, the application program is provided with a number, such as one or more, 'out of the box' grids. In such embodiments, a user is offered a repository of pre-made grids that are pre-configured with a particular layout of tiles, and links to particular datastreams. Such a grid can be used as a starting point for a user who first opens the program, and may contain, for example, a tile configured to provide content for each of several commonly used programs or websites. By way of example, a pre-configured grid may contain an array of 4 tiles, that include: a tile configured to link to a home-page of an Internet search engine, such as Google; a tile configured to link to an information archive such as Wikipedia; a tile configured to link to a user's e-mail program; and a tile configured to access the local file-system on the user's device.

The grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display.

In a preferred embodiment, the grid permits a regular layout of tiles on the display screen such that the tiles are uniform in size and shape, as depicted in FIGS. 8-11. Each tile is indexed by its position on the grid. For example 802-2-1 is the first tile in the second row. Tiles in the first row of the grid are 802-1-1, 802-1-2, 802-1-3 and so on, to 802-1-N. Tiles on the second row 1, 802-2-2, 802-2-3 and so on, to 802-2-N. And, tiles on the bottom row are 802-M-1, 802-802-M-3 and so on to 802-M-N. There are no gaps between the tiles, the tiles are not permitted to overlap and the whole grid is covered by tiles. FIG. 8 shows one embodiment in which all tiles are the same size and are presented in an array comprising M rows and N columns. There is no particular requirement that the arrangement consists of more than one row and more than one column. On the display of a mobile telephone or smart phone, for example, a single row of tiles may be apposite. In a preferred embodiment, a display of a smart, cellular or mobile telephone presents a single tile at any one time but it is possible to scroll from tile to tile across the grid, by using, for example, buttons on the phone, or other methods of control.

FIG. 9 shows an arrangement in which there is a unit tile size, that of tile 802-1-1, but tile 802-1-2 and tile 802-M-1 have each been configured to occupy regions of the grid equal to exact multiples of the unit tile size. Such an arrangement may be useful and important if one or more datastreams is of particular interest but the others are also to be monitored at the same time.

In some embodiments, a grid comprises instructions for assigning tile size intelligently when a user specifies, or receives, a number of tiles. The instructions can comprise a learning algorithm that learns the preferred sizes of the most active tiles and does its best to keep the user happy without the user having to manually assign, resize, or move tiles around. Thus, for example, a user may wish to set up a grid quickly, and specify seven tiles. Seven does not neatly partition into a square or rectangular array, but the program understands that particular applications benefit from being displayed in tiles that are greater than the unit tile size, and therefore automatically assigns such applications to larger tiles without the user's intervention.

FIG. 10 shows an arrangement of tiles in which Tile 802-M-1 is associated with a further grid 1000. The lower half of the FIG. shows an enlarged perspective of that tile showing a grid with Y columns and X rows.

FIG. 11 shows an arrangement of tiles in which are depicted different application programs associated with three of the tiles. Tile 802-2-2 links to a file viewer displaying a specific file; tile 802-M-1 presents streaming video; Tile 802-M-N depicts a page of information on the world wide web.

In some embodiments, a grid can be configured with a foreground option such that, when a user's display has already been configured to contained a number of tiles, upon selecting a tile in a particular way, e.g., middle-clicking on it, the tile would expand in size and be displayed in the foreground relative to the rest of the grid.

FIG. 12 shows a schematic data structure of the attributes of some embodiments of grid object 700. The architecture shown in FIG. 12 applies to any grid, including a top-level grid 700 shown in FIG. 7 as well as to a grid that is contained within a tile.

Significantly, the grid manages the flow of information to the tiles. For example, the grid can communicate with the display device in order to determine its current configuration and allocation of resources. In some embodiments, using a so-called "carousel" approach, the grid continually cycles around the currently displayed tiles, one by one, refreshing the content of a tile each time it is accessed. When a given tile is refreshed, the refresh operation is completed before refreshing the next tile in sequence. In this way, the cycling rate may be set so that the current content of all tiles are

Petitioner Microsoft Corporation - Ex. 1001, p. 38

**17**

reasonably up to date. The cycling can be interrupted by a user selecting a given tile, so that that tile alone becomes continuously updated. In this way, the user does not need to worry about manually refreshing multiple tiles.

In a preferred embodiment, according to priorities that may be applied to individual tiles on a tile by tile basis if desired, the grid manages the refresh rate of each tile in the grid. For example, for locally stored word processing or spread-sheet files, the user might configure the tiles to refresh only when the underlying data is written to the local hard drive. Similarly, a user might configure tiles containing infrequently updated Hyper-Text Markup Language ("HTML") data from the Internet to refresh at a certain time each day. At the other extreme, a user might configure an active tile to display a television channel at a refresh rate of 29 frames per second, while at the same time configuring inactive tiles to display different channels at a refresh rate of once every five seconds. In this way, a user could monitor many channels until program content of interest appeared in one of the tiles without the burden of actively refreshing each tile.

In other embodiments, the grid itself assigns priorities to the tiles based on identifiers such as quality of service tags that are associated with the information source itself. In still another embodiment, the grid automatically assigns priorities to the tiles based upon its recognition of the type of data that is presented to it. In this way, the grid can associate information sources with tiles that occupy different levels of priorities in a hierarchy of levels, if present. It is to be understood that an identifier such as a QoS tag can be used to assign to a tile a priority that is higher than that of another tile that would display the same type of data, and would have the same priority in the absence of such an identifier. Thus, for example, QoS tags can be used not only to assign two video-streams a higher priority than a web-browser tile, but can be used to prioritize one videostream over another. It is also to be understood that not all information sources need be accompanied by identifiers for the grid to be able to assign priorities itself. In the absence of an identifier for a particular information source, the grid can assign a priority based on the type of data, a user preference or some arbitrarily low priority based on other considerations such as bandwidth and availability of other system resources.

The grid itself has an address **1204** that specifies its location within the file system of the device in which the application program program runs. The grid has associated with it several utility programs: a configuration wizard **1206** that may be called by the user when setting up a new grid; a tile creation function **1208** utilized by the configuration wizard when initializing new tiles; a tile annihilation function **1210** utilized in case of error or when resizing the grid.

The grid object stores the number of rows **1212** and the number of columns **1214** of tiles that are present. The grid also stores a tile list **1216** containing attributes of each respective tile. In particular, the address of each tile, its priority and its refresh rate are stored by the grid program. The grid also stores other attributes of tiles such as their respective positions on the grid as given by their column and row number. The priority of a tile may be used to determine its refresh rate in some embodiments of the present technology. A tile can have a password feature built into it if it is desired to restrict access to the tile's content. The grid itself can have a toolbar by which its attributes may be accessed and modified.

Much as in the manner in which tiles may be sendable, in some embodiments, grids should also be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a grid, such as

**18**

selecting a "send" option in a selection menu accessed by right-clicking on the grid, or by activating a button on the grid, send a grid that has already been configured to another user. The grid could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the grid from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the grid, i.e., send the grid from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously. When sending a grid, the key attributes that would be sent would include the grid configuration, such as its size, and the locations of datastreams associated with the respective tiles.

A grid could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a grid as a file to a removable medium such as a CD-R, or a USB-drive, and transfer the grid-file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable grids would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a grid to another member of the community from within the online environment.

In a preferred embodiment, a grid is a special form of a tile. It is a tile that can create and manage an array of other tiles. Accordingly, its data structure also comprises those elements of a tile data structure shown in FIG. **5** in addition to those shown in FIG. **12**. If the grid has a parent grid, the address of the parent grid **1202** is stored. For example, grid **1000**, associated with tile **802-M-1** of FIG. **10**, has grid **700** as its parent.

In some embodiments of the present technology, the grid is a document created in a markup language, such as HTML, SGML or XML, and is therefore suitable for display via a web-browser. In this embodiment, the addresses of the parent grid, the grid itself and each of the tiles are expressed as Uniform Resource Locators (URL's). The various functions controlled by the grid are accessible through function calls devised according to methods familiar to one skilled in the art. For example, "dynamic HTML", java applets or simple CGI-scripts can provide the technological basis for enabling various grid utilities. FIG. **13** is illustrative code for establishing a grid.

In some embodiments, a grid can provide a sub-layer of functionality around "favorites" and history, thereby allowing users to see what data streams have been recently accessed by any one or more of the tiles, as well as to create lists of sites as favorites.

The application program may be downloaded from a predetermined web-site and preferably operates in a client-server mode. Users may download preconfigured grids from the predetermined server. A grid configuration "wizard" program which guides a user through a step by step set up of a custom-grid may also be downloaded. Other web hosts are able to deliver content to end-users via the predetermined server. Some basic functions of the grid can be carried out on the predetermined server and provided to the user. According to the capabilities of the device on which the grid is displayed, the server may take on more demanding functions.

A grid can also be offered as a web-based service, for example one that provides single-sign-on to chosen services (where possible) that are accessible via a user's pre-determined tiles.

Petitioner Microsoft Corporation - Ex. 1001, p. 39

US 9,043,712 B2

**19**

Grid Configuration Wizard

In some embodiments of the present technology, the set up of a particular grid is achieved through a grid configuration program ("wizard") that is downloaded to the display device from a remote site. The grid configuration program permits a user to define and install one or more grids on the client system. When a tile is partitioned into a further array of tiles, the grid configuration program can also be used. Some embodiments of the user interface of the grid configuration wizard are shown in FIG. **14**.

A first screen displayed by the grid configuration wizard comprises an application program logo **1404**, button **1406** to guide the user to the next screen and a number of choices, such as **1408**. The user is offered the choice of preconfigured, or "standard" grid configurations, selected from a list. Examples of such grids include grids themed by content such as sport-related grids or by type of data such as grids whose content is video-based.

Additionally, the user is permitted to configure "customized" grids in which each tile can be taken from a list of predefined samples or can be initialized according to the user's wishes. For example, a user can assign a priority to a tile, or can select a tile from a hierarchical scheme of predefined priorities, or can specify that a tile set its own default priority by recognizing the type of data that it receives or an identifier such as a QoS tag associated with that data. In a second screen **1412** displayed by the grid configuration wizard, a tiled area **1416** represents the grid that the user is building. Sample tile categories **1418** such as "weather", "news", "stocks", or "sports" are listed. In an alternate embodiment, a grid can be filled by the "drag and drop" technique in which a selected document **1414** is moved on to the display area of the grid configuration program and automatically becomes a tile. In some embodiments, as described elsewhere herein, the grid is able to intelligently and automatically assign a size and location of such a tile in the grid. A button **1410** offers the user the chance to go back one screen.

In a third screen **1420** displayed by the grid configuration wizard, the user can name the grid and, optionally, store it for future reference, for example in an archive of preferred grids. The user can elect to finish grid construction by clicking the "Finish" button **1412**, or launch the grid immediately by activating button **1422**. When launching the grid immediately, the grid is automatically constructed on the fly according to the content and tile types specified by the user during the set up procedure.

Architecture of Application Program Software

The hierarchy of the software in a preferred embodiment of the present technology, the Surfcast System (see, e.g., www-.surfcast.com, the textual and graphical contents of the various pages of which as of the filing date of the instant application are incorporated herein by reference in their entirety), is illustrated in FIG. **15**. It is understood that the Surfcast System is merely an exemplary embodiment and that other software products can be developed that fulfill the functions of the present technology. It is further understood that the Surfcast System or other equivalent systems, may be distributed between a client and one or more servers and that all parts of it need not reside on a single device. It is also to be understood that such software may be offered as a web-based service without needing to be downloaded or installed on a user's local device.

The Surfcast System software comprises a number of modules. In FIG. **15**, an arrow connecting two modules means that one module uses an interface of the other. The arrow comes from the module invoking the interface towards the module

**20**

whose interface is being invoked. An interface may simply be a function call between the two modules or, for example, a call to a dynamic linked library (DLL).

The Surfcast application program **1500** takes its underlying data from two sources, a metabase **1506** and a system library **1514** that preferably resides on the device on which the application program is running. For example, the application program **1500** may be required to call functions from the system library while it is running. Actual tiles that a user visualizes can be spawned from the metabase **1506**.

Data structures for user tiles **1502** are obtained from the XP core **1504** which itself also utilizes components from the system library **1514**. In a preferred embodiment there are different data structures for tiles of different priorities. The XP core is an abstraction layer for the operating system environment. Tiles that utilize components such as buttons take these components from the widget set **1508**. A widget is a basic user interface element such as a button or a text input box. The metabase also uses an interface of the widget set **1508**, and can therefore use functions within the widget set. The widget set requests functions from the XP core.

Objects in the metabase **1506** that retrieve content from remote sources such as world wide web pages utilize a connection manager and bandwidth controller **1512**. A URL loader **1510** decides whether content should be obtained afresh by contacting the connection manager **1512**, or from content previously stored in cache. Effectively, the URL loader manages the connection manager, and calls functions within it.

Underlying all of the Surfcast application program's operations are functions from the operating system library **1516** that is supplied with the device on which the application program is running.

Each of the objects shown in FIG. **15** is now described in further detail by reference to FIGS. **16-21**.

The Surfcast application program **1500**, in FIG. **16**, comprises a launcher **1618** and a framework **1620**. The launcher opens the program from scratch whereas the framework is responsible for managing grids and tiles. The user interacts directly with the framework to set up a preferred arrangement of tiles on the display. In some embodiments, the framework initially contains a prescribed set of tiles. The framework controls communication between tiles, for example, in the case of conditional content.

Tiles **1502**, FIG. **16**, are the equivalent of an application in a conventional GUI system. They can be built in C++ using the Surfcast tile builder application program interface (API) using XP core classes, or via a utility such as a custom tile editor or via a script file. Some predefined tiles are included with the basic Surfcast system including a web browser tile called a surftile **1602**, tiles for contacts and communications such as a chat tile **1604** and an e-mail tile **1608**. Media-player tiles such as a video tile **1606** are also supplied, as are tiles that interface to commonly used desktop programs. A word tile **1610** interfaces to a word processor; excel tile **1612** interfaces to a spreadsheet program. A general content viewer that can compose pieces of content clipped from a variety of sources, layout tile **1616**, is also provided. Reg tile **1614** is a general purpose tile that permits a user to define his/her own tile type.

In a preferred embodiment, all tiles have a common base class, and each specialized type of tile has its own class that builds upon the base class. There are many ways in which specific tile classes can be derived from the common base class. In a preferred embodiment, tiles are categorized into a hierarchy. There may be a tile class specific to each level in the hierarchy. Functions for specific tile classes are readily appar-

Petitioner Microsoft Corporation - Ex. 1001, p. 40

US 9,043,712 B2

**21**

ent to one of skill in the art. Tiles may additionally be represented by markup language files and viewed within a web-browser environment.

The data classes in XP core **1504**, FIG. **16**, comprise base classes and utility classes with which tiles and widgets are built. In general, classes within the XP core describe how tiles can communicate with one another and with the overall application program framework **1620**. In particular, XP core classes are generic and portable, thereby permitting cross-platform capability.

XP core classes include: tilebase **1622** for the generic class that underlies all tiles; tile base view **1624**; tile controller **1626**; canvas **1628**; and event classes **1630** for event handling. A view is what a tile uses to draw itself. Tile base view **1624** is the base class for all views associated with a visual object. A controller processes events **1630**, for example mouse moves, clicks, keyboard events and external events. Tile controller **1626** is the base class for controllers associated with a tile. A canvas **1628** is an area of screen on which to render some image, for example a tile.

The metabase **1506**, FIG. **17**, is a local store for platform-specific implementations of the descriptions of tiles, grids and other objects. Tiles, grids and content are created, saved and restored via the metabase. The metabase contains tile type and content type registries such as tile registry **1732**, and a local database of grids and content such as content store **1734** and grid store **1736**. Unknown tile and content types can be obtained from remote servers. Tile types are abstracted so that if a grid contains a particular type of tile, for example an e-mail tile, the metabase provides whatever is appropriate for the device the application is running on. Items in the metabase are "persistent", that is they are not saved explicitly but are preserved from session to session.

The widget set **1508**, FIG. **17**, comprises a platform-specific set of visual components that tiles can use. Widget set contains the predefined widgets that are included with the system. It can be extended with new widgets. It includes such useful widgets as a button **1738**, a label **1740**, an edit widget **1742** that enables a user to enter text into an editable field and a list widget **1744** that enables a user to select from a set of options. Items within the widget set can be used with tile types such as text input tiles, web browser tiles, and a streaming video tile. The term widget can also include more complex objects such as a video player that can be inserted into a tile as easily as a button.

The URL loader **1510**, FIG. **17**, provides a mechanism for retrieving content. The URL loader **1510** interacts with connection manager **1512** for tiles which need to make a network connection. Tiles and the metabase ask for content for a given URL and the content manager will attempt to retrieve it. The metabase also contacts the connection manager through the URL loader to ascertain whether there is sufficient bandwidth for the transfer. In particular, the connection manager decides whether the URL loader should furnish tile content from the cache **1746**, as would be the case if the content has been recently displayed and stored locally. Alternatively, if the content is not cached, the URL loader supervises loading of content from the location specified by the URL.

The URL loader **1510** also comprises a file manager **1748** for organizing the cached content. The URL loader additionally comprises a DOM (data object model) renderer **1750** that administers the parsing of pages in markup languages such as XML and HTML. The URL loader may also comprise an implementation of an API for XML rendering such as SAX. In an alternate embodiment, such an API may reside in the XP core module.

**22**

The system library **1514** comprises commonly used utilities within the application program, including, but not limited to, code for string manipulations, file handling and server communication. The system library module comprises generic code and can be compiled for any operating system.

The operating system library **1516**, FIG. **17**, comprises utilities that differ in their implementation from system to system but are needed for operation of the application program. For example, utilities that may be found in system library **1516** are those that provide support for threads and synchronization **1752**, debugging tools **1754**, graphics libraries **1756**, further basic string manipulations **1760** and connections **1762**. Additionally, not shown in FIG. **17**, useful items in the operating system library include utilities that permit definitions of objects, sockets, input devices and hardware devices. Items in the operating system library are accessible through classes with documented public interfaces.

The operation of the widget set **1508** is further described with respect to FIG. **18**. As previously mentioned, the widget set contains widgets for various functions such as buttons, text labels, etc. Illustrated in FIG. **18** is a set of widgets for buttons.

FIG. **18** shows the class hierarchy for the button widget. In FIG. **18**, a solid line with an arrow head indicates a relationship of inherency between two classes. Base classes for widgets are grouped together in box **1809**. Widget class **1810** is a container for other classes. All widgets use the base class widget **1810** stored in the XP core module and further described later. Accordingly, button **1800** is a specific class inherited from widget **1810**.

Widget view **1812** is a class, also stored in XP core, that defines the look and feel of the widget. Button view **1802** inherits from widget view and controls how a button draws itself.

In the scheme of FIG. **18**, user tile **1816** comprises three objects, tile controller **1626**, the base class tile **1622** and tile base view **1624**, each of which is found in XP core and is further described later. Tile base view **1624** is responsible for drawing the tile and can employ one or more widgets.

A button is something that a user can click on. A button provides button events to a button event consumer. A button event consumer is also known as a client, i.e., clients that use buttons implement button event consumer **1808** to be notified of button events. For example, a button event consumer may be a "play" function in a video tile. The button event consumer interacts with a control structure tile controller **1626** associated with a user tile **1816** by telling the tile that the button has been activated. Button event consumer **1808** is itself a class that inherits from an event consumer class, described later.

Button controller **1804** controls how button events **1806** are processed, for example mouse and keyboard events. It inherits class structure from widget controller **1814** stored in XP core. Not all button events **1806** are recognized by the button controller **1804**: for example, a particular key-stroke may have no effect on the state of the button.

Other widgets follow a similar pattern. They include: textedit, for inputting text; textlabel, for displaying text; textspinner, for selecting from a choice of options; datewidget, for entering a date; list, for selecting from a choice of options; titlebar; and a toolbar.

Metabase **1506** is further described with respect to FIG. **19**. Arrows between the components in FIG. **19** denote interfaces. The metabase comprises a registry **1900** and store **1902** of tile and grid types, a content store **1918** and a content and tile link database **1920**.

Petitioner Microsoft Corporation - Ex. 1001, p. 41

US 9,043,712 B2

23

The tile type registry **1900** contains a list of tile and widget types along with information about how to create them and what they are called, as well as other information such as pointers to objects from which tiles are created. In a preferred embodiment, the list of tile types includes tiles in a hierarchy of categories. The tile and grid store **1902** contains a library of stored grids and tiles. Tiles can save themselves or be restored. In a preferred embodiment, grids are just special cases of tiles. Tiles from the tile library can be called and displayed on the screen by asking the registry to load tiles. The tile and grid store interfaces to an XML library **1906**.

Tiles from the tile and grid store can also be saved outside the metabase in a library of markup language files, e.g., an XML library **1906**.

Also in the metabase **1506** is metabase tile **1904** which utilizes tile base **1622** from the XP core module. All tiles inherit from this class.

DLL's can contain additional tiles and widgets that can be created by independent third parties. These can be implemented within the metabase through the tile factory **1916** and tile creator **1914**, both of which interface to the tile type registry **1900**. The tile factory **1916** contains the description and classes necessary for someone to register a new tile type. Tile creator **1914** is the code that does the tile creation at runtime. In general, independent creation of tiles is facilitated by supplying a tile toolkit to third parties.

Inquiry utility **1912** is an optional means for an outside user to interface to the metabase, for example to ascertain the class structures of stored tile classes.

Content store **1918** is a cache that contains content of tiles for the previous session. The content store **1918** follows a similar pattern to the tile type registry and the tile store. The content and tile link database **1920** is a database of information about how tiles and grids are related, and how content is related between them. Content tile link database **1920** copes with descriptions of relationships between tiles and also themes of content for related tiles. This database can also be used in the context of "knowledge management", i.e., those operations that monitor a user's activities and attempt to suggest further sources of content based on it. Both content store **1918** and the database **1920** interface with tile type registry **1900**.

FIG. **20** shows a further description of classes found in the XP core and their interaction with the operating system library **1516**. As discussed below, some arrows between objects within XP core denote inheritance of classes.

Canvas **1628** describes an area of screen that can be drawn to. GfxContext **2002** is a set of graphics primitives, for example for line-drawing, colors and space filling. It is a generic version that encapsulates and abstracts operating system-specific features inherited from GfxContextFactory **2032** in the operating system library **1516**. Win32 GfxContext **2034** is an example of a graphics context used with the Windows operating system. Other GfxContent **2036** includes alternative platform dependent graphics contexts.

The foundation classes are tile base **1622**, tile base view **1624** and tile base controller **2008**. Tile base **1622** is the base class for all visual objects such as tiles, widgets and grids. The tile class **2010**, and widget base class **2016**, inherit from tile base. Where tiles are in a hierarchy of categories, there may be several tile classes that inherit from tile base.

A widget effectively functions as a special kind of tile that can be placed inside a tile. Widget base **2016** is not meant to be instantiated on its own but is a foundation for the widget class **1810**, FIG. **18**, used by a generic widget.

Tile base view **1624** is the base class for all views associated with a visual object. A view is what a tile uses to draw

24

itself. Inheriting from tile base view are tile view **2012**, the base class for all views associated with tiles, and widget view **1812**, the base class for all views associated with widgets. Tile base view and tile base also interface with canvas **1628**.

Tile base controller **2008** is the base class for all controllers associated with a visual object. Inheriting from tile base controller are tile controller **1626**, the base class for controllers associated with a tile, and widget controller **2020**, the base class for all controllers associated with widgets. A controller processes all events. Tile base interfaces with both tile base view **1624** and tile base controller **2008**. Tile base controller interfaces to event system **2022**. Finally, event system **2022** also communicates between the operating system library **1516** and the tile base controller **2008**.

Event system **2022** is further described with respect to FIG. **21**. An event can be any one of a mouse movement event, another mouse event such as a mouse-click, or a keyboard event such as a keystroke. In FIG. **21**, event **2112** is the base class. Other classes such as mouse movement event **2106**, mouse event **2108** and keyboard event **2110** derive from the base class by inheritance. The event consumer **2104** is a class responsible for directing events to the controller. The event producer **2102** interprets system events into Surfcast events for an event consumer. The boxes **2122**, **2124**, **2126**, **2128**, **2130** and **2132** are multiplexers handling the case where multiple clients are affected by multiple types of events. An event is communicated to tile base controller **2008**.

Managing Connections to More Than One Datastream

When two or more tiles connect to sources of data available over a network, communication must be established in such a way that the rate at which updated data is transmitted to the grid can be controlled. In practice, for an embodiment of the application which resides on a user's computer, a flow control protocol such as TCP is required. In this way, each tile can communicate with the remote datastream to which it is linked and a determination can be made of available bandwidth at the time of data transfer. Alternatively, in a client-server mode, flow control is not necessary because communication within the server suffices, as is described below.

It is not practical to fire up a separate browser program from each tile that wishes to download data from a site on the world wide web. A web-browser is very greedy on memory and resources and the user would have little or no control over the respective rates at which data was downloaded from different sites.

Instead, in a preferred embodiment of the present technology, a hierarchy of layers manages the simultaneous connection and allocation of resources to different world wide web sites, as shown in FIG. **22**. The layer structure applies to the way in which any given tile downloads content.

At the highest level there exists a widget, referred to as "SurfWidget" **2200**, which is the basic browser control within the application program of the present technology. Ideally, this widget operates in conjunction with any commonly used world wide web browser. It is typically associated with a tile type such as surftile **1602**.

The surf widget communicates with a surf widget controller **2202** in a control layer **2201**. Also in the control layer is a web browser application program **2204**. Examples of such a program include Microsoft's Internet Explorer and Netscape's Navigator software. The surf widget controller **2202** handles the interaction between the surf widget **2200** and the web-browser **2204**. The surf widget controller also passes on requests from the browser to the URL Manager **2206** in the next layer, the URL layer **2205**. The surf widget controller then pipes back the results to be rendered to surf widget. A typical example of this process in operation would

Petitioner Microsoft Corporation - Ex. 1001, p. 42

US 9,043,712 B2

25

be: a user clicks on a hyper-link in a web-page; the web-browser makes a request for that page to surf widget controller 2202; the request gets handed to the URL manager 2206; once the page is loaded, the URL manager 2206 notifies the surf widget controller, which in turn sends the information to the web-browser for rendering.

The responsibility for obtaining pages of content is that of the URL layer 2205. When a URL is requested, the URL manager 2206 issues a request for the page and any subsequent media to the connection manager 2210. The URL manager keeps track of the requested URL for future use, if it is requested again. The URL manager also queues up URL's that have been requested according to their focus, i.e., the tile that a user has currently selected and according to the respective priorities of the active tiles.

In a preferred embodiment, a pre-fetch utility such as URL pre-fetch manager 2208 can be implemented. It saves the user time if items can be pre-fetched instead of waiting for their download. Several strategies can be used to obtain pre-fetch items for the user. Using a history of a user's previous browsing habits, it is possible to predict what the user will probably want next. Another function of a pre-fetch utility is to periodically check the validity of items in the cache to make sure they are up to date. As would be familiar to one skilled in the art, some of the new HTTP 1.1 methods would prove very useful for this, namely the conditional gets. Another strategy is to start loading links from the page that a user is browsing, regardless of whether the user has selected the links. Although such an approach could be very wasteful of resources if there are a lot of links and very few are ultimately accessed and also because a lot of links tend to be advertisers, this approach could be effective in situations where very high capacity bandwidth exists.

The connection layer 2209 handles each individual request for download passed to it through the URL manager, regardless of whether it is an HTML page, a graphic or sound file. The connection manager 2210 understands the total bandwidth available for allocation, for example, whether the device is connected to a modem or a T-1 line. It will also manage the connection to the requested site and maintain its own cache. Before making a network request for an item, connection manager 2210 first checks its cache, the connection manager cache 2212. If the item is not in the cache, the connection manager then passes the request off to the HTTP protocol socket 2214 in the protocol layer 2215. The way in which HTTP protocols and caches work is familiar to one skilled in the art.

The protocol layer 2215 consists of a suite of different socket types, 2214, 2216 and 2218, intended to support different communication protocols, such as HTTP, FTP and also a client server protocol specific to the application program via the surfcast protocol socket 2218. Preferably protocols employed are able to recognize QoS tags in the headers of packets that are passed through the layer.

The socket layer 2219 comprises at least one socket 2220. The socket layer wraps up all the system implementation specifics for a given platform and allows generic socket types to be built on top. The socket keeps track of its bandwidth usage, which can then be queried at the connection layer. The socket layer then facilitates bandwidth management.

With all communications going through the same socket layer it is possible to easily collect data about a user's bandwidth usage. If, at the connection layer, it is noticed that the total bandwidth allocation has been exceeded, it is a simple case of blocking further data transfer until such time as total bandwidth usage falls back under what has been allocated.

26

As a user switches focus from one tile to another, priorities can be dynamically re-allocated to ensure the fastest possible loading of the selected page. Such an allocation can take into account priorities that have been assigned to the tiles based on their content, as well as based on identifiers associated with the information such as quality of service tags. All other communications can then abide by the same rules, allowing for complete control.

The sequence of events and functions in a "dynamic bandwidth allocation" feature of the present technology are described as follows. The dynamic bandwidth allocation feature involves a URL loader, the connection manager 2210 and a bandwidth controller.

The tiles that need access to the network resource for downloading content from a URL, pass certain parameters to the URL loader which manages all such requests from the tiles. These parameters include the URL itself, the priority of the tile, the minimum bandwidth requirement if any, and the maximum bandwidth requirement, if any.

The URL loader detects the need for a connection to a network resource, as would be notified to it by the connection manager. In the case of dial-up connections, the connection manager is responsible for allocating the modem resource and making the dial-up. Once a connection is made and the network resource is available, the URL loader requests the bandwidth controller to start delivering the required content, taking into account the additional parameters for each request.

The bandwidth controller 2300 is an object that comprises a number of functions, as shown in FIG. 23. AddURL 2302 is a function used by the URL loader to add an additional connection request to those already considered. RemoveURL 2304 is used by URL loader when cancelling or aborting a request. GetURLStatus 2306 is used by URL loader to obtain a status report for a given request. GetStatus 2308 is used to obtain a general status report for the overall bandwidth. The bandwidth controller 2300 is additionally able to execute a main cycle loop over the outstanding URL requests for the purposes of managing the bandwidth among them. The following pseudocode describes steps within the main cycle loop, according to some embodiments of the present technology.

```
while ( uncompleted requests outstanding )
{
    calculate bandwidth obtained per request;
    check for need to postpone, stall or cancel lower priority requests;
    check for need to increase higher priority requests;
    detect completed requests and notify requestor;
    detect undeliverable requests and reissue or cancel if necessary;
    carry out other service and statistics functions, as required;
}
```

Each of these steps is explained, as follows. One or more of the steps may be performed in a different order from that presented above without departing from the scope of the present disclosure.

The step of calculating the bandwidth obtained per request utilizes a function that calculates obtained bandwidth for each of the managed requests, including requests that are stalled (or postponed) due to priority issues. This calculation takes place frequently because of the nature of the network. The bandwidth obtained can vary drastically even during the course of the individual network transaction, and therefore a priority based dynamic system must continuously accommodate such fluctuations. The result of calculating the band-

Petitioner Microsoft Corporation - Ex. 1001, p. 43

US 9,043,712 B2

**27**

width obtained is used both for feedback to users and for making decisions in the subsequent steps within the main cycle loop.

The step of checking for the need to postpone, stall or cancel lower priority requests is another precautionary mechanism to use for the purposes of adjusting the currently active connections. If outstanding requests are not achieving the desired minimum bandwidth, or an actual bandwidth in line with the priority of a given request is not achieving, bandwidth must be made available to the higher priority requests, by stalling, cancelling or postponing lower priority requests. A throttle feature implemented consistent with the layer nature of the stack can be applied wherein the frequency of issuing requests can be decreased. A complete cancellation of a request followed by reload from cache is usually the last resort.

The step of checking for the need to increase higher priority requests has the opposite effect.

If applied, higher priority requests are increased by means of spawning additional simultaneous requests, or by increasing the throttle mentioned above.

Both the steps of checking the need to postpone and checking the need to increase a priority can provide feedback to the user in terms of their success or failure. Status parameters can additionally be collected and calculated.

The step of detecting completed requests and notifying the requestor utilizes a function for handling successful completed requests. Conversely, the step of detecting undeliverable requests followed by reissuing or canceling the request if necessary is the mechanism for avoiding undeliverable requests, or retrying temporarily unavailable requests.

Other service and statistics functions may also be called, as may be necessary for supplying information to the layers above the connection layer.

Client-Server Interaction

It is envisaged that the methods of the present disclosure can be carried out using software that is distributed between a client and at least one server. At one extreme, as discussed hereinabove, the software runs entirely on a server. At another extreme, the client only hosts a browser that displays the grid and bandwidth allocation decisions are processed by a server. It is preferred that the server undertake more resource and bandwidth intensive tasks than the client.

In some embodiments of the present disclosure, FIG. 24, the user at client device **2400** interacts with server software on a server **2402**. The server stores locally a profile comprising user-specific content **2406** that can feed customized data to the user. For example, the user may store pre-defined grid configurations on the server. Additionally, passwords for specific web-sites can be stored along with the user's profile. A grid generator **2404** on the server creates a grid of tiles according to user-specified content. Each tile has been created on the server by producing an image from the location specified. For example, tile creator **2408-1** produces a tile from content **2410-1**. Thus, when a user logs on to the server, for example through a conventional web-browser, a grid of tiles is downloaded to the user's system. Where an identifier is present in content such as **2410-1**, tile creator **2408-1** can preferably recognize such an identifier and ascribe a priority to the tile that it creates based on that identifier. In an alternate embodiment, the tile creator automatically assigns a priority to the tile based on the type of the information content.

The client-server embodiment provides a number of advantages. For example, individual users and the devices they use may be differentiated. Therefore, the tile-content that the server delivers can be customized according to the rendering device of a particular user.

**28**

Turning next to FIG. **25**, each time a user logs on to the server **2402**, a "session" is initiated, step **2500**. The server verifies the user's identity, step **2502** and acknowledges the log-in, step **2506**. The client registers one or more resources, such as connection bandwidth, cost per transmission unit and properties of local playback device, step **2504**. From this information, the server identifies the client device type, for example, set-top box or personal computer, step **2508**. At step **2510**, the server retrieves grid settings specific to the user, if appropriate. In preferred embodiments the server adjust grid settings according to the type of device, for example the size of its display. In preferred embodiments, the server adjusts grid settings according to the type of its display. Details of a session, as defined by tile content and priorities can be held over from one session to another, both for the purposes of permitting a user to continue with ongoing work and in order to protect against the adverse consequences of abnormal disconnections. Additionally, targeted advertising and messaging can be delivered to subsets of users via the predetermined server.

Having rendered a grid, step **2512**, and delivered it to the client device, the user can request sources of information such as datastreams, step **2518**. Any number of datastreams can be requested at once, the corresponding stream request information which defines parameters for each stream is communicated to the server which verifies and calculates parameters for each stream, step **2516**. In some embodiments the server allocates a priority to each stream according to the type of content, e.g., video, audio, static web-page content. In a preferred embodiment, the server uses an identifier associated with a datastream and allocates a priority based on that identifier. Such an identifier may be a quality of service tag.

Upon completion of these steps, the server **2402** knows the client characteristics and is able to distribute bandwidth available to the client among multiple content servers using for example a bandwidth controller **2300**. In this example, if the client has an incoming bandwidth of say 56 Kbits/second, and is requesting datastreams from three sources with equal priority, then the server will respond for each request that a bandwidth of $56/3 = 18.7$ Kbits/sec is available for each datastream.

The requested datastreams are displayed on the client device, step **2520** and, if the user changes the content of a tile or explicitly requests an update or refresh operation on the tile, step **2522**, an update request is sent to the server, step **2524**. Once the new content has been received, the grid is rendered anew, step **2526**. Preferably the refresh rates of tiles on the client are allocated according to priorities associated with each tile.

Intensive operations on each displayed tile are also channeled through the predetermined server. For example, refresh operations on a tile generate a refresh request that is sent to the predetermined server. Similarly, requests to thumbnail a given image can be carried out, by request, on the predetermined server and the resulting compressed image transmitted to the user.

In the foregoing embodiment, the server component may reside locally on the client machine, in which case the server is known as the "Resource Manager", or it may be a remote server.

In a preferred embodiment of client server operation, shown in FIG. **26**, aspects of a user's grid profile are transmitted to third parties so that the third parties may then communicate tile based content directly to the user. For example, a user's custom grid may contain a tile that points to a third party web-site **2604**. Content **2606** from the 3rd party web-site is typically transferred to the server for dissemination to the

Petitioner Microsoft Corporation - Ex. 1001, p. 44

US 9,043,712 B2

29 30

user. The server **2602** notifies the 3rd party web-site that the user requires tiled data by, for example, transmitting user information **2608**. The third party then permits the tile based content of its web-site to be transmitted directly to the user. The third party may attach an identifier to its information so that the server can assign a priority to the data.

The use of servers also allows for the latest versions of tiles to be downloaded and installed across all devices. Users are then able to share grids and tiles with other users. The server side technology provides users of all client devices, from desktop PC's to mobile telephones with a consistent experience.

The majority of the server side code is preferably written in Java, with C++ being used where appropriate. The methods and apparatus of the present disclosure are not dependent on the particular programming language employed. Inter-server communication also preferably utilizes XML to provide consistency with other aspects of the disclosure.

In a preferred embodiment, either Oracle 8i or SQL "Server 2000" are used to provide a relational database (RDB) functionality of the server. Both of these RDB's now provide direct SQL to XML transformations. Databases are preferably developed using the ANSI 92 SQL standard, which is usable by either of the RDB's.

Thin Client Technology

An object of the application program of the present disclosure is that it should operate on a variety of devices, including mobile telecommunications devices such as cellular phones, handheld web-browsers, palm pilots, personal digital assistants and other devices that can communicate by protocols such as wireless application protocol (WAP).

Accordingly, because most handheld or mobile devices do not have the same amount of local storage and processing power as desktop computers and set-top boxes, a special version of the application program of the present disclosure is envisaged for mobile devices. The special version embodies so-called 'thin client' technology in which a lot of the operations are performed by a server instead of the device itself.

An "n-tier" architecture is one that is designed generically for a multitude of platforms, for example PC"s, PDA's, WAP phones, and UNIX systems. Accordingly, in order to maximize the use of mobile devices, the application program of the present disclosure employs an n-tier architecture allowing the majority of the processing to be carried out on the server with the results being sent to the device for rendering. This model allows for a reduced size system to be stored on mobile devices, with the system logic residing on remote servers. Preferably the server, which usually has a much wider bandwidth connection than does a given client, carries out the role of monitoring datastreams for updates, prior to transmitting refreshed content to the client.

The features that are moved from client to server will be dependent upon the device in question. For example, it is possible to provide the client with more features on a personal digital assistant such as a Palm pilot than on a WAP Phone.

When using thin client technology, it becomes especially important for the refresh rates of the tiles to be sensibly allocated according to a priority scheme. Accordingly the thin-client implementation preferably allows for the automatic allocation of tile priorities based on the type of information content being transmitted. The thin client implementation also preferably permits the allocation of tile priorities based on recognition of an identifier such as a "quality of service tag" associated with a source of information.

In order to provide a level of consistency between the devices and the servers, the markup language XML is pref-

erably used to wrap the data that is being transmitted. As previously described, the system of the present disclosure uses a metabase to store information about the user's current grid and tile configurations. A synchronization procedure allows the metabase to be stored on a server and queried by any device. In this way it is possible to provide consistent grid and tile implementations independent of the device and its location. Such an embodiment would permit a variant of "peer to peer" communication.

FIG. **27** provides an example of the way in which wireless devices can interact with a server. A personal digital assistant (PDA) **2700** or a WAP phone **2702** communicates in a wireless manner with a dial-in bank **2704**. The dial-in bank communicates data to a server farm **2706** which is connected to the internet **2710**, optionally through a firewall **2708**. Alternatively, another personal digital assistant such as **2714** can communicate with an internet service provider such as **2712**, also connected to the internet **2710**. The server farm **2706** is able to provide content directly to a PDA such as **2700** or indirectly, over the internet, to a PDA such as **2714**.

What is claimed is:

**1**. A method executed by a device under the control of a program, the device including a memory for storing the program, the method comprising:

  partitioning a visual display rendered by the device into an array of tiles, wherein each tile in the array of tiles is associated with an information source in a plurality of information sources, wherein content of a second tile of the array of tiles depends upon content of a first tile of the array of tiles;

  assigning a first update rate to the first tile;

  updating information from a first information source in the plurality of information sources presented to the first tile in accordance with the first update rate; and

  updating content of the second tile based on the information updated to the first tile.

**2**. The method of claim **1**, wherein information from the first information source contains an identifier that is used in the assigning of the first update rate to the first tile.

**3**. An electronic readable memory to direct an electronic device to function in a specified manner, the memory comprising:

  a first set of instructions to control communication with a plurality of information sources;

  a second set of instructions to arrange a visual display rendered by the device into an array of tiles;

  a third set of instructions to associate a first information source of said plurality of information sources to a first tile of said array of tiles and a second information source of said plurality of information sources to a second tile of said array of tiles, wherein content of the second tile of the array of tiles depends upon content of the first tile of the array of tiles; and

  a fourth set of instructions to:

    update the first tile with information from said first information source retrieved in accordance with a first update rate and to

    update information to said second tile based on the information updated to the first tile.

**4**. The electronic readable memory of claim **3**, wherein information from the first information source contains an identifier and wherein the first update rate is based upon the identifier.

\* \* \* \* \*

Petitioner Microsoft Corporation - Ex. 1001, p. 45



US009032317B2

(12) **United States Patent**
    Santoro et al.

(10) **Patent No.:**     **US 9,032,317 B2**
(45) **Date of Patent:**         **May 12, 2015**

(54) **SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES**

(71) Applicant: **SurfCast, Inc.**, Portland, ME (US)

(72) Inventors: **Ovid Santoro**, Lincolnville, ME (US); **Klaus Lagermann**, Copenhagen (DK); **Tom Dechaene**, Overijse (BE)

(73) Assignee: **SurfCast, Inc.**, Portland, ME (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 99 days.

(21) Appl. No.: **13/759,942**

(22) Filed: **Feb. 5, 2013**

(65) **Prior Publication Data**

US 2013/0151599 A1      Jun. 13, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/163,257, filed on Jun. 17, 2011, which is a continuation of application No. 12/124,125, filed on May 20, 2008, now Pat. No. 7,987,431, which is a continuation-in-part of

(Continued)

(51) **Int. Cl.**
    **G06F 15/00**      (2006.01)
    **G06F 13/00**      (2006.01)
    **H04L 29/06**      (2006.01)
    **G06F 3/0481**     (2013.01)
    **G09G 5/14**       (2006.01)
    **H04M 1/725**      (2006.01)

(52) **U.S. Cl.**
    CPC .............. **H04L 67/42** (2013.01); **G06F 3/0481** (2013.01); **G09G 5/14** (2013.01); **G09G 2370/027** (2013.01); **H04M 1/72544** (2013.01)

(58) **Field of Classification Search**
    CPC ................................. G06F 67/42; H04L 67/42
    USPC ......... 715/853, 744, 721, 851, 768, 763–765, 715/716, 729, 738, 840
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,712,191 A | * | 12/1987 | Penna .......................... 715/853 |
| 4,905,171 A | | 2/1990 | Kiel et al. |
| 5,140,678 A | | 8/1992 | Torres |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0651544 A2      5/1995

OTHER PUBLICATIONS

IPR2013-00292, May 22, 2013, Microsoft Corporation.

(Continued)

*Primary Examiner* — Kevin Nguyen
(74) *Attorney, Agent, or Firm* — VLP Law Group LLP; Richard G. A. Bone

(57) **ABSTRACT**

A computerized method of presenting information from a variety of sources on a display device. Specifically the present invention describes a graphical user interface for organizing the simultaneous display of information from a multitude of information sources. In particular, the present invention comprises a graphical user interface which organizes content from a variety of information sources into a grid of tiles, each of which can refresh its content independently of the others. The grid functionality manages the refresh rates of the multiple information sources. The present invention is intended to operate in a platform independent manner.

**19 Claims, 27 Drawing Sheets**



Petitioner Microsoft Corporation - Ex. 1001, p. 1

## US 9,032,317 B2

Page 2

### Related U.S. Application Data

application No. 11/140,546, filed on May 27, 2005, now Pat. No. 7,376,907, which is a continuation of application No. 10/136,873, filed on Apr. 30, 2002, now Pat. No. 7,028,264, which is a continuation-in-part of application No. 09/702,325, filed on Oct. 30, 2000, now Pat. No. 6,724,403.

(60) Provisional application No. 60/162,522, filed on Oct. 29, 1999.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,321,750 | A | 6/1994 | Nadan |
| 5,321,808 | A | 6/1994 | Rupp |
| 5,371,847 | A | 12/1994 | Hargrove |
| 5,432,932 | A | 7/1995 | Chen et al. |
| 5,473,745 | A | 12/1995 | Berry et al. |
| 5,550,968 | A | 8/1996 | Miller et al. |
| 5,635,980 | A | 6/1997 | Lin et al. |
| 5,712,995 | A | 1/1998 | Cohn |
| 5,721,951 | A | 2/1998 | DorEl |
| 5,764,972 | A | 6/1998 | Crouse et al. |
| 5,812,123 | A * | 9/1998 | Rowe et al. ..................... 725/43 |
| 5,819,284 | A | 10/1998 | Farber et al. |
| 5,848,356 | A | 12/1998 | Jambhekar et al. |
| 5,901,228 | A | 5/1999 | Crawford |
| 5,905,492 | A * | 5/1999 | Straub et al. .................. 715/744 |
| 5,959,621 | A | 9/1999 | Nawaz et al. |
| 6,025,837 | A * | 2/2000 | Matthews et al. ............. 715/721 |
| 6,047,197 | A | 4/2000 | Jarrad |
| 6,061,576 | A | 5/2000 | Terrasson |
| 6,104,700 | A | 8/2000 | Haddock et al. |
| 6,118,493 | A * | 9/2000 | Duhault et al. ............... 348/564 |
| 6,278,448 | B1 | 8/2001 | Brown et al. |
| 6,363,445 | B1 | 3/2002 | Jeddeloh |
| 6,418,309 | B1 | 7/2002 | Moon et al. |
| 6,430,405 | B1 | 8/2002 | Jambhekar et al. |
| 6,456,334 | B1 | 9/2002 | Duhault |
| 6,807,558 | B1 | 10/2004 | Hassett et al. |
| 6,832,355 | B1 | 12/2004 | Duperrouzel et al. |

#### OTHER PUBLICATIONS

IPR2013-00293, May 22, 2013, Microsoft Corporation.
IPR2013-00294, May 22, 2013, Microsoft Corporation.
IPR2013-00295, May 22, 2013, Microsoft Corporation.
"Microsoft Internet Explorer Resource Kit", (MSIE Resource Kit), Microsoft Press, A Division of Microsoft Corporation, 1998.
Civil Action No. 2:12-cv-00333-DBH in the United States District Court for the District of Maine filed on Oct. 30, 2012 in connection with U.S. Pat. No. 6,724,403.
Cisco-Quality of Service, "Fact Sheet Quality of Service Fact Sheet" Available Web Site: http://www.cisco.com/warp/public/cc/so/neso/vvdo/avvid/eeqos_ds.htm Accessed on Oct. 21, 2002.
IP Quality of Service: An Overview Available Web Site: http://www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm Accessed on Oct. 21, 2002.
Loyall et al., "Specifying and Measuring Quality of Service in Distributed Object Systems", IEEE, Published in the Proceedings of

ISORC'98, Apr. 20-22, 1998 in Kyoto, Japan. Available web site: http://www.dist-systems.bbn.com/papers/1998/ISORC/isorcweb.html Accessed on Oct. 21, 2002.
White Paper, "The need for Qos: The Internet protocol's "best-effort" service has worked well so far, so why do we need to change it?" Available Web Site: http://www.sop.in-ria.fr/rodeo/rserban/Files/Need for QoS-v4.pdf Accessed on Oct. 21, 2002.
"User's Manual", Nokia Corporation, Jun. 7, 1998, pp. 1-190.
"User's Guide", Motorola Envoy Wireless Communicator, 1994, pp. 1-90.
"Simon Say's 'Here's How!' Users Manual", Simon Mobile Communications Made Simple, 1994, pp. 1-41.
Baecker, et al., "Readings in Human-Computer Interaction: Toward the Year 2000, 2nd Edition", 1995, pp. 1-952.
Schneiderman, "Designing the User Interface: Human-Computer Interaction, 3rd Edition", 1998, pp. 1-640.
Cerami, "Delivering Push", 1998, pp. 1-428.
Myers, "The User Interface for Sapphire", Computer Graphics & Applications, vol. 4, No. 12, Dec. 1984, pp. 13-23.
Myers, "A Taxonomy of Window Manager User Interfaces", Computer Graphics & Applications, Sep. 1988, pp. 65-84.
Teitelman, "A Tour Through Cedar", Xerox Palo Alto Research Center, 1984, pp. 181-195.
"OpenStep User Interface Guidelines", Sun Microsystems, 1996, pp. 1-216.
Lane, et al., "Technical Research Report—User Interfaces for a Complex Robotic Task: A Comparison of Tiled vs. Overlapped Windows", Jan. 1997, pp. 1-13.
Bly, et al., "A Comparison of Tiled and Overlapping Windows", Human Factors in Computing Systems, Apr. 1996, pp. 101-106.
Isaacs, "Inside Dynamic HTML", Microsoft Press, 1997, pp. 1-28.
Cohen, et al., "Constraint-Based Tiled Windows", Computer Graphics & Applications, Nov. 1984, pp. 1-12.
Gancarz, "Uwm: A User Interface for X Windows", Summer Conference Proceedings, Usenix, Jan. 1986, pp. 429-440.
"Submission request to W3C", http://www.w3/org/submission/1997/5/ Accessed Web Site on May 17, 2013.
"Proposal for a Handheld Device Markup Language", http://www.w3/org/TR/NOTE-Submission-HDML Accessed Web Site on May 17, 2013.
"Handheld Device Markup Language FAQ", http://www.w3.org/TR/NOTE-Submission-HDML-FAW.html Accessed Web Site on May 17, 2013.
"Unwired Planet Will Publish Handheld Device Transport Protocol for Internet Access From Mobile Phones and Pagers", http://www.ncns.com/news/2/uwplanet.html Accessed Web Site May 17, 2013.
Wessels, "Web Caching. 1st Edition", Jun. 2001, p. 37.
Yeager, et al., "Web Server Technology, The Advanced Guide for World Wide Web Information Providers", 1996, p. 208.
Tibken, "Before Apple's iPad, there was the Intel IPAD. Seriously.", CNet News, Dec. 5, 2013 (http://news.cnet.com/8301-1035_3-57614579-94/before-apples-ipad-there-was-the-intel-ipad-seriously/) Accessed Web Site Jan. 23, 2014.
Non-Final Office Action mailed May 23, 2014 from the United States Patent Office in related U.S. Appl. No. 13/163,257.
Final Written Decision entered Oct. 14, 2014 from the United States Patent Office in corresponding Inter Partes Review case IPR 2013-00292.
IPR2014-0271: Petition filed by Microsoft Corporation against U.S. Pat. No. 6,724,403, Dec. 19, 2013.

* cited by examiner

Petitioner Microsoft Corporation - Ex. 1001, p. 2



Fig. 1

Petitioner Microsoft Corporation - Ex. 1001, p. 3



Fig. 2

Petitioner Microsoft Corporation - Ex. 1001, p. 4





Fig.3
(Prior Art)

Petitioner Microsoft Corporation - Ex. 1001, p. 5



Fig. 4

Petitioner Microsoft Corporation - Ex. 1001, p. 6



Fig. 5

Petitioner Microsoft Corporation - Ex. 1001, p. 7

```
<TD><A HREF="tile2_target.htm"
      TARGET="new"
      ONMOUSEOVER=action1(arg3)
      ONMOUSEOUT=action2(arg4)
      REFRESH=timeout(500)
      SOURCE=http://www.camelot.castle/swords/excalibur.til
      CLICKMAP=      { 0,0,50,50, clickfunction1( clickargument1),
                      51,0,50,50, clickfunction2( clickargument2),.
                      0,51,50,10, clickfunction3( clickargument3) }
      TOOLBAR={"local/toolbars/radio.too" PLACEMENT="bottom" }
      ALARM="alarms/condition_rain=TRUE, condition_weekend=FALSE,
            alarmaction=blow_the_horn">

</TD>
```

Fig. 6

Petitioner Microsoft Corporation - Ex. 1001, p. 8



Fig. 7

Petitioner Microsoft Corporation - Ex. 1001, p. 9



Fig. 8

Petitioner Microsoft Corporation - Ex. 1001, p. 10



Fig. 9

Petitioner Microsoft Corporation - Ex. 1001, p. 11



**Fig. 10**

Petitioner Microsoft Corporation - Ex. 1001, p. 12



FIG. 11

Petitioner Microsoft Corporation - Ex. 1001, p. 13



Fig. 12

Petitioner Microsoft Corporation - Ex. 1001, p. 14

```
<HTML>
<HEAD>
<TITLE>Surfcast Grid Example</TITLE>
<META NAME= "Resource Manager"CONTENT= "RESMGR.EXE">
<META NAME= "Author" CONTENT= "Surfcast, Inc.">
</HEAD>
...
<BODY BACKGROUND= "surfback.gif">
<TABLE>
<TR>
<TD><A HREF= "http://www.somewhere.com/sometarget.html"
    TARGET= "new"
    ONMOUSEOVER=action1(arg1)
    ONMOUSEOUT=action2(arg2)
    REFRESH=timeout(200)
    SOURCE= "http://www.surfcast.com/tilelibrary/tile2.til">
</TD>

<TD><A HREF= "http://www.somewhereelse.com/someothertarget.html"
    TARGET= "new"
    ONMOUSEOVER=action3(arg3)
    ONMOUSEOUT=action4(arg4)
    REFRESH=timeout(500)
    SOURCE= "http://www.camelot.castle/swords/excalibur.til">
</TD>

<TD><A HREF= "local/document.htm"
    TARGET= "new"
    ONMOUSEOVER=action1(arg3)
    ONMOUSEOUT=action2(arg4)
    REFRESH=timeout(0)
    SOURCE= "local/documents/somedocument.til">
</TD>

</TR>

</TABLE>
</BODY>
</HTML>
```

Fig. 13

Petitioner Microsoft Corporation - Ex. 1001, p. 15



Fig. 14

Petitioner Microsoft Corporation - Ex. 1001, p. 16



**Fig. 15**

Petitioner Microsoft Corporation - Ex. 1001, p. 17



Fig. 16

Petitioner Microsoft Corporation - Ex. 1001, p. 18



Fig. 17

Petitioner Microsoft Corporation - Ex. 1001, p. 19



Fig. 18

Petitioner Microsoft Corporation - Ex. 1001, p. 20

APPX00319



**Fig. 19**

Petitioner Microsoft Corporation - Ex. 1001, p. 21



Fig. 20

Petitioner Microsoft Corporation - Ex. 1001, p. 22



Fig. 21

Petitioner Microsoft Corporation - Ex. 1001, p. 23



Fig. 22

Petitioner Microsoft Corporation - Ex. 1001, p. 24



**Fig. 23**

Petitioner Microsoft Corporation - Ex. 1001, p. 25



**Fig. 24**

Petitioner Microsoft Corporation - Ex. 1001, p. 26



Fig. 25

Petitioner Microsoft Corporation - Ex. 1001, p. 27



**Fig. 26**

Petitioner Microsoft Corporation - Ex. 1001, p. 28



Fig. 27

Petitioner Microsoft Corporation - Ex. 1001, p. 29

US 9,032,317 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM AND METHOD FOR SIMULTANEOUS DISPLAY OF MULTIPLE INFORMATION SOURCES

## CLAIM OF PRIORITY

This application is a continuation of application Ser. No. 13/163,257, filed Jun. 17, 2011, which is a continuation of application Ser. No. 12/124,125, now U.S. Pat. No. 7,987, 431, which is a continuation-in-part of application Ser. No. 11/140,546, now U.S. Pat. No. 7,376,907, which is a continuation of application Ser. No. 10/136,873, now U.S. Pat. No. 7,028,264, which is a continuation-in-part of application Ser. No. 09/702,325, now U.S. Pat. No. 6,724,403, which claims benefit of priority to provisional application Ser. No. 60/162, 522, filed Oct. 29, 1999, all of which applications are incorporated by reference herein in their entireties.

## TECHNICAL FIELD

The present disclosure relates to methods of presenting information from a variety of sources on a display device. Specifically the present disclosure describes a graphical user interface for organizing simultaneous display of information from a multitude of sources.

## BACKGROUND

The scope of the global communications capacity, comprising fixed link and wireless networks, continues to expand rapidly. The variety and complexity of communication devices proliferates and the number of users escalates. As a result, users are faced with increasingly complex systems and interfaces with which to manage multiple sources of information. At the same time, society has increased its demands on time and productivity so that users no longer have the luxury of focusing their attention on a single source of information or means of communication. Instead, the norm today is for people to carry out many tasks simultaneously.

As might be expected, these demands have exposed substantial problems in current communications technology. In particular, users are faced with insufficient resources to manage and access the volume and variety of information available to them in an efficient and productive manner. While a variety of tools designed to assist in accessing and managing these resources have been created, these tools remain unsatisfactory. Consequently, users are impeded by the myriad of information sources, each with its own method of use and often with its own login and password requirements, as well as by slow retrieval times to access the information. The result is an unacceptable delay for many operations, as well as inefficiencies in transferring information from one source to another.

Under the present art, for example, it is usually the case that a user lacks the bandwidth resources to receive multiple video signals simultaneously. If an individual were receiving one video signal, it is usually impractical to receive a second at the same time due to bandwidth constraints. Thus, the user could not, for example, monitor multiple video data streams of sporting or news events; instead, the user could monitor only one video data stream at a time.

To address such bandwidth resource limitations, the current art only accesses information when the user requests it. As a result, there is an inevitable delay between the user's request for information and the communications device's presentation of it. For example, if a user wants to monitor sources of news information on the Internet using current browser technology, the user must continuously and manually request the news data from its source to determine whether the data has been updated. Prior to requesting and subsequently receiving the data, the user has no way of knowing whether the data has been updated. In any case, the user is unlikely to want to refresh the status of each application by manual intervention himself at the frequency necessary to ensure that the information is up to date. Additionally, if a user wishes to view two or more webpages simultaneously, (s)he must run two or more copies of the web-browser program. The act of manually refreshing the content of alternate programs in order to ascertain which have any new material to offer is fundamentally inefficient.

Similarly, the user's access to such data is not in real-time or even near real-time because each time the user wants to view the information, (s)he must request it from its source and wait for the source to transmit it to him. Thereafter, (s)he must wait until his/her communications device has received and processed the information before it is presented. For complex information such as a video signal, this can take longer than a minute to occur; and, even for simple information, this process can take many seconds. Thus, the user is denied real-time or near real-time access to the information.

Present technology that locally stores or "caches" previously accessed information to make it available to the user more rapidly does not solve this problem, because the cached information is necessarily old. The user's communications device must still verify the accuracy of the information with the source before the system displays the cached information. As a result, the user is denied real-time or near real-time access to updated information.

Similarly, if a user wishes to make two or more simultaneous downloads there is no control over the relative rates at which the respective downloads would occur. So-called "push technologies" attempt to address this problem by organizing information from a number of related sources and sending it periodically to a user. While this arrangement frees a user from actively participating in the download, the price is that the user has little control over the organization of the information and can only practically handle a small number of such transmissions at any one time. Each transmission is subject to the bandwidth available.

Of course, not all tasks require the same allocation of resources and, correspondingly, not all tasks have equal priorities for a given user. In particular, a user may wish to customize the information environment in such a way that many processes are occurring synchronously, yet each is communicating with the user at a rate that is acceptable. For example, a television viewer may wish to know what is being broadcast on several channels at the same time but only care to watch one of them closely. An Internet user may wish to be continually in touch with sources of data from audio, video, chat-room, video-conferencing and e-mail checker utilities, but not wish all of them to update at the same frequency; the user would be satisfied merely to see at a glance a recent status of each. Some of these processes, such as chat-room activities entail very little data transmission and can, indeed, be effectively updated on a continuous basis, whereas others require a great deal of bandwidth but could usefully be sampled at a lower rate. The current art lacks any technology for controlling the respective refresh rates of several simultaneous information sources. Furthermore, the current art lacks technology that can automatically design an appropriate refresh rate based on the type of data that is received.

At the same time that users are limited by system resources, they are also finding that they have no effective way of managing the multiplicity of available data types and information

Petitioner Microsoft Corporation - Ex. 1001, p. 30

US 9,032,317 B2

**3**

sources. It is difficult both to conduct two or more different types of computing activities at the same time or to monitor two or more different information sources simultaneously because the tools available are confusing, inflexible, and/or otherwise difficult to implement. Users require immediate access to a wide variety of up to date content presented in a flexible, easily customized interface.

In addition to restrictions in the capacity of today's networks, there is very little conformity amongst the information content. A typical communication device, such as a personal computer, television or mobile telephone, comprises a display unit connected to a processing unit that can accept information from many different sources. As described above, the signals, data and/or datastreams that are available to such a device are diverse, including, for example, HTML content, e-mail, or streaming audio and video. Correspondingly, the software tools that interpret and process the different information sources present each in a different way to the user. From a user's perspective, distinctions between the different types of information could usefully be removed so that each is viewed in a similar way and such that the current presentation associated with any information source gives an immediate indication of its current content. The present reality is different, however. The user must contend with a wide range of icons and program windows that may occupy space on a user's display screen. Another lack of conformity is the different mode of behavior for programs that address different types of information. An effort to standardize the ways in which different types of information are presented to the user would be advantageous. Equally, unification of the way in which those types of information are managed would save time and increase user productivity, for productivity is reduced when users must cope with different attributes of different programs and learn distinct paradigms for different types of information. And, furthermore, a way of conforming the way in which information about multiple datastreams can be communicated between users would be desirable.

The nature of the application program windows and their respective icons predominantly found on today's computer displays is restrictive. The application window typically displays the current content or output of only a single program and program icons convey nothing of the program's current state or content. Often, an icon is a static image which is merely characteristic of the program or data represented thereby rather than the program's current state or its information content. In the present art, there is no intermediate between a window or an icon.

Thus, while a window may be resized as appropriate, it will frequently occupy the full display area, effectively limiting the user to a view of a single program. It may have active areas around its borders, such as menu bars, scroll bars, or tool bars, designed to allow the user to control aspects of the window's appearance or to set parameters specific to the operation of the program controlling it. Icons, in contrast, offer ease of display when multiple programs are active, but they do not permit viewing or control of the underlying program or data represented thereby. Instead, icons require user intervention, typically in the form of a mouse-click on an icon of interest, to view or control the program or information. Consequently, the user's viewing options are limited to a choice between one presenting very limited information about a multitude of programs and information and one presenting full information, but of only a single program or data source.

The fact that the GUI's of the present art are largely restricted to icons and windows diminishes the capacity to organize, manage, and access available information. With the Internet representing an ever expanding view of currently

**4**

accessible global information, the need for flexible information management tools has become crucial. Similarly, with the current expansion of television programming available, for example, through cable television and satellite broadcasting, the need to manage this audiovisual content becomes acute. The convergence of television programming and computers increases these management needs all the more.

Current computer operating system software utilizes bookmarking schemes for managing Internet locations and complex database technologies for managing specialist information. Neither provides visual immediacy or ease of layout. Bookmark hierarchies are presented as cascading textual menus, and database technologies arrange information into rigidly defined structures. The missing capability is a visual categorization in which an area of the display unit itself becomes the bookmark and the arrangement on the display becomes the categorization, independent of the type of content.

While the most common way of accessing information sources is via a personal computer, present day technology exists to communicate via a television or set-top box, handheld computing device, mobile and cellular telephones, all manner of "hybrid" devices such as an internet-accessible games player, camera phones, the "Blackberry", or even in-car navigation and security systems, in which case Internet content and other data can be displayed as some portion of the screen. There is a growing convergence of technologies: televisions are beginning to find application as viewers of non-television data, (for example through use of "Vertical Blanking Interval" technology in which a signal is inserted into the main video signal or through set-top boxes providing limited computer and communications functionality); computers are already finding application for the display of movies, real-time data streams, and the playing of audio data; handheld computing devices and mobile telephones can also access the Internet and other information sources; and other devices are becoming able to access a variety of signals, e.g., digital signals from satellites such as digital radio broadcasts.

To summarize the current state of the art, display technologies currently lack an interface which is capable of organizing any type of information, and presenting such information to the user in a consistent manner, in such a way that all currently open channels are able to indicate their activity on a continual basis, and which could run on any device. Furthermore the current art is deficient in respect of organizing multiple sources of information in a relevant manner that takes into account relationships between the various sources.

SUMMARY

Accordingly, the present disclosure provides an easy to use graphical interface that facilitates the organization and management of multiple data sources corresponding to a user's needs and interests. The present disclosure comprises a grid of tiles that resides on the user's computer desktop. The grid of tiles provides a uniform, graphical environment in which a user can access, operate, and/or control multiple data sources on electronic devices. Additionally, the disclosure provides for automatic control of the refresh rates of multiple data sources, based on the character of the data or on "quality of service tags" that accompany the data. Such automatic control may operate in conjunction with one or more user preferences for the refresh rates of certain data. Both the grids and the tiles can be transferred, e.g., by e-mail, from one user to another, or between multiple different devices belonging to a single user. The graphical environment is uniform with respect to the source of accessed information and can manage

Petitioner Microsoft Corporation - Ex. 1001, p. 31

US 9,032,317 B2

**5**

multiple streams of content, entirely of the user's choice. For example, the technology presents video clips, e-mail messages, television shows, Internet sites, application programs, data files and folders, live video streams, music, radio shows, and any other form of analog signal, digital data or electronically stored information, to the user uniformly and simultaneously, regardless of whether the information is stored locally or available via modem, T1 line, infrared, or any other form of communication. The user's impression of the interface is also independent of the type of electronic device upon which it is implemented.

The present disclosure comprises a method executed by a computer under the control of a program stored in computer memory, said method comprising the steps of: partitioning a visual display of a computer into an array of tiles, such as into a non-overlapping configuration; assigning a first refresh rate to a first tile of said array of tiles and a second refresh rate to a second tile of said array of tiles; updating information presented to said first tile in accordance with said first refresh rate; and updating information presented to said second tile in accordance with said second refresh rate. The manner of assigning the first and second refresh rates may depend upon the type of information received by each tile, including but not limited to the information content or an identifier contained in, or associated with, the information.

The present disclosure additionally includes an electronic readable memory to direct an electronic device to function in a specified manner, comprising: a first set of instructions to control simultaneous communication with a plurality of datastreams; a second set of instructions to partition a display into an array of tiles; a third set of instructions to associate a first datastream of said plurality of datastreams with a first tile of said array of tiles and a second datastream of said plurality of datastreams with a second tile of said array of tiles; a fourth set of instructions to retrieve data from said first datastream in accordance with a first retrieval rate and retrieve data from said second datastream in accordance with a second retrieval rate; and a fifth set of instructions to present data to said first tile in accordance with said first retrieval rate and present data to said second tile in accordance with said second retrieval rate. The first and second retrieval rates may be automatically assigned by the fourth and fifth set of instructions respectively, based upon the type of datastream or an identifier that accompanies each datastream, with or without the additional use of one or more user-specified retrieval rates.

The present disclosure additionally includes a system for facilitating the organization and management of multiple data sources, comprising: a device that includes a processor configured to execute instructions, a memory connected to the processor to store at least one program that includes a graphical user interface, and an input device that includes a display, wherein the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plurality of information sources with a first tile of the array of tiles and a second information source of the plurality of information sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and

**6**

present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

The application program described herein runs on, and the grids and tiles of which are transferable between, many different devices, including, but not limited to set-top box, personal computer, mobile phone, and other hand-held device. The grid and tiles retain the same characteristics, regardless of operating device. For example, the tiles remain individually configurable and can offer near real-time views of their data content. The application therefore permits the user's interaction with a range of electronic devices to be unified.

Additionally it is to be understood that the application program or programs described herein may be distributed between a client device and a server in such a way that certain data storage and intensive functions are carried out on a server.

BRIEF DESCRIPTION OF THE DRAWINGS

Additional objects and features of the disclosure will be more readily apparent from the following detailed description and appended claims when taken in conjunction with the drawings, in which:

FIG. **1** shows a representative embodiment of a user interface comprising a grid of tiles as might be depicted on a display screen.

FIG. **2** depicts a system that accepts data in at least one form through at least one port and which additionally displays data to a user.

FIG. **3** shows stylized examples of an icon and an application window as are commonly found in computer display systems of the background art.

FIG. **4** shows several tiles as might be found in a typical embodiment of the present technology.

FIG. **5** shows an exemplary data structure of the tile object within a graphical user interface.

FIG. **6** shows one embodiment of a tile in markup language.

FIG. **7** shows the hierarchy of software objects underlying the instant technology, comprising a grid object, tile objects and files or application software.

FIG. **8** shows an exemplary layout of a display produced by the technology described herein.

FIG. **9** shows an alternative exemplary layout of the display produced by the technology described herein.

FIG. **10** shows an exemplary layout of a display wherein a tile contains another instantiation of a grid.

FIG. **11** shows an exemplary layout of a display including specific examples of tile contents.

FIG. **12** shows the data structure of the grid object which forms part of a graphical user interface.

FIG. **13** shows one embodiment of a grid in markup language.

FIG. **14** shows a sequence of windows that demonstrate how a grid might be set up for initial use by a "wizard" tool.

FIG. **15** shows an example of the architecture of a computer program in a preferred embodiment of the present technology.

FIG. **16** shows the architecture of the application program and its components in a preferred embodiment of the present technology.

FIG. **17** shows the architecture of components of the computer program in a preferred embodiment of the present technology.

FIG. **18** shows an outline of the widget-set used in a preferred embodiment of the present technology.

Petitioner Microsoft Corporation - Ex. 1001, p. 32

US 9,032,317 B2

7                                              8

FIG. **19** shows an outline of the metabase according to a preferred embodiment of the present technology.

FIG. **20** shows an outline of the XP Core and its interaction with the operating system library in a preferred embodiment of the present technology.

FIG. **21** shows an overview of the event system utilized in a preferred embodiment of the present technology.

FIG. **22** shows an overview of the connection layers that are responsible for controlling the download of multiple web-pages from the world wide web.

FIG. **23** shows a number of functions used by the band-width controller.

FIG. **24** is a schematic representation of the relationship between a server and a client device.

FIG. **25** shows a series of interactions between a client device and a server.

FIG. **26** shows how a user, a server and third party content providers communicate in accordance with an embodiment of the technology.

FIG. **27** shows an embodiment in which the application program communicates with one or more wireless devices.

DETAILED DESCRIPTION OF THE
TECHNOLOGY

FIG. **1** shows an illustrative configuration of the graphical user interface of the present disclosure. A grid **1** consisting of a 3 by 3 matrix of nine tiles demonstrates some of the different contents that tiles can display. Tile **10** points to a database of stock quotes. Tile **20** displays the active folders in an elec-tronic mail utility. Tile **30** displays a portion of an alphabetical list of quoted companies. Tiles **40**, **50**, **60**, **70** and **80** point to websites displaying, respectively, high technology news, electronic goods for sale, categories of business news, items available by auction and the Wall Street Journal. Tile **90** points to the file-viewer of a windows-based operating sys-tem, such as Microsoft Windows™, and displays the cur-rently accessible disc drives or partitions.

Within the scope of the present invention, an information source may comprise any analog signal, source of digital data or a datastream, including, but not limited to one or more of, video, audio, text, and graphics. The information may be in any format, including but not limited to ASCII, bitmap, MP3, JPEG, GIF, TIFF, a mark-up language such as HTML, XML, VRML, HDML, formatted text such as rich text format, or binary. Preferably the software of the present disclosure is able to recognize the type or format of the information source and assign properties to tiles according to the type. In another preferred embodiment, the information source or is accompanied by an identifier that indicates a priority to be attached to the information when displayed by the graphical user interface. Such an identifier may be referred to as a "quality of service", (QoS) tag.

FIG. **2** is a general representation of a data display system **100** within which the present invention may be implemented. System **100** comprises a processor such as central processing unit **104**, an input device **106**, data connection ports **108-1** through **108-N**, a display **110** and a main memory **112**, all connected via bus **116**. Residing in the memory **112** is an operating system **120**, a file system **122**, a cache **124** for temporary storage of information, application programs **128-1** through **128-N** and a graphical user interface (GUI) program **126** that is responsible for presenting information on to display **110**. Information may enter and/or leave the system through any one of the ports **108-1** through **108-N** which may themselves be connected to a tuner **114**, or via a network interface **134** to a communications network. If a tuner **114** is employed, it may channel input from a wireless signal **130** or a cable network **132**.

In some embodiments of the present disclosure, system **100** is a personal computer such as a desktop workstation, a portable notebook or laptop computer, or a wearable com-puter. In that case the input device **106** may be a keyboard, mouse, voice-activated device, trackpad, trackball, or any combination thereof and the display **110** may be a conven-tional cathode ray tube (CRT) or flat-screen display such as an active matrix LCD, or an OLED. The network interface **134** may then be a connection to the Internet or to a local area network via a cable and modem or a digital subscriber line or ISDN, or via a wireless connection, such as WiFi, Bluetooth, or a wireless connection, for example, using 802.11a/b/g to the Internet.

In another embodiment of the present invention, system **100** is a mobile or cellular phone or personal digital assistant and the input device **106** may consist of several buttons on a keypad, a touch-sensitive screen with or without a touching device such as a stylus, or a microphone and voice-recogni-tion software. In this embodiment, the display **110** is prefer-ably an LCD screen or an electroluminescent display, and ports **108** receive data from radio signals or a portable or wireless modem. Consistent with this embodiment, it is also possible that system **100** is, or comprises part of, a hybrid device such as an internet-ready entertainment device that also has a games playing function or the ability to display an electronic book, or has a digital audio function as does an MP3 player. It is also possible that system **100** is a portable navigation system, such as a GPS device especially one that has an additional functionality such as cellular telephone communication capability or the ability to pick up broadcast radio or TV signals.

In yet another embodiment of the present disclosure, sys-tem **100** comprises a set-top box wherein display **110** is a TV screen or monitor, and tuner **114** accepts input in the form of a wireless signal **130** from broadcast transmissions or cable signals from the cable network **132**.

It is consistent with the present disclosure that, as discussed hereinbelow, system **100** comprises a client device that com-municates with a server.

It is also envisaged that the present disclosure can comprise a device that accepts digital signals from a satellite, such as an "XM" radio transmission. It is further contemplated that the present invention can interface to an in-car navigation and security system that utilizes GPS technology or satellite com-munication means, such as the "OnStar" system. Accord-ingly, the present disclosure may also find application in conjunction with an in-car entertainment and display system.

Input device **106** may be a hand-held remote control appa-ratus or buttons located on the set-top box or touch-sensitive areas of display **110**. Accordingly, the display **110** and the input device **106** need not be part of the same physical device as the device that contains processor **104**.

According to the present disclosure, the processor executes instructions to: control simultaneous communication with a plurality of information sources; partition the display into an array of tiles; associate a first information source of the plu-rality of information sources with a first tile of the array of tiles and a second information source of the plurality of infor-mation sources with a second tile of the array of tiles, such that information from the first information source is displayed on the first tile and information from the second information source is displayed on the second tile, wherein information from at least one of the first source and the second source contains an identifier; retrieve information from the first

Petitioner Microsoft Corporation - Ex. 1001, p. 33

US 9,032,317 B2

9

information source in accordance with a first retrieval rate and retrieve information from the second information source in accordance with a second retrieval rate wherein the first and second retrieval rates are allocated based upon the identifier; and present information to the first tile in accordance with the first retrieval rate and present information to the second tile in accordance with the second retrieval rate.

As is known to those skilled in the art, a graphical user interface is a computer program that resides in memory **112** of some data processing system and that provides means for presenting information, input to, and output from, application programs **128** or content of datastreams from ports **108** on an associated display. In the background art each datastream is associated with a window. The graphical user interface allows a user to control the arrangement and display format of the data content in each window. Usually a graphical user interface permits a user to specify and alter operating parameters of application programs running on the system, though at any given time a particular application program will take priority, meaning that a particular window will be displaying continually updating content. Typical operating parameters that may be changed depend upon the application program but include the number of buttons on a tool bar and number of visible toolbars, the size of the text displayed and the color of the background.

By contrast, the graphical user interface of the current disclosure not only permits a user to control the layout of the data content but to prioritize each application program running on the system and each datastream of interest. A novel feature of the present disclosure is that the data content of any number of the programs can vary in real time and the rate at which the display of each—on a respective tile—is updated can be controlled by the user. Furthermore, in another embodiment, in the absence of initial preferences specified by the user, the present technology is able to assign a rate at which the display of a tile is refreshed according to the type of data or according, for example, to an identifier that is presented with each datastream or source of information, and may take into account the available bandwidth.

When the present technology assigns a refresh rate to a tile according to the type of data, it is envisaged that the type of the data is automatically recognized or ascertained. For example, according to this embodiment the present technology distinguishes between types of data such as video, audio and web-based content, based on the format of the datastream in question and preferably assigns a higher priority to types of data that vary in real time, such as video or audio content.

When the present technology assigns a refresh rate to a tile according to an identifier presented with each source of information, the nature of the identifier may vary according to the type of data or the protocol that is employed for its transmission. In preferred embodiments, the identifier is a tag that is associated with a "Quality of Service" (QoS) implementation. As is known to one of skill in the art, QoS refers to the ability of a data communications system to define and differentiate levels of performance. For example, in Internet protocol (IP), QoS tags are presented as specific pre-set bits in packet headers. When the packets are received, a priority can be assigned according to the bits that have been set. For a description of QoS in the IP context, see, for example, www.ittc.ukans.edu/~rsarav/ipqos/ip_qos.htm. A finer granularity of QoS is possible using Resource Reservation Protocol ("RSVP"). For a description of QoS in wide area networks (WAN), see for example, www.cisco.com/warp/public/cc/so/neso/vvda/avvid/eeqos_ds.pdf. In networks that communicate via Asynchronous Transfer Mode (ATM), each distinct datastream has an identifier, often called a "virtual

10

channel identifier," that accompanies each of its packets (or cells). In a preferred embodiment, the identifier is contained within a header attached to each packet or cell. QoS is achieved by discriminating between datastreams according to their different identifiers. QoS may be controlled by adjusting parameters that include a packet loss ratio, a packet cell delay variation, a maximum packet loss transfer delay and a mean packet transfer delay. A user's desire in respect of the priority to be accorded to a particular datastream is communicated amongst the various nodes in the network. A more detailed description can be found in, for example, *High Performance Communication Networks*, Walrand, J. and Varaiya, P., Morgan Kaufmann Publishers, Inc., (1996).

Accordingly, an identifier suitable for use by the present technology for assigning a refresh rate to a tile includes a bit or bits in a packet header, or a tag that accompanies or is in the header of each tile or packet.

Consistent with altering refresh rates according to a QoS concept is that the level of packet loss can be adjusted according to the priority level associated with different types of data. Furthermore, a fully-implemented QoS capability permits prioritization based on criteria other than the type of the data. For example, traffic can be prioritized according to the IP address of a source or destination device. Traffic can also be differentiated based on whether or not they are real-time, such as voice or video.

Tile Objects

In the ensuing discussion, tile objects are introduced and described and contrasted with existing elements of graphical user interfaces. A tile presents content from any information source.

Conventional graphical user interfaces of the background art provide two distinct representations of programs, files, and datastreams, as shown in FIG. **3**. One representation is an icon **320**, the other is a window **340**. An icon typically occupies only a relatively small proportion of the available display area and comprises an easily recognizable depiction of the program or file, either through its logo **322** or some characteristic picture with the name **324** of the program visible. An icon can be selected by, for example, a touch screen pointer, a cursor controlled by a mouse with a button, or by a keyboard stroke or a combination of keyboard strokes, or any combination of the foregoing. In response to a further selection operation on an icon, for example a double-click of a mouse button, the graphical user interface will provide a window that can be used to communicate further information to the program or review the associated datastream.

A window **340** may occupy a substantial percentage of available screen space, usually 90-100%. The window **340** usually comprises a title bar **348** and a display area **354**. The window **340** can commonly be resized by the user for example by using buttons **352** or a draggable area **356** and has a format which contains many active areas around its borders. Examples of active areas include a menu bar **342**, a vertical scroll bar **344**, a horizontal scroll bar **350** and one or more tool bars **346**. Each active area may be used to control aspects of the window's appearance or to set parameters specific to the operation of the program associated with it such as text formatting options in a word-processing package or redirection of a web-browser to its stored home location.

In the present disclosure, a third graphical representation of programs and files, herein called a tile, is introduced. Tiles permit "dynamic bookmarking" of information in that each tile is a viewer of a single information source—including streaming data sources—and can be customized with the user's choice of content as well as initialized with sets of

Petitioner Microsoft Corporation - Ex. 1001, p. 34

US 9,032,317 B2

**11**

options that are pre-determined by the software of the present disclosure according to the type of data that the tile displays.

A tile is different from an icon because it provides a real-time or near real-time view of the underlying information in that it contains continually refreshed content. A tile is different from a window because a tile will typically be smaller in size than a window, allowing the user to view multiple tiles simultaneously if desired.

A tile provides an at-a-glance view of the current status of the program or file associated with it but does not necessarily have the large number of active areas associated with windows such as title bar, menu bar, toolbars, and scroll bars. Therefore tiles lead to a reduction in clutter on the display screen because many tiles may be displayed simultaneously without overlapping with one another in the way that windows must necessarily do. Tiles may overlap one another during configuration of a grid, or when moving tiles from one location to another, but typically, tiles are arranged adjacent to one another. Tiles are superior to icons because they give an immediate indication of the current state of the file or program and have utility functions associated with them, as described hereinbelow. Another advantage of using tiles is a uniformity of appearance between tiles which correspond to different programs and datastreams. The display content of a tile will differ from application to application though its size and format need not.

A tile is associated with a program, file or datastream, similar to the way in which an icon and a window are. A tile may present data in any of a number of ways. For example, in a preferred embodiment, the tiles may present a miniaturized, "thumbnail" view of the underlying information; a "porthole" view of a portion of the underlying information as viewed at full size; a symbol indicating whether the information has been updated since it was last viewed; or a custom interface designed to allow rapid access to the underlying information. The way in which a tile displays content may be independently configured for each tile and may be set up in a default manner that depends upon the type of information being displayed.

FIG. **4** illustrates representative tiles. Tile **402** displays a picture or graphic such as may be stored in a bit-map, JPEG, TIFF or GIF file, or on a world-wide web page. The content of tile **402** is typically a miniaturized representation of a graphic or still-frame from a datastream. Tile **404** displays a portion of a text document or text of a world-wide web page. In this sense the tile functions as a transparent panel placed on top of a document, thus permitting a portion of the document to be displayed. Tile **406** displays a further array of tiles that may be displayed in full by expanding tile **406** to occupy the full area of the display. Tile **408** has been configured to link to an electronic mail program. An exemplary alarm setting associated with tile **408** has been configured so that the tile displays an envelope and the message "New Mail!" when an email message has been received by the mail program. It would be understood that other alarm or alert settings may be associated with a tile, for example, configurable by a user. Thus, a tile could be established to broadcast a particular alert when the datastream to which it is connected encounters a particular condition, or transmits a particular signal.

Tile **410** displays a name, "FM 101", denoting the title of a broadcast signal, in this case audio, that is associated with the tile. Tile **412** displays a "thumbnail" of the document viewed in a window such as **340**. A "thumbnail", as used herein, is a miniaturized representation of an image that retains sufficient characteristics to permit easy recognition of the image. For example, if the document displayed in a window were a

**12**

document with multiple pages, tile **412** may display a thumbnail of the first page of the document.

Tiles are selectable and live. When a tile is selected, whether by mouse click or otherwise, the tile instantly provides the user with access to the underlying information, whether that data be a hierarchical menuing system leading the user to a different level or tiles, a word processing file stored on a local area network, a spreadsheet stored locally on a user's computer, HTML file on the Internet, or a television signal. The tiles are live in that each contains real-time or near real-time information.

In a preferred embodiment a selection operation is associated with a tile. For example, clicking on a tile will cause it to immediately refresh its contents. Selecting tile **402** causes the most recent frame of the video stream to be displayed by the tile, or, if the picture were obtained from a static graphic file, causes the most recent version of the file to be displayed by the tile. Selecting tile **404** or tile **412** causes the most recent version of the document to be displayed.

In a preferred embodiment, a second selection operation is associated with a tile. For example, double-clicking a tile causes that tile to occupy a substantial fraction of the whole display area. In this embodiment, double clicking tile **402** or **412** causes the image to be expanded to fit the whole display area. In an alternate embodiment, selecting a tile causes it to occupy an area in the middle of the display that is larger in area than a single tile but does not occupy the full display. If tile **404** were double-clicked, as much of the document as could be displayed in the enlarged tile in regular font size becomes visible. Double-clicking tile **408** causes the mailbox window of the e-mail utility to be sufficiently enlarged to allow new messages to be selected and read. Double-clicking tile **410** causes the audio stream to become audible over the appropriate channel of the system and need not necessarily cause the tile to occupy a substantial fraction of the display area.

A representative tile data structure **500** is shown in FIG. **5**. It is important to understand that the tile itself is an image that at any given instant is resident on the file system. This image is separate and distinct from the application program or file associated with the tile. The tile data structure **500** comprises two addresses: a tile address **502** that defines the location on the file system where the tile image is stored; and a target address **504** that is the location at which the file or application program associated with the tile can be found. Additionally, the tile data structure contains a name **506** that may be displayed on the tile in certain circumstances (for example the title of a broadcast signal, as in Tile **410**).

Tiles of the present disclosure may be assigned at least seven functions, including but not limited to: an initialization function **508** that is responsible for establishing a connection with the target address **504**; a refresh function **510** that handles updates to the tile image stored at the tile address **502**; a screen-size function **512** that stores the dimensions of the display area filled by the tile upon receipt of a request; an alarm function **514** that permits the tile to display an alarm or warning when the application program associated with the tile encounters a designated event; an on mouseover function **518** and an on mouseout function **520** which control the behavior of the tile when a selection tool such as a mouse-controlled cursor is placed respectively on and off the tile; and a toolbar function **522** which may permit an array of special buttons to appear on or adjacent to the tile for the purposes of adjusting properties of the tile.

Refresh function **510** is able to indicate a retrieval rate at which information is retrieved from a source of information so that the information is displayed and refreshed in the tile.

Petitioner Microsoft Corporation - Ex. 1001, p. 35

US 9,032,317 B2

**13**

Preferably refresh function **510** is able to interpret an identifier that accompanies the information displayed by the tile. In some embodiments, a tile is configured so that a right-click of a 2- or 3-button mouse while the cursor is over the tile would activate the tool-bar function. In a preferred embodiment, right-clicking on a tile can reveal a menu of options that enables the user to ascertain properties of the tile, such as the bandwidth it is consuming.

In some embodiments of the present disclosure, the tile is itself a document created in a markup language such as HTML or XML as shown in FIG. **6** and is suitable for display in a web-browser. In this embodiment, a tile occupies a position in a table defined with elements of mark-up language which will be familiar to one skilled in the art. Tile-specific attributes are introduced which control the way in which a web-browser displays the tile. In the example in FIG. **6**, the tile has a clickable map, i.e., separate areas of the tile produce separate results when clicked. Also, this tile has a toolbar, which in some embodiments may appear if the mouse is right-clicked when the cursor is over the tile.

In another embodiment of the present disclosure, tiles communicate with one another and have conditional content. That is, the content of one tile depends upon the content of another. Such conditional content enables more than one tile to be refreshed simultaneously, or nearly simultaneously, by requesting a given tile to be refreshed. Alternatively, a tile may be set up to specify one or more other tiles whose contents are linked to it. For example, a first tile may show a web-based listing for the Nasdaq Stock index, and one or more conditionally dependent tiles may link to web pages that show the weekly, and yearly fluctuations of the index and the performance of previously chosen stocks.

In some embodiments, tiles should be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a tile, such as selecting a "send" option in a selection menu accessed by right-clicking on a tile, or by activating a button on the tile, send a tile that has already been configured to another user. The tile could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the tile from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the tile, i.e., send the tile from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously.

A tile could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a tile to a removable medium such as a CD-R, or a USB-drive, and transfer the file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable tiles would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a tile to another member of the community from within the online environment.

In a preferred embodiment, tiles are categorized into a number of levels, arranged hierarchically so that tiles in each level have priority over those in other levels. Such a priority indicates that tiles with highest priority will refresh most frequently. Accordingly, each tile has a tile level **524** in this embodiment. In one aspect of this preferred embodiment, priorities are assigned according to the type of data that is displayed by the tile. According to such an aspect, the highest

**14**

priority is assigned to a video or web-based conference, for example; the next priority is assigned to a videostream such as a movie or broadcast TV signal; a third priority is attached to a media player such as RealPlayer; and lower priority tiles handle local applications and files. Tiles within a given level can be set up to compete equally for available system resources and bandwidth.

Grid Object

The arrangement, layout and independent functioning of the tiles on the display and exemplary software for their control is now described with respect to FIGS. **7-13**.

The overall hierarchy of a graphical user interface embodied by the present technology is summarized in FIG. **7**. The Grid **700** is the top level functionality to which application programs are subordinate. The grid can replace the functionality of a user's computer desktop and offers similar and additional features. Grid **700** comprises a matrix or array of tiles of which tiles **702**, **704**, **706**, **708** and **710** are representative. The user can control the grid in such a way that the tiles **702**, **704**, **706**, **708**, and **710** present simultaneous information content from a plurality of sources independently of one another. The grid controls the layout and priorities of the tiles. Each tile is associated with a data stream or application program thereby permitting a number of different images to be displayed simultaneously. In particular, different tiles can be—and typically are—associated with different contents. For example, tile **702** is connected to a web-page viewer **712** such as a browser. Tile **704** is connected to a source of streaming video **714**, such as Real Player. Tile **706** is connected to an audio player **716** such as a CD-player program or a source of streaming audio such as Real Audio. Tile **708** is connected to a file viewer **718** such as a text-editor or a word-processing package. Tile **710** is associated with another grid object **720**, thereby permitting a "layering" of information hierarchies. In a preferred embodiment, a grid embodies a similar underlying data structure to a tile.

Each tile is separately associated with a source of information, for example, an application program, datastream or file, any one of which may be another grid object. Such a hierarchical structure permits a user to organize programs and information through the graphical user interface. For example, separate categories of information can be displayed on separate grids allowing each grid to be associated with a theme. In some embodiments, a grid can be configured to be populated with a fixed number of popular web pages based on, say, most recently visited URL's, or most frequently visited URL's over a period of time such as a week or a month.

In some embodiments, a source of information has an identifier, such as a quality of service tag, associated with it. The grid assigns a priority to a tile based upon the identifier, or based upon the type of data that the source of information comprises. Where tiles are ranked into levels, the grid assigns an information source to a tile in a level that is appropriate for the type of data or the identifier associated with the information source. In this way, a tile can be automatically given a priority that is appropriate for the type of information that it is to display.

By using the native attributes of a tile, a user may specify a presentation of the grid, consisting of its dimensions, (i.e., the number of tiles to display and their arrangement), and the programs or files to be associated with each tile. A single grid, composed of multiple tiles, may therefore present a number of information sources simultaneously.

Together, the grid and tiles comprise the application through which a user can view simultaneously information from a multitude of available sources including multiple sites on the Internet or some other distributed computer network,

Petitioner Microsoft Corporation - Ex. 1001, p. 36

US 9,032,317 B2

15

receive signals from multiple broadcast channels, and open and view multiple files. In some embodiments, the application may be run through ordinarily available computer operating systems, whereupon the application overlays the user's desktop and acts as if it were a "borderless browser". Therefore the application resides over existing applications without replacing any of them; rather it enables those applications to be called from the grid itself. The application, therefore, becomes a graphical file manager in which the content of continuously changing files, e.g., datastreams, is being displayed in real-time or near real-time, depending on the respective assigned priorities. Effectively, the application can be used instead of the user's computer "desktop" because it has a more visually intuitive dynamic menuing system than a traditional desktop.

In a preferred embodiment, a grid of tiles replaces the functionality of the computer "desktop" utilized by many computer operating systems. Whereas a desktop is typically populated by static icons and tool bars, a grid of tiles instead presents to the user an array of snapshots of current programs and files. The essence of the grid is that its content is dynamic and informative. As previously discussed, icons are inherently limited in the information that they can present and windows clutter the entire desktop without permitting more than one to be readily displayed simultaneously. By contrast, each tile on the grid can show the current status of the data or datastream associated with it. The fact that a tile may refer to a separate grid permits nesting of grids and consequently a hierarchy of organized information sources.

The grid also understands the interests of the user and acts as a repository for passwords and identifiers to subscription services. In this way, it is not necessary for a user to remember and enter a user name and password to access data requiring such a log-in. In this same vein, Internet sites of interest can be "bookmarked" and stored by the grid, each such site possessing its own tile. The grid is also nestable in that a tile in one grid may point to a separate grid and tiles in the separate grid may point back to the first grid or to yet more grids. If desired, a user can impose a "theme" on a grid and thereby categorize, group, and/or otherwise manage his/her data sources. In this manner, the user can group tiles relating to particular subject matters, Internet sites, documents, or otherwise in a grid according to some specialty. A tile in such a grid could link to another grid to provide a connection between related categories. Equally, a tile on one grid can point to the same information source as a tile on another grid.

In some embodiments, the application program is provided with a number, such as one or more, 'out of the box' grids. In such embodiments, a user is offered a repository of pre-made grids that are pre-configured with a particular layout of tiles, and links to particular datastreams. Such a grid can be used as a starting point for a user who first opens the program, and may contain, for example, a tile configured to provide content for each of several commonly used programs or websites. By way of example, a pre-configured grid may contain an array of 4 tiles, that include: a tile configured to link to a home-page of an Internet search engine, such as Google; a tile configured to link to an information archive such as Wikipedia; a tile configured to link to a user's e-mail program; and a tile configured to access the local file-system on the user's device.

The grid can be configured to contain any number of tiles, from one to as many as can reasonably fit on the user's display.

In a preferred embodiment, the grid permits a regular layout of tiles on the display screen such that the tiles are uniform in size and shape, as depicted in FIGS. **8-11**. Each tile is indexed by its position on the grid. For example **802-2-1** is the

16

first tile in the second row. Tiles in the first row of the grid are **802-1-1, 802-1-2, 802-1-3** and so on, to **802-1**-N. Tiles on the second row are **802-2-1, 802-2-2, 802-2-3** and so on, to **802-2**-N. And, tiles on the bottom row are **802-M-1, 802-M-2, 802-M-3** and so on to **802-M**-N. There are no gaps between the tiles, the tiles are not permitted to overlap and the whole grid is covered by tiles. FIG. **8** shows one embodiment in which all tiles are the same size and are presented in an array comprising M rows and N columns. There is no particular requirement that the arrangement consists of more than one row and more than one column. On the display of a mobile telephone or smart phone, for example, a single row of tiles may be apposite. In a preferred embodiment, a display of a smart, cellular or mobile telephone presents a single tile at any one time but it is possible to scroll from tile to tile across the grid, by using, for example, buttons on the phone, or other methods of control.

FIG. **9** shows an arrangement in which there is a unit tile size, that of tile **802-1-1**, but tile **802-1-2** and tile **802-M-1** have each been configured to occupy regions of the grid equal to exact multiples of the unit tile size. Such an arrangement may be useful and important if one or more datastreams is of particular interest but the others are also to be monitored at the same time.

In some embodiments, a grid comprises instructions for assigning tile size intelligently when a user specifies, or receives, a number of tiles. The instructions can comprise a learning algorithm that learns the preferred sizes of the most active tiles and does its best to keep the user happy without the user having to manually assign, resize, or move tiles around. Thus, for example, a user may wish to set up a grid quickly, and specify seven tiles. Seven does not neatly partition into a square or rectangular array, but the program understands that particular applications benefit from being displayed in tiles that are greater than the unit tile size, and therefore automatically assigns such applications to larger tiles without the user's intervention.

FIG. **10** shows an arrangement of tiles in which Tile **802-M-1** is associated with a further grid **1000**. The lower half of the Fig. shows an enlarged perspective of that tile showing a grid with Y columns and X rows.

FIG. **11** shows an arrangement of tiles in which are depicted different application programs associated with three of the tiles. Tile **802-2-2** links to a file viewer displaying a specific file; tile **802-M-1** presents streaming video; Tile **802-M-N** depicts a page of information on the world wide web.

In some embodiments, a grid can be configured with a foreground option such that, when a user's display has already been configured to contained a number of tiles, upon selecting a tile in a particular way, e.g., middle-clicking on it, the tile would expand in size and be displayed in the foreground relative to the rest of the grid.

FIG. **12** shows a schematic data structure of the attributes of some embodiments of grid object **700**. The architecture shown in FIG. **12** applies to any grid, including a top-level grid **700** shown in FIG. **7** as well as to a grid that is contained within a tile.

Significantly, the grid manages the flow of information to the tiles. For example, the grid can communicate with the display device in order to determine its current configuration and allocation of resources. In some embodiments, using a so-called "carousel" approach, the grid continually cycles around the currently displayed tiles, one by one, refreshing the content of a tile each time it is accessed. When a given tile is refreshed, the refresh operation is completed before refreshing the next tile in sequence. In this way, the cycling rate may be set so that the current content of all tiles are

Petitioner Microsoft Corporation - Ex. 1001, p. 37

US 9,032,317 B2

**17**                                                                **18**

reasonably up to date. The cycling can be interrupted by a user selecting a given tile, so that that tile alone becomes continuously updated. In this way, the user does not need to worry about manually refreshing multiple tiles.

In a preferred embodiment, according to priorities that may be applied to individual tiles on a tile by tile basis if desired, the grid manages the refresh rate of each tile in the grid. For example, for locally stored word processing or spread-sheet files, the user might configure the tiles to refresh only when the underlying data is written to the local hard drive. Similarly, a user might configure tiles containing infrequently updated Hyper-Text Markup Language ("HTML") data from the Internet to refresh at a certain time each day. At the other extreme, a user might configure an active tile to display a television channel at a refresh rate of 29 frames per second, while at the same time configuring inactive tiles to display different channels at a refresh rate of once every five seconds. In this way, a user could monitor many channels until program content of interest appeared in one of the tiles without the burden of actively refreshing each tile.

In other embodiments, the grid itself assigns priorities to the tiles based on identifiers such as quality of service tags that are associated with the information source itself. In still another embodiment, the grid automatically assigns priorities to the tiles based upon its recognition of the type of data that is presented to it. In this way, the grid can associate information sources with tiles that occupy different levels of priorities in a hierarchy of levels, if present. It is to be understood that an identifier such as a QoS tag can be used to assign to a tile a priority that is higher than that of another tile that would display the same type of data, and would have the same priority in the absence of such an identifier. Thus, for example, QoS tags can be used not only to assign two video-streams a higher priority than a web-browser tile, but can be used to prioritize one videostream over another. It is also to be understood that not all information sources need be accompanied by identifiers for the grid to be able to assign priorities itself. In the absence of an identifier for a particular information source, the grid can assign a priority based on the type of data, a user preference or some arbitrarily low priority based on other considerations such as bandwidth and availability of other system resources.

The grid itself has an address **1204** that specifies its location within the file system of the device in which the application program program runs. The grid has associated with it several utility programs: a configuration wizard **1206** that may be called by the user when setting up a new grid; a tile creation function **1208** utilized by the configuration wizard when initializing new tiles; a tile annihilation function **1210** utilized in case of error or when resizing the grid.

The grid object stores the number of rows **1212** and the number of columns **1214** of tiles that are present. The grid also stores a tile list **1216** containing attributes of each respective tile. In particular, the address of each tile, its priority and its refresh rate are stored by the grid program. The grid also stores other attributes of tiles such as their respective positions on the grid as given by their column and row number. The priority of a tile may be used to determine its refresh rate in some embodiments of the present technology. A tile can have a password feature built into it if it is desired to restrict access to the tile's content. The grid itself can have a toolbar by which its attributes may be accessed and modified.

Much as in the manner in which tiles may be sendable, in some embodiments, grids should also be sendable, for example by e-mail or by Instant Messaging, such as in the form of an e-mail attachment. In such embodiments a user could, by performing a particular operation on a grid, such as

selecting a "send" option in a selection menu accessed by right-clicking on the grid, or by activating a button on the grid, send a grid that has already been configured to another user. The grid could be sent via e-mail, via a mobile device such as a phone, via a Web-based interface, or via a game-console such as PlayStation, etc. The user could send the grid from any device which can be used to access a network such as the Internet (via either a wired or wireless connection). The user could also 'multicast' the grid, i.e., send the grid from one point (his/her device) to many points, i.e., multiple persons or devices, simultaneously. When sending a grid, the key attributes that would be sent would include the grid configuration, such as its size, and the locations of datastreams associated with the respective tiles.

A grid could also be transferred as a file, from one device to another, without using a transmission system such as e-mail. For example, a user could save a grid as a file to a removable medium such as a CD-R, or a USB-drive, and transfer the grid-file to another system that is capable of reading the removable medium.

The advent of "social networking" on computer networks such as the Internet means that readily sendable grids would be particularly beneficial. For example, a user of an online-community such as Facebook and MySpace could transfer a grid to another member of the community from within the online environment.

In a preferred embodiment, a grid is a special form of a tile. It is a tile that can create and manage an array of other tiles. Accordingly, its data structure also comprises those elements of a tile data structure shown in FIG. **5** in addition to those shown in FIG. **12**. If the grid has a parent grid, the address of the parent grid **1202** is stored. For example, grid **1000**, associated with tile **802**-M-1 of FIG. **10**, has grid **700** as its parent.

In some embodiments of the present technology, the grid is a document created in a markup language, such as HTML, SGML or XML, and is therefore suitable for display via a web-browser. In this embodiment, the addresses of the parent grid, the grid itself and each of the tiles are expressed as Uniform Resource Locators (URL's). The various functions controlled by the grid are accessible through function calls devised according to methods familiar to one skilled in the art. For example, "dynamic HTML", java applets or simple CGI-scripts can provide the technological basis for enabling various grid utilities. FIG. **13** is illustrative code for establishing a grid.

In some embodiments, a grid can provide a sub-layer of functionality around "favorites" and history, thereby allowing users to see what data streams have been recently accessed by any one or more of the tiles, as well as to create lists of sites as favorites.

The application program may be downloaded from a predetermined web-site and preferably operates in a client-server mode. Users may download preconfigured grids from the predetermined server. A grid configuration "wizard" program which guides a user through a step by step set up of a custom-grid may also be downloaded. Other web hosts are able to deliver content to end-users via the predetermined server. Some basic functions of the grid can be carried out on the predetermined server and provided to the user. According to the capabilities of the device on which the grid is displayed, the server may take on more demanding functions.

A grid can also be offered as a web-based service, for example one that provides single-sign-on to chosen services (where possible) that are accessible via a user's pre-determined tiles.

Petitioner Microsoft Corporation - Ex. 1001, p. 38

US 9,032,317 B2

**19**

Grid Configuration Wizard

In some embodiments of the present technology, the set up of a particular grid is achieved through a grid configuration program ("wizard") that is downloaded to the display device from a remote site. The grid configuration program permits a user to define and install one or more grids on the client system. When a tile is partitioned into a further array of tiles, the grid configuration program can also be used. Some embodiments of the user interface of the grid configuration wizard are shown in FIG. **14**.

A first screen displayed by the grid configuration wizard comprises an application program logo **1404**, button **1406** to guide the user to the next screen and a number of choices, such as **1408**. The user is offered the choice of preconfigured, or "standard" grid configurations, selected from a list. Examples of such grids include grids themed by content such as sport-related grids or by type of data such as grids whose content is video-based.

Additionally, the user is permitted to configure "customized" grids in which each tile can be taken from a list of predefined samples or can be initialized according to the user's wishes. For example, a user can assign a priority to a tile, or can select a tile from a hierarchical scheme of predefined priorities, or can specify that a tile set its own default priority by recognizing the type of data that it receives or an identifier such as a QoS tag associated with that data. In a second screen **1412** displayed by the grid configuration wizard, a tiled area **1416** represents the grid that the user is building. Sample tile categories **1418** such as "weather", "news", "stocks", or "sports" are listed. In an alternate embodiment, a grid can be filled by the "drag and drop" technique in which a selected document **1414** is moved on to the display area of the grid configuration program and automatically becomes a tile. In some embodiments, as described elsewhere herein, the grid is able to intelligently and automatically assign a size and location of such a tile in the grid. A button **1410** offers the user the chance to go back one screen.

In a third screen **1420** displayed by the grid configuration wizard, the user can name the grid and, optionally, store it for future reference, for example in an archive of preferred grids. The user can elect to finish grid construction by clicking the "Finish" button **1412**, or launch the grid immediately by activating button **1422**. When launching the grid immediately, the grid is automatically constructed on the fly according to the content and tile types specified by the user during the set up procedure.

Architecture of Application Program Software

The hierarchy of the software in a preferred embodiment of the present technology, the Surfcast System (see, e.g., www-.surfcast.com, the textual and graphical contents of the various pages of which as of the filing date of the instant application are incorporated herein by reference in their entirety), is illustrated in FIG. **15**. It is understood that the Surfcast System is merely an exemplary embodiment and that other software products can be developed that fulfill the functions of the present technology. It is further understood that the Surfcast System or other equivalent systems, may be distributed between a client and one or more servers and that all parts of it need not reside on a single device. It is also to be understood that such software may be offered as a web-based service without needing to be downloaded or installed on a user's local device.

The Surfcast System software comprises a number of modules. In FIG. **15**, an arrow connecting two modules means that one module uses an interface of the other. The arrow comes from the module invoking the interface towards the module

**20**

whose interface is being invoked. An interface may simply be a function call between the two modules or, for example, a call to a dynamic linked library (DLL).

The Surfcast application program **1500** takes its underlying data from two sources, a metabase **1506** and a system library **1514** that preferably resides on the device on which the application program is running. For example, the application program **1500** may be required to call functions from the system library while it is running. Actual tiles that a user visualizes can be spawned from the metabase **1506**.

Data structures for user tiles **1502** are obtained from the XP core **1504** which itself also utilizes components from the system library **1514**. In a preferred embodiment there are different data structures for tiles of different priorities. The XP core is an abstraction layer for the operating system environment. Tiles that utilize components such as buttons take these components from the widget set **1508**. A widget is a basic user interface element such as a button or a text input box. The metabase also uses an interface of the widget set **1508**, and can therefore use functions within the widget set. The widget set requests functions from the XP core.

Objects in the metabase **1506** that retrieve content from remote sources such as world wide web pages utilize a connection manager and bandwidth controller **1512**. A URL loader **1510** decides whether content should be obtained afresh by contacting the connection manager **1512**, or from content previously stored in cache. Effectively, the URL loader manages the connection manager, and calls functions within it.

Underlying all of the Surfcast application program's operations are functions from the operating system library **1516** that is supplied with the device on which the application program is running.

Each of the objects shown in FIG. **15** is now described in further detail by reference to FIGS. **16-21**.

The Surfcast application program **1500**, in FIG. **16**, comprises a launcher **1618** and a framework **1620**. The launcher opens the program from scratch whereas the framework is responsible for managing grids and tiles. The user interacts directly with the framework to set up a preferred arrangement of tiles on the display. In some embodiments, the framework initially contains a prescribed set of tiles. The framework controls communication between tiles, for example, in the case of conditional content.

Tiles **1502**, FIG. **16**, are the equivalent of an application in a conventional GUI system. They can be built in C++ using the Surfcast tile builder application program interface (API) using XP core classes, or via a utility such as a custom tile editor or via a script file. Some predefined tiles are included with the basic Surfcast system including a web browser tile called a surftile **1602**, tiles for contacts and communications such as a chat tile **1604** and an e-mail tile **1608**. Media-player tiles such as a video tile **1606** are also supplied, as are tiles that interface to commonly used desktop programs. A word tile **1610** interfaces to a word processor; excel tile **1612** interfaces to a spreadsheet program. A general content viewer that can compose pieces of content clipped from a variety of sources, layout tile **1616**, is also provided. Reg tile **1614** is a general purpose tile that permits a user to define his/her own tile type.

In a preferred embodiment, all tiles have a common base class, and each specialized type of tile has its own class that builds upon the base class. There are many ways in which specific tile classes can be derived from the common base class. In a preferred embodiment, tiles are categorized into a hierarchy. There may be a tile class specific to each level in the hierarchy. Functions for specific tile classes are readily appar-

Petitioner Microsoft Corporation - Ex. 1001, p. 39

US 9,032,317 B2

21

ent to one of skill in the art. Tiles may additionally be represented by markup language files and viewed within a web-browser environment.

The data classes in XP core **1504**, FIG. **16**, comprise base classes and utility classes with which tiles and widgets are built. In general, classes within the XP core describe how tiles can communicate with one another and with the overall application program framework **1620**. In particular, XP core classes are generic and portable, thereby permitting cross-platform capability.

XP core classes include: tilebase **1622** for the generic class that underlies all tiles; tile base view **1624**; tile controller **1626**; canvas **1628**; and event classes **1630** for event handling. A view is what a tile uses to draw itself. Tile base view **1624** is the base class for all views associated with a visual object. A controller processes events **1630**, for example mouse moves, clicks, keyboard events and external events. Tile controller **1626** is the base class for controllers associated with a tile. A canvas **1628** is an area of screen on which to render some image, for example a tile.

The metabase **1506**, FIG. **17**, is a local store for platform-specific implementations of the descriptions of tiles, grids and other objects. Tiles, grids and content are created, saved and restored via the metabase. The metabase contains tile type and content type registries such as tile registry **1732**, and a local database of grids and content such as content store **1734** and grid store **1736**. Unknown tile and content types can be obtained from remote servers. Tile types are abstracted so that if a grid contains a particular type of tile, for example an e-mail tile, the metabase provides whatever is appropriate for the device the application is running on. Items in the metabase are "persistent", that is they are not saved explicitly but are preserved from session to session.

The widget set **1508**, FIG. **17**, comprises a platform-specific set of visual components that tiles can use. Widget set contains the predefined widgets that are included with the system. It can be extended with new widgets. It includes such useful widgets as a button **1738**, a label **1740**, an edit widget **1742** that enables a user to enter text into an editable field and a list widget **1744** that enables a user to select from a set of options. Items within the widget set can be used with tile types such as text input tiles, web browser tiles, and a streaming video tile. The term widget can also include more complex objects such as a video player that can be inserted into a tile as easily as a button.

The URL loader **1510**, FIG. **17**, provides a mechanism for retrieving content. The URL loader **1510** interacts with connection manager **1512** for tiles which need to make a network connection. Tiles and the metabase ask for content for a given URL and the content manager will attempt to retrieve it. The metabase also contacts the connection manager through the URL loader to ascertain whether there is sufficient bandwidth for the transfer. In particular, the connection manager decides whether the URL loader should furnish tile content from the cache **1746**, as would be the case if the content has been recently displayed and stored locally. Alternatively, if the content is not cached, the URL loader supervises loading of content from the location specified by the URL.

The URL loader **1510** also comprises a file manager **1748** for organizing the cached content. The URL loader additionally comprises a DOM (data object model) renderer **1750** that administers the parsing of pages in markup languages such as XML and HTML. The URL loader may also comprise an implementation of an API for XML rendering such as SAX. In an alternate embodiment, such an API may reside in the XP core module.

22

The system library **1514** comprises commonly used utilities within the application program, including, but not limited to, code for string manipulations, file handling and server communication. The system library module comprises generic code and can be compiled for any operating system.

The operating system library **1516**, FIG. **17**, comprises utilities that differ in their implementation from system to system but are needed for operation of the application program. For example, utilities that may be found in system library **1516** are those that provide support for threads and synchronization **1752**, debugging tools **1754**, graphics libraries **1756**, further basic string manipulations **1760** and connections **1762**. Additionally, not shown in FIG. **17**, useful items in the operating system library include utilities that permit definitions of objects, sockets, input devices and hardware devices. Items in the operating system library are accessible through classes with documented public interfaces.

The operation of the widget set **1508** is further described with respect to FIG. **18**. As previously mentioned, the widget set contains widgets for various functions such as buttons, text labels, etc. Illustrated in FIG. **18** is a set of widgets for buttons.

FIG. **18** shows the class hierarchy for the button widget. In FIG. **18**, a solid line with an arrow head indicates a relationship of inherency between two classes. Base classes for widgets are grouped together in box **1809**. Widget class **1810** is a container for other classes. All widgets use the base class widget **1810** stored in the XP core module and further described later. Accordingly, button **1800** is a specific class inherited from widget **1810**.

Widget view **1812** is a class, also stored in XP core, that defines the look and feel of the widget. Button view **1802** inherits from widget view and controls how a button draws itself.

In the scheme of FIG. **18**, user tile **1816** comprises three objects, tile controller **1626**, the base class tile **1622** and tile base view **1624**, each of which is found in XP core and is further described later. Tile base view **1624** is responsible for drawing the tile and can employ one or more widgets.

A button is something that a user can click on. A button provides button events to a button event consumer. A button event consumer is also known as a client, i.e., clients that use buttons implement button event consumer **1808** to be notified of button events. For example, a button event consumer may be a "play" function in a video tile. The button event consumer interacts with a control structure tile controller **1626** associated with a user tile **1816** by telling the tile that the button has been activated. Button event consumer **1808** is itself a class that inherits from an event consumer class, described later.

Button controller **1804** controls how button events **1806** are processed, for example mouse and keyboard events. It inherits class structure from widget controller **1814** stored in XP core. Not all button events **1806** are recognized by the button controller **1804**: for example, a particular keystroke may have no effect on the state of the button.

Other widgets follow a similar pattern. They include: textedit, for inputting text; textlabel, for displaying text; textspinner, for selecting from a choice of options; datewidget, for entering a date; list, for selecting from a choice of options; titlebar; and a toolbar.

Metabase **1506** is further described with respect to FIG. **19**. Arrows between the components in FIG. **19** denote interfaces. The metabase comprises a registry **1900** and store **1902** of tile and grid types, a content store **1918** and a content and tile link database **1920**.

Petitioner Microsoft Corporation - Ex. 1001, p. 40

US 9,032,317 B2

**23**

The tile type registry **1900** contains a list of tile and widget types along with information about how to create them and what they are called, as well as other information such as pointers to objects from which tiles are created. In a preferred embodiment, the list of tile types includes tiles in a hierarchy of categories. The tile and grid store **1902** contains a library of stored grids and tiles. Tiles can save themselves or be restored. In a preferred embodiment, grids are just special cases of tiles. Tiles from the tile library can be called and displayed on the screen by asking the registry to load tiles. The tile and grid store interfaces to an XML library **1906**.

Tiles from the tile and grid store can also be saved outside the metabase in a library of markup language files, e.g., an XML library **1906**.

Also in the metabase **1506** is metabase tile **1904** which utilizes tile base **1622** from the XP core module. All tiles inherit from this class.

DLL's can contain additional tiles and widgets that can be created by independent third parties. These can be implemented within the metabase through the tile factory **1916** and tile creator **1914**, both of which interface to the tile type registry **1900**. The tile factory **1916** contains the description and classes necessary for someone to register a new tile type. Tile creator **1914** is the code that does the tile creation at runtime. In general, independent creation of tiles is facilitated by supplying a tile toolkit to third parties.

Inquiry utility **1912** is an optional means for an outside user to interface to the metabase, for example to ascertain the class structures of stored tile classes.

Content store **1918** is a cache that contains content of tiles for the previous session. The content store **1918** follows a similar pattern to the tile type registry and the tile store. The content and tile link database **1920** is a database of information about how tiles and grids are related, and how content is related between them. Content tile link database **1920** copes with descriptions of relationships between tiles and also themes of content for related tiles. This database can also be used in the context of "knowledge management", i.e., those operations that monitor a user's activities and attempt to suggest further sources of content based on it. Both content store **1918** and the database **1920** interface with tile type registry **1900**.

FIG. **20** shows a further description of classes found in the XP core and their interaction with the operating system library **1516**. As discussed below, some arrows between objects within XP core denote inheritance of classes.

Canvas **1628** describes an area of screen that can be drawn to. GfxContext **2002** is a set of graphics primitives, for example for line-drawing, colors and space filling. It is a generic version that encapsulates and abstracts operating system-specific features inherited from GfxContextFactory **2032** in the operating system library **1516**. Win32 GfxContext **2034** is an example of a graphics context used with the Windows operating system. Other GfxContent **2036** includes alternative platform dependent graphics contexts.

The foundation classes are tile base **1622**, tile base view **1624** and tile base controller **2008**. Tile base **1622** is the base class for all visual objects such as tiles, widgets and grids. The tile class **2010**, and widget base class **2016**, inherit from tile base. Where tiles are in a hierarchy of categories, there may be several tile classes that inherit from tile base.

A widget effectively functions as a special kind of tile that can be placed inside a tile. Widget base **2016** is not meant to be instantiated on its own, but is a foundation for the widget class **1810**, FIG. **18**, used by a generic widget.

Tile base view **1624** is the base class for all views associated with a visual object. A view is what a tile uses to draw

**24**

itself. Inheriting from tile base view are tile view **2012**, the base class for all views associated with tiles, and widget view **1812**, the base class for all views associated with widgets. Tile base view and tile base also interface with canvas **1628**.

Tile base controller **2008** is the base class for all controllers associated with a visual object. Inheriting from tile base controller are tile controller **1626**, the base class for controllers associated with a tile, and widget controller **2020**, the base class for all controllers associated with widgets. A controller processes all events. Tile base interfaces with both tile base view **1624** and tile base controller **2008**. Tile base controller interfaces to event system **2022**. Finally, event system **2022** also communicates between the operating system library **1516** and the tile base controller **2008**.

Event system **2022** is further described with respect to FIG. **21**. An event can be any one of a mouse movement event, another mouse event such as a mouse-click, or a keyboard event such as a keystroke. In FIG. **21**, event **2112** is the base class. Other classes such as mouse movement event **2106**, mouse event **2108** and keyboard event **2110** derive from the base class by inheritance. The event consumer **2104** is a class responsible for directing events to the controller. The event producer **2102** interprets system events into Surfcast events for an event consumer. The boxes **2122**, **2124**, **2126**, **2128**, **2130** and **2132** are multiplexers handling the case where multiple clients are affected by multiple types of events. An event is communicated to tile base controller **2008**.

Managing Connections to More than One Datastream

When two or more tiles connect to sources of data available over a network, communication must be established in such a way that the rate at which updated data is transmitted to the grid can be controlled. In practice, for an embodiment of the application which resides on a user's computer, a flow control protocol such as TCP is required. In this way, each tile can communicate with the remote datastream to which it is linked and a determination can be made of available bandwidth at the time of data transfer. Alternatively, in a client-server mode, flow control is not necessary because communication with the server suffices, as is described below.

It is not practical to fire up a separate browser program from each tile that wishes to download data from a site on the world wide web. A web-browser is very greedy on memory and resources and the user would have little or no control over the respective rates at which data was downloaded from different sites.

Instead, in a preferred embodiment of the present technology, a hierarchy of layers manages the simultaneous connection and allocation of resources to different world wide web sites, as shown in FIG. **22**. The layer structure applies to the way in which any given tile downloads content.

At the highest level there exists a widget, referred to as "SurfWidget" **2200**, which is the basic browser control within the application program of the present technology. Ideally, this widget operates in conjunction with any commonly used world wide web browser. It is typically associated with a tile type such as surftile **1602**.

The surf widget communicates with a surf widget controller **2202** in a control layer **2201**. Also in the control layer is a web browser application program **2204**. Examples of such a program include Microsoft's Internet Explorer and Netscape's Navigator software. The surf widget controller **2202** handles the interaction between the surf widget **2200** and the web-browser **2204**. The surf widget controller also passes on requests from the browser to the URL Manager **2206** in the next layer, the URL layer **2205**. The surf widget controller then pipes back the results to be rendered to surf widget. A typical example of this process in operation would

Petitioner Microsoft Corporation - Ex. 1001, p. 41

US 9,032,317 B2

25

26

be: a user clicks on a hyper-link in a web-page; the web-browser makes a request for that page to surf widget controller **2202**; the request gets handed to the URL manager **2206**; once the page is loaded, the URL manager **2206** notifies the surf widget controller, which in turn sends the information to the web-browser for rendering.

The responsibility for obtaining pages of content is that of the URL layer **2205**. When a URL is requested, the URL manager **2206** issues a request for the page and any subsequent media to the connection manager **2210**. The URL manager keeps track of the requested URL for future use, if it is requested again. The URL manager also queues up URL's that have been requested according to their focus, i.e., the tile that a user has currently selected and according to the respective priorities of the active tiles.

In a preferred embodiment, a pre-fetch utility such as URL pre-fetch manager **2208** can be implemented. It saves the user time if items can be pre-fetched instead of waiting for their download. Several strategies can be used to obtain pre-fetch items for the user. Using a history of a user's previous browsing habits, it is possible to predict what the user will probably want next. Another function of a pre-fetch utility is to periodically check the validity of items in the cache to make sure they are up to date. As would be familiar to one skilled in the art, some of the new HTTP1.1 methods would prove very useful for this, namely the conditional gets. Another strategy is to start loading links from the page that a user is browsing, regardless of whether the user has selected the links. Although such an approach could be very wasteful of resources if there are a lot of links and very few are ultimately accessed and also because a lot of links tend to be advertisers, this approach could be effective in situations where very high capacity bandwidth exists.

The connection layer **2209** handles each individual request for download passed to it through the URL manager, regardless of whether it is an HTML page, a graphic or sound file. The connection manager **2210** understands the total bandwidth available for allocation, for example, whether the device is connected to a modem or a T-1 line. It will also manage the connection to the requested site and maintain its own cache. Before making a network request for an item, connection manager **2210** first checks its cache, the connection manager cache **2212**. If the item is not in the cache, the connection manager then passes the request off to the HTTP protocol socket **2214** in the protocol layer **2215**. The way in which HTTP protocols and caches work is familiar to one skilled in the art.

The protocol layer **2215** consists of a suite of different socket types, **2214**, **2216** and **2218**, intended to support different communication protocols, such as HTTP, FTP and also a client server protocol specific to the application program via the surfcast protocol socket **2218**. Preferably protocols employed are able to recognize QoS tags in the headers of packets that are passed through the layer.

The socket layer **2219** comprises at least one socket **2220**. The socket layer wraps up all the system implementation specifics for a given platform and allows generic socket types to be built on top. The socket keeps track of its bandwidth usage, which can then be queried at the connection layer. The socket layer then facilitates bandwidth management.

With all communications going through the same socket layer it is possible to easily collect data about a user's bandwidth usage. If, at the connection layer, it is noticed that the total bandwidth allocation has been exceeded, it is a simple case of blocking further data transfer until such time as total bandwidth usage falls back under what has been allocated.

As a user switches focus from one tile to another, priorities can be dynamically re-allocated to ensure the fastest possible loading of the selected page. Such an allocation can take into account priorities that have been assigned to the tiles based on their content, as well as based on identifiers associated with the information such as quality of service tags. All other communications can then abide by the same rules, allowing for complete control.

The sequence of events and functions in a "dynamic bandwidth allocation" feature of the present technology are described as follows. The dynamic bandwidth allocation feature involves a URL loader, the connection manager **2210** and a bandwidth controller.

The tiles that need access to the network resource for downloading content from a URL, pass certain parameters to the URL loader which manages all such requests from the tiles. These parameters include the URL itself, the priority of the tile, the minimum bandwidth requirement if any, and the maximum bandwidth requirement, if any.

The URL loader detects the need for a connection to a network resource, as would be notified to it by the connection manager. In the case of dial-up connections, the connection manager is responsible for allocating the modem resource and making the dial-up. Once a connection is made and the network resource is available, the URL loader requests the bandwidth controller to start delivering the required content, taking into account the additional parameters for each request.

The bandwidth controller **2300** is an object that comprises a number of functions, as shown in FIG. **23**. AddURL **2302** is a function used by the URL loader to add an additional connection request to those already considered. RemoveURL **2304** is used by URL loader when cancelling or aborting a request. GetURLStatus **2306** is used by URL loader to obtain a status report for a given request. GetStatus **2308** is used to obtain a general status report for the overall bandwidth. The bandwidth controller **2300** is additionally able to execute a main cycle loop over the outstanding URL requests for the purposes of managing the bandwidth among them. The following pseudocode describes steps within the main cycle loop, according to some embodiments of the present technology.

```
while ( uncompleted requests outstanding )
{
    calculate bandwidth obtained per request;
    check for need to postpone, stall or cancel lower priority requests;
    check for need to increase higher priority requests;
    detect completed requests and notify requestor;
    detect undeliverable requests and reissue or cancel if necessary;
    carry out other service and statistics functions, as required;
}
```

Each of these steps is explained, as follows. One or more of the steps may be performed in a different order from that presented above without departing from the scope of the present disclosure.

The step of calculating the bandwidth obtained per request utilizes a function that calculates obtained bandwidth for each of the managed requests, including requests that are stalled (or postponed) due to priority issues. This calculation takes place frequently because of the nature of the network. The bandwidth obtained can vary drastically even during the course of the individual network transaction, and therefore a priority based dynamic system must continuously accommodate such fluctuations. The result of calculating the band-

Petitioner Microsoft Corporation - Ex. 1001, p. 42

US 9,032,317 B2

27                                                    28

width obtained is used both for feedback to users and for making decisions in the subsequent steps within the main cycle loop.

The step of checking for the need to postpone, stall or cancel lower priority requests is another precautionary mechanism to use for the purposes of adjusting the currently active connections. If outstanding requests are not achieving the desired minimum bandwidth, or an actual bandwidth in line with the priority of a given request is not achieving, bandwidth must be made available to the higher priority requests, by stalling, cancelling or postponing lower priority requests. A throttle feature implemented consistent with the layer nature of the stack can be applied wherein the frequency of issuing requests can be decreased. A complete cancellation of a request followed by reload from cache is usually the last resort.

The step of checking for the need to increase higher priority requests has the opposite effect. If applied, higher priority requests are increased by means of spawning additional simultaneous requests, or by increasing the throttle mentioned above.

Both the steps of checking the need to postpone and checking the need to increase a priority can provide feedback to the user in terms of their success or failure. Status parameters can additionally be collected and calculated.

The step of detecting completed requests and notifying the requestor utilizes a function for handling successful completed requests. Conversely, the step of detecting undeliverable requests is the mechanism for avoiding undeliverable requests followed by reissuing or canceling the request if necessary is the mechanism for avoiding undeliverable requests, or retrying temporarily unavailable requests.

Other service and statistics functions may also be called, as may be necessary for supplying information to the layers above the connection layer.

Client-Server Interaction

It is envisaged that the methods of the present disclosure can be carried out using software that is distributed between a client and at least one server. At one extreme, as discussed hereinabove, the software runs entirely on a server. At another extreme, the client only hosts a browser that displays the grid and bandwidth allocation decisions are processed by a server. It is preferred that the server undertake more resource and bandwidth intensive tasks than the client.

In some embodiments of the present disclosure, FIG. 24, the user at client device 2400 interacts with server software on a server 2402. The server stores locally a profile comprising user-specific content 2406 that can feed customized data to the user. For example, the user may store pre-defined grid configurations on the server. Additionally, passwords for specific web-sites can be stored along with the user's profile. A grid generator 2404 on the server creates a grid of tiles according to user-specified content. Each tile has been created on the server by producing an image from the location specified. For example, tile creator 2408-1 produces a tile from content 2410-1. Thus, when a user logs on to the server, for example through a conventional web-browser, a grid of tiles is downloaded to the user's system. Where an identifier is present in content such as 2410-1, tile creator 2408-1 can preferably recognize such an identifier and ascribe a priority to the tile that it creates based on that identifier. In an alternate embodiment, the tile creator automatically assigns a priority to the tile based on the type of the information content.

The client-server embodiment provides a number of advantages. For example, individual users and the devices they use may be differentiated. Therefore, the tile-content that the server delivers can be customized according to the rendering device of a particular user.

Turning next to FIG. 25, each time a user logs on to the server 2402, a "session" is initiated, step 2500. The server verifies the user's identity, step 2502 and acknowledges the log-in, step 2506. The client registers one or more resources, such as connection bandwidth, cost per transmission unit and properties of local playback device, step 2504. From this information, the server identifies the client device type, for example, set-top box or personal computer, step 2508. At step 2510, the server retrieves grid settings specific to the user, if appropriate. In preferred embodiments the server adjust grid settings according to the type of device, for example the size of its display. In preferred embodiments, the server adjusts grid settings according to the type of its display. Details of a session, as defined by tile content and priorities can be held over from one session to another, both for the purposes of permitting a user to continue with ongoing work and in order to protect against the adverse consequences of abnormal disconnections. Additionally, targeted advertising and messaging can be delivered to subsets of users via the predetermined server.

Having rendered a grid, step 2512, and delivered it to the client device, the user can request sources of information such as datastreams, step 2518. Any number of datastreams can be requested at once, the corresponding stream request information which defines parameters for each stream is communicated to the server which verifies and calculates parameters for each stream, step 2516. In some embodiments the server allocates a priority to each stream according to the type of content, e.g., video, audio, static web-page content. In a preferred embodiment, the server uses an identifier associated with a datastream and allocates a priority based on that identifier. Such an identifier may be a quality of service tag.

Upon completion of these steps, the server 2402 knows the client characteristics and is able to distribute bandwidth available to the client among multiple content servers using for example a bandwidth controller 2300. In this example, if the client has an incoming bandwidth of say 56 Kbits/second, and is requesting datastreams from three sources with equal priority, then the server will respond for each request that a bandwidth of 56/3=18.7 Kbits/sec is available for each datastream.

The requested datastreams are displayed on the client device, step 2520 and, if the user changes the content of a tile or explicitly requests an update or refresh operation on the tile, step 2522, an update request is sent to the server, step 2524. Once the new content has been received, the grid is rendered anew, step 2526. Preferably the refresh rates of tiles on the client are allocated according to priorities associated with each tile.

Intensive operations on each displayed tile are also channeled through the predetermined server. For example, refresh operations on a tile generate a refresh request that is sent to the predetermined server. Similarly, requests to thumbnail a given image can be carried out, by request, on the predetermined server and the resulting compressed image transmitted to the user.

In the foregoing embodiment, the server component may reside locally on the client machine, in which case the server is known as the "Resource Manager", or it may be a remote server.

In a preferred embodiment of client server operation, shown in FIG. 26, aspects of a user's grid profile are transmitted to third parties so that the third parties may then communicate tile based content directly to the user. For example, a user's custom grid may contain a tile that points to a third party web-site 2604. Content 2606 from the 3rd party web-site is typically transferred to the server for dissemination to the

Petitioner Microsoft Corporation - Ex. 1001, p. 43

US 9,032,317 B2

**29**

user. The server **2602** notifies the 3rd party web-site that the user requires tiled data by, for example, transmitting user information **2608**. The third party then permits the tile based content of its web-site to be transmitted directly to the user. The third party may attach an identifier to its information so that the server can assign a priority to the data.

The use of servers also allows for the latest versions of tiles to be downloaded and installed across all devices. Users are then able to share grids and tiles with other users. The server side technology provides users of all client devices, from desktop PC's to mobile telephones with a consistent experience.

The majority of the server side code is preferably written in Java, with C++ being used where appropriate. The methods and apparatus of the present disclosure are not dependent on the particular programming language employed. Inter-server communication also preferably utilizes XML to provide consistency with other aspects of the disclosure.

In a preferred embodiment, either Oracle 8i or SQL "Server 2000" are used to provide a relational database (RDB) functionality of the server. Both of these RDB's now provide direct SQL to XML transformations. Databases are preferably developed using the ANSI 92 SQL standard, which is usable by either of the RDB's.

Thin Client Technology

An object of the application program of the present disclosure is that it should operate on a variety of devices, including mobile telecommunications devices such as cellular phones, handheld web-browsers, palm pilots, personal digital assistants and other devices that can communicate by protocols such as wireless application protocol (WAP).

Accordingly, because most handheld or mobile devices do not have the same amount of local storage and processing power as desktop computers and set-top boxes, a special version of the application program of the present disclosure is envisaged for mobile devices. The special version embodies so-called 'thin client' technology in which a lot of the operations are performed by a server instead of the device itself.

An "n-tier" architecture is one that is designed generically for a multitude of platforms, for example PC's, PDA's, WAP phones, and UNIX systems. Accordingly, in order to maximize the use of mobile devices, the application program of the present disclosure employs an n-tier architecture allowing the majority of the processing to be carried out on the server with the results being sent to the device for rendering. This model allows for a reduced size system to be stored on mobile devices, with the system logic residing on remote servers. Preferably the server, which usually has a much wider bandwidth connection than does a given client, carries out the role of monitoring datastreams for updates, prior to transmitting refreshed content to the client.

The features that are moved from client to server will be dependent upon the device in question. For example, it is possible to provide the client with more features on a personal digital assistant such as a Palm pilot than on a WAP Phone.

When using thin client technology, it becomes especially important for the refresh rates of the tiles to be sensibly allocated according to a priority scheme. Accordingly the thin-client implementation preferably allows for the automatic allocation of tile priorities based on the type of information content being transmitted. The thin client implementation also preferably permits the allocation of tile priorities based on recognition of an identifier such as a "quality of service tag" associated with a source of information.

In order to provide a level of consistency between the devices and the servers, the markup language XML is preferably used to wrap the data that is being transmitted. As

**30**

previously described, the system of the present disclosure uses a metabase to store information about the user's current grid and tile configurations. A synchronization procedure allows the metabase to be stored on a server and queried by any device. In this way it is possible to provide consistent grid and tile implementations independent of the device and its location. Such an embodiment would permit a variant of "peer to peer" communication.

FIG. **27** provides an example of the way in which wireless devices can interact with a server. A personal digital assistant (PDA) **2700** or a WAP phone **2702** communicates in a wireless manner with a dial-in bank **2704**. The dial-in bank communicates data to a server farm **2706** which is connected to the internet **2710**, optionally through a firewall **2708**. Alternatively, another personal digital assistant such as **2714** can communicate with an internet service provider such as **2712**, also connected to the internet **2710**. The server farm **2706** is able to provide content directly to a PDA such as **2700** or indirectly, over the internet, to a PDA such as **2714**.

What is claimed is:

**1**. A system for communicating with multiple data sources, the system comprising:

a client device adapted for communication with a server device, wherein the client device includes a display device, a processor configured to execute instructions, and a memory connected to the processor, wherein the processor executes instructions to:

display, using the display device, a grid of tiles, wherein a first tile of said grid of tiles is associated with a first data source residing on the server device, and a second tile of said grid of tiles is associated with a second data source, and wherein the first tile displays a current content from the first data source and the second tile displays a current content from the second data source; and

check whether content in the first data source is updated relative to the current content of the first tile and, if so, display updated information from the first data source on the first tile.

**2**. The system of claim **1**, wherein a configuration of the grid of tiles is stored in the memory.

**3**. The system of claim **1**, wherein the processor further executes instructions to check whether content in the second data source is updated relative to the current content of the second tile and, if so, display updated information from the second data source on the second tile.

**4**. The system of claim **1**, further comprising a server device in communication with the client device.

**5**. A method executed by a client device under control of a program, the client device including a processor, a display device for rendering a visual display, and a memory for storing the program, the method comprising:

partitioning by the client device at least a portion of the visual display into an array of tiles, a first tile in the array of tiles being associated with a first information source, the first information source being located on a first server device;

assigning by the client device a first update rate to the first tile;

at a first update time in accordance with the first update rate, sending a conditional request from the first client device to the first server device for an update of information in the first tile if the information from the first information source currently displayed in the first tile has not changed since a last update;

receiving at the client device a response to the conditional request from the first server device; and

Petitioner Microsoft Corporation - Ex. 1001, p. 44

US 9,032,317 B2

| 31 | 32 |

determining whether to update the first tile in accordance with the response from the first server device.

**6**. The method of claim **5**, wherein the first information source is associated with the first tile by the client device.

**7**. The method of claim **5**, wherein the client device partitions the at least a portion of the visual display under control of a user of the client device.

**8**. The method of claim **5**, further comprising:

updating the first tile with information received in response to the conditional request if the response to the conditional request includes updated information.

**9**. The method of claim **5**, wherein no update of the first tile is performed if the response to the conditional request indicates that the information in the first tile has not changed since a previous update of the first tile.

**10**. The method of claim **5**, further comprising:

assigning by the client device a second update rate to a second tile in the array of tiles;

at a second update time in accordance with the second update rate, sending a conditional request from the client device to a second server device for an update of information in the second tile if the information from the second information source currently displayed in the second tile has not changed since a last update;

receiving at the client device a response to the conditional request from the second server device; and

determining whether to update the second tile in accordance with the response from the second server device.

**11**. The method of claim **5**, wherein information from the first information source contains an identifier that is used in the assigning of the first update rate to the first tile.

**12**. A system comprising:

a first device that includes a processor, a display device for rendering a visual display, and a memory, the first device being configured to:

partition at least a portion of the visual display into an array of tiles, a first information source being associated with a first tile in the array of tiles, the first information source being located on a second device;

receive an update message from the second device including updated information for updating the first tile; and

update the first tile in accordance with information in the update message; and

a second device that includes a processor and a memory, the second device being configured to:

assign a first update rate for updating information from the first information source;

at each time for updating the information from the first information source in accordance with the first update rate, determine whether the information from the first information source has changed since the last update time and send the update message including updated information in accordance with the determination.

**13**. The system of claim **12**, wherein the first information source is assigned to the first tile by the first device.

**14**. The system of claim **12**, wherein the first device partitions the at least a portion of the visual display under control of a user of the first device.

**15**. The system of claim **12**, wherein information from the first information source contains an identifier that is used in assigning the first update rate.

**16**. A method, comprising:

partitioning by a first device at least a portion of a visual display into an array of tiles, a first information source being associated with a first tile in the array of tiles, the first information source being located on a second device, wherein the visual display is rendered by the first device;

assigning by the second device a first update rate for updating information from the first information source;

at a time for updating the information from the first information source in accordance with the first update rate, determining by the second device whether the information from the first information source has changed since the last update time and sending an update message including the updated information in accordance with the determination;

receiving by the first device an update message from the second device including updated information for updating the first tile; and

updating the first tile in accordance with the updated information.

**17**. The method of claim **16**, wherein the first information source is assigned to the first tile by the first device.

**18**. The method of claim **16**, wherein the first device partitions the at least a portion of the visual display under control of a user of the first device.

**19**. The method of claim **16**, wherein the information from the first information source contains an identifier that is used in the assigning of the first update rate.

\* \* \* \* \*

Petitioner Microsoft Corporation - Ex. 1001, p. 45

## **CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:  The brief has been prepared using a proportionally spaced typeface and includes 12,785 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).


Date:  February 19, 2024                   /s/ Shaun D. Gregory
                                           Shaun D. Gregory